1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - -   X

UNITED STATES OF AMERICA,   :   22-CR-208(CBA)


        -against-          :   United States Courthouse
                               Brooklyn, New York

QING MING YU, ANTONY ABREU   :
And ZHE ZHANG,
                               August 18, 2023
        Defendant.         :   10:00 o'clock a.m.

- - - - - - - - - - - -   X


TRANSCRIPT OF STATUS CONFERENCE
BEFORE THE HONORABLE CAROL BAGLEY AMON
UNITED STATES DISTRICT JUDGE.


APPEARANCES:


For the Government:        BREON PEACE
                           United States Attorney
                           BY:  DEVON LASH
                                NADIA E. MOORE
                                GABRIEL PARK
                           Assistant United States Attorneys
                           271 Cadman Plaza East
                           Brooklyn, New York


For Deft. Yu:              JAMES KOUSOUROS, ESQ.
                           EVAN L. LIPTON, ESQ.


For Deft. Abreu:           SUSAN G. KELLMAN, ESQ.
                           EYLAN SCHULMAN, ESQ.


For Deft. Zhang:           JOEL S. COHEN, ESQ.
                           HENRY E. MAZUREK, ESQ.
                           JASON SER, ESQ.

```
                           Proceedings                        2
```

1    APPEARANCES:   (Continued)

2
     Court Reporter:              Charleane M. Heading
3                                 225 Cadman Plaza East
                                  Brooklyn, New York
4                                 (718) 613-2643

5
     Proceedings recorded by mechanical stenography, transcript
6    produced by computer-aided transcription.

7

8                        *    *    *    *    *

9

10            THE CLERK:  Good morning.  This is criminal cause

11   for a status conference, 22-CR-208, USA versus Yu, et al.

12            May the parties please state your name for the

13   record starting with the government.

14            MS. LASH:  Good morning, Your Honor.  Devon Lash,

15   Gabriel Park and Nadia Moore on behalf of the United States.

16            THE COURT:  Good morning.

17            MR. KOUSOUROS:  Good morning, Judge.  James

18   Kousouros on behalf of Allen Yu.

19            MR. LIPTON:  Evan Lipton also on behalf of Allen Yu.

20            THE COURT:  Good morning.

21            MS. KELLMAN:  Good morning, Your Honor.  Susan

22   Kellman for Anthony Abreu and I'm assisted at counsel table by

23   co-counsel Eylan Schulman.  Good morning, Judge.

24            THE COURT:  Good morning.

25            MR. MAZUREK:  And good morning, Judge.  Henry

Proceedings                                                    3

1  Mazurek, I'm joined at counsel table by Jason Ser and Joel

2  Cohen, on behalf of Zhe Zhang.

3          MR. STEIN:  Good morning, Your Honor.

4          THE COURT:  Good morning.  Everyone may be seated.

5          Well, it's really hard to know where to begin but

6  why don't I start with Ms. Kellman's request for an

7  adjournment.

8          Ms. Kellman, the government in responding to your

9  letter talks about the Rule 16 material.  Let me just ask the

10 government a question about that.

11         On page 2 of your letter, you're talking about the

12 translations of Chinese words and text and audio messages.

13 These are -- what was turned over recently that constituted

14 Rule 16 statements of defendants?  I'm not clear on that.

15         MS. LASH:  Above where it says, "Translations of the

16 Chinese words including audio and text messages" --

17         THE COURT:  Right.

18         MS. LASH:  -- the Snapchat warrant and return

19 included statements of Defendant Anthony Abreu.

20         THE COURT:  But are you not using those now?

21         MS. LASH:  We are not, Your Honor.

22         THE COURT:  So when you say "Translations of Chinese

23 words including text and audio messages" --

24         MS. LASH:  Those translations -- well, so, I'll

25 start with the messages, Your Honor.

Proceedings                                    4

1        There are messages contained on the defendants'

2   phones.  The responsive records were produced to the

3   defendants beginning in June of 2022 and concluding in the

4   fall of 2022.  So the messages have been in the defense's

5   custody for over a year now.

6        THE COURT:  What was turned over recently?

7        MS. LASH:  Translations of -- the messages were

8   partially in English and some of the messages included Chinese

9   characters.  And what we turned over was the translations of

10  the Chinese characters that were included in the message.

11        I want to be clear, the messages, they're not

12  speaking back and forth in Chinese.  The messages are mostly,

13  primarily in English with the inclusion of certain Chinese

14  characters.  So we've translated the characters and produced

15  the translations in the last month.

16        THE COURT:  But are the messages understandable

17  without the characters being translated?

18        MS. LASH:  I believe so, yes.  I mean, certainly,

19  you would need the characters -- if there's additional

20  commentary, you would want to see the full message but,

21  primarily, a lot of these messages are in English.

22        THE COURT:  And how much of that do you intend to

23  offer into evidence at trial?

24        MS. LASH:  Your Honor, we're offering conversations

25  between the defendants and, with cooperating witnesses and

Proceedings                                                    5

1  some of those messages include the Chinese characters and
2  audio messages that were sent, you know, short messages in
3  Mandarin or Cantonese.  So we will be offering them at trial
4  and will be producing next week the specific messages with the
5  translations that we've already produced to them next to the
6  characters so the defense can see those.
7           THE COURT:  I'm not understanding what you're
8  saying.  What is it you're producing next week that's
9  different from what you've produced already?
10          MS. LASH:  It's not different from what we've
11 produced already.  I'm only saying we've produced to them
12 every translation that we've received in an abundance of
13 caution so the defense can review, you know, what they would
14 like, but next week is our exhibit deadline.  So for the
15 exhibit deadline, we'll be giving them the exact phone
16 messages that we will be entering into evidence with the
17 translations of the part of the phone message.
18          THE COURT:  And how many of those will that be?
19          MS. LASH:  It's difficult to give you a number.
20 There are, there are five individuals' approximately phone
21 messages, but they span the months of the conspiracy.  So I
22 can't tell you how many individual messages that they are but,
23 again, the defense has had these messages for over a year now.
24          THE COURT:  Now, you made references to a terabyte
25 of data which you described as 3500 material.  What is that?

Proceedings                                          6

1          MS. LASH:  So, Your Honor, if you'll look at page 3

2     of our letter, I think Defendant Abreu's request for an

3     adjournment was based, in part, on the fact that the

4     government produced cell phones and jail calls from three

5     individuals that we expect to testify.  I have not checked

6     whether this consists of a terabyte of data.  The drive that

7     included these messages was a terabyte so it, to fit, had to

8     be less than that amount.

9          Again, this is not Rule 16 material.  This is not

10    information that the government is using in its case-in-chief.

11    This is information that we provided under the Jencks Act

12    weeks before the Court-ordered deadline to give the defense

13    additional time to review it if they chose to.

14         THE COURT:  Does the government know specifically of

15    any Brady material included within that, those calls such that

16    it would impeach the witness' testimony?

17         MS. LASH:  Your Honor, no, we're not aware of any

18    Brady material on the phones that we've reviewed.  You know,

19    I'd like the opportunity to talk with the agents.  I'm not

20    sure that we've reviewed every single jail call that we've

21    produced.  If it's in our possession, you know, we've turned

22    it over so the defense can have it, but we've done a Brady

23    review of the materials in this case and when we come across

24    materials, we've promptly turned them over.

25         THE COURT:  Well, it might be helpful to review

Proceedings                                                    7

1    those in terms of assisting the defense and reviewing all of

2    this material.  It might be helpful for the government to

3    review it and to highlight anything that they believe might be

4    directly impeaching of some testimony the government intends

5    to offer.

6              MS. LASH:  We'll take a look at those calls and if

7    we're aware of any material that would impeach our witnesses,

8    we're happy to point that out.

9              THE COURT:  Okay.

10             So, Ms. Kellman, with that discussion, why is it

11   that you need an adjournment here?  I mean the government has

12   indicated that this is largely 3500 material, that they've now

13   agreed that they'll review it to determine if there's

14   something that impeaches one of their witnesses, they'll

15   highlight it to you.

16             MS. KELLMAN:  That is very courteous to them, Judge,

17   but that is not their call as much as it is our call.

18             THE COURT:  It isn't their call but they're

19   attempting to --

20             MS. KELLMAN:  Help us?

21             THE COURT:  Well, yes.  You've said that -- I mean

22   this is 3500 material which technically, under the law,

23   doesn't have to be turned over until a witness testifies.

24   Now, I understand that that's not a practical way to proceed

25   at trial because it would require adjournments for you to look

Proceedings                                          8

1    at it, but this is being provided substantially in advance of

2    the trial.

3            MS. KELLMAN:  Well, it would be substantially in

4    advance, Judge, if it was in English and a substantial portion

5    of it is in Spanish and a substantial portion of it is in

6    Chinese and I think one of my colleagues can speak to the fact

7    that he had an interpreter working on the Chinese recordings

8    and the Chinese interpreter who we've all known in this

9    building for well over 25 years didn't recognize the dialect

10   as Mandarin or Chinese or Fuzhou, all three languages which

11   she's familiar.  So that wasn't very helpful.

12           I notice that the government was very quick to point

13   out in the footnote that the Jencks Act doesn't require us,

14   the government, to turn over this material in advance of

15   trial.  We would be happy to wait until after the witnesses

16   testify while our teams are working on deciphering what's

17   there and if we haven't gotten through it, then we'll just

18   need a week or two or three or four during the trial.  That

19   doesn't seem practical, but the government seems to think that

20   that's the law.  They put it on page 3 in case any of us

21   didn't know that that was the law.

22           For us to get a terabyte, and I assumed they use a

23   terabyte -- the government is so manipulative in the language.

24   Well, we assume it's less than that because it only carries a

25   terabyte.  I assume you used a terabyte disk because you

Proceedings                                          9

1   needed a terabyte disk.  I assume you didn't have six letters

2   on it and just used a terabyte out of an excess of caution.

3          We just got this and one of my colleagues has had an

4   opportunity to have an interpreter listen to the Chinese piece

5   of it and I'm still trying to find a Spanish interpreter who

6   has time to sit down and listen to the Spanish recordings all

7   of which I received in my office on the disk I think on Monday

8   with a number of other things.  So those are, I counted 14

9   separate phones and they are all calls that involve, I assume,

10  cooperating individuals and our clients.  And it's not the

11  government's job, respectfully, I appreciate --

12          THE COURT:  Are they phone calls from --

13          MS. KELLMAN:  Jails.

14          THE COURT:  I understand, but are they phone calls

15  to your clients?

16          MS. KELLMAN:  Yes.

17          THE COURT:  They represented them as largely calls

18  to family.

19          MS. KELLMAN:  Well, I think they are a combination

20  of things.  I can't tell you what the Chinese ones say and I

21  can't tell you what the Spanish ones say but my understanding

22  is that there are a number of calls that are family related

23  and also -- they're all jail calls from the cooperators.

24          I'm sorry, Judge.  One second.

25          MS. LASH:  Your Honor, I can address that if that

Proceedings                                                    10

1  would be helpful.  These are calls made by and to the

2  cooperating witnesses.  The defendants are not present on

3  these calls whatsoever.

4           As to the Spanish speaking calls, I tried to address

5  this in the letter, we pull calls based on the PIN that is

6  used when a person places the call.  It appears that one of

7  the cooperating witnesses gave his PIN to a Spanish-speaking

8  individual who placed calls using his PIN.  As I say in the

9  letter, we can tell them which calls we believe -- I mean, any

10 call where the person is speaking in Spanish, the witness

11 doesn't speak Spanish so it's certainly not him.  We're happy

12 to give them a list of which calls those are.

13          THE COURT:  You mean they're calls made by someone

14 totally unrelated to the case?

15          MS. LASH:  Yes, Your Honor.

16          THE COURT:  Well --

17          MS. KELLMAN:  And we figured that out how, exactly?

18          THE COURT:  But you can't -- are you capable of

19 giving a list to the defendants of the calls that don't even

20 relate to the case?

21          MS. LASH:  Yes, Your Honor.  We'll, as I said in the

22 letter, we'll tell them --

23          THE COURT:  That would be helpful.

24          MR. KOUSOUROS:  Your Honor, if I may.  I picked up

25 this the minute it was raised so I've had the most lead time

Proceedings                                              11

1    here.

2           That's not really the problem because I'll tell you,

3    you know, it's easy at least for some of these calls to

4    determine when it's not my client.  So I can just turn it off

5    and I can rid myself of 15 minutes of some guy yelling at, you

6    know, his other family members.

7           What I will tell you is this.  As I said, I had the

8    most lead time.  We've gone right away on it and I will tell

9    you that with respect to one of the cooperating witnesses,

10   without giving any names because things are under seal, there

11   are some interesting phone calls that seemingly do relate to

12   this case so we really do need to listen to them.  We're

13   trying to get through them but I'll tell you, we're really,

14   we're really working all the time on it and we haven't really

15   gotten that far.  We identified the ones we need.  We

16   transcribed them.

17          There are calls from another cooperating witness and

18   they're right, most of them are family, but at least two or

19   three of the calls thus far that we've been able to translate

20   do relate to -- I'll give you an example.  If you do it, it

21   needs to be perfect, relating to the cooperation.

22          So we really do need to listen to them.  We had Lily

23   in the office for five hours Tuesday night and there's a

24   dialect that she doesn't understand and we've made a lot of

25   phone calls to try to get somebody that doesn't understand the

Proceedings                                                    12

1  dialect and, of course, we're spending our lives at the MDC,

2  you know, going through them with our client.

3          I know it hasn't been said but I will tell you that

4  in terms of an adjournment, I'm not asking for a lot of time

5  here.  Quite frankly, I'm not asking for anything that will

6  likely change the trial schedule.  I mean, they've said four

7  or five weeks.  75 percent of the time, that's an

8  overestimate.  I mean I'm asking for a couple of weeks.  I'm

9  not -- but there are a ton of phone calls.

10         THE COURT:  A couple of weeks changes the trial

11 considerably.

12         MR. KOUSOUROS:  I don't think it's going to be a

13 four to five week trial.  In any event, I don't think that's

14 what governs.  We're working on this.  We're working hard.  We

15 can't understand a ton of them.  The ones we can understand,

16 there actually are a few of them that at least preliminarily I

17 will tell you are relevant, enough to say that we really need

18 to listen to them, and I don't have a problem with the ones

19 that don't relate to my client, quite frankly.

20         THE COURT:  Well, does everyone know -- does defense

21 counsel know which ones don't relate?

22         MR. KOUSOUROS:  With the ones that are in English --

23 we have an Asian case.  When we have someone with a Spanish

24 accent yelling at his counterpart for not picking up the phone

25 quickly enough, we know that that's not our client, we can

Proceedings                              13

1   dispense with those, but there are a lot of calls.  That's not

2   the majority of calls.  It really isn't.

3           So we do need to listen to them and it's more of a

4   job than I think the government is relating.

5           MR. MAZUREK:  Judge.

6           MS. LASH:  Your Honor --

7           THE COURT:  Mr. Mazurek, did you want to add your

8   thoughts to this?

9           MR. MAZUREK:  Yes, if I may, Your Honor.

10          My co-counsel have been talking about these jail

11  calls.  To be quite honest --

12          THE COURT:  Which is always admirable from counsel.

13          MR. MAZUREK:  Yes.

14          THE COURT:  Okay.

15          MR. MAZUREK:  The amount of material that, honestly,

16  that we are most concerned with have to do with these 14 phone

17  extractions that we received this week, this terabyte of data.

18  Let me briefly explain.

19          THE COURT:  Which 14 phone extractions are you

20  talking about?

21          MR. MAZUREK:  So there were 14 phones.  In fact, I

22  think they're identified on page 2 of Ms. Kellman's letter.

23  The 14 phone extractions are ten phone extractions from one

24  cooperating witness, three phone extractions from a second

25  cooperating witness, and one phone extraction from the third

Proceedings                                    14

1   cooperating witness.

2          Now, of these, we had responsive materials that the

3   government collected pursuant to a search warrant as to two of

4   the ten phones of cooperating witness number one, we did not

5   have any of the three in cooperating witness number two and we

6   did not have the phone extraction of cooperating witness

7   number three.

8          So the large extent of the material that we just

9   received, and I will tell you it took us basically 48 hours

10  just to upload the disk that would received on Monday or

11  Tuesday of this week onto our system.  This material,

12  Your Honor, represents the lion's share of information that I

13  think is relevant for purposes of cross-examination of the

14  three most important witnesses in this case.

15         The evidence that the government has produced to

16  date as to my client does not include forensic evidence, does

17  not include cell cite records that are that relevant.  The

18  evidence against my client is largely, if not entirely, based

19  on these three cooperating witnesses.

20         It is incumbent upon us to review all of those

21  phones because the reality is in today's world, in today's

22  digital world, most of the relevant evidence in this case can

23  be located on those devices and we are responsible for going

24  through those painstakingly because the relationships, as

25  Your Honor has probably learned through some of the pretrial

Proceedings                                                    15

1  filings and the 404(b) filings, are what the government is
2  going to try to use to convict my client and those
3  associations and other associations can only be untangled by
4  going through each of these phones and it is not an easy
5  process.  It is a lot, a lot of material.  To be able -- for
6  us to be effective in our representation on
7  cross-examination -- the government can say, you know, they'll
8  look for impeachment material and so forth, they have a
9  constitutional obligation to do that under Brady and Giglio,
10 however, we know what our theory of the defense is and we have
11 to be able to review those materials.
12         Of the ten phones of cooperating witness number one,
13 I believe the government, I believe --
14         THE COURT:  Ten phones?
15         MR. MAZUREK:  I'm sorry?
16         THE COURT:  Ten phones?
17         MR. MAZUREK:  Two of those were produced as Rule 16.
18 The other eight we're getting for the first time.  And I
19 believe that the, you know, that fact cooperating witness
20 started cooperating in February of this year.  We're just
21 getting it now.  Now, I know the government can say it's only
22 Jencks but I don't even think that's true because they've
23 admitted that they haven't gone through it, so it may include
24 Brady and Giglio and we didn't get it.
25         If they're not going to review these materials, and

Proceedings                                    16

1    that's a lot of materials, in order to comply with their Brady

2    and Giglio obligation and they're just going to turn over, you

3    know, a terabyte of data and say have at it and hope you find

4    that stuff, then they should do it immediately.  They

5    shouldn't wait for Jencks material because it could include

6    other things as well.

7            That's the problem that I see as the most serious

8    here.  In order for me to prepare my cross-examination, we

9    don't have the other 3500 material which they're not producing

10   until September 1st, and we are continuing to litigate issues

11   that come up like Brady on this other Senquiz matter, it's

12   very difficult to complete everything that we need to do in

13   the allotted time.

14           I joined in Mr. Kousouros' request that even if we

15   get the two weeks so we can review the ten phone extractions

16   that we're getting now for the first time which is, again,

17   essential to my preparation for trial, I think that could help

18   alleviate some of the constitutional concerns here.

19           MS. LASH:  Your Honor, may I respond to that?

20           First of all, we have gone through every single one

21   of these phones and produced responsive records that we intend

22   to use in our case in chief, and if we found, would have

23   identified Brady and Giglio materials on all these phones.  My

24   statement about the review was simply for the jail calls.

25           THE COURT:  Well, you're talking now about something

Proceedings                                     17

 1   different.  He's talking about phones that the cooperators

 2   used, not the jail calls.

 3           MS. LASH:  I understand.

 4           THE COURT:  The phones they presumably were using

 5   during the course of this conspiracy.  So, clearly, you've

 6   given him that material.  He has to look at it.

 7           MS. LASH:  Yes, Your Honor.

 8           THE COURT:  What's the point of giving it to him if

 9   he doesn't have to review it?

10           MS. LASH:  Right.  So not all these phones were in

11   use during the conspiracy.  These were phones that we seized

12   pursuant to search warrants.  So many of them, the majority of

13   the ten phones from the cooperating witness were not in use

14   during the time of the conspiracy and at least one of these

15   phones consists of only a report that's -- it's a single page

16   and says what the phone number is and who used it.  So it's a

17   vast overstatement to say ten phones, one terabyte of data.

18           As to the other phones, we've reviewed them.  We

19   have produced the material that we intend to use in our case

20   in chief and that we believe is responsive to this case.  I

21   understand that Mr. Mazurek and the other counsel want to go

22   through these devices to prepare their cross-examinations.

23   That's why we've given it to them a month ahead of trial.

24   They have the ability to do that in the time allotted.  We do

25   not think that there is an adjournment that's necessary here

Proceedings                                        18

1    simply for the review of 3500 material.

2           THE COURT:  How long is the government's

3    case-in-chief?

4           MS. LASH:  So we've estimated three to four weeks.

5           THE COURT:  Three to four weeks?

6           MS. LASH:  Yes, Your Honor.

7           THE COURT:  It seems like a long time for something

8    that happened on one night.

9           MS. LASH:  It might go faster, but at this time, you

10   know, we have a number of witnesses and we don't want to give

11   you an underestimate.

12          MS. KELLMAN:  Your Honor, if I may, just to add to

13   the full picture here, I am sure that the government's

14   intentions are good and they certainly intend to do our job as

15   well as their job which is decide what we need and what we

16   don't need, but I can't imagine how we can effectively

17   represent our clients if we don't have an opportunity to go

18   through the materials.  We can't rely on them telling us what

19   it is they think we're going to need.

20          Fine, if one of the phones doesn't have anything on

21   it but one piece of paper, tell us which one and then that

22   eliminates that problem, but we have to go through this

23   material, we have to find people who can help us translate

24   them, and that's only one piece of the problem we're having,

25   Judge, because there is this other situation which I wrote

Proceedings                                    19

1    about and I think it's been sealed, I don't know how

2    Your Honor wants me to handle it in the courtroom, but there

3    is a vast amount of investigation that needs to be done with

4    respect to this particular cooperator and a confidential

5    source.

6              We read the material very, very differently from the

7    government's very short version of, you know -- their person

8    may have participated, he wasn't the shooter, but this person

9    seemed to say he was the shooter and I don't know how many

10   times we've read the grand jury testimony and the 302s and it

11   was the government that choose to put this individual in the

12   grand jury I assume because they believed this person.

13             THE COURT:  I know but you need to talk to the

14   person.

15             MS. KELLMAN:  Well, the person is in prison

16   somewhere.

17             THE COURT:  I know and there's an application that's

18   been made --

19             MS. KELLMAN:  Yes, there is.

20             THE COURT:  -- that will allow you to speak to the

21   person which I need to talk to counsel about.

22             MS. KELLMAN:  Right.  And, again, we're moving in

23   that direction.  We're doing everything that we can, Judge, to

24   get it to the right place.

25             THE COURT:  How many weeks is it before trial now,

Proceedings                                    20

1   three weeks?

2          MS. KELLMAN:  Three weeks.

3          The other thing, Judge, is, by the way, we still

4   haven't gotten the bulk of the 3500 material that we're going

5   to be using to cross-examine the cooperators.  That doesn't

6   come for another two weeks.  I have a paralegal and a

7   co-counsel.  I mean, I need, you know, six more paralegals to

8   start going through the stuff to be able to do it on time.

9   And in fairness, Judge, we're trying to work together so that,

10  you know -- some of my co-defendants' lawyers are taking,

11  we're dividing up the work as best we can.

12         THE COURT:  Let me just cut through this.

13         What I will consider is -- I'm going to ask the

14  counsel to work diligently.  I'm going to ask the government

15  to assist in that by, first of all, giving them a list of all

16  the calls that don't have anything to do with this case, with

17  the Spanish guy talking to his relatives, and we'll have

18  another status conference right directly the Friday before the

19  trial if there's any time on that day.  I'm not sure.

20         THE CLERK:  The 8th, yes.

21         THE COURT:  Let's put it down for September 8th.

22         My plan would be to go forward with jury selection

23  on September 11th.  If I'm persuaded by the time of our next

24  conference that you desperately need additional time, we'll

25  pick the jury on the 11th and begin the following week, and

Proceedings                                                      21

1    you are going to have to persuade me you weren't able to do

2    everything you needed to do.  I mean the government does have

3    a lengthy case.  I realize that, you know, during the trial,

4    you're obviously preparing for cross-examination but, you

5    know, there are weekends and things that material can be

6    reviewed as well.

7              So that's the best I can do because this case has to

8    go forward and I'm not persuaded that in view of the length of

9    the government's case, that counsel cannot be prepared.

10             Do you think your case will not conclude by

11   September 25th?  Is that accurate, that it won't?

12             MS. LASH:  Your Honor, I think that's going to

13   depend on stipulations with the defense counsel.  There is the

14   ability for the government to cut out a large number of

15   witnesses if the defense will agree to certain stipulations

16   and we intend to propose those in the next few days for the

17   defense's review.  So I don't want to give Your Honor an

18   estimate without knowing whether we'll be able to stipulate to

19   a number of witnesses not testifying.

20             THE COURT:  All right.

21             MS. LASH:  I'm sorry.  Can I add, Your Honor, I just

22   looked at the calendar and given the two Jewish holidays, I

23   think I can say it will not conclude by September 25th.

24             THE COURT:  Pardon me?

25             MS. LASH:  Given the two Jewish holidays that we'll

Proceedings                                    22

1    be off plus the jury selection, I don't think we will conclude

2    by September 25th.

3            MR. STEIN:  Your Honor, pardon me.  I believe that

4    the first holiday, Rosh Hashanah, is on a weekend so I don't

5    think that would impact our being in court.  I may be wrong.

6    I'm about to look.

7            THE COURT:  I thought the last time we had this

8    discussion we determined at best, there were two days that

9    were problematic.  If there's not two days that are

10   problematic, that would be fine.  I don't know about the

11   jurors.

12           MS. LASH:  My memory was that we discussed two days

13   but if that's wrong --

14           THE COURT:  Yes.  If we don't need two days, fine,

15   let us know.

16           There was an ex parte application made by

17   Mr. Mazurek and I would just ask you to come to sidebar for a

18   moment for me to question you about that.  This is not

19   monumental to the government's case.

20           (Continued on next page.)

21

22

23

24

25



Sealed by Order of the Court                    24





Sealed by Order of the Court                          26



17    (End of sealed portion.)

18    (Continued on next page.)

CMH        OCR        RDR        FCRR

Proceedings                                                27

1         THE COURT:  Okay.  The next matter that I want to

2    take up deals with the renewed applications for a Franks

3    hearing with regard to the search warrants.

4         Now I believe the government has said with respect

5    to one of the search warrants that it is not an issue, the

6    issue being that the government had information that a

7    confidential source who was used in the affidavit had

8    admitted, to another individual, that he, in fact, was the

9    shooter whereas in the affidavit, he claims that one of the

10   defendants, Mr. Abreu, is the shooter.

11        There's one of the search warrant affidavits that

12   you say, I believe, Ms. Dash, this issue doesn't arise because

13   the government did not have that information at the time the

14   warrant was issued?

15        MS. DASH:  Yes, Your Honor.

16        THE COURT:  Which one is that?

17        MS. LASH:  That's the Zhang cell site affidavit.

18        THE COURT:  Okay.  And the affiant in that case was

19   Mr. Lin?

20        MS. LASH:  Yes, Your Honor.

21        THE COURT:  Mr. Mazurek?

22        MR. MAZUREK:  Mr. Ser is going to handle that.

23        THE COURT:  Okay.  Mr. Ser?

24        MR. SER:  Thank you, Your Honor.

25        I think what I want to do is just identify what we

Proceedings                              28

1   now know based upon the government's response with regard to

2   the information related to -- and I won't refer to his name on

3   the record, obviously, given that everything was sealed.

4              THE COURT:  I probably just did but in any event.

5              MR. SER:  But the individual we now know through

6   disclosure of the Brady material that Your Honor ordered the

7   government to produce to us on July 13th.  We received some of

8   that material on July 14th and again on August 3rd.

9              The August 3rd disclosure was comprised of an

10  affidavit by a Queens County Assistant District Attorney who

11  used information that he obtained from this individual at a

12  meeting where the ADA and some unknown individuals and members

13  of NYPD were present at the ADA's office in Queens, and this

14  is May 1, 2019.  At that meeting, this individual specifically

15  stated to the ADA and NYPD that confidential witness 1, one of

16  the government's cooperators, specifically admitted to him

17  that he shot Mr. Yu.

18             THE COURT:  My understanding is that the government

19  at the point in time that they did the warrant that we're

20  discussing, they did not have that information.

21             MR. SER:  Right.  I will get to that.

22             THE COURT:  Because that's the key issue.

23             MR. SER:  I think what they're saying is they didn't

24  have access to the affidavit that contained that information

25  but I think there's two fallacies with that.

Proceedings                                    29

1          One, they claim that weren't on notice about that

2    because there's nothing in the NYPD reports that said anything

3    along these lines and the agent and I'm presuming the

4    prosecutors reviewed the NYPD file, but the NYPD file actually

5    identifies a search warrant application that went out, not

6    just the subpoena but an actual search warrant application

7    filed by a prosecutor in Queens County.  So that being in the

8    NYPD report would have put at least the agent, if he had

9    reviewed these materials, on notice about a search warrant

10   application related to cell phone data and an application by

11   the ADA in Queens.

12         We presume, obviously, that the agent obtained or

13   the government prosecutors obtained the NYPD file from either

14   NYPD or from the Queens County District Attorney's Office.  We

15   don't know how they obtained it.  There's no indication in the

16   government's opposition as to when or how those materials were

17   related to either Agent Lin or prosecutors.  In fact, there's

18   not a single mention in the government's opposition as to the

19   exact date when they learned about the information.

20         Now, they may say that they don't have the affidavit

21   but that's, I think, secondary to the question of did they

22   know about the information because in Agent Lin's affidavit,

23   in paragraph 3, he specifically says:  My affidavit is based

24   upon my personal observations and my training and experience

25   and information obtained from -- and this is the exact

Proceedings                                          30

1    wordage -- other agents and witnesses.

2              So there's no indication as to when the government,

3    either prosecutors or Agent Lin learned about this information

4    through contacts with either the NYPD, whether it be officers

5    or detectives, or from the ADA himself and there was another

6    ADA, a female ADA according to the DD5 materials, so we know

7    there were multiple Queens County prosecutors on the case,

8    there's not a single indication in the government's opposition

9    as to when they learned about these statements by this

10   individual who told NYPD and an ADA on multiple occasions, not

11   just one, but according to the government's opposition,

12   May 1st, then again in October, multiple meetings with State

13   prosecutors and NYPD occurred where this was said over and

14   over again.

15             We don't know when the government first learned

16   about that information, put aside when they first got the

17   affidavit, when they first learned about the information

18   because even without the affidavit, had they learned about

19   that information, that would give rise to the same Franks

20   issues that we're alleging here.

21             THE COURT:  Well, assuming that they didn't know

22   about the information, you agree there's no Franks issue?

23             MR. SER:  No, because it's mentioned in the DD5, I

24   think, at a minimum, we have a reckless omission.

25             THE COURT:  What is mentioned in the DD5?  It's not

Proceedings                                              31

1    this statement that impeaches -- the witness is not mentioned

2    in that DD5, correct?

3           MR. SER:  Right, but there's a mention of a search

4    warrant application that was never sought or obtained.

5           Now, the other question -- again, this goes to the

6    exchange of information.  Presumably when the FBI came in and

7    took over the case, they spoke to their cohorts and colleagues

8    at NYPD including this Detective Galgano and this

9    Detective Capo whose e-mail appears as an exhibit to the

10   government's opposition.

11          One, that e-mail, it's unclear how or why that was

12   prepared, who precipitated it, who asked for it, but it

13   certainly read like an affidavit, albeit a very inaccurate

14   one, because it admits all these meetings that this individual

15   had with ADAs and NYPD.

16          THE COURT:  What affidavit are you talking about?

17   I'm sorry.

18          MR. SER:  This is an e-mail attached to the

19   government's opposition.  It reads like an affidavit.  It's by

20   Officer, I believe, Capo Swears.

21          THE COURT:  This was attached to --

22          MR. SER:  The government's opposition.

23          THE COURT:  To your search warrant?

24          MR. SER:  To the renewed opposition.

25          THE COURT:  I don't have that.

Proceedings                                                        32

1          MR. SER:  It was filed under seal.

2          MS. LASH:  Your Honor, we have a copy.

3          THE COURT:  Okay.

4          (Pause.)

5          THE COURT:  Were there any other attachments to your

6    letter other than this one?

7          MS. LASH:  No, Your Honor.

8          THE COURT:  What does this show according to the

9    government?  What is the significance of this according to the

10   government?

11         MS. LASH:  Your Honor, we obtained that late on

12   Tuesday night.  We became aware of it and we are endeavoring

13   to gather any statement that any officer recorded about Carlos

14   Senquiz so we attached it to give to the defense and also to

15   support the background information that we included in our

16   affidavit.

17         THE COURT:  What affidavit?

18         MS. LASH:  I'm sorry.  Our opposition.

19         MR. SER:  That raises another point, Your Honor.

20   There is no affidavit attached to the opposition either from

21   Agent Lee or any other FBI agent or task force officer.

22   There's no sworn statement as to when and how this information

23   was obtained, learned, nor was anything from a prosecutor in a

24   sworn affidavit.

25         This all begs the question of what communications

Proceedings                                      33

1   were going on with the ADA, the District Attorney's Office and

2   NYPD either between the FBI or the Eastern District U.S.

3   Attorney's Office prior to that May 3, 2021 search warrant

4   application, what were they aware of?  Even if they didn't

5   have that affidavit with the ADA, even if they didn't have the

6   affidavit by the Queens ADA, what did they know, what did they

7   learn through those communications?  We don't have a single

8   indication that, number one, there were any communications and

9   we don't know what was learned with regard to Carlos Senquiz's

10  statement.

11          It's difficult to conceive how, when an FBI agent

12  comes in or a whole task force team comes in and assumes a

13  murder investigation, that they wouldn't speak with NYPD, try

14  to get as much information as they could about the

15  investigation, and then ask what leads do you have.  I'm not

16  sure there's a stronger lead in an investigation than an

17  admission by an individual claiming to have shot the victim in

18  the investigation case and it just, it seems, it almost

19  impossible to imagine a scenario where that conversation would

20  not be had.

21          I think the same could be said when, perhaps,

22  government prosecutors for the Eastern District speak with an

23  ADA in Queens.  What have you done?  What's been your

24  investigation?  The search warrant may have come up.  Why

25  didn't you seek that search warrant?  What information or

Proceedings                                                    34

1    basis did you have to seek it?

2         This, this ADA swore under, you know, in his

3    affidavit, you know, to the fact that these statements were

4    being made by Carlos Senquiz to the ADA and an NYPD official

5    at minimum.  So I can't understand how a conversation like

6    that would not have taken place when a federal investigation

7    takes over a state investigation.

8         Then the final question is it's not uncommon for

9    there to be cross-designated, you know, officers or members of

10   the investigation team, especially when it's the FBI working

11   on a federal investigation that began as a state case or even

12   when it didn't.  It's very common to have cross-designated

13   individuals and whether Detective Galgano or this

14   Detective Capo in this e-mail chain were part of that is

15   unclear.

16        By September of 2021, we know the federal

17   government's investigating, we know we've already had federal

18   applications for search warrants made, and it seems like

19   Officer or Detective Galgano is taking the lead on trying to

20   get information.  Is Galgano a member of this task force and

21   if so, what conversations were had with him, when and what was

22   known prior to that May 3rd search warrant affidavit.

23        So I do think we need to have a Franks hearing

24   because these are the major issues we need to get into.

25        THE COURT:  Who are your witnesses at the Franks

Proceedings                                          35

1   hearing, the affiant?

2          MR. SER:  Who are the witnesses?

3          THE COURT:  Yes, the affiant to the warrant?

4          MR. SER:  Well, it depended on who the government

5   chose to call.  I can't tell you who they would want to call

6   but I can tell you the defense would call the witnesses for

7   sure to find out.  I certainly would want to hear from the ADA

8   and the detectives involves in the investigation.  I think

9   this is crucial information to determine what was known.  And

10  if it's known to a single member of the task force, then it's

11  imputed to all.  Same for the federal prosecutor.  If the

12  prosecutor is aware of it, it's imputed to the investigation

13  team.

14         So the tentacles on this, I think, are several and

15  can't just be answered, one, by opposition without an

16  affidavit but, two, without at least a hearing and then the

17  government can choose to call whoever they wish and the

18  defense can call who we wish.

19         THE COURT:  Well, a Franks hearing, in my view,

20  deals with the affiant and, at best, the government prosecutor

21  that assisted in the warrant, assisted in drafting the

22  warrant.  I don't know how we opened this up to state DAs.

23         MR. SER:  I think that's a start.

24         THE COURT:  That doesn't make any sense to me.

25         MR. SER:  I think that's a start at a minimum,

Proceedings                                    36

1   Your Honor, I agree with that, and we'll see what becomes

2   relevant by way of witnesses.

3              THE COURT:  Do you want to respond to this?

4              There are two issues.  I mean counsel is raising

5   this issue with respect to his client but we have the issue

6   raised directly with respect to the other warrant application.

7   So the issue becomes more straightforward with regard to those

8   because by that time, the government, in fact, knew this

9   information that this particular witness claimed that he heard

10  from the government's witness that, in fact, he was the one

11  who pulled the trigger and not the defendant.

12             MS. LASH:  So, Your Honor, first to respond to the

13  arguments that Mr. Ser put forth, the Zhang affidavit for the

14  cell site warrant which was sworn in May of 2021 includes the

15  information that the FBI affiant knew at the time.  There is a

16  paragraph that states that this individual sent -- I'm

17  sorry -- the government's cooperating witness sent this

18  individual a YouTube video showing the shooting.  This is laid

19  out for the Magistrate Judge's review.  This was indicated in

20  the file, in the NYPD file which the agent reviewed and

21  included it in the warrant.

22             As we've explained, we did not obtain the cell site

23  affidavit that the ADA swore out until only a few weeks ago.

24  Whether we should have done it sooner or not is not the

25  question here.

Proceedings                                    37

1          THE COURT:  The question is really can someone put

2     in an affidavit saying that we did not have the information

3     that this witness claimed to have had a conversation with a

4     cooperating witness.

5          MS. LASH:  Yes.

6          THE COURT:  I mean, you would need an affidavit to

7     that effect by both the government and the affiant who swore

8     to the warrant.

9          MS. LASH:  Yes, Your Honor.  We can put in both of

10    those affidavits.  So that's the first issue.

11         Now, I think, to the second issue of the other two

12    applications, as we explain in the letter, I'll start with

13    Mr. Yu's application, not every piece of information in an

14    investigation needs to be included in an affidavit for a

15    warrant.  If so, affidavits for warrants would span hundreds

16    of pages.

17         THE COURT:  Well, this, you know, this isn't like,

18    you know, someone saw somebody walk across the street.  This

19    is a significant piece of information.

20         What is difficult to understand is, as I understand

21    it, the government put this information before the grand jury

22    in this case after an affidavit -- well, I'm not sure of the

23    sequence.  This individual was put in a federal grand jury to

24    testify to what was not included in the affidavit if I, if I

25    understand that correctly.  So that's a little troubling.

Proceedings                                                    38

1          MS. LASH:  Your Honor, the individual is put into

2     the grand jury to, to authenticate and discuss the cell phone

3     messages and the messages do not say that the government --

4          THE COURT:  I know, but he testified to the fact

5     that he was -- that the cooperating witness was the shooter.

6     He testified as to that in the grand jury.

7          MS. LASH:  He did but, but you asked -- you're

8     saying that the witness was put into the grand jury for that

9     purpose.  He was not.  He was put in to talk about the phone

10    messages and then made that statement while in the grand jury.

11         THE COURT:  You mean he wasn't asked the question?

12         MS. LASH:  Well, he was asked what he understood

13    those messages to mean which answer was expected that he was

14    involved in the shooting when he said he was the shooter which

15    was an unexpected answer.

16         MS. KELLMAN:  Excuse me, Your Honor.

17         THE COURT:  Why, because he told you before that

18    wasn't true?

19         MS. LASH:  No.

20         THE COURT:  He always has maintained that.

21         MS. LASH:  He maintained that to the NYPD

22    previously, yes.

23         THE COURT:  And he maintained it to the government,

24    correct?  He maintained it to you.

25         MS. LASH:  He told the FBI agents that when he was

Proceedings                                                    39

1    interviewed in June of 2021.  So, yes, he did say that

2    previously.

3              THE COURT:  All right.  So the question is why

4    wasn't that brought to the attention of the judge who was

5    issuing the warrants here?

6              MS. LASH:  Because, Your Honor, at that time, the

7    government had interviewed this cooperating witness who had

8    provided information about what happened the night of

9    February 11, 2019.  That information was corroborated by

10   several different sources of evidence, several different

11   individuals unknown to the cooperating witness corroborating

12   the information that CW1 provided.

13             The information that this individual provided

14   concerning CW1 was not similarly corroborated and, therefore,

15   the government has the ability to make a reasoned judgment as

16   to include what information they want.

17             THE COURT:  Who made the decision as to what went in

18   the warrant affidavit, the AUSA or the affiant?

19             MS. LASH:  I think it's a process, Your Honor, and

20   the decision is made together.

21             THE COURT:  So it was, it was a purposeful decision

22   not to include it because you didn't find it credible.

23             MS. LASH:  Yes, Your Honor.

24             MR. SER:  And, Your Honor, one other fine point to

25   this that I didn't touch on was that there actually is a

Proceedings                                          40

1    footnote by the affiant which says the information provided is

2    consistent with the evidence and we know that's not

3    necessarily the case.  So there's a misstatement in all of

4    these search warrants.

5                THE COURT:  Why is that a misstatement?

6                MR. SER:  They're aware of these statements by

7    Senquiz that this confidential witness admitted --

8                THE COURT:  But if they don't credit those

9    statements --

10               MR. SER:  That's their view though.  They don't get

11   to say that.

12               THE COURT:  No, there are two different things here.

13   There is putting in a misleading statement and if the affiant,

14   together with the government, thinks that this statement made

15   by this witness was not credible, then I don't, I don't think

16   you can argue that something is technically a lie or a

17   reckless or misleading statement.

18               What it might pertain to is the credibility of CW1,

19   that at least someone else has said he was the shooter.

20               MR. SER:  And there's no, you know, there's no

21   characterization or limit on the reference to evidence that

22   it's consistent with.  So I think the inference to flow from

23   that, certainly the outright suggestion is that all the

24   evidence we have is consistent with what we're representing

25   this individual to have said when it really isn't the case.

Proceedings                                                    41

1          There is no limitation of qualification on what

2     evidence is consistent with and that dovetails to what

3     Your Honor said.  There should have been absolutely something

4     in there that said we have this other material, it's

5     completely contradictory to what Senquiz is telling us,

6     however, and if they want to address it in the affidavit and

7     explain why it shouldn't preclude issuance of a search

8     warrant, that should have been perhaps a course, but it's

9     material for sure.

10          MR. KOUSOUROS:  Your Honor, if I may, with respect

11     to Mr. Yu, Your Honor has framed the issue and resolved, I

12     think, what the basic facts are here.  A:  It is clearly Brady

13     and Giglio material.  B:  It was a conscious decision.  This

14     isn't about negligence or anything like that.  So then the

15     question becomes --

16          THE COURT:  So we know, I mean, in terms of a Franks

17     hearing, we know two things.  We know that the government

18     intentionally didn't put it there.

19          MR. KOUSOUROS:  Correct.

20          THE COURT:  They've said that.

21          MR. KOUSOUROS:  Well, when I read their response and

22     they said it was a reasoned and a considered decision, I

23     understood that to be conceded.

24          With respect to the corroboration, I think the

25     question really is, you know, the government essentially, as

Proceedings                                          42

1   they made clear on July 13th, made a decision that these

2   fellows did it and that's the way they were going to proceed.

3   The reality is that Senquiz's information was just as

4   corroborated as anybody else's, and if they were relying on

5   Senquiz, they would tell you:  Your Honor, he gave us a cell

6   phone and on that cell phone were the text messages received

7   from CW1.

8            THE COURT:  The cell phone messages though do not

9   establish that he was, that CW1 was the shooter.

10           MR. KOUSOUROS:  But the corroboration in the

11  affidavit that they cite with respect to Mr. Yu, nothing to do

12  with whether he paid anybody to do anything.  They're

13  corroborated to the extent that the murder happened.  They're

14  corroborated to the extent that CW1 says other people were

15  there.  They're corroborated to the extent that, yes, my

16  client owned a business and the deceased double-crossed him.

17  But only CW1 provides the information which was hearsay from

18  the other cooperator as to my client's involvement.

19           All I'm saying is that they made the decision.

20  Corroboration -- when I mean corroboration, no, the text

21  messages don't say CW1 said he shot him, but so many of the

22  facts that Senquiz put forward and testified to -- and I may

23  add, Your Honor, you're right.  They asked the questions --

24  they didn't start the grand jury testimony with, you know, the

25  general authentication questions.  They went through all of

Proceedings                                        43

1    this and elicited this testimony from Senquiz.

2         I would say that Senquiz's testimony was

3    corroborated in many respects, in terms of giving him the cell

4    phone, the fact that he said he sent me a video and said do

5    you recognize me in the video.  There you have the video

6    that's in Senquiz's text.  He has always been consistent.

7    There's nothing about anything he said in 2019 to NYPD, in

8    2019 to an ADA, in 2021 when he was interviewed by the FBI,

9    and then put into the grand jury by the very government

10   prosecuting our client saying they don't believe Senquiz, the

11   man has been consistent throughout.

12        So really the question is, from Mr. Yu's

13   perspective, as we put in our memo and I think I just

14   addressed so I won't go into it, but whether or not it was

15   critical to the determination of probable cause, not as to

16   whether just the murder happened but to whether Allen Yu had

17   any role in it, and I would submit to you that as

18   Your Honor --

19             THE COURT:  Well --

20             MR. KOUSOUROS:  I'm sorry.

21             THE COURT:  Allen Yu admits he had a role in it.

22             MR. KOUSOUROS:  I'm sorry?

23             THE COURT:  He admits he had a role in it.

24             MR. KOUSOUROS:  Allen Yu?

25             THE COURT:  No, I'm sorry.  I didn't mean to

Proceedings                                    44

1    interrupt.  I'm sorry.

2          MR. KOUSOUROS:  No.  I'm saying I think the question

3    is when you look at the affidavit, without this information,

4    then -- withdrawn.

5          Was this information that was omitted critical to a

6    determination on probable cause.  My point is this.  Yes,

7    there are many other people that are included in that

8    affidavit, but the only person, the only person that

9    implicates Allen Yu in these crimes is CW1 and all he says, I

10   was present for a conversation I couldn't understand, the

11   other cooperator told me my uncle needs you for some

12   unidentified purpose and that he later learned, from that

13   cooperator, that this was for an nefarious purpose.

14         There's no indication he ever communicated with my

15   client.  There's no information that CW1 ever spoke to or was

16   ever again in the presence of my client.  I think it is

17   critical that the issuing magistrate should have known that

18   this fellow admitted to being the shooter and the other

19   information that is <u>Brady</u>.

20         I think it's of note that before he was a

21   cooperator, he admitted to doing the shooting, asked for a gun

22   because he feared retaliation, it was very, very specific,

23   sent the video and then after he became a cooperator, all of a

24   sudden, his conduct became minimized from executing a man to

25   just being a lookout.  I cannot imagine that that was not

Proceedings                                              45

1    information the issuing magistrate would have.  Indeed,

2    Your Honor, in denying our motion, properly looked at it and

3    said it's corroborated because CW1 says he was sitting in a

4    car with another cooperator observing it while another guy

5    committed the shooting.  I can't imagine that this shouldn't

6    have been in that affidavit.

7            So I think they've solved some of the issues here

8    and kind of reduced it with respect to Mr. Yu to that issue.

9    We know it's <u>Brady</u>, <u>Giglio</u>, we know it was intentional, and

10   now the question is should it have been in there.

11           THE COURT:  Do you have authority that says that

12   <u>Brady</u> material should be incorporated within an affidavit for

13   a search warrant, that the government has an obligation to

14   provide, to put <u>Brady</u> material into a search warrant

15   application, <u>Brady</u> impeachment material which presumably I

16   guess this is?

17           MR. KOUSOUROS:  Well, Your Honor, the recent

18   decision, I don't have the name, by Judge Raggi in which the

19   case was remanded for a Franks hearing addresses some of these

20   issues.  The law that I would present to you for decades is

21   that if there is an omission, then the question is whether it

22   was critically important to the determination of probable

23   cause.

24           I also have to say that I don't know that I'd

25   categorize this only as an omission when in the affidavit, CW1

Proceedings                                    46

1   specifically says that it was another person, that he watched

2   another person commit the shooting.  It depends on who you

3   believe, of course, but if CW1 was telling the truth when he

4   said that he was the person that executed the man, then it is

5   a misrepresentation.

6         I will provide the -- I'll do some research and try

7   to very narrow it down.

8         THE COURT:  But on this issue, I don't know, it

9   seems like it's fairly well fleshed out.  I don't know that we

10  need a Franks hearing.  In other words, the government has

11  said, yes, we know about this with respect to the other, we

12  didn't credit the information, and then because we believed

13  for other reasons that this person was telling the truth.

14        I mean those are the facts.  I think you can argue

15  from that whether they had the obligation to do it.  I don't

16  know that we need anything else in terms of a hearing.

17        MR. KOUSOUROS:  I think you're right to the extent

18  that I stand in different shoes because the issue with my

19  colleagues is whether they knew what they say they knew.

20        THE COURT:  Yes, I know.  That's a different issue.

21        MR. KOUSOUROS:  Yes.  Yes.

22        THE COURT:  But this issue is -- let's say if this

23  issue is resolved and it's resolved against the defendant,

24  then it wouldn't make any difference about the other issues

25  because they say even if they knew about it, it didn't have to

Proceedings                                                              47

1   be included.  So I think it's more central to your --

2          MR. KOUSOUROS:  I think more of the facts are

3   flushed out in my case.  If I can think of a reason for

4   participating in a Franks hearing, I'll let you know.

5          MS. LASH:  Your Honor, can I respond to the point

6   about the --

7          MS. KELLMAN:  Can I just finish?  I'd like to just

8   finish a thought, if I may, Judge, based on something the

9   government said quite a while ago and something Your Honor

10  just said --

11         THE COURT:  All right.

12         MS. KELLMAN:  -- which is there came a time when the

13  government made a decision as to what they were going to

14  believe.  Just a few minutes ago, the government said, Well,

15  we decided -- we didn't expect that answer to come out in the

16  grand jury and they didn't, they didn't think that he was

17  going to say that someone else was the shooter, but that seems

18  hard to fathom given the fact that they interviewed them at

19  the --

20         THE COURT:  Yes, I doesn't know there would be a

21  necessity to rely on that statement.

22         MS. KELLMAN:  But the thing that seems critical to

23  me is that in the grand jury minutes, he specifically asked

24  all these questions, one after the other.  I mean it's on two

25  pages.  It lays out exactly what happened and that's not raw

Proceedings                                                    48

1   because he's already done the 302, he's already been

2   interviewed, I think, on the 26th.  In 2021, he was

3   interviewed.  And on the 26th, there was a 302 that they

4   didn't decide, Oh, we don't believe this guy.  No, they wrote

5   a 302 where they accepted all the information and put down

6   what he said on the 29th.

7            Just a few days later, they put him in the grand

8   jury and to say that he wasn't, that they didn't expect those

9   answers, the question are:

10           Did Potato -- Potato sent you a link online of some

11  videos.

12           Yes.

13           And did the video depict the shooting of an Asian

14  man in Queens?

15           Yes.

16           Why did Potato send you the video?

17           To tell me that it was him who shot the Asian man.

18           Why did he say that?  What did they expect the

19  answer to be?  Given the fact that they had interviewed him,

20  you know, for as long as they needed.  They didn't put him in

21  the grand jury after hearing him say that he was the shooter

22  on numerous occasions.  They put him in the grand jury and

23  they're surprised now that that's what he said?  That's what

24  he told them for three days.

25           And now they say:  Why did he show the video?

Proceedings                                          49

1          He wanted to show me that he was the shooter.  He

2    told me to look at the video and see if I can see him as the

3    shooter.

4          Did you speak with him the next day?

5          Yes.

6          And what did Potato tell in regard to the shooting?

7          He said that, that he was behind the shooting.

8          Did he tell you -- that's not it.

9          He used the word "toys."

10         What did toy mean to you?

11         It meant gun.

12         And then it goes on.  He's talking about how he

13   needed a gun.  Why, why did he need a gun?  He tells the guy.

14   They're asking him these questions.

15         Why did he need a gun?

16         Because he was afraid because of what he did there

17   would be retaliation.

18         THE COURT:  Well, Ms. Kellman, are you questioning

19   the credibility of the government's assertion that they didn't

20   believe Senquiz when he said that and that they believed CW1?

21   Are you questioning the credibility of that assertion?

22         MR. SER:  Judge, can I --

23         THE COURT:  I'm asking Ms. Kellman a question.

24   Okay?  You can speak after.

25         MS. KELLMAN:  Your Honor, he has a different piece

Proceedings                                            50

1   of paper in his hand right now.

2          MR. SER:  I'm just wanted to close the loop on the

3   question that we talked about earlier about the believability

4   of Senquiz and this is the question you just posed to

5   Ms. Kellman.

6          There is a footnote on page 7 of the search warrant

7   affidavit that we're challenging in our Franks motion and that

8   says:  "CS1 has been indicted for narcotics distribution

9   charges.  CS1 has been providing information to law

10  enforcement in the hope of receiving a cooperation agreement

11  and leniency at sentencing."  Then the last sentence in that

12  full paragraph, which I won't continue to read:  "CS1's

13  information has been corroborated by other information in my

14  investigation including as described herein and I believe

15  CS1's information to be credible and reliable."

16         Agent Lin is specifically saying this person has

17  been proffering, they know about Senquiz at the time they

18  filed this affidavit.

19         THE COURT:  That doesn't mean that he still thinks

20  that CW1 is credible and reliable.  Why does that undermine

21  that if he doesn't believe that portion of the other witness'

22  testimony?

23         MR. SER:  That's -- this is in the May 3, 2021

24  search warrant application.  Whether or not they believe him

25  later is a different story but at the time of this

Proceedings                                                    51

1  application, they believe them.

2          THE COURT:  Who are they referring to?

3          MR. SER:  Mr. Senquiz.

4          THE COURT:  I apologize.  I missed it.

5          MR. SER:  So that footnote makes clear two things

6  that are really crucial to this issue here.  One, that he's,

7  the agent, Agent Lin knows, based upon his averring this in

8  his affidavit, that Senquiz has been providing information to

9  law enforcement.  He knows.

10         THE COURT:  But at that point in time, at least all

11 that he knows that he said, according to the government, all

12 that he knows that he said is what Senquiz said about what

13 went on and not the fact that he claimed that David Yu

14 admitted to him that he was the --

15         MR. SER:  Well, we don't know that for sure.  That's

16 why we need the hearing.  How can he make a claim about

17 credibility and reliability without interviewing Senquiz?

18 That's the question.

19         MS. KELLMAN:  Just to finish up my thought, it seems

20 to me that they start this search warrant affidavit in May of

21 2021 and then they interview him in June and they have this

22 opportunity to interview him as they need, they wrote a 302.

23 They've made a determination that he's believable because in

24 my experience, it's not often that the government says, I

25 think this guy is a liar, let's put him in the grand jury.

Proceedings                                          52

1        With respect to the statement the government just made a

2    few minutes ago that we, you know, we didn't think he was

3    going to talk about the gun, all you have to do is read the

4    grand jury minutes.  It's clear they're asking about who is

5    the shooter.  So how they didn't expect that answer given the

6    interviews, I mean, they have somebody who they decided is the

7    shooter.  They've made a decision, one, from a Brady point of

8    view we don't know about, that would be nice, and, two, it's

9    in the affidavit.

10        THE COURT:  There's really no defense to the fact

11    that you didn't know about this witness much earlier in this

12    case.

13        MS. KELLMAN:  And Brady has nothing to do with this?

14        THE COURT:  I'm sorry?

15        MR. KOUSOUROS:  She's agreeing.

16        MS. KELLMAN:  I'm sorry.

17        THE COURT:  No.  I'm saying that the defense clearly

18    needed to know about the existence of this witness and what he

19    had said much earlier than they found out about it.

20        MS. KELLMAN:  Of course.  I missed one word.

21        THE COURT:  I have great difficulty understanding

22    why that information wasn't provided to the defense early on.

23        MR. SER:  I just have two final things and I'll sit

24    down and let us continue.

25        One, if you take a look at I think it's Exhibit B to

Proceedings                                        53

1  my motion, it's the first page of that 302, it identifies

2  Jesus Capo who is in the e-mail chain that Your Honor looked

3  at that's attached to the government's opposition.  He's

4  identified in the 302 as Task Force Officer Jesus Capo.  So we

5  know at least one state NYPD official was involved in the

6  federal investigation.

7          This is dated June 29, 2021, not, you know -- this

8  is approximately two months after Agent Lin's May 3, 2021

9  affidavit gets filed.  So I do think there's a strong

10  connection here that would demonstrate some sort of

11  communication, especially, when coupled with that footnote I

12  read earlier, how or why would Agent Lin would know about

13  that.  Either he interviewed Senquiz or he got a full download

14  from the NYPD, maybe through Officer Capo.

15          Thirdly, because we don't have any of the materials

16  beyond the ADA's affidavit, we are making a Brady request for

17  all notes, handwritten, typed, and reports of any meeting that

18  the state or federal government has had with Senquiz because

19  we know there's a May 1st interview.

20          THE COURT:  Well, the federal government, I would

21  direct that they provide that information.

22          I think the government, you should make efforts to

23  get the information from the state and turn it over to

24  counsel.  If they don't turn it over to you, then you can

25  subpoena the state.

Proceedings                                              54

1        MR. SER:  And it's especially crucial now because

2   the government is claiming they don't believe him so all of

3   this material --

4        THE COURT:  No, I understand.

5        What I would like the government to do is, first of

6   all, with respect to the earlier affidavit that counsel has

7   just been discussing, to provide an affidavit from the affiant

8   for the warrant as to how he came in, how and when he came in

9   to possession of information with regard to Mr. Senquiz.  I

10  want an affidavit from him to that effect.

11       I'd also like an affidavit from the government to

12  explain the statement in their letter which is in support of

13  their claim that the omission was a result of a considered and

14  reasonable judgment that the information was not necessary to

15  the application.  In other words, explain how it is you came

16  to that conclusion and why you didn't credit the information

17  of Mr. Senquiz.

18       MR. SER:  Your Honor, we would ask the Court to

19  consider perhaps an affidavit from Agent Capo who is obviously

20  a task force officer and a member of the investigation as

21  well.

22       THE COURT:  We're dealing with the warrants now.

23  We're not going past that.  You understand the affidavits I'm

24  seeking?

25       MS. LASH:  I do, Your Honor.

Proceedings                                            55

1          MR. SER:  But if this was a joint decision as to how
2     and what went into --
3          THE COURT:  Was this a joint decision?  Was this a
4     task force?
5          MR. SER:  A joint task force, Your Honor.
6          MS. LASH:  Your Honor, I think the affidavits that
7     you've laid out from the affiant and then from a government
8     attorney explaining those answers will answer the question.
9     I'm not sure how the task force officer would shed any light
10    on this issue.
11         THE COURT:  Who is this person?  Is it Galgano
12    you're talking about?
13         MR. SER:  No, Capo, C-A-P-O.  He's from the
14    109th Precinct, Your Honor.
15         MS. LASH:  Detective Capo was a member of the
16    109th Precinct and now is a task force officer with the FBI
17    who is -- I'm sorry.  I'm corrected.  He was not in the
18    109th precinct.  He's a detective with the NYPD who is now
19    working with the FBI.
20         THE COURT:  Was he working with the FBI during the
21    time that the applications and warrants were being requested?
22         MS. LASH:  Yes, Your Honor.
23         THE COURT:  I don't understand what he adds to this
24    though.  He's not the affiant on the warrant.
25         MR. SER:  But he's got an NYPD.org e-mail address as

Proceedings                                    56

1    of this e-mail which comes in September of 2021.  It seems

2    like he's still part of NYPD and working with Agent Lin and a

3    member of this joint task force.

4              MS. LASH:  I'm sorry, Your Honor.  He's not a joint

5    task member.  He's a member of the FBI.  There's no NYPD and

6    FBI task force.

7              THE COURT:  Lin can address whether he spoke to this

8    person or got any information.  Include that within the

9    confines of his affidavit.

10             MR. SER:  And he was working according to his e-mail

11   with the ADA and Queens District Attorney's Office.

12             THE COURT:  Well, the ADA is beyond my purview at

13   the moment.

14             MS. LASH:  I don't think that's correct, Your Honor.

15             THE COURT:  Pardon me?

16             MS. LASH:  I don't think that that statement is

17   correct but we'll take a look at it.

18             THE COURT:  I would ask you to provide these

19   affidavits by Wednesday of next week.

20             MS. LASH:  No problem.

21             THE COURT:  Okay.  I think the remaining issue that

22   we have deals with similar acts.

23             I think the seminal case on the similar act

24   testimony is <u>Huddleston versus United States</u> and there are a

25   number of findings that this court has to make before I will

Proceedings                                            57

1    permit the government to admit a similar act.

2           The first and obviously most important is that a

3    reasonable jury can find, by a preponderance of the evidence,

4    that the defendant committed the act so it has to be relevant.

5    Second, it must be offered for a proper purpose under 404(b),

6    in other words, not just propensity.  And, third, the court

7    must determine whether the probative value of the similar act

8    evidence is substantially outweighed by its potential for

9    unfair prejudice.  Lastly, if requested, the court should

10   instruct the jury that the similar act evidence is to be

11   considered for the proper purpose for which it was admitted

12   and not for any other purpose.

13          Now, one of the acts or bad acts that the government

14   wishes to prove is that the defendant Allen Yu took steps to

15   destroy those new companies such as calling vendors and

16   subcontractors to blackball and canceling building permits,

17   contacting USCIS to terminate work visas.

18          Now, the government offers, the basis for this is it

19   shows motive for the defendant to harm Chris Yu so that is a

20   proper purpose.  I think one of the issues that defense raises

21   is what is the government's evidence to prove that Mr. Yu did

22   this and how is it that the government would intend to prove

23   that.

24          MS. LASH:  Through witness testimony, Your Honor.

25          THE COURT:  And are these witnesses' admissible

Proceedings                                        58

1   testimony that Mr. Yu told them to do this?

2             MS. LASH:  Either -- yes, the testimony from the

3   witnesses would be admissible as to statements from Mr. Yu

4   himself.

5             THE COURT:  To them?

6             MS. LASH:  To them.

7             THE COURT:  All right.  And then the other thing

8   that the government wants to offer proof of is that the

9   defendant told a police officer that there was no animosity

10  between them and you want to impeach that statement with this?

11            MS. LASH:  Yes, Your Honor.

12            THE COURT:  But the government is going to offer

13  that statement as being a false statement?

14            MS. LASH:  Yes, Your Honor.

15            THE COURT:  All right.  Well, it seems at least --

16  and these are all preliminary findings.  Something can come up

17  during the trial that could change these findings but,

18  preliminarily, I think that this would meet all of the

19  requirements of Huddleston because this goes to prove motive.

20            Now, this other testimony about Mr. Yu contacting

21  ICE about an employee of Yu's rival company.  Now, how are you

22  proving that?

23            MS. LASH:  Your Honor, that is from an e-mail from

24  Mr. Yu's phone in which he sends an e-mail to an immigration

25  officer specifically reporting the employee from his company

Proceedings                                              59

1    that was moving to the victim's company.

2              THE COURT:  And that's an e-mail on his phone?

3              MS. LASH:  Yes, Your Honor.

4              THE COURT:  Well, that seems to -- have you

5    identified or provided the e-mail to counsel?

6              MS. LASH:  Yes, Your Honor.

7              THE COURT:  That would seem to also deal with motive

8    and the government has a basis to link it to the defendant so

9    that would be admissible.

10             Now, Abreu and Zhang sold marijuana together with

11   Co-Conspirator one, and that's to show the existence and

12   development of a criminal relationship between the

13   co-conspirators?

14             MS. LASH:  Yes, Your Honor, in part.

15             THE COURT:  In part?  What other part?

16             MS. LASH:  Well, Your Honor, the existence of their

17   marijuana relationship is also just inextricably intertwined

18   with the events of this conspiracy.

19             THE COURT:  How so?

20             MS. LASH:  Well, discussions of the marijuana, their

21   knowledge of each other because of marijuana, not as to a, not

22   as to that cooperating witness which Your Honor referenced but

23   as to another cooperating witness.  The discussion of the

24   murder came up during a marijuana transaction.

25             THE COURT:  Well, that's to establish the

Proceedings                                              60

1   relationship.  The marijuana isn't directly related to the

2   murder-for-hire; in other words, they're not paying anyone

3   with marijuana or anything like that.  Correct?

4            MS. LASH:  That's correct.

5            THE COURT:  So it's just relevant to the

6   relationship between Abreu, Zhang and a co-conspirator who is

7   going to testify?

8            MS. LASH:  Yes.

9            THE COURT:  You know, that, again, seems like a

10  proper purpose to admit it.

11           I don't -- the cocaine trafficking seems to me to be

12  on a different level.  I mean this is something that happened

13  after the transaction, after the murder-for-hire?

14           MS. LASH:  Yes, Your Honor.

15           THE COURT:  What's the relevance of the cocaine?

16           MS. LASH:  The cooperating witness who will testify

17  as to an admission from Defendant Anthony Abreu telling him

18  that he committed the murder subsequently engaged in a cocaine

19  transaction with him.  Therefore, the fact of the cocaine

20  transaction shows the closeness of the relationship between

21  the cooperating witness and Defendant Abreu.  Both men were

22  arrested for the cocaine transaction and the cooperating

23  witness testified against the defendant which will be elicited

24  in his direct examination.

25           THE COURT:  That he testified against him in a

Proceedings                                                61

1    cocaine case?

2          MS. LASH:  I -- well, certainly the fact of his

3    cocaine conviction will be elicited in his direct examination.

4          THE COURT:  Well, that's the co-conspirator though.

5    The fact that he has a cocaine conviction is relevant to his

6    impeachment but it's not relevant.  It doesn't make any

7    difference who he did it with.

8          MR. MAZUREK:  I just want to correct the record.

9    This is Mr. Mazurek on behalf of Mr. Zhang.

10          This individual is not an alleged co-conspirator in

11    the murder-for-hire.  I just want that to be clear.  And

12    that's why our concern about the hearsay that's going to be

13    raised against our client is going to come into evidence.

14          THE COURT:  Wait a minute.  The person who is going

15    to testify on the stand about the co-conspirator is not going

16    to be talking about the murder-for-hire?

17          MS. LASH:  I'm not sure -- the person who is going

18    to testify about the cocaine transaction?

19          THE COURT:  Yes.

20          MS. LASH:  Is not a co-conspirator.  He is an

21    unrelated friend of two of the defendants in this case and one

22    of the defendants, Anthony Abreu, later made an admission to

23    him that he committed the shooting.

24          THE COURT:  So he can testify to the admission.

25          MS. LASH:  Yes.  He's not testifying to the events

1    of the murder-for-hire.  He's not aware of that.

2         THE COURT:  So the government is going to call this

3    individual to testify that Abreu made an admission to him that

4    he engaged in the murder.

5         MS. LASH:  Yes.  This witness will also testify as

6    to his relationship with Abreu, his relationship with

7    Defendant Zhang, and to comments that Defendant Zhang made to

8    him after the day of the murder which were not a direct

9    admission but evinced guilt for something he that he had done.

10        THE COURT:  What is the evidence of their

11   relationship other than the cocaine trafficking?

12        MS. LASH:  They were also engaged in marijuana

13   trafficking together.

14        THE COURT:  So you can explain it by the marijuana

15   trafficking; you don't need to bring in the cocaine

16   trafficking.

17        MS. LASH:  Your Honor, I expect that it's going to

18   come out on cross-examination.  This witness that we'll call

19   has previously testified against this defendant so I expect

20   that the counsel will bring this out as --

21        THE COURT:  Well, if they bring it out, they bring

22   it out.

23        MR. KOUSOUROS:  Well, Judge, as we put in our 404(b)

24   response basically conceding to what they had asked for, you

25   know, we do come to a point where with respect to Mr. Yu,

Proceedings                                                        63

1   there does become unfair spillover prejudice.

2          You know, we can cross-examine this fellow as to

3   whether he's got a cocaine conviction without cross-examining

4   him as to whether he testified against another co-defendant

5   and, you know, to the extent that we can seek advanced rulings

6   from the Court and we can, therefore, limit our

7   cross-examinations, I'm speaking for myself now, you know,

8   there is a balancing here.  So I think that they can get

9   certain of their evidence out without bringing out the fact

10  that somebody my client is sitting at the table with has this

11  other massive conviction for which this defendant testified

12  against him for.

13         I'm asking the Court to consider, with respect to

14  the 404(b) against the other defendants in this case, that

15  there will be unfair spillover prejudice to Mr. Yu who's got

16  absolutely no involvement.

17         THE COURT:  Well, I think that can be handled with a

18  limiting instruction, that the evidence is only admissible

19  against X and Y defendant and only for this purpose.

20         At this point in time, I am not inclined to have the

21  government on their direct of this witness talk about a

22  cocaine trafficking relationship with Abreu and Zhang, but it

23  could very well be that based on how the cross-examination

24  goes, that this will come out in any event.

25         MR. MAZUREK:  Judge, can I just ask -- in Ms. Lash's

Proceedings                                          64

1    statements to the Court just now she indicated that there may

2    be admissions that they seek to, the government seeks to

3    introduce through this witness of Mr. Zhang that were made

4    shortly after, I guess, in time to the murder-for-hire.

5         I would ask for those, I guess that's 3500 material,

6    but given the fact that the government just said that it's not

7    an admission, it wasn't an admission to the murder-for-hire, I

8    want to know what those statements are so maybe we can

9    litigate that issue in limine before rather than just address

10   it as this witness testifies.  I would like to know what those

11   statements are that are alleged as to Mr. Zhang.

12        MS. LASH:  Your Honor, I believe the statements are

13   laid out in all the search warrant affidavits so I'm not sure

14   what Mr. Mazurek means when he's not sure when I'm referring

15   to, but these are statements of the witness, they'll be

16   released on the 3500 schedule.

17        I'm sorry.  If there's any other questions, I'm

18   happy to address that.

19        MR. MAZUREK:  I just want to know what the

20   statements are.  I understand there are some statements that

21   are opaquely referenced in the search warrant affidavits but

22   we have in limine motions that are due.  I would like to be

23   able to brief this issue.  I think it's very significant.

24        If the government is saying that there's an

25   admission by Mr. Zhang that is related to the murder of a

Proceedings                                             65

1   cooperating witness, I just want to be able to identify the

2   issue and address it.

3            THE COURT:  What would be the issue?

4            MR. MAZUREK:  I'm sorry?

5            THE COURT:  What would be the issue?  In other

6   words, the government is offering testimony that your client

7   said to this witness, I was engaged in the murder.  What would

8   be the -- what would you argue about that?

9            MR. MAZUREK:  I want to know whether -- I know that

10  there's some reference in the search warrant affidavits that

11  the witness was just saying something about my client

12  mentioning something that he felt he wasn't --

13           THE COURT:  That what?

14           MR. MAZUREK:  He felt he was not clean or he was

15  dirty or something like that, I just don't know the relevance

16  of that with respect to the murder-for-hire and if there's

17  anything that makes it --

18           THE COURT:  What specifically is the witness going

19  to say?

20           MS. LASH:  I don't have the statements in front of

21  me but, in essence, it's that he saw him the day after the

22  murder, he told him he felt dirty, he wanted to do good acts

23  to make up for that feeling.  These are laid out in the search

24  warrant affidavits.  It's a statement of a party opponent.

25           THE COURT:  Is that all he said though or did he say

Proceedings                                          66

1    something more significant than that, I mean more direct than

2    that?

3                MS. LASH:  Your Honor, he made those statements the

4    day after the murder.

5                THE COURT:  Yes, I know, but is that it?  Is that

6    all he said, that's all Mr. Mazurek wants to know, or did he

7    say something else?

8                MS. LASH:  That's the sum and substance of what he

9    said.  I don't have the statement right in front of me.

10               THE COURT:  To make this easier, just pull out

11   whatever 302 deals with these statements and give it to

12   Mr. Mazurek in case he wants to make some earlier application.

13               MS. LASH:  I'm happy to point Mr. Mazurek to the

14   information that the person will provide in sum and substance.

15               THE COURT:  Well, don't you have the actual 302 or

16   report?

17               MS. LASH:  Your Honor, there's several 302s that

18   pertain to this.

19               THE COURT:  Just turn them all over now.  It's not a

20   problem.

21               MR. MAZUREK:  Thank you, Judge.

22               MS. LASH:  Your Honor, this is a cooperating

23   witness.  There are several 302s.  This information is

24   sensitive.  This is not a participant in the murder.  This is

25   a civilian witness at this point.  We're intending to turn

Proceedings                                          67

1   over all of his statements together to the defense on

2   September 1st, the deadline that we've previously agreed and

3   that this court has ordered.

4           THE COURT:  You've already proffered what he, this

5   person would say.

6           MS. LASH:  Yes.

7           THE COURT:  Can you proffer more specifically --

8           MS. LASH:  Yes.

9           THE COURT:  -- what he would say?

10          MS. LASH:  Yes, I did.

11          THE COURT:  Well, tell counsel precisely what the

12  witness is going to say.  I don't know why you couldn't just

13  take his name out of the 302 and give him the substance.

14          MS. LASH:  Because there's not one 302.  There's

15  several 302s.  But I will tell him -- I will give him the

16  substance of the statement in an e-mail after this conference.

17          MR. MAZUREK:  Judge, I would just ask for the 302s.

18  This is what -- they have it.  We know who the witness is.  I

19  don't understand.  There's no hiding the ball here.  Let's

20  just have the information.

21          It's critical if they're going to say this is a

22  statement of a party opponent that has to do with the murder.

23  All I've heard is something about not feeling clean.  I don't

24  even understand what that is in terms of relevance to a

25  murder-for-hire.

Proceedings                                    68

1          MS. LASH:  Your Honor, statements --

2          MR. MAZUREK:  If they have it, turn it over.

3          MS. LASH:  -- statements about feeling guilty,

4     feeling dirty the day after this individual committed a murder

5     are clearly relevant.

6          MR. MAZUREK:  He didn't commit a murder.  He's

7     presumed innocent.

8          THE COURT:  I don't know, Ms. Lash, what the

9     distinction is in your mind between your providing him with

10    the substance of what he would say and turning over 302s with

11    the person not identified.  So I mean I can't understand why

12    you think one is no problem and the other is a problem.

13         So I'm going to direct you -- you can black out the

14    name.  You'll have to tell them later, but obviously black out

15    the name of the witness so he can see precise statements that

16    the 302 reports that this person said.  Then if he wants to

17    make a motion to me that, oh, you know, this is unclear, he

18    can.

19         I don't know if you have to make a formal motion.

20    You can argue it before the fellow testifies.  This isn't

21    rocket science, this particular one.

22         So do that and we can have it teed up.  The motions

23    in limine are due Monday.

24         MR. MAZUREK:  Monday.

25         THE COURT:  What motions in limine are the

Proceedings                                          69

1   defendants going to make?  If you can just preview them for

2   me.

3          MR. KOUSOUROS:  Your Honor, I have conferred with

4   the government to try to limit the motions in limine.

5          The one issue that I was prepared to move on, I

6   would ask Your Honor respectfully to allow me to simply

7   respond to the government's motion.  It has to do with the

8   admissibility of prior inconsistent statements.  Instead of

9   you getting two submissions, I'd ask you to let me just

10  respond on the response date because my response really has to

11  do more with the government's proffer.  We know what the

12  statements are.  I've asked about them and they've been

13  courteous enough to tell me.

14         THE COURT:  Is that the only thing you raise?

15         MR. KOUSOUROS:  Well, we've discussed other things

16  as well.  The government informed me yesterday they're not

17  admitting certain things on their direct case so that got, you

18  know, eliminated from my presentation.

19         THE COURT:  I don't understand what your application

20  is.  You shouldn't have to make an application because the

21  government is going to make it?

22         MR. KOUSOUROS:  What I'm saying is both of our

23  motions in limine are due on Monday.

24         THE COURT:  Correct.

25         MR. KOUSOUROS:  The issue that I was going to

Proceedings                                          70

1  present is an issue the government is going to move on.  I'm

2  asking you instead of my having to file something on Monday,

3  let me file something in response.

4          THE COURT:  That's fine.  That's fine as long as

5  there's not something else you would have raised in a motion

6  in limine.

7          MR. KOUSOUROS:  No.  If there's something separate

8  and distinct, I'll submit it on Monday, but I don't anticipate

9  there being anything.

10         THE COURT:  And the parties have been in discussion

11 about working this out so there's not a lot of --

12         MR. KOUSOUROS:  That's the way we eliminated a

13 couple of issues.

14         THE COURT:  Okay.

15         MS. LASH:  Your Honor, on the motions in limine,

16 just a housekeeping matter, the government submitted a request

17 to have our deadline also be on Monday for the motions and I

18 just haven't seen that granted.

19         THE COURT:  I thought we granted it.  It was granted

20 yesterday.

21         MS. LASH:  Okay.  My apologies.

22         MR. MAZUREK:  And, Judge, do you want to hear

23 proposed in limine motions from Defendant Zhang?

24         THE COURT:  Yes.

25         MR. MAZUREK:  So we've been in discussion with the

Proceedings                                                              71

1   government about what we believe are hearsay statements with

2   respect to, as to Mr. Zhang.

3           I submitted at the beginning of the week a series of

4   six statements to the government that they've identified in

5   the course of their discovery.  They indicated to us that they

6   still seek to introduce five of those six.  So we'll be

7   briefing those issues as to why we believe they're

8   inadmissible and hearsay against Zhang.

9           THE COURT:  Anybody else doing motions in limine?

10          Ms. Kellman?

11          MS. KELLMAN:  Our motions had basically to do also

12  with the cocaine and I think we resolved it.

13          THE COURT:  Okay.

14          Talking about, just to wrap up on the similar acts,

15  there's testimony that Abreu carried and used a firearm before

16  and after the murder and testimony where Zhang described Abreu

17  as a person who could take someone out, a real gangster.

18          How is the government going to establish that?

19          MS. LASH:  As to both of those, Your Honor, through

20  multiple witnesses' testimony.

21          THE COURT:  So there will be witnesses who testified

22  that they knew Abreu carried a gun?

23          MS. LASH:  Yes, Your Honor.

24          THE COURT:  And had a firearm after the murder as

25  well?

Proceedings                                          72

1          MS. LASH:  Yes, Your Honor, not -- to be clear, not

2    the murder weapon but a firearm that he carried himself.

3          THE COURT:  And what is the temporal connection?

4          MS. LASH:  Several months after the murder, I expect

5    the witness will testify that he observed Mr. Abreu carrying a

6    firearm in May of 2019.

7          THE COURT:  And what about before?

8          MS. LASH:  One witness will testify that he observed

9    Mr. Abreu carrying a revolver which was the type of firearm

10   that was used in this case.

11         THE COURT:  When?

12         MS. LASH:  I believe it was late 2017 or early 2018,

13   Your Honor, which would be a year before the murder.

14         THE COURT:  And what about the testimony about

15   Zhang's description of Abreu, what is the context of that

16   discussion?

17         MS. LASH:  The context of that statement occurs at

18   Defendant Allen Yu's Chinese New Year party which was in

19   February of 2018 and Mr. Zhang was describing his relationship

20   with Abreu approximately a year before the murder took place.

21         THE COURT:  His relationship?  And who is going to

22   testify to this?

23         MS. LASH:  To the comment about being a real

24   gangster, that one, Your Honor?

25         THE COURT:  Yes.

Proceedings                                      73

1          MS. LASH:   A cooperating witness who is connected to

2     both Mr. Zhang and Mr. Abreu.

3          THE COURT:   Does either counsel want to be heard on

4     this?

5          MR. MAZUREK:   Judge, I would ask again -- this is

6     the first I'm hearing about February 2018 statements by my

7     client to Allen Yu.   I would like to be able to see those

8     statements.   I don't know where they are.   I haven't seen any

9     statements like that.

10         MS. LASH:   No.   What's described in the motion is

11    testimony by a cooperating witness of statements that

12    Mr. Zhang made.

13         MR. MAZUREK:   Yes.   I would like -- since there are

14    statements by my client, I would like to see what they are so

15    I can determine, I mean -- that's not part of the 404(b)

16    notice as to Mr. Zhang.   I didn't read that in the 404(b)

17    section on Mr. Zhang so I would like to see those statements.

18         THE COURT:   Yes.   I think if you're arguing these as

19    404(b), that you need to provide counsel with, and you want a

20    ruling about it, you need to provide counsel with the precise

21    statements.

22         MS. KELLMAN:   And the time.

23         MS. LASH:   Your Honor, we're happy to provide this.

24    I thought they were provided in the 404(b) notice but if

25    they're not, we will take a look and provide them after the

Proceedings                                74

1   conference.

2          MS. KELLMAN:  And I assume that's also when the

3   statements were made.

4          THE COURT:  Yes, that's important.  That should be

5   in whatever account of the statement there is.  It should

6   be -- I mean, I imagine if the statement is in a report, it

7   would say when it was made.

8          The fraudulent license plates, how are you going to

9   prove that?

10          MS. LASH:  Your Honor, through witness testimony and

11   documentary evidence including the admission of one of the

12   fraudulent license plates at issue.

13          THE COURT:  Can you run that by me again?

14          MS. LASH:  Your Honor, the government will call a

15   witness who will testify that Mr. Abreu picked up his car in

16   January of 2019, one month before the murder, and the car

17   contained a West Virginia license plate with a certain number

18   series.

19          The government will offer another witness who

20   arrested Mr. Abreu one month after the murder with a different

21   fraudulent West Virginia license plate and the government will

22   offer testimony from a witness the night of the murder who

23   photographed the getaway vehicle that showed a third

24   fraudulent license plate.

25          The government will also offer testimony from an

Proceedings                                    75

1   individual who will explain that all of these license plates

2   are fraudulent and, beyond being fraudulent, they share

3   similar characteristics in their fraudulentness.

4           THE COURT:  All right.  With regard to the

5   intimidating a witness, what is your position with respect to

6   those, Ms. Kellman?

7           As I understand it, it's that Mr. Abreu told a

8   witness in a court appearance that rats can be easily killed

9   in prison?

10          MR. SCHULMAN:  Your Honor, Eylan Schulman for

11  Mr. Abreu.

12          It's our position on those that it's, that the

13  statements were vague, not clear, subject to multiple

14  interpretations, and ultimately lead to 403 reasons, lead to

15  confusion about what the underlying intent was.  Similarly,

16  with respect to the text messages that Mr. Abreu supposedly

17  sent to the individual about, you know, don't be afraid if the

18  government comes to speak to you and tell them, essentially

19  tell them the truth but don't be intimidated by the

20  government.

21          THE COURT:  Well, what's the problem?  Is that what

22  they say?

23          MS. LASH:  No, Your Honor.  The statements encourage

24  the witness not to --

25          THE COURT:  Do you have these?  Have you provided

Proceedings                                        76

1  these statements to the court or just an account of what they

2  are?

3           MS. LASH:  We can provide these to the Court after

4  the conference.  I think --

5           THE COURT:  Provide it to the court and counsel.

6  This is 404(b).  You want to put this into evidence.

7           MS. LASH:  Your Honor, I think this is quoted in the

8  motion as statements.

9           THE COURT:  It's what?

10          MS. LASH:  It's quoted in the motion.

11          THE COURT:  Look, if you want this stuff in, you've

12  got to provide the court with the basis for it and provide

13  counsel with the basis for it.  This is, you know -- you're

14  making a 404(b) motion.  I don't know why we need to be so

15  hesitant about providing them with the information.  I'm not

16  understanding what the problem there is.

17          So provide him with whatever documentary evidence

18  there is of the fact that this happened so I can look at it

19  too.  I mean I need to look at these things to determine

20  whether I think there's a reasonable basis for that, that this

21  is a threat or not a threat.

22          MS. LASH:  Yes, Your Honor.  We've long provided

23  these to defense but we'll --

24          THE COURT:  The documents that establish this?

25          MS. LASH:  Yes, Your Honor.

Proceedings                                      77

1        THE COURT:  Okay.  Well, good.  Now give them to me.

2   We'll all know what it's about.

3        All right.  I think we've basically taken up the

4   majority of the issues.  Is there anything else that needs to

5   be resolved right this moment?

6        MS. LASH:  Nothing from the government, Your Honor.

7        MR. KOUSOUROS:  Your Honor, I just want to take care

8   of some housekeeping matters.

9        I'd like to just hand up to the Court two orders,

10  one for Mr. Yu to be able to wear clothing, civilian clothing.

11       THE COURT:  Okay.

12       MR. KOUSOUROS:  It takes time to deal with the

13  Marshals.

14       Another order, respectfully, is for Ms. Emma Cole to

15  be permitted to bring her laptop and phone.

16       THE COURT:  Who is Emma Cole?

17       MR. KOUSOUROS:  Emma is our assistant and paralegal.

18       THE COURT:  Will she be seated at counsel table?

19       MR. KOUSOUROS:  Yes.

20       THE COURT:  Okay.

21       MR. KOUSOUROS:  The other one, Judge, and I've

22  conferred with the government, I have an order that I'm going

23  to amend depending on what you tell me.  We got the

24  government's consent to provide Mr. Yu with a computer.  We

25  had talked about it a long time ago.  It took a long time.  We

Proceedings                                    78

1   got the computer, they loaded it, but now the MDC won't accept

2   it without a court order.

3          So the government has no objection.  It's ready to

4   go.  So if it's okay, we'll submit an order to the Court.

5   That's going to help in preparation because he'll be able to

6   review these materials.

7          THE COURT:  All right.  So they've given you no

8   other basis for not accepting it other than they prefer to

9   have a court order, correct?

10          MR. KOUSOUROS:  They want a court order because

11  their position is that he's got access to a computer in the

12  unit and they're not, quote, unquote, "aware" of technical

13  issues.  I'll tell you that I'm aware of recurring technical

14  issues and what's the harm?  I see people --

15          THE COURT:  I don't know.  That's the problem.

16          The government isn't opposing this?

17          MS. LASH:  We're not, Your Honor.  We only just ask

18  to review the order --

19          MR. KOUSOUROS:  Of course.

20          MS. LASH:  -- and ensure that it complies with MDC's

21  procedure.

22          THE COURT:  And I take it you'll touch base with the

23  MDC to make sure that there's no other overarching security

24  issue or something.

25          MS. LASH:  Yes, we will.

Proceedings                                      79

1         MS. KELLMAN:  Your Honor, just to fill the record

2    out and maybe this helps, but in the last year, we've been

3    working with the Court of Appeals with Alan Nelson and the BOP

4    and we can now, CJA counsel, can now have anything, all of the

5    material loaded on a laptop, in fact, Mr. Nelson is

6    warehousing laptops.  Once we buy them, he warehouses them.

7    So any one of us who wants a computer for our clients, we have

8    the government load it and disable it, the MDC confirms that

9    it's been disabled, and our clients have been able to get them

10   without any difficulty.

11        One of the reasons that this evolved, Judge, is

12   because of the number of lockdowns at the jail.  They may have

13   a machine on their unit.  Ninety-nine percent of the time --

14        THE COURT:  Can you talk to counsel and make sure he

15   has it?

16        MS. KELLMAN:  I will.

17        THE COURT:  Just talk with Ms. Kellman.  Make sure

18   it's done the way you're saying because they may tell you take

19   it back to the government.  Just Ms. Kellman has the

20   experience with it.

21        MR. KOUSOUROS:  Very well.

22        THE COURT:  Just do it the same way and you won't

23   have a problem.

24        MR. KOUSOUROS:  I have one other application.

25        Is there any way that the government will agree or

Proceedings                                              80

1   if we can kind of work something out to put some of these

2   phone images of the jail calls which are in Chinese, our

3   ability to allow our clients to have them so they can listen

4   to them with a specific order?

5            THE COURT:  Have you discussed this with the

6   government?

7            MR. KOUSOUROS:  The answer is constantly -- well, I

8   mean it's sensitive, Judge.

9            THE COURT:  You know, I have no idea.  This is

10  getting to be a little stream of consciousness here.

11           What is it that you're precisely asking me for?

12  What did you discuss with the government?  If you haven't

13  discussed it before, you know, just --

14           MR. KOUSOUROS:  Well, I haven't discussed it because

15  it kind of came up --

16           THE COURT:  Why don't you discuss it with them.

17           MR. KOUSOUROS:  Absolutely.

18           THE COURT:  And if there's some issue that you need,

19  then you can address it.

20           MR. KOUSOUROS:  No problem.  May I hand this up to

21  the clerk?  These are the two easy orders.

22           THE COURT:  Easy orders.  Okay.

23           MR. KOUSOUROS:  Thank you very much, Judge.

24           THE COURT:  Okay.

25           MR. KOUSOUROS:  Judge, thank you very much.

Proceedings                                          81

1           THE COURT:  All right.  Thank you.

2           MR. MAZUREK:  Judge, before we adjourn, I just want

3    to put on the record in addition to our opposition to the

4    404(b) brief, we exchanged a motion to sever Defendant Abreu.

5    I just want to be clear the reasoning and put that on the

6    record, the reasoning for the motion.

7           We talked today again in court about a number of

8    Rule 404(b) acts that the government is seeking to introduce

9    uniquely against Co-Defendant Abreu relating to intimidation

10   of at least two witnesses, the carrying of guns, and most

11   significantly a confession that they're alleging was made by

12   Mr. Abreu to a non-co-conspirator in this case but was said in

13   another context that would be abject hearsay with respect to

14   Mr. Zhang.

15          The reason I --

16          THE COURT:  But it doesn't implicate Mr. Zhang, does

17   it?

18          MR. MAZUREK:  It does because the entire theory of

19   the government's case against my client is going to rest

20   largely on the association of these two defendants.  That is

21   to say that one of the government's cooperators is going to

22   say that he needed Mr. Abreu to carry out this task and the

23   only way he could get to Mr. Abreu is through Mr. Zhang.

24          So that affiliation, the government is going to

25   bootstrap the fact that the credibility of its cooperating

CMH        OCR        RDR        FCRR

Proceedings                                    82

1   witnesses is enhanced because they have a confession by one of

2   the co-defendants in this case through one of the

3   co-conspirators.

4            So what I suspect one of their arguments are going

5   to be, at closing is going to be you don't have to take the

6   words of our co-conspirators or our cooperating witnesses

7   because it's corroborated by the words of the actual defendant

8   in this case.  That is an improper prejudicial spillover that

9   no matter what you tell the jury, close your ears as to

10  Mr. Zhang but you're not to consider it against Mr. Zhang when

11  the entire premise of the government's or a large premise of

12  the government's evidence and theory as to my client's

13  culpability is going to be you know Mr. Zhang was involved

14  because Abreu was involved and he admitted it, you heard it

15  from our witness from the witness stand.  That is a

16  prejudicial spillover that cannot be cured by some magical

17  instruction to the jury that says, Close your ears, jury, when

18  you hear that argument by the government or close your ears

19  when you hear that with respect to Mr. Zhang about words from

20  the witness.

21            So we move, we move for severance.

22            THE COURT:  All right.  You've made your motion.

23            I'm not inclined to grant your severance motion

24  because I think at the time that any such testimony comes out,

25  I will make it very plain to the jury that this is testimony

Proceedings                                      83

1   that can only be considered against the defendant Abreu and

2   not any other defendant and the fact that one defendant admits

3   his culpability doesn't necessarily suggest that the other

4   defendants are culpable too.  You know, it's clearly a view of

5   the case that Mr. Abreu may have been involved but other

6   defendants were not.

7          So I'm not inclined to grant a severance.  Again,

8   you know, during the course of the trial, if something comes

9   up or counsel thinks that something was said that creates a

10  need for the severance, then the motion can be renewed at that

11  time.

12         Okay.  Thank you.

13         (Matter concluded.)

14

15

16

17                  *      *      *      *      *

18

19

20

21  I certify that the foregoing is a correct transcript from the
    record of proceedings in the above-entitled matter.

22

23     /s/ Charleane M. Heading              August 22, 2023
    _____     _____
24      CHARLEANE M. HEADING                      DATE

25

CMH      OCR      RDR      FCRR