1352

1      UNITED STATES DISTRICT COURT
       EASTERN DISTRICT OF NEW YORK
2
       - - - - - - - - - - - - - - X
3
       UNITED STATES OF AMERICA,         : 22-CR-208(CBA)
4                                        :
                                         :
5                                        :
           -against-                     : United States Courthouse
6                                        : Brooklyn, New York
                                         :
7                                        :
       QING YU and ZHE ZHANG,            : October 2, 2023
8                                        : 9:00 a.m.
               Defendants.               :
9                                        :
                                         :
10
       - - - - - - - - - - - - - - X
11
              TRANSCRIPT OF CRIMINAL CAUSE FOR JURY TRIAL
12             BEFORE THE HONORABLE CAROL BAGLEY AMON
              UNITED STATES SENIOR DISTRICT COURT JUDGE
13

14     A P P E A R A N C E S :

15     For the Government:   BREON PEACE
                             United States Attorney
16                           Eastern District of New York
                             271 Cadman Plaza East
17                           Brooklyn, New York 11201
                       BY:   DEVON LASH
18                     BY:   NADIA MOORE
                       BY:   GABRIEL PARK
19                           Assistant United States Attorneys

20     For the Defendant     LAW OFFICE OF JAMES KOUSOUROS
       Qing Yu:              260 Madison Avenue, 22nd Floor
21                           New York, New York 10016
                       BY:   JAMES KOUSOUROS, ESQ.
22                     BY:   EVAN  LIPTON, ESQ.

23

24

25

```
1   For the Defendant       MEISTER SEELIG & FEIN LLP
    Zhe Zhang:                   125 Park Ave, 8th Floor
2                                New York, New York 10017
                            BY:  HENRY MAZUREK, ESQ.
3                           BY:  JASON SER, ESQ.

4                           JOEL S. COHEN, P.C.
                                 75 Maiden Lane, Suite 607
5                                New York, New York 10013
                            BY:  JOEL COHEN, ESQ.
6

7   ]
    Proceedings recorded by computerized stenography.  Transcript
8   produced by Computer-aided Transcription.

9

10                        *         *         **

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Proceedings                                                1354

1          (In open court - jury not present.)

2          THE COURTROOM DEPUTY:  Good morning.  This is

3    criminal cause for a trial, 22-cr-208, USA versus Qing Yu,

4    also known as Allen Yu and Zhe Zhang.

5          May the parties state your name for the record,

6    starting with the Government.

7          MS. LASH:  Devon Lash, Nadia Moore, Gabriel Park,

8    and we are joined by Paralegal Specialist Elizabeth Reed and

9    Special Agent Christopher Lin.

10          THE COURT:  Good morning.

11          MR. KOUSOUROS:  Good morning, Judge.

12          James Kousouros for Mr. Yu, along with Evan Lipton

13    and Emma Cole.

14          THE COURT:  Good morning.

15          MR. MAZUREK:  And good morning, Your Honor.  Henry

16    Mazurek, Jason Ser, and Paralegal Specialist Carla Abreu on

17    behalf of Mr. Zhang.

18          THE COURT:  Good morning.

19          We are waiting for the defendants to come up.

20          There is a matter that I just wanted to bring to

21    your attention.  I think it is procedural.  I'm not doing

22    anything at the moment.

23          Can I have the list.

24          I don't know why the marshals are not here.

25          (Pause.)

Proceedings                                              1355

1          THE COURT:  I just wanted to bring to your attention

2    information we have gotten from jurors.  You can be seated.

3    Two jurors:  Wendy Todd, Juror No. 2; and Andrew Parks, Juror

4    No. 3 have travel plans.  Wendy Todd is October 12th and

5    Andrew Parks is October 13th.

6          We are really coming up on those dates.  So I'm just

7    saying to the extent that anybody can expedite this, please do

8    your best to do that.

9          Also, Alternate No. 2, Althea Barton, she's supposed

10   to start a new job tomorrow with Northwell Health.  She needed

11   health insurance.  She needed the job.  I persuaded Northwell

12   Health to take her on as of today, to pay her until October

13   13th, and to give her health insurance, which was I think a

14   real testament to powers of persuasion.  I said almost had my

15   courtroom deputy hum *America the Beautiful* in the background.

16   They were very generous to do that.  But, again, you know,

17   they've told me that she can't stay past that day.  So there

18   is the potential, if this doesn't move along, that we have

19   three jurors gone, which would leave us with just one

20   alternate.  So I wanted to advise the parties of that so that

21   they understood the necessity of moving forward.

22         Have we heard from the marshals?

23         THE COURTROOM DEPUTY:  There was a late load.

24         THE COURT:  They are coming upstairs?

25         THE COURTROOM DEPUTY:  Yes.  Yes.

Proceedings                                        1356

1          MS. LASH:  And, Your Honor, for jurors two and

2     three, how long are their travel plans?  Is it an extended

3     trip or --

4          THE COURT:  One is going to Europe --

5          THE COURTROOM DEPUTY:  One is extended

6     international.  The second one is a domestic for a weekend.

7          MS. LASH:  Fine.

8          THE COURT:  Find out more about that or talk to him

9     -- her about changing that.

10         THE COURTROOM DEPUTY:  Okay.

11         THE COURT:  So the marshals are their way up.

12    Counsel, if you could advise your -- do you think we need to

13    repeat all of this in front of the defendants or can you

14    advise the defendants.

15         MR. KOSOUROS:  I have no problems advising my

16    client.

17         MR. MAZUREK:  Same, Your Honor.

18         THE COURT:  While we are waiting, the Government has

19    indicated in a letter over the weekend, Mr. Mazurek, that they

20    haven't gotten any discovery in terms of your case.  Can you

21    provide that to the Government?

22         MR. MAZUREK:  Yes, Your Honor.  We started providing

23    it over the weekend.

24         THE COURT:  Okay.

25         MS. LASH:  And just as to that discovery, Your

Proceedings                           1357

1   Honor, we have requested we receive it by tomorrow, taking to

2   heart, you know, trying to expedite our case and move it

3   along.  There is a real chance that we could rest even before

4   Friday of this week.  We need the 26.2 material for the

5   witnesses.

6              THE COURT:  Yes.  Mr. Mazurek?

7              MR. MAZUREK:  Yes, Your Honor.

8              THE COURT:  Can you honor that request?

9              MR. MAZUREK:  Yes.

10             THE COURT:  Thank you.

11             The defendants are coming out.

12             (Defendants present.)

13             THE COURT:  Let me just address, Mr. Yu and Mr.

14  Zhang, I have advised your counsel this morning that three

15  jurors either have travel plans or have to start work by

16  October 12th or 13th, and that was Juror No. 2, Juror No. 3

17  and Alternate No. 2, and that they can tell you more details,

18  but I wanted to put that on the record before the marshals had

19  time to bring you up.  That's all we discussed in your

20  absence, other than I asked Mr. Mazurek that he make sure he

21  provide the discovery the Government had requested.  We also

22  addressed that, but nothing of significance to your case.  I

23  just wanted to know that's what we talked about when you

24  weren't here, and we are hoping the jurors are here.

25             THE DEFENDANT:  Thank you.

Proceedings                                    1358

1          THE COURT:  Is your witness here?

2          MS. LASH:  Yes, Your Honor.

3          THE COURT:  Do you want them to take the stand so we

4    can --

5          MR. KOUSOUROS:  Who are you calling?

6          MS. LASH:  Brainys Acosta Pena.

7          And Your Honor, he will be testifying through a

8    Spanish interpreter.

9          THE COURT:  Okay.  I have separated the jurors out a

10   bit.  I have asked the jurors to wear masks.  I appreciate you

11   all wearing the mask.

12         Mr. Zhang, you should wear a mask.  You know, we had

13   three jurors get COVID and I'm behind a screen.  I'd be happy

14   to wear for solidarity.

15         MR. KOUSOUROS:  While we're waiting, when we are up

16   examining or cross-examining.

17         THE COURT:  You don't have to wear it for

18   questioning and the witness doesn't have to wear it.

19         Are they here?

20         THE COURTROOM DEPUTY:  No, we are still waiting, at

21   least two.

22         Excuse me.  9 o'clock arrival didn't stick with a

23   few, I guess.

24         (Pause in the proceedings.)

25         THE COURT:  Okay.  So we're missing just one juror

Proceedings                                    1359

1  now.

2          MS. LASH:  Your Honor, while we are waiting, there

3  is an issue that I wanted to raise.  I don't know if you want

4  to do it at sidebar or I could ask the witnesses to step out.

5  It doesn't relate to the witness's testimony.

6          THE COURT:  It's all right.  If it doesn't relate to

7  the witness's testimony, it's all right.

8          MS. LASH:  Your Honor, the defense informed us that

9  they have subpoenaed retired Detective Michael Galgano to

10 testify about his investigation into the homicide, as well as

11 his interviews of Carlos Senquiz, and his receipt of the

12 Carlos Senquiz phone.

13         As to the first point, the Government continues to

14 believe that Detective Galgano's investigation into the

15 homicide is not relevant to the case and we'd like an offer of

16 proof as to what testimony they're seeking to elicit

17 concerning the interviews of Carlos Senquiz as, you know, we

18 believe this is hearsay information.  And, again, the

19 information contained on the phone, that information, while he

20 might recognize the phone as the phone collected from Mr.

21 Senquiz, the content of the phone is hearsay and we don't

22 believe it is admissible.

23         THE COURT:  Mr. Mazurek.

24         MR. MAZUREK:  Yes, Your Honor, just as the

25 Government has done with respect to the collection of evidence

Proceedings                                          1360

1   and the introduction --

2            THE COURT:  I'm sorry.  The jurors are here.

3            MR. MAZUREK:  We will take this up later or --

4            THE COURT:  Yes.

5            We just spaced the jurors out a little bit so they

6   are not on top of each other.

7            They are going to be sitting --

8            MS. LASH:  Your Honor, Ms. Campbell, I'm not sure if

9   we have sworn the interpreters.

10           THE COURT:  We will in front of the jurors.

11           (Pause in the proceedings.)

12           THE COURT:  I also appreciate everyone honoring the

13  request to wear the mask, because I just think we can't be too

14  cautious.

15           (Pause.)

16           THE COURT:  Good morning, ladies and gentlemen.

17           THE JURY:  Good morning.

18           THE COURT:  Please be seated.

19           Sorry for all of the confusion.  My idea was to have

20  you spaced out a little bit as I mentioned in terms of the

21  COVID issues we have had.  The parties are wearing masks.  And

22  the only time that I am not requiring a party to wear a mask

23  is when they are questioning, and the witnesses do not have to

24  wear a mask when they are answering.  We have these screens in

25  front of them.

Proceedings                                    1361

1          So, welcome.

2          And I think we are ready to go.  Math is not our

3   strong suit here when it comes to organizing.  I think we have

4   got it down now.

5          All right.  Ms. Lash.

6          MS. LASH:  Thank you, Your Honor.

7          THE COURT:  We need to swear in the interpreters

8   first and then the witness.

9          THE COURTROOM DEPUTY:  Yes.

10          Interpreters, could you raise your right hand

11   please?

12          (Interpreters sworn.)

13          THE COURTROOM DEPUTY:  Thank you.

14          May the witness stand and raise his right hand.

15          Do you solemnly swear or affirm that the answers and

16   testimony you are about to give to the Court will be the truth

17   the whole truth and nothing but the truth?

18          THE WITNESS:  Yes, I swear.

19          THE COURTROOM DEPUTY:  Thank you.

20          (Witness sworn.)

21          THE COURTROOM DEPUTY:  May you please state and

22   spell your name for the record.

23          THE WITNESS:  Brainys Acosta.

24          THE COURTROOM DEPUTY:  Thank you.  You may be

25   seated.

Proceedings                                              1362

1          THE COURT:  I'm sorry.  What is your full name?

2          THE WITNESS:  Brainys Alberto Acosta Pena.

3          THE COURT:  Okay.  You may inquire.

4          (Continued on next page.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1   BRAINYS ALBERTO ACOSTA PENA,

2        called as a witness, having been first duly

3        sworn/affirmed, was examined and testified as follows:

4   DIRECT EXAMINATION

5   BY MS. LASH:

6   Q    Mr. Acosta Pena, you may be seated.

7             Good morning.

8   A    Good morning.

9   Q    How old are you?

10  A    25.

11  Q    Where do you live?

12  A    Jackson Heights.

13  Q    Are you employed?

14  A    Yes.

15  Q    What do you do for work?

16  A    Barber.

17  Q    Where were you born, Mr. Acosta Pena?

18  A    In the Dominican Republic.

19  Q    And in what year did you move to the United States?

20  A    2017.

21  Q    Mr. Acosta Pena, are you familiar with an individual

22  named Anthony Abreu?

23  A    Yes.

24  Q    How do you know him?

25  A    Because he is my cousin's husband.

1  Q    What is your cousin's name?

2  A    Soiry.

3  Q    Are Anthony Abreu and your cousin Soiry currently

4  married?

5  A    I don't know what to say there.

6  Q    In what year did you first meet Anthony Abreu?

7  A    2018.

8  Q    And after meeting him in 2018, how many times would you

9  say you saw him in person?

10  A    About four, five times.

11  Q    At what types of events would you see Anthony Abreu in

12  person?

13  A    Family events, birthday parties, things of the sort.

14  Q    Sitting here today, how would you describe your

15  relationship with Anthony Abreu?

16  A    I don't have a relationship with him.

17  Q    Mr. Acosta Pena, I would like to show you a photograph

18  that is in evidence marked as Government Exhibit 4.

19        Can you see the photograph on the screen in front of

20  you, Mr. Acosta Pena?

21  A    Yes.

22  Q    Who is this person?

23  A    Anthony.

24  Q    Mr. Acosta Pena, I would like to ask you a few questions

25  about a vehicle that you owned in 2019.

Acosta Pena - direct - Lash                    1365

1  A    Okay.

2  Q    In early 2019, let's say, January of 2019, did you own a

3  car?

4  A    No.  No. It was in February.

5  Q    In January of 2019, were you looking to purchase a car?

6  A    Yes.

7  Q    What kind of car were you looking to purchase?

8  A    2008 Honda Accord V6.

9  Q    Why were you looking to purchase a 2008 Honda Accord V6?

10 A    Because that was the car that I liked.  It was my

11 favorite car.

12 Q    Without telling us what you said, did you talk to anyone

13 about buying a car in early 2019?

14 A    Yes.

15 Q    Who did you talk to?

16 A    Anthony.

17 Q    And why did you talk to Anthony about buying a car?

18 A    Well, because he had friends or, rather, a friend that

19 used to buy vehicles at auction, so it occurred to me to ask

20 him.

21 Q    I would like to show you another photograph that's marked

22 for identification as Government Exhibit 459.

23        MS. LASH:  I will ask Ms. Reed, could you flip

24 through the five pages of Government Exhibit 459 for the

25 witness.

Acosta Pena - direct - Lash                    1366

1   Q    Can you see those photographs, Mr. Acosta Pena?

2   A    Yes.

3   Q    Do you recognize these photographs?

4   A    Yes.

5   Q    And what is being photographed in these pictures?

6   A    The car that I bought.

7   Q    And what type of car is it?

8   A    A 2003 Honda Accord V6.

9   Q    Did you take these photographs?

10  A    Yes.

11  Q    Are they fair and accurate depictions of the Honda Accord

12  that you photographed?

13  A    Yes.

14       MS. LASH:  Your Honor, the Government offers

15  Government Exhibit 459 into evidence.

16       THE COURT:  459 will be received.

17       (Government's Exhibit 459 received in evidence.)

18       MS. LASH:  Ms. Campbell, if we can dim the lights

19  just because I noticed some of the jurors don't have screens

20  outside the box.

21       THE COURTROOM DEPUTY:  I'm sorry, I'm pressing the

22  button but it is not working.

23       MS. LASH:  Just one moment.

24       (Pause.)

25       THE COURTROOM DEPUTY:  I'm sorry, Ms. Lash, it is

1   not dimming as it should.

2          MS. LASH:  No problem, Ms. Campbell.

3          Could I, Your Honor, turn the screen here for the

4   jurors so they could have a clear view?

5          THE COURT:  Yes.

6          Okay.  Everyone can see the exhibit?

7          JURORS:  Yes.

8          THE COURT:  Okay.  And for the jurors in the front,

9   if you just turn a bit to your right, you can see it on that

10  screen too.

11         MS. LASH:  I do have paper copies, Your Honor, if

12  that would be easier.

13         THE COURT:  Can everyone see it?

14         THE JURY:  Yes.

15         THE COURT:  Okay.

16  BY MS. LASH:

17  Q    Mr. Acosta Pena, looking at the first page of Government

18  Exhibit 459, what kind of car is this?

19  A    It's a 2003 Honda Accord V6.

20  Q    And what color is the car?

21  A    White.

22         MS. LASH:  Ms. Reed, if we could go to the second

23  page.

24  Q    Is this a picture of the same car?

25  A    Yes.

1          MS. LASH:  And the third page, Ms. Reed.

2    Q    Is this another photograph of that same car?

3    A    Yes.

4          MS. LASH:  The fourth page, Ms. Reed.

5    Q    On the right side, the white car, is that a photograph of

6    the same Honda Accord?

7    A    Yes.

8    Q    I'm sorry.  I said the right side.  I meant the left side

9    of the photograph.

10   A    Yes.

11   Q    What kind of car is partially shown on the right side of

12   the photograph?

13   A    A Honda.

14   Q    Who did that car belong to?

15   A    Anthony's.

16         MS. LASH:  And the fifth page, Ms. Reed.

17   Q    What's pictured here, Mr. Acosta Pena?

18   A    Some rims.

19         MS. LASH:  We can take that down.  Thank you.

20   Q    I would like to ask you some questions about your

21   purchase of that car.

22   A    Okay.

23   Q    Who sold you the Honda Accord?

24   A    Anthony.

25   Q    How did you communicate with Anthony about the purchase

1   of the car?

2   A    I communicated with him through SnapChat.

3   Q    What is SnapChat, Mr. Acosta Pena?

4   A    It's an application where you can share notes and videos

5   and you can also communicate with other people.

6   Q    Did you go see the Honda Accord in person?

7   A    Yes.

8   Q    On what date did Anthony contact you about seeing the car

9   in person?

10  A    The 16th.  Sorry.  February 13th, 2019.

11  Q    After receiving the message from Anthony about seeing the

12  car, what did you do?

13  A    I went to see it.

14  Q    On what date did you go see the car?

15  A    February 16th.

16  Q    Where did you go see the car in February -- and I'm

17  sorry, what year was this?

18  A    2019.

19  Q    Where did you go see the car on February 16th of 2019?

20  A    His house.

21  Q    I would like show you what has been marked for

22  identification as Government Exhibit 567.

23       MS. LASH:  This is just for the witness only.

24  Q    When you can see the photos on the screen, I will ask Ms.

25  Reed to page through them.

Acosta Pena - direct - Lash                    1370

1          There are four photographs here.  Do you recognize

2    this location?

3    A    Yes.

4    Q    And what location is this?

5    A    Where Anthony used to live.

6    Q    And is this the location where you saw the Honda Accord

7    on February 16th of 2019?

8    A    Yes.

9          MS. LASH:  Your Honor, apologies.

10   Q    Do these photographs fairly and accurately depict the

11   place where you saw the car?

12   A    Yes.

13         MS. LASH:  Your Honor, the Government offers

14   Government Exhibit 567 into evidence.

15         THE COURT:  567 will be received.

16         (Government's Exhibit 567 received in evidence.)

17   BY MS. LASH:

18   Q    Looking at the first photograph on the screen in front of

19   you, Mr. Acosta Pena, what do we see in the middle of the

20   photograph?

21   A    The driveway of the house where he lived.

22   Q    And looking again in the middle of the photograph, you

23   see vehicles parked inside that driveway.  What location is

24   that?

25   A    That's the parking lot where Anthony kept the Honda.

Acosta Pena - direct - Lash                1371

1    Q    I'd also like to show you one more photograph.

2         MS. LASH:  This is in evidence, it is Government

3    Exhibit 1001.

4    Q    What is this a photograph of, Mr. Acosta Pena?

5    A    Several cars on the parking lot.

6    Q    And do you recognize this location?

7    A    Yes.

8    Q    And what is it?

9    A    The parking lot where the car was.

10   Q    Using this photograph, can you describe where the white

11   Honda Accord was parked when you saw it on February 16, 2019?

12   A    On the left side, right here, behind the black car that

13   is there on the left.

14   Q    Thank you.

15        MS. LASH:  We can take this down, Ms. Reed.

16   Q    When you arrived on February 16th of 2019 to look at the

17   car, who was there?

18   A    Anthony.

19   Q    Was anyone else there?

20   A    No.

21   Q    What condition was the Honda Accord in?

22   A    Well, inside it did not have a radio or the speakers or

23   the lights, the trunk was disorganized, the speakers were

24   missing, and the trunk was damaged.

25   Q    Can you tell me about the exterior of the Honda Accord?

Acosta Pena - direct - Lash                    1372

1  A    Well, on the exterior, the Honda inscription was missing

2  three letters, and on the rear right-hand side of the car

3  there was rust.

4  Q    Did the car have a license plate?

5  A    No.

6  Q    Did you take any photographs or videos of this car on

7  February 16th of 2019?

8  A    Yes.

9  Q    I'd like to show you what's marked for identification as

10  Government Exhibit 319.

11          MS. LASH:  I will ask Ms. Reed to pull up 319 and

12  play the short video for the witness, please.

13          (Video playing.) (Video stopped.)

14  Q    Do you recognize this video, Mr. Acosta Pena?

15  A    Yes.

16  Q    Did you take this video?

17  A    Yes.

18  Q    Does it fairly and accurately depict the Honda Accord on

19  February 16th of 2019?

20  A    Yes.

21          MS. LASH:  Your Honor, the Government offers

22  Government Exhibit 319 into evidence.

23          THE COURT:  319 will be received.

24          (Government's Exhibit 319 received in evidence.)

25          MS. LASH:  I'd like to publish this video to the

Acosta Pena - direct - Lash                    1373

1  jurors.

2         (Exhibit published.)

3         MS. LASH:  Ms. Reed, if you could play this video.

4         (Video playing.)

5         MS. LASH:  Ms. Reed, if we could go to eight seconds

6  in this video, please.

7         (Video playing.)

8  Q    Mr. Acosta Pena, the car in the background, what car was

9  that?

10 A    The Honda that belonged to Anthony.

11 Q    And what color was that Honda?

12 A    Gold.

13 Q    Why did you take this video of the white Honda Accord on

14 February 16th of 2019?

15 A    Because I was excited since it was my first car.

16 Q    Did you make a decision whether or not you would purchase

17 that car?

18 A    Yes.

19 Q    How much did you agree to pay for the car?

20 A    2,300.

21 Q    Did you pay the full $2,300 for the Honda Accord?

22 A    No.

23 Q    What happened?

24 A    I gave him $1,700 cash.  And then for the remainder, he

25 brought another Honda to the parking lot at my house and he

Acosta Pena - direct - Lash                    1374

1    parked it there as credit.

2         MS. LASH:   Ms. Reed, if we could pull up Government

3    Exhibit 459, page 4.  That's in evidence.

4         (Exhibit published.)

5    Q    Mr. Acosta Pena, again, looking at the right side of this

6    photograph, is that the car that Anthony parked at your house?

7    A    Yes.

8    Q    Mr. Acosta Pena, what, if any, paperwork did you receive

9    in the purchase of the car?

10   A    The title.

11   Q    And whose name was on the title that you received?

12   A    Anthony's.

13   Q    When did you take possession of the car?

14   A    When he brought it to my house.

15   Q    And when approximately did that happen?

16   A    About a week after I saw it.

17   Q    Now, I'd like to show you another video, Mr. Acosta Pena.

18   This is marked for identification as Government Exhibit 317.

19        MS. LASH:   And Ms. Reed, for efficiency-sake, I'm

20   going to play Government Exhibit 317 and another video marked

21   for identification as Government Exhibit 318.

22        (Video playing.)

23   Q    Mr. Acosta Pena, do you recognize what has been marked as

24   Government Exhibit 317, the first video clip that you saw?

25   A    Yes.

Acosta Pena - direct - Lash                    1375

1    Q    What is this a video of?

2    A    It's a video of the car I bought.

3    Q    Did you take this video?

4    A    Yes.

5    Q    Now, Government Exhibit 318, the second video that you

6    viewed, do you recognize that video?

7    A    Yes.

8    Q    And what is shown in that video?

9    A    The white Honda.

10   Q    Did you also take the video in Government Exhibit 318?

11   A    Yes.

12   Q    Are Government Exhibits 317 and 318 fair and accurate

13   depictions of the white Honda Accord?

14   A    Yes.

15            MS. LASH:  Your Honor, the Government offers

16   Government Exhibits 317 and 318 into evidence.

17            THE COURT:  All right.  They will be received.

18            (Government's Exhibits 317 and 318 received in

19   evidence.)

20            MS. LASH:  Ms. Reed, if we could put Government

21   Exhibit 317 on the screen, please, and Government Exhibit --

22   before we get to 318, for the witness only.

23   Q    Can I show you one more photograph, Mr. Acosta Pena, this

24   is marked as Government Exhibit 317-A.

25            Do you recognize Government Exhibit 317-A?

Acosta Pena - direct - Lash                    1376

1  A    Yes.

2  Q    Is this a still capture for a paused photograph from

3  Government Exhibit 317?

4  A    Yes.

5         MS. LASH:  Your Honor, the Government offers

6  Government Exhibit 317-A into evidence.

7         THE COURT:  It will be received.

8         (Government's Exhibit 317-A received in evidence.)

9         MS. LASH:  Ms. Campbell, if we can go Government

10  Exhibit 317-A to the jurors.  Thank you.

11  Q    Mr. Acosta Pena, you said this is a screen capture of the

12  video we just watched; is that right?

13  A    Yes.

14  Q    And what do you notice about the logo of the car in this

15  screen capture?

16  A    There are letters missing.  There are three letters

17  missing.

18  Q    Mr. Acosta Pena, when did you take the video in

19  Government Exhibit 317?

20  A    I believe it was on May 12th.  I don't remember the year,

21  but it was on May 12th.

22  Q    And Mr. Acosta Pena, do you recall testifying before a

23  grand jury in this matter?

24  A    Yes.

25  Q    I'd like to show you a transcript of your testimony

Acosta Pena - direct - Lash                    1377

1   before the grand jury to see if it refreshes your recollection

2   as to the date.

3   A    Okay.

4            MS. LASH:  Ms. Reed, if we can pull up what has been

5   marked for identification as 3500-BA-T8 and go to page 23.

6            (Exhibit published.)

7            MS. LASH:  And Madam Interpreter, if you could read

8   to the witness from lines 23.

9            THE INTERPRETER:  Could that be blown up for a bit

10  for the interpreter.

11           MS. LASH:  I have a paper copy, Your Honor, if I

12  could approach.

13           THE INTERPRETER:  Thank you.

14           What were the lines for the interpreter, please?

15           MS. LASH:  Page 23, starting at line 20 through page

16  24, ending at line 2, please.

17           MR. MAZUREK:  Your Honor, just for the record, this

18  will be just to the witness.

19           THE COURT:  Yes, it is.

20  BY MS. LASH:

21  Q    Mr. Acosta Pena, on what date did you take the video that

22  we viewed in Government Exhibit 317?

23  A    May 22, 2019.

24           I apologize to everyone, because it's been so many

25  years and, well, you know.

Acosta Pena - direct - Lash                 1378

1   Q    Now, I'd like to show you what's in evidence as
2   Government Exhibit 318.
3          MS. LASH:  Ms. Reed, if we could play this short
4   clip for the jurors as well.
5          (Video playing.)  (Video stopped.)
6   Q    On what date did you take the video in Government Exhibit
7   318?
8   A    May 22, 2019.
9   Q    And the video that's -- I'm sorry, the car that is
10  depicted in Government Exhibits 317 and 318, who did you
11  purchase that car from?
12  A    From Anthony.
13  Q    And do these videos depict the same vehicle that you saw
14  on February 16th of 2019?
15  A    Yes.
16  Q    Do you still own the Honda Accord, Mr. Acosta Pena?
17  A    No.
18  Q    What did you do with the car?
19  A    I sold it.
20  Q    How did you advertise it for sale?
21  A    I advertised it on a website called Offer Up.
22  Q    What is Offer Up?
23  A    It's a site where you can buy and sell all different
24  kinds of items.
25  Q    Like Ebay?

Acosta Pena - direct - Lash                    1379

1  A    Yes.  It's like --

2  Q    I'd like to show you what's in evidence as --

3          MS. LASH:  My apologies.  I missed the answer from

4  the interpreter.

5  A    Yes.  It's like Ebay and Amazon, yes.

6  Q    Thank you.

7          Mr. Acosta Pena, I would like to show you what's in

8  evidence as Government Exhibit 459.

9          Is this the car that you advertised on Offer Up?

10 A    Yes.

11 Q    And who did you purchase this car from?

12 A    From Anthony.

13 Q    Did you make any changes to the car after you purchased

14 it?

15 A    Yes.

16 Q    What did you do?

17 A    I changed the rims.

18 Q    Why did you do that?

19 A    Because I liked those rims better.

20         MS. LASH:  Thank you, Your Honor.  No further

21 questions.

22         THE COURT:  Mr. Kousouros, do you have anything?

23         MR. KOUSOUROS:  I do not, Your Honor.

24         THE COURT:  Okay.  Do you, Mr. Mazurek?

25         MR. MAZUREK:  Yes, Your Honor.

Acosta Pena - cross - Mazurek                    1380

1   CROSS-EXAMINATION

2   BY MR. MAZUREK:

3   Q    Good morning, Mr. Acosta Pena.

4   A    Good morning.

5   Q    My name is Henry Mazurek, and I represent the defendant

6   Zhe Zhang in this case.

7            And we've never met before; correct?

8   A    Uh-hum.  No, never.

9   Q    You just have to answer out loud so that the reporter can

10  record your answers.  Okay?

11  A    Okay (in English.)

12  Q    Have you ever heard the name Zhe Zhang before?

13  A    No.

14  Q    Have you ever met Zhe Zhang?

15  A    No.

16  Q    You were asked questions on direct examination about a

17  fellow by the name of Anthony Abreu; right?

18  A    Yes.

19  Q    And this is someone who you're not related by blood but

20  you're related because your cousin married him; correct?

21  A    Yes.

22  Q    Okay.  And I think you -- correct me if I am wrong, but I

23  think you testified on direct examination that you came from

24  the Dominican Republic in or about 2017 or 2018; is that

25  right?

Acosta Pena - cross - Mazurek                 1381

1              THE INTERPRETER:  Interpreter's correction.

2    A    2017.

3    Q    Okay.  And had you met Mr. Abreu before that in the

4    Dominican Republic?

5    A    He traveled there with my cousin.  I just saw him there.

6    That was it.

7    Q    Okay.  So the first time that you -- well, when he

8    traveled there with your cousin, you saw him in family

9    gatherings, I imagine, in the Dominican Republic?

10   A    Yes, I saw him one time.

11   Q    Okay.  And then you saw him again when you moved to New

12   York?

13   A    Yes.

14   Q    And you moved to the area in Flushing, Queens?

15   A    Yes.

16   Q    And you lived there with your mother?

17   A    Yes.

18   Q    Okay.  And, so, when you moved to Flushing, you learned

19   that Mr. Abreu also lived nearby in the Corona neighborhood of

20   Queens?

21   A    Yes.

22   Q    And, so, you got to see him a little bit more than in the

23   Dominican Republic once you moved to Queens; right?

24   A    I didn't see him that many times.

25   Q    But at least several times; is that right?

Acosta Pena - cross - Mazurek                1382

1  A    The four to five times that I saw him were at family

2  get-togethers and at parties, things like that.

3           MR. MAZUREK:  I'm going show you -- just for the

4  witness -- what has been marked for identification as

5  Government Exhibit 397, if we can put that on the screen.

6           And for the Government, it should be on the flash

7  drive.

8           MS. LASH:  Your Honor, if we can have a minute to

9  review.

10           THE COURT:  Yes.

11           MS. LASH:  Objection to relevance, Your Honor.

12           MR. MAZUREK:  To establish the relationship with

13  Pena, Your Honor.

14           THE COURT:  With Mr. Abreu?

15           MR. MAZUREK:  Yes.

16           THE COURT:  All right.  I will allow him to identify

17  it.

18  BY MR. MAZUREK:

19  Q    Okay.  So if you could look on your screen, Mr. Acosta

20  Pena?

21           Is it on your screen?

22  A    Yes.

23  Q    Great.

24           Do you recognize the individual shown in that

25  photograph?

Acosta Pena - cross - Mazurek                    1383

1          THE COURT:   I think just the man --

2    A    Yes.

3          THE COURT:   -- identified in the photograph.

4    Q    And specifically, do you see Mr. Abreu in that

5    photograph?

6    A    Yes.

7               (Continued on next page.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Acosta Pena - cross - Mazurek                    1384

1   (Continuing.)

2   BY MR. MAZUREK:

3   Q    And do you see yourself?

4   A    Yes.

5        MR. MAZUREK:  Your Honor, I move for admission of

6   Z-97.

7        THE COURT:  All right.

8        But can you tell me, is Mr. Abreu, where is he in

9   the photograph?  Is he on the right or on the left or in the

10  middle?

11       THE WITNESS:  On the right.

12       THE COURT:  In the pink shirt?

13       THE WITNESS:  Yes.

14       THE COURT:  And you are where?

15       THE WITNESS:  On the left side the white shirt.

16       THE COURT:  All right.

17       Z-97 will be received.

18       MR. MAZUREK:  Thank you, Your Honor.

19       (Defendant's Exhibit Z-97 was received in evidence.)

20  Q    And is your cousin that we've been talking about, Soiry,

21  also in this photograph?

22  A    Yes.

23  Q    And she's the woman in the middle; is that right?

24  A    Yes.

25  Q    So, again, you would see Mr. Abreu at these kinds of

Acosta Pena - cross - Mazurek                1385

1  family events like a birthday party that's depicted in the

2  photograph, right?

3  A    Yes.

4  Q    And through these meetings, you learned that Mr. Abreu

5  was someone who was interested in automobiles and cars, right?

6  A    Yes.

7  Q    He was someone who had access to buy and sell cars; is

8  that fair?

9  A    Yes.

10  Q    And -- I have another question.

11         THE COURT:  You can take down the photograph.

12         MR. MAZUREK:  I'm sorry?

13         THE COURT:  I said you can take down the exhibit.

14         MR. MAZUREK:  You can take down that photograph.

15  Q    You were asked questions on direct examination about a

16  couple of cars, the one that you purchased, right?  The white

17  Honda, right?

18  A    Yes.

19  Q    And before you saw that car, you were interested in

20  purchasing a Honda Accord, right?

21  A    Yes.

22  Q    Did you always like Honda Accords even when you were back

23  in the Dominican Republic?

24  A    Yes.

25  Q    And is it fair to say that the Honda Accord is a car that

Acosta Pena - cross - Mazurek                1386

1  is very poplar in the Dominican Republic?

2          MS. LASH:  Objection.

3          THE COURT:  Yeah, I'll sustain the objection.

4          MR. MAZUREK:  Okay.

5  Q    But, anyway, you were interested in that particular brand

6  of car back in 2019, right?  A Honda Accord, I'm sorry?

7  A    Yes.

8  Q    And you also testified about going to Mr. Abreu's house

9  in Corona, right, back then?

10 A    Yes.

11 Q    And I think we were looking at some photographs where

12 there seemed to be like a parking lot in the back of the house

13 where he lived, right?

14 A    Yes.

15         MR. MAZUREK:  And if we can put on the screen what's

16 already been admitted as GX Government Exhibit 1001, page two.

17 Q    Okay.  So, you see what's on the screen, Mr. Acosta Pena?

18 A    Yes.

19 Q    And is this the parking lot that was in the back of the

20 building where Mr. Abreu lived in 2019?

21 A    Yes.

22 Q    Okay.  And there are a number of cars in this video -- on

23 this picture.  Did you take this photograph?

24 A    No.

25 Q    But you recognize the lot as the one in the back of the

Acosta Pena - cross - Mazurek                    1387

1  Abreu home?

2  A    Yes.

3  Q    And the times that you visited the Abreu house, I mean,

4  were there also lots of cars in that lot?

5  A    I wouldn't be able to say because I would come in using

6  the front door.  I never came in through the parking lot.

7  Q    Okay.  So the only times you went to the parking lot was

8  to inspect the cars or the car that you were looking at?

9  A    Yes.

10 Q    Okay.  And did you know whether Mr. Abreu owned a bunch

11 of or had access to a bunch of Hondas back in 2019?

12         THE INTERPRETER:  During 2019?

13         MR. MAZUREK:  Yes.

14         THE INTERPRETER:  Thank you.

15 A    I don't know.

16 Q    Okay.  You said that he himself had a gold Honda that was

17 parked at your house for awhile?

18 A    Yes.

19 Q    And then he's also the one who said he found this white

20 Honda for you, right?

21 A    Yes.

22 Q    Did you see him with any other Hondas?

23 A    No.

24 Q    And talking about the car that you eventually purchased

25 from him, you said that you were -- were you talking to him

Acosta Pena - cross - Mazurek          1388

1    about wanting to by a honda Accord sometime in January of

2    2019?

3    A    Yes.

4    Q    Okay.  And did you have a specific car in mind?

5    A    Yes.

6    Q    And what kind of car was that?

7    A    It was a Honda Accord, but a different model.

8    Q    Okay.  Was it a 2010 V6 Honda Accord?

9    A    Yes.

10   Q    And you had found it online or sent a picture to

11   Mr. Abreu?

12   A    Yes, I sent him a picture.

13   Q    Okay.  And, again, this was sometime in January of 2019,

14   right?

15   A    Yes.

16   Q    Now, you didn't purchase the vehicle in the photo you

17   sent to Mr. Abreu, right?

18   A    No.

19   Q    Instead, sometime later, Mr. Abreu suggested that he had

20   access to another vehicle, another Honda Accord?

21   A    Yes.

22   Q    Now, you don't know where Mr. Abreu obtained the Honda

23   Accord that you ultimately purchased, right?

24   A    I don't know.

25   Q    And you don't know when he had that car -- when he first

1    got that car, I should say?

2    A    I don't know.

3    Q    Okay.  You first saw the car on or about February 16th of

4    2019, is that right?

5    A    Not on the sixth.

6    Q    The 16th?  I'm sorry.

7    A    Yes.

8    Q    Okay.  So the record is clear, it's February 16th when

9    you first saw the car?

10   A    Yes.

11   Q    And you don't know how much in advance of February 16th

12   Mr. Abreu had the car?

13   A    I don't know.

14   Q    And the first time you said you saw the car was at this

15   parking lot that's on the screen, right, GX 1001?

16   A    Yes.

17   Q    Okay.

18              MR. MAZUREK:  If we could take that photograph down

19   and put on the screen what's already been admitted into

20   evidence as Government Exhibit 319.  It's a video.  And if we

21   could play the short video.

22              (Video played.)

23   Q    So, Mr. Acosta Pena, you took that video, right?

24   A    Yes.

25   Q    And where did you take that video?

Acosta Pena - cross - Mazurek                    1390

1   A    At the parking lot where he lived.

2   Q    Okay.  Was that the first time that you saw the car?

3   A    Yes.

4   Q    Did you agree to purchase the car on that day?

5   A    Yes.

6   Q    Did you take the car from Mr. Abreu to your house on that

7   day?

8   A    No.

9   Q    Was there a reason why you didn't just take it on that

10  day?

11  A    I did not have a license and that is why I did not want

12  to drive it home.

13  Q    Okay.  You intended to get a license because you're

14  buying a car, right?

15  A    Yes.

16  Q    And you, in fact, did take the car with you to your house

17  about a week or so later; is that right?

18  A    Yes.

19  Q    And you still did not have a license at that point in

20  time, right?

21  A    Right.

22  Q    So did Mr. Abreu drive you to your house with the car?

23  A    Yes.

24  Q    Okay.  And you didn't do that on February 16th, you did

25  that sometime a week or so later, right?

1  A    Yes.

2  Q    Do you know whether there was an issue about how the car

3  was working on February 16th is the reason why you didn't take

4  it on that date?

5  A    The car had small issue and I also did not have a license

6  to be able to drive it.

7  Q    Do you know that what that issue was that the car had?

8  A    It was, like, a bad sparkplug.  It was something simple

9  that we -- something we replaced later.

10 Q    So the car was just not -- it was not working at that

11 point in time on February 16th?

12 A    The car did start and it was drivable, I just didn't want

13 to bring it with me on the 16th of February.

14 Q    Okay.  But what about, you said there was a sparkplug

15 issue?

16 A    Yes.

17 Q    Okay.  So it was just you didn't have a license and,

18 also, you wanted to have the car repaired before you took it

19 away?

20 A    No.  I repaired the car myself.

21 Q    You later repair --

22 A    Once the car was parked at my house, I replaced the

23 broken sparkplug.  That was it.

24 Q    Okay.  And you learned about the broken sparkplug on the

25 16th from Mr. Abreu, correct?

Acosta Pena - cross - Mazurek                    1392

1   A    It was on my own.  I realized it myself.

2   Q    You inspected the car and realized that there was that

3   problem on the 16th?

4   A    Yes.

5   Q    Okay.  And I think you testified on direct, was there --

6   that was no drivers -- there was no license plate on the car

7   when you saw it on the 16th of February?

8   A    No.

9   Q    So when you took the car a week later from Abreu's

10  parking lot to your house, did you drive it without a license

11  plate?

12  A    No, he put a license plate on it to be able to bring it

13  to my home.

14  Q    And was that a Pennsylvania license plate?

15  A    Yes.

16  Q    And was it a paper plate or was it a metal plate?

17  A    Metal.

18  Q    Now, when you inspected the car on February 16th, you

19  were talking about, I think on direct examination, the

20  condition it was in, if you remember?

21  A    Yes.

22  Q    And you were first asked about the interior of the car,

23  correct?

24  A    Yes.

25  Q    What was the style of the interior of the car, if you

Acosta Pena - cross - Mazurek                1393

1  remember?

2  A    Well, the car was missing the speakers, the radio, the

3  lights in the interior, and then the trunk was disorganized

4  and it was also missing speakers.  That was it.

5  Q    Would you say that the car was clean or dirty?

6  A    Dirty.

7  Q    And when you say the trunk was disorganized, was there

8  damage to the trunk?

9  A    No, it was also, like -- everything was out of place.

10 Everything had to be back -- to be put back in place.

11 Q    Okay.  And you said that the lights weren't working.

12 Which lights were not working in the car?

13 A    Interior lights.

14 Q    Okay.  So when you got in the car, there would be no --

15 there's no lights when you opened or closed the doors?

16 A    Exactly.

17 Q    All right.  Now, the exterior of the car, I think you

18 were asked questions about that as well, right?

19 A    Yes.

20 Q    Did you notice marks on the car, on the exterior?

21 A    The car was missing three letters.

22 Q    Okay.  Yeah, you testified to that on direct about that.

23 You're talking about the Accord emblem, the name Accord on the

24 bumper, or on the trunk?  I'm sorry.

25 A    Yes, yes.

Acosta Pena - cross - Mazurek                 1394

1   Q      And what three letters were missing?

2   A      A-C-C.

3   Q      And that's one of the -- I guess the thing that you

4   noticed the most about the exterior of the car?

5   A      That and only that it had a small rusted area in the

6   back.  That's it.

7   Q      Where on the back?

8   A      The right rear door, like, on the fender line in the

9   back.

10  Q      Okay.  And that's the right -- so it's the passenger rear

11  door had rust on the bottom of the fender by the fender line?

12  A      Yes.

13  Q      Other than that, you didn't notice, when you were looking

14  around the car, any problems with the exterior, any damage I

15  should say?

16  A      Exactly.

17  Q      Okay.  Now, you took the car sometime is it, I guess, the

18  week of February 23rd of 2019?

19  A      Yes.

20  Q      And before we get to that, one other question I had about

21  the exterior of the car.  I asked you this question about the

22  interior.  The exterior, would you say it was clean or dirty

23  when you saw it?

24  A      Dirty.

25  Q      I'm sorry?

Acosta Pena - cross - Mazurek                    1395

1   A    Dirty.

2   Q    Oh, thank you.  When you say dirty, that means it looked

3   like it hadn't been washed in a while; is that what you mean?

4   A    Yes.

5   Q    Thank you.  So you took the car back to your house, or

6   the house where you were living, during the week of

7   February 23rd of 2019; is that right?

8   A    Yes.

9   Q    And how long did you own that car from the time that you

10  had it at your house from February 23rd until you sold it?

11  A    About seven or eight months.

12  Q    Okay.  And you ended up selling it because you never

13  obtained your driver's license; is that right?

14  A    Because of the insurance.  Insurance was very high around

15  there.

16  Q    Yeah.  So you couldn't afford the car insurance and you

17  decided that, you know, there's no point in keeping the car?

18  A    Yes.

19  Q    Now, you said you made some changes to the car before you

20  sold it, right?

21  A    Yes, I made one change.

22  Q    Which was just the rims of the car?

23  A    Yes.

24  Q    Did you have to tinker any -- and you said you had to

25  change a sparkplug.  Did you have to tinker with the engine at

Acosta Pena - cross - Mazurek                    1396

1  all?

2  A    No, only the sparkplug.

3  Q    Okay.  Now, you were also shown videos on direct

4  examination that you took sometime in May of that year, in

5  2019, right?

6  A    Yes.

7  Q    Why did you take those videos, sir?

8  A    It was my first car and I wanted to film it.

9  Q    You were excited about it, right?

10  A    Yes.

11  Q    Okay.  Now, the -- when you purchased it, you said that

12  there was -- Mr. Abreu gave you the paperwork for the car,

13  right?

14  A    Yes.

15         MR. MAZUREK:  And if we could put on the screen

16  what's been admitted into evidence as Government Exhibit 459.

17  And then turn to page five of that exhibit.  Actually, turn to

18  page four.  And could we blow up the picture of the car on

19  page four.

20         THE INTERPRETER:  Your Honor?

21         THE COURT:  Yes.

22         THE INTERPRETER:  I'm sorry, the witness has

23  indicated he needs a short break.

24         THE COURT:  All right.

25         Ladies and gentlemen, we'll take a ten-minute

Acosta Pena - cross - Mazurek          1397

1   recess.

2            (Jury exits the courtroom.)

3            THE COURT:  The witness can be taken out and come

4   back.

5            (The witness steps down.)

6            (Brief recess.)

7            (Witness resumes the witness stand.)

8            (Judge takes the bench.)

9            (Jury enters the courtroom.)

10           THE COURT:  I think we're ready to begin.  Everyone

11  be seated.

12           MR. MAZUREK:  Thank you, Your Honor.

13           And if we could put on the screen what's been

14  admitted as Government Exhibit 459 and turn to page four,

15  please.

16  BY MR. MAZUREK:

17  Q    And this is the white Honda that we've been talking

18  about -- one moment --

19           Okay.  So on the screen is the white Honda we've

20  been talking about that you bought, your very first car,

21  right?

22  A    Yes.

23  Q    And we were talking about some of the paperwork you

24  obtained when you purchased it, right?

25  A    Yes.

1   Q    Now, on the screen is a photograph that you, I guess,

2   posted on OfferUp, and do you see on the windshield in the

3   lower corner, there seems to be some documentation, right?

4   A    Those are the papers, yes.

5   Q    Okay.  And that includes a New York State registration?

6   A    Yes, I see that.

7   Q    Was that a registration that you obtained for the

8   vehicle?

9   A    No.

10  Q    Okay.  So that was from the prior owner?

11  A    Yes, it came like that when I bought it.

12  Q    Okay.  Do you know who the car was registered to at that

13  point in time?

14  A    No.

15  Q    Okay.  And you also talked about, on direct examination,

16  about title paperwork that you received for the car, right?

17  A    Yes.

18  Q    And you said that you reviewed that title paperwork

19  before you purchased it, right?

20  A    No.

21  Q    No.  You never looked at it, or?

22  A    I saw the title after the car was at my house.

23  Q    Okay.  That's when Mr. Abreu delivered it to you, right?

24  A    Yes.

25  Q    Okay.  And when he delivered it to you, you reviewed it,

Acosta Pena - cross - Mazurek                    1399

1    right?

2    A    Yes, I signed it.

3    Q    Okay.  Because, again, you were excited, this is your

4    first car, right?

5    A    Yes.

6    Q    And you testified on direct examination that the previous

7    owner on the title paperwork was Anthony Abreu; is that right?

8    A    Yes.

9    Q    Now, before you testified here today, you had met with

10   agents from the FBI who interviewed you about this same car

11   way back in May of last year, right?

12   A    Yes.

13   Q    And when you met with them in May of '22, did you have

14   the title paperwork for this car?

15   A    No.

16   Q    And you were remembering what was on that title paperwork

17   when you interviewed with the agents back in May of '22,

18   right?

19   A    Yes.

20   Q    And they asked you about whose name was on the title

21   paperwork, right?

22   A    Yes.

23   Q    And isn't it true, Mr. Acosta Pena, that you told them

24   that you noticed that Abreu's name and signature was not on

25   the title when you interviewed with the agents in May of '22?

1  A    No, it was my signature.

2  Q    Yes, but you told the agents in May of '22 when they

3  asked you whether the title paperwork that you signed had

4  Abreu's name as the previous title owner, you said that you

5  noticed that Abreu's name and signature was not on the title?

6  A    I did not say that.  I said it was in his name.

7          MR. MAZUREK:  If we could put on the screen, just

8  for the witness, Your Honor, what's been premarked for

9  identification as 3500 BAP-1, and, specifically, page two.

10 Q    Is there anything that might refresh your memory,

11 Mr. Acosta Pena, of what you told the agents back in May of

12 '22?

13 A    Well, did you have something to put up here then?

14 Q    Would it help you -- I mean, May of '22 was a long time

15 ago.  You remember meeting with the agents, right?

16 A    Yes, I do, but the thing about the title, it's been

17 almost five years now and I don't have that off the top of my

18 head.

19 Q    Right.  So if I have a document to show you, could it

20 help maybe refresh your memory about what you said about the

21 title paperwork back in May of '22?

22 A    Yes, please.

23         MR. MAZUREK:  So, I'm going to ask the interpreter

24 if you could, just for the witness -- if you need us to blow

25 it up, let us know, just read the first two sentences of the

Acosta Pena - cross - Mazurek                1401

1  page that's on the witness's screen, just to the witness.

2           THE INTERPRETER:  The witness's screen is currently

3  black.

4           THE COURTROOM DEPUTY:  It's on now.

5           THE INTERPRETER:  It's on again.  Thank you.

6           THE COURT:  What part do you want read?

7           MR. MAZUREK:  The first two sentences.  I think they

8  are highlighted, Your Honor, on the screen.

9  Q    Okay.  Are you ready, Mr. Acosta Pena?

10 A    Yes.

11 Q    So, now, does that refresh your memory that in May of '22

12 when the FBI agents interviewed you, you told them that you

13 noticed at the time that Abreu's name and signature was not on

14 the title?

15 A    Well, remembering it now, yes, because it's been such a

16 long time to have this in my head and the way that you're

17 asking me the questions is really confusing me.

18 Q    I'm sorry.  But is the answer that -- let me try to

19 clarify the question.  My question is:  Isn't it true that

20 back in May of '22 when you were asked questions about the

21 title, you told the agents that you noticed that Abreu's name

22 and signature was not on the title?

23 A    Yes.

24           MR. MAZUREK:  I have nothing further, Your Honor.

25           THE COURT:  Does the government have anything

Lash - redirect - Acosta Pena                    1402

1    further?

2              MS. LASH:  Very briefly, Your Honor.

3    REDIRECT EXAMINATION

4    BY MS. LASH:

5    Q    Mr. Acosta Pena, Mr. Mazurek asked you some questions

6    about the condition of the car in February of 2019; do you

7    remember that?

8    A    Yes.

9    Q    In what month and year did you sell the white Honda

10   Accord?

11   A    Well, it's been almost five years now.  It -- it might

12   have been that it was sold in September because it was left

13   parked in my yard for seven or eight months.

14   Q    Mr. Acosta Pena, on your screen I'm going to show you

15   what's been marked for identification as 3500 BAP-8.

16             And, Ms. Reed, if we could just go to page 29.

17             And, Madam Interpreter, could you read, just to the

18   witness, lines through 9 through 11.

19             THE INTERPRETER:  Yes.

20             MR. MAZUREK:  Your Honor, objection.  I don't know

21   what recollection is attempted to be refreshed here.

22             MS. LASH:  Your Honor, the testimony was he can't

23   quite remember, he thinks it was around September of 2019.

24   I'm showing him his grand jury testimony in which he stated

25   the month and the year that the car was sold.

Lash - redirect - Acosta Pena                    1403

1          MR. MAZUREK:  We would so stipulate to that.

2          THE COURT:  I will allow it.

3          MS. LASH:  Madam Interpreter, it's lines 9 through

4    11.

5          THE INTERPRETER:  Yes.

6    A    What do you call that when you post something and then

7    you upload it again?

8    Q    Yes.  And, Mr. Acosta Pena, what month and year did you

9    sell the car?

10   A    In November of 2019.

11   Q    Have you seen the Honda Accord since you sold it in

12   November of 2019?

13   A    No.

14   Q    Thank you.  No further questions.

15         THE COURT:  All right.

16         Thank you, you can step down.

17         (The witness steps down.)

18         THE COURT:  Call your next witness, please.

19         MR. PARK:  Yes, Your Honor, the United States calls

20   Jonathan Diver.

21         THE COURTROOM DEPUTY:  Remain standing and raise

22   your right hand, please.

23         (Continued on next page.)

24

25

Diver - direct - Park                                      1404

1          (Witness takes the witness stand.)

2   JONATHAN DIVER, called as a witness, having been first duly

3   sworn/affirmed, was examined and testified as follows:

4          THE COURTROOM DEPUTY:  Will you please state and

5   spell your name for the record.

6          THE WITNESS:  Jonathan Diver, J-O-N-A-T-H-A-N, last

7   name Diver, D-I-V-E-R.

8          THE COURTROOM DEPUTY:  Thank you.  You may be

9   seated.

10          THE WITNESS:  Thank you.

11  DIRECT EXAMINATION

12  BY MR. PARK:

13  Q    Good morning, Mr. Diver.

14  A    Good morning.

15  Q    Mr. Diver, where do you currently work?

16  A    I'm currently employed by the Manhattan District

17  Attorney's Office in the Violent Criminal Enterprise Unit.

18  Q    What is your role there?

19  A    I'm an investigative analyst.

20  Q    How long have you been an investigative analyst there?

21  A    As an analyst with that unit, I've been there for about

22  nine years.

23  Q    What are your duties and responsibilities as an

24  investigative analyst?

25  A    As an analyst in that unit, I assist the assistant

Diver - direct - Park                    1405

1  district attorneys and also law enforcement on cases that have

2  to deal with violent crimes such as shootings, homicides,

3  gang-related violence, gun trafficking cases, drug trafficking

4  cases, and also put together presentations for them.  I assist

5  by watching surveillance videos that brought to me from law

6  enforcement.  I assist by combing through social media.  I

7  also assist by going through extractions that are received

8  from social media warrants or iCloud warrants, any phone

9  extractions, I also will go through those for any related

10  evidence to the case, I will listen to jail calls from time to

11  time, and, again, I put together presentations.

12  Q    In your current role, did you create any presentations

13  for this case?

14  A    Yes, I did.

15  Q    What kind of work did you create?

16  A    I created a video compilation.

17  Q    Are you being paid for your work in this case?

18  A    Yes, I am.

19  Q    What is your rate?

20  A    I'm getting paid $100 an hour for the work and $150 an

21  hour for testimony.

22  Q    And besides creating the video compilation, were you

23  involved in any other way in this investigation?

24  A    No.

25  Q    Can you explain to the jury what a video compilation is?

Diver - direct - Park                    1406

1   A     Yeah.  So what I call a video compilation is a seres of

2   clips that I put together using a program called Adobe Premier

3   Pro.  It's a program that allows me to insert clips from

4   various different surveillance cameras, to put them in

5   chronological order in order for the viewer to see a more

6   movie-like film.

7   Q     How many video compilations have you created in your

8   career?

9   A     Probably over 40.

10  Q     For this case, where did you obtain the underlying

11  surveillance videos?

12  A     I received the surveillance video from Detective Capo.

13  Q     And, approximately, how many hours of videos did you

14  review to create the compilation video?

15  A     I would say over 50 hours.

16  Q     Were the underlying videos you reviewed in this case

17  labeled Government Exhibits 100 through 315?

18  A     Yes.

19  Q     And did you also review still captures of those

20  underlying surveillance video footage videos?

21  A     Yes.

22            MR. PARK:  Your Honor, may I approach the witness?

23            THE COURT:  Yes.

24            (Continued on the following page.)

25

1    BY MR. PARK: (Continuing.)

2    Q    Mr. Diver, I just handed you what are marked for

3    identification as Government Exhibit 100A, 101A, 103A through

4    103E, 105A, 106A through 106B, 140A, 148A, 305A, 307A through

5    307F.  They are 19 separate photographs.

6              Do you see those?

7    A    Yes, I do.

8    Q    What are they?

9    A    These are still images that are taken, that are captured

10   from different surveillance cameras from this incident.

11   Q    And are these still captures a fair accurate captures of

12   the surveillance video footage that you reviewed?

13   A    Yes.

14             MR. PARK:  Your Honor, the Government offers what

15   are marked as Government Exhibit 100A, 101A, 103A through

16   103E, 105A, 106A through 106B, 140A, 148A, 305A, and 307A

17   through 307F into evidence.

18             THE COURT:  All right.  They'll be received.

19             (Government Exhibits 100A, 101A, 103A through 103E,

20   105A, 106 through 106B, 140A, 148A, 305A, and 307A through

21   307F, were received in evidence.)

22   BY MR. PARK:

23   Q    I know you briefly explained what a video compilation is.

24             But can you tell the jury what you did once you

25   received the underlying videos?

1  A    Yes.  So once I received the underlying videos, I go

2  through each individual video from start to finish to analyze

3  them and to review them in its entirety.  From there, I'll cut

4  or clip certain portions from different surveillance cameras

5  and put them into Adobe Premiere Pro, a program, which allows

6  me to clip throughout different surveillance cameras to put in

7  chronological order.

8  Q    And how did you know how to put the videos in

9  chronological order?

10 A    I start with using the timestamps that are available on

11 each video.  Some timestamps, sometimes they are off by a

12 couple of minutes, fast or slow.  So I would then have to

13 figure out what the difference is in time in order to line the

14 videos up correctly.  The way I do that is by in this case, it

15 was vehicles I would follow from one surveillance camera into

16 the next that shows me that the video is continuous, and if

17 the video didn't have a timestamp, I know it's still the

18 following video from the previous video I inserted.

19 Q    You mentioned you were trying to identify vehicles.

20       What items or individuals were you tracking while

21 reviewing the videos?

22 A    While reviewing the videos, I was keeping track of a

23 white Enterprise van, a white Honda sedan, and also a white

24 Camry sedan.

25 Q    And were there any videos that did not have timestamps?

DIVER - DIRECT - MR. PARK                1409

1   A     Yes, there was.

2   Q     And how did you figure out where to put them in the

3   chronological order?

4   A     I used the timestamps that I knew were accurate from

5   131-01 Fowler Avenue.  I used the timestamps from there to

6   figure out the continuous video that leads into the next one.

7   Q     Did you use any overlay or effects while creating this

8   video compilation?

9   A     Yes, I did.

10  Q     What is an overlay?

11  A     So in Adobe Premiere Pro, it allows you to add certain

12  effects, and one of the overlays you are able to do is a

13  highlight feature.  You're able to throw onto the video itself

14  without change the underlying document, a highlight or

15  spotlight on certain individuals or vehicles or whatever you

16  may want to highlight.

17  Q     And what other effects did you use?

18  A     For this video compilation, I also used a zoom in feature

19  which allows the video to be zoomed in on a certain location

20  for a certain period of time.  I also used the fast forward

21  feature that speeds up the video.  You can speed it up or slow

22  it down.  In this instance, I sped it up in certain portions

23  of the video.  I also did side by side which allows you, the

24  viewer, to see what is occurring in two different video

25  cameras at the same exact time, side by side.

DIVER - DIRECT - MR. PARK                    1410

1          And I also did picture to picture which shows an

2   overall, the background video of one camera angle while also

3   able to see a different camera angle on the bottom right-hand

4   corner.

5   Q    Did any of those effects change the underlying footage?

6   A    No.

7   Q    An item that I handed you is a thumb drive that is marked

8   Government Exhibit 320.

9          Do you recognize that thumb drive?

10  A    Yes, I do.

11  Q    How do you recognize that?

12  A    I recognize this because it has my initials on it and it

13  has the date that I initialed it.

14  Q    And what does that thumb drive contain?

15  A    This contains the video compilation I created for this

16  investigation.

17  Q    And I would like to show just the jury -- just the

18  witness only --

19          THE COURT:  I'm sorry, what is the exhibit number?

20          MR. PARK:  Your Honor, it's Government Exhibit 320.

21  BY MR. PARK:

22  Q    Do you see video on your screen there?

23  A    Yes.

24  Q    Is that, Government Exhibit 320, the compilation video

25  you created?

DIVER - DIRECT - MR. PARK                    1411

1    A    Yes, it is.

2            MR. PARK:  Your Honor, the Government offers

3    Government Exhibit 320 into evidence.

4            THE COURT:  All right.  It'll be received.

5            (Government Exhibit 320, was received in evidence.)

6            MR. PARK:  Your Honor, I would like to publish to

7    the jury, and if you can dim the lights.

8            (Exhibit published.)

9            MR. PARK:  And just for the Court's awareness, this

10   footage does contain a portion of the shooting of the victim.

11   BY MR. PARK:

12   Q    Mr. Diver, before I play the video, can you tell the jury

13   what is shown on the top left corner of the screen?

14   A    Yes.  So here in this surveillance video camera, camera

15   four, top left, if you see a date and time which reads

16   February 12th, 2019, Tuesday, at 12:37:17 a.m.

17   Q    And how about the bottom right of the screen?

18   A    And the bottom right is the -- indicates which camera

19   angle this video is taken from.

20   Q    And what location does this camera angle show?

21   A    This is 131-01 Fowler Avenue, right outside the karaoke

22   bar.  Facing north, sorry.

23           MR. PARK:  Playing Government Exhibit 320.

24           (Video recording played.)(Video recording stopped.)

25           MR. PARK:  I'm pausing the video at 10 seconds.

DIVER - DIRECT - MR. PARK                    1412

1    BY MR. PARK:

2    Q    Mr. Diver, can you tell the jury what is shown in the

3    footage here?

4    A    Yes.  So in this freeze frame of the video, it's a

5    highlight feature that I had spoken about earlier.  It's one

6    of the features that Adobe Premiere Pro allows me to insert

7    overplay over top of any video, and in this instance, I'm

8    highlighting a white Honda sedan.

9             MR. PARK:  Resuming the video.

10            (Video recording played.)(Video recording stopped.)

11            MR. PARK:  And pausing at 15 seconds.

12   Q    Can you tell us the camera that's on the bottom right

13   corner?

14   A    Yeah.  So Camera 3 is, again, from one 131-01 Fowler

15   Avenue, and now we're facing the south.

16            MR. PARK:  And resuming.

17            (Video recording played.)(Video recording stopped.)

18            MR. PARK:  And pausing at 19 seconds.

19   Q    What is shown on the top right corner of this video?

20   A    At the top right corner you see the white sedan -- the

21   white Honda sedan that you had previously seen in the angle

22   before, and you will see it turn into the parking lot.

23   Q    Is that the same white Honda that was under the spotlight

24   earlier?

25   A    Yes.

DIVER - DIRECT - MR. PARK                    1413

1          MR. PARK:  Resuming.

2          (Video recording played.)(Video recording stopped.)

3          MR. PARK:  And pausing the video at 30 seconds.

4    Q    Which camera does this angle show?  Or which location?

5    A    So Camera 16, again, is from 131-01 Fowler Avenue, and

6    now we're -- this is facing west.

7    Q    And what is shown on the left side of the screen there?

8    A    Again, the left-hand side is the continuation of that

9    white Honda sedan.

10          MR. PARK:  Resuming the video.

11          (Video recording played.)(Video recording stopped.)

12          MR. PARK:  And pausing the video at 34 seconds in.

13   Q    What is the camera that's shown on the bottom right?

14   A    This camera is Camera 10 from 131-01 Fowler Avenue, and

15   now this is facing east.

16   Q    Do you know which street?

17   A    Oh, sorry, this is -- this is Fowler Avenue.

18   Q    And what is shown on the top portion of the center of

19   this screen?

20   A    Again, this is the continuation of the white Honda sedan.

21          MR. PARK:  Resuming the video.

22          (Video recording played.)(Video recording stopped.)

23          MR. PARK:  And I'm pausing the video at 48 seconds

24   in.

25   Q    Can you tell us what is shown on the video here?

1    A    Yes.  So here when you see a slide like this or a portion

2    like this, this is title slide that I inserted into the video

3    to show that there's a gap in time, and how long the gap in

4    time is from the previous clip until the next one.

5              MR. PARK:  Resuming the video.

6              (Video recording played.)(Video recording stopped.)

7              MR. PARK:  Pausing the video at two minutes and two

8    seconds in.

9    Q    Mr. Diver, can you tell the jury what is shown on this

10   footage here?

11   A    Yes.  So this part of the video compilation is what I

12   described before as the side by side.  On the left-hand side

13   you see it's Camera 16, which is facing west on Fowler Avenue.

14   On the right of that is Camera 3, which is facing south on

15   131st Street.  And this is to show the viewer what is

16   occurring at the same time in two different camera angles.

17   Q    And in both of the camera angles, what is highlighted?

18   A    In both camera angles, 16 and 3, you can see the white

19   Honda sedan is highlighted in both.

20             THE COURT:  Is what?

21             THE WITNESS:  The white Honda sedan is highlighted

22   in both.

23             THE COURT:  So is the white Honda sedan during all

24   the time, kept moving?

25             THE WITNESS:  This is after the first, I guess,

DIVER - DIRECT - MR. PARK                1415

1   first go-around, I'll call it.  The first go-around of the

2   incident location.

3            THE COURT:  At one point, maybe I misunderstood you.

4   I thought you said something about pulling into a parking lot.

5            THE WITNESS:  It's about to do that.

6            THE COURT:  Oh, okay.  Sorry.

7            MR. PARK:  Resuming the video.

8            (Video recording played.)(Video recording stopped.)

9            MR. PARK:  Pausing the video at three minutes and 10

10  seconds in.

11  BY MR. PARK:

12  Q    Mr. Diver, besides the spotlighted white Honda sedan,

13  what other vehicle is shown moving?

14  A    In both Camera 16 and Camera 3, you see a white

15  Enterprise work van.

16  Q    In this compilation video, is there additional footage

17  later on showing a white Enterprise van?

18  A    Yes.  You'll see it highlighted in different portions of

19  the video.

20           THE COURT:  Can you just clarify for the jury where

21  the white Honda is now and where the van is.

22           THE WITNESS:  Yes.

23           THE COURT:  Where is the white Honda?

24           THE WITNESS:  The white Honda is currently backing

25  into a parking spot in the parking lot.  If you're looking at

1  Camera 16, in the top left, it's pulling into the parking

2  spot.  And if you're looking at Camera 3, the top right, it's

3  currently backing up into the parking spot.

4          THE COURT:  And where is the parking spot located?

5          THE WITNESS:  It's located at the corner of 131st

6  Street and Fowler Avenue right near that column that you see.

7          THE COURT:  So it's located at 133rd Street and

8  Fowler?

9          THE WITNESS:  131st Street and Fowler, the corner.

10         THE COURT:  But the parking lot itself is on what

11  street?

12         THE WITNESS:  I'm not exactly sure.  It's the

13  corner.  I'm not exactly sure what street that is.

14         THE COURT:  The van is turning down what street?

15         THE WITNESS:  The van is turning down Fowler Avenue.

16         THE COURT:  Okay.  I'm sorry, you can continue.

17         MR. PARK:  Your Honor, I'll show the witness and the

18  jury what is in evidence as Government Exhibit GX52 which is a

19  map of this vicinity.

20         THE COURTROOM DEPUTY:  Mr. Park are you showing him

21  the map?

22         MR. PARK:  I'm plugging in.

23  BY MR. PARK:

24  Q    Mr. Diver, who is shown -- what is shown is what's

25  already in evidence Government Exhibit 52.  I'm zooming into

1    the left bottom corner of this map.

2            Do you see it on your screen?

3    A    Yes.

4    Q    We were just looking at the split screen on Government

5    Exhibit 320, and you were explaining to the Court where the

6    white Honda sedan was about to park.

7            Can you explain around where on this map that was

8    happening?

9    A    So if you see where 131-01 Fowler Avenue is?

10   Q    Right here where my mouse is pointing?

11   A    Yes.  It's where the bend is at the corner of the

12   building.  It's underneath the highway that's right there.

13   Q    So it white below the red pin that is shown?

14   A    Yes.

15   Q    And where was the white Honda trying to park?

16   A    Right where your arrow -- your cursor is currently, that

17   parking lot underneath the highway.

18   Q    So bottom -- left and a little below to the red pin

19   there?

20   A    Yes.

21   Q    Underneath the highway?

22   A    Yes.  Underneath the highway.

23   Q    Thank you.

24            MR. PARK:  I'm going back to Government Exhibit 320.

25   Resuming the video from three minutes and 10 seconds.

1     (Video recording played.)(Video recording stopped.)

2          MR. PARK:  I'm pausing the video at three minutes

3     and 48 seconds in.

4     Q    Mr. Diver, can you tell us what is happening on this

5     screen right here?

6     A    Oh, yes.  So here in the screen you can still see that

7     the white Honda sedan is highlighted in the parking lot in a

8     parking spot.  In the bottom left-hand corner indicated is the

9     speed that I -- the amount of speed that I sped up the video

10    for during this timeframe.

11    Q    And can you tell the jury what time is shown on the top

12    left corner of the screen?

13    A    Yes.  So top left, it's February 12th, 2019, at

14    12:43:58 a.m.

15          MR. PARK:  Resuming the video.

16          (Video recording played.)(Video recording stopped.)

17          MR. PARK:  And pausing at three minutes and 58

18    seconds in.

19    Q    Can you tell the jury what is shown on the right side of

20    the video here?

21    A    Yes.  So now this is what I was talking to, referring to

22    as picture to picture.  You see in the back, the main video is

23    capturing the camera outside of 131-01 Fowler Avenue facing

24    north, and the bottom right-hand corner is the camera outside

25    of 131-01 Fowler Avenue facing south, which is highlighting

1    the white Honda sedan in the parking lot.

2    Q    And from the video that we're about to resume, what

3    happens to that white Honda sedan that is spotlighted?

4    A    It just continues to sit there, parked.

5             MR. PARK:  Resuming the video.

6             (Video recording played.)(Video recording stopped.)

7             MR. PARK:  And pausing the video at four minute and

8    12 seconds in.

9    Q    What is spot highlighted on the left side of the video?

10   A    In the top left portion of the video that is now

11   highlighted a white Enterprise work van.

12            MR. PARK:  Resuming the video.

13            (Video recording played.)(Video recording stopped.)

14            THE COURT:  What is happening now?

15            THE WITNESS:  This is just speeding up the video

16   portion to show that the white Honda sedan has not moved from

17   that parking spot.  It's sped up 100X speed.

18            THE COURT:  All right.  So the Honda then is still

19   in the parking lot?

20            THE WITNESS:  The Honda sedan, right.

21            THE COURT:  It was a Honda accord, is that right?

22            THE WITNESS:  Yes.

23            THE COURT:  And we saw the Enterprise van go around.

24            Was that the second time it had been around?

25            THE WITNESS:  Yes.  And that's the second time the

1    Enterprise van has been around.

2            THE COURT:  And the cars now that you see in this

3    video, what street are they parked on?

4            THE WITNESS:  That street is 131st Street, and were

5    facing south.

6            MR. PARK:  And we're paused at five minutes and 23

7    seconds at this time.

8    BY MR. PARK:

9    Q    Mr. Diver, what is the time that is shown on the top left

10   corner of the screen?

11   A    The time is 2:01:16 a.m.

12           MR. PARK:  Resuming the video.

13           (Video recording played.)(Video recording stopped.)

14           MR. PARK:  Pausing the video at five minutes and 42

15   seconds in.

16   Q    What just happened on the screen?

17   A    On the screen here now you see the video is now zoomed

18   into that particular location where the white Honda accord is

19   parked.

20   Q    And why did you decide to zoom in at this time?

21   A    To show movement from around the car.

22           MR. PARK:  Resuming the video.

23           (Video recording played.)(Video recording stopped.)

24           MR. PARK:  Pausing the video at seven minutes and 30

25   seconds in.

DIVER - DIRECT - MR. PARK                    1421

1   Q    Mr. Diver, what is shown in the screen now?

2   A    The camera angle that you're seeing now is from inside

3   the karaoke bar at 131-01 Fowler Avenue.  This is one of the

4   third floor hallway cameras.

5   Q    And what is the time that is indicated on the top left

6   corner?

7   A    The time says 2:29:19 a.m.

8              MR. PARK:  Resuming the video.

9              (Video recording played.)(Video recording stopped.)

10             MR. PARK:  And pausing the video at seven minutes

11  and 34 seconds.

12  Q    Who is that individual that just turned around and faced

13  the camera in the middle of the hallway?

14  A    So the individual in the direct middle with his hands

15  near his neck region is the victim in this case.

16             MR. PARK:  Resuming the video.

17             (Video recording played.)(Video recording stopped.)

18             MR. PARK:  And pausing the video at seven minutes

19  and 43 seconds in.

20  Q    What is shown on this camera angle?

21  A    Again, this is a different camera angle from inside the

22  camera karaoke bar at 131-01 Fowler Avenue.  This is a

23  different camera angle that is located on the third floor.

24             MR. PARK:  Resuming the video.

25             (Video recording played.)(Video recording stopped.)

DIVER - DIRECT - MR. PARK                    1422

1          MR. PARK:  And pausing the video at eight minutes

2    and four seconds in.

3    Q    Who is the individual on the very center of the screen

4    wearing a long dark coat?

5    A    Again, that is the victim in this incident.

6          MR. PARK:  Resuming the video.

7          (Video recording played.)(Video recording stopped.)

8          MR. PARK:  Pausing the video at eight minutes and 11

9    seconds in.

10   Q    What is shown on this camera angle?

11   A    This camera angle, you'll see the victim exiting the

12   elevator and now this is from, again, inside the karaoke bar

13   on the first floor facing the elevator, and also facing 131st

14   Street, out the door.

15   Q    And when you say, out the door, you're referring to the

16   left side of the screen there?

17   A    Yes.  Sorry.

18         MR. PARK:  Resuming the video.

19         (Video recording played.)(Video recording stopped.)

20         THE COURT:  Just so we're acclimated.

21         What street is the victim facing at this point?

22         THE WITNESS:  So the victim is now currently on

23   131st Street, and this camera angle is facing north.

24         MR. PARK:  And for the record, we are now paused at

25   eight minutes and 37 seconds in.

DIVER - DIRECT - MR. PARK                    1423

1       MR. PARK:  Resuming the video.

2       (Video recording played.)(Video recording stopped.)

3       MR. PARK:  Pausing the video at 10 minutes and 59

4  seconds.

5  BY MR. PARK:

6  Q    Mr. Diver, what is spotlighted on the top portion -- top

7  center portion of this video?

8  A    So here is the third vehicle that I had spoken about

9  earlier, being highlighted.  This is the white Camry sedan

10  that you will see in the video.

11  Q    And just to be clear, that is a different white sedan

12  than that was parked earlier?

13  A    Yes.  The one that is parked earlier is a Honda and this

14  one is a Camry.

15  Q    And based on your review and creation of this video, do

16  you also track this vehicle later on?

17  A    Yes.

18       MR. PARK:  And resuming the video.

19       (Video recording played.)(Video recording stopped.)

20       MR. PARK:  And I'm pausing 11 minutes and two

21  seconds in.

22  Q    Can you explain to the jury what is shown here?

23  A    Yes.  So this is indicating that the next footage that

24  you're about to see is the same timeframe, except at a

25  different camera angle.  The next one will be facing the south

DIVER - DIRECT - MR. PARK                    1424

1   on 131st Street instead of North.

2   Q    And what incident will this alternate angle show?

3   A    This will show the shooting from another angle.

4         MR. PARK:  Resuming the video.

5         (Video recording played.)(Video recording stopped.)

6         MR. PARK:  And pausing the video at 11 minutes and

7   10 seconds in.

8   Q    Is this a split screen that is shown here?

9   A    Yes, it is.

10  Q    And why did you decide to place a split screen for this

11  footage?

12  A    For this footage, on the left-hand side I placed it, this

13  one there so you can see what is occurring from the parking

14  lot coming towards the karaoke bar.  On the right-hand side,

15  it's the closeup view of the shooting itself outside of the

16  karaoke bar.

17         MR. PARK:  Resuming.

18         THE COURT:  Which direction -- excuse me -- is the

19  parking lot?

20         The victim is now facing south; is that correct?

21         THE WITNESS:  Yes, the victim is facing south.

22         THE COURT:  Where is the parking lot?  Is it south

23  of him or north of him?

24         THE WITNESS:  It's south of him.  It's the top

25  middle of the video on the right, and on the video on the

```
                    DIVER - DIRECT - MR. PARK              1425
```

1  left, you see that white Honda on the top right still parked

2  in that parking lot.

3          THE COURT:  Okay.

4  BY MR. PARK:

5  Q    And Mr. Diver, on the right side of the screen here where

6  my mouse is, a little bit towards the right of where the time

7  mark is, is that towards where the parking lot is?

8  A    Yes, it is.

9          MR. PARK:  Resuming the video.

10          (Video recording played.)(Video recording stopped.)

11          MR. PARK:  Now pausing at 12 minutes and 31 seconds

12  in.

13  Q    What is spotlighted on the top right portion of the

14  Camera 3 screen on the left side?

15  A    So the left side Camera 3 you see now the white sedan is

16  highlighted, the white Honda Accord is highlighted again, but

17  the shooter is getting out of the passenger side door.

18          MR. PARK:  Resuming the video.

19          THE COURT:  Where do you see that?

20          THE WITNESS:  In the Camera 3 where it is

21  highlighted --

22          THE COURT:  Show where you see it getting out of the

23  door.

24          THE WITNESS:  You have to go back a few seconds.  If

25  you look closely, you see the door opening and an individual

DIVER - DIRECT - MR. PARK                1426

1    leaving the passenger side.

2         MR. PARK:  So went back to 12 minutes and 26 seconds

3    mark.  Resuming the video.

4         (Video recording played.)(Video recording stopped.)

5         THE WITNESS:  Now is when the door is opening.

6         MR. PARK:  And I'm paused at 12 minutes and 29

7    seconds in.

8         Resuming the video.

9         (Video recording played.)(Video recording stopped.)

10        THE WITNESS:  And now is when that individual just

11   stepped out of the passenger seat.

12        MR. PARK:  And that's 12 minutes and 31 seconds.

13        Resuming the video.

14        (Video recording played.)(Video recording stopped.)

15        MR. PARK:  And pausing the video at 13 minutes and

16   29 seconds.

17   BY MR. PARK:

18   Q    What is shown inside the spotlight on the top right

19   portion of Camera 3 on the left side?

20   A    So you see the white Honda Accord has left the parking

21   spot that it was in and is about to turn onto Fowler Avenue.

22   Q    And what is shown on the right side of the scene?

23   A    The right-hand side you can see the white Honda Accord in

24   the top left highlighted leaving that parking spot again, and

25   also, the shooter fleeing, heading south on 131st Street.

DIVER - DIRECT - MR. PARK                    1427

1        MR. PARK:  Resuming the video.

2        (Video recording played.)(Video recording stopped.)

3        MR. PARK:  And now pausing the video at 13 minutes

4   and 35 seconds.

5   Q    Who is about to be shown in this footage?

6   A    On this footage, you will see the white Toyota Camry that

7   continues to follow the white Honda Accord, post-shooting.

8   Q    And is this after the shooting?

9   A    Yes, it's after the shooting.

10  Q    And based on your review, where is the victim at this

11  point?

12  A    This van that is parked directly in front of the karaoke

13  bar, it's on the other side of it near the passengers front.

14       MR. PARK:  Resuming the video.

15       (Video recording played.)(Video recording stopped.)

16       MR. PARK:  And pausing the video at 14 minutes and

17  29 seconds.

18  Q    Which car is spotlighted in the center of the screen?

19  A    This is the white Toyota Camry.

20       MR. PARK:  Resuming the video.

21       THE COURT:  What happened just before that?

22       THE WITNESS:  So the video goes back to show the

23  continuation of the shooter fleeing and getting into the white

24  Honda Accord on Fowler Avenue.

25       THE COURT:  So the shooter got into the white --

DIVER - DIRECT - MR. PARK                1428

1        THE WITNESS:  Honda Accord.

2        THE COURT:  -- on Fowler?

3        THE WITNESS:  Yes.

4        THE COURT:  And this car that you now have in the

5    video, the Camry, what is that doing?

6        THE WITNESS:  That is now continuing to follow the

7    white Honda Accord east on Fowler.

8        MR. PARK:  Resuming the video.

9        (Video recording played.)(Video recording stopped.)

10       MR. PARK:  Now pausing the video at 14 minutes and

11   36 seconds in.

12   Q    Which location is shown on this camera angle?

13   A    So this is the AC Appliances location which is at 131-31

14   Fowler Avenue.  This camera angle is facing west.

15   Q    And what street is this?

16   A    This is Fowler Avenue.

17   Q    And what are we about to see on this footage here?

18   A    You're about to see the continuation of the white Honda

19   Accord fleeing, followed by the white Toyota Camry following

20   that vehicle.

21       MR. PARK:  Resuming the video.

22       (Video recording played.)(Video recording stopped.)

23       MR. PARK:  Pausing the video at 14 minutes and 43

24   seconds.

25   Q    What is spotlighted on the top center portion of this

DIVER - DIRECT - MR. PARK                1429

1  screen?

2  A    Here you see the white Honda accord heading east on

3  Fowler Avenue.

4         MR. PARK:  Resuming the video.

5         (Video recording played.)(Video recording stopped.)

6         MR. PARK:  Pausing the video at 15 minutes and four

7  seconds in.

8  Q    What is spotlighted on the top center portion of this

9  screen?

10 A    So here at this portion, you see the white Toyota Camry

11 heading east, continuing to follow white Honda Accord.

12        MR. PARK:  Resuming the video.

13        (Video recording played.)(Video recording stopped.)

14 Q    And now 15 minutes and six seconds in, which location is

15 shown in this camera angle?

16 A    So this is from the same location, 131-31 Fowler Avenue.

17 This is now showing the video east on Fowler.

18 Q    And is that Fowler Avenue on the screen?

19 A    Yes, it is.

20 Q    And what are we about to see on the footage?

21 A    You're about to see the continuation of the white Honda

22 Accord freeing, followed by the white Toyota Camry continuing

23 to follow.

24        MR. PARK:  Resuming the video.

25        (Video recording played.)(Video recording stopped.)

DIVER - DIRECT - MR. PARK                1430

1          MR. PARK:  Pausing the video at 15 minutes and 33

2    seconds in.

3    Q    What location is shown on this camera?

4    A    This is the BP gas station which is located at 49-04

5    College Point Boulevard.  So this is the intersection of

6    College Point Boulevard and Fowler Avenue.

7    Q    And now, the street that is shown on the very top portion

8    of this screen going horizontal, which street is that?

9    A    That's College Point Boulevard.

10   Q    And what is the cross street that is shown on the right

11   side of the scene going vertical?

12   A    That is Fowler Avenue.

13   Q    And what lot is shown on the left side of the vehicle?

14   A    That is the BP gas station.

15   Q    And what are we going to observe on this camera angle?

16   A    At this camera angle, you will see the white Honda Accord

17   come to the stoplight and make a right, followed by the white

18   Toyota Camry coming to that same stoplight, following it, and

19   making a right.

20          MR. PARK:  Resuming the video.

21          (Video recording played.)(Video recording stopped.)

22          MR. PARK:  And pausing the video at 16 minutes and

23   22 seconds in.

24   Q    What is highlighted on the top left portion of the

25   screen?

DIVER - DIRECT - MR. PARK                1431

1    A    So from this camera angle, you see the top left is the

2    white Enterprise work van.

3    Q    And what time is shown on the bottom center of the

4    screen?

5    A    The timestamp here says 2:38:08 a.m.

6              MR. PARK:  Resuming the video.

7              (Video recording played.)(Video recording stopped.)

8              (Continued on the following page.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Diver - cross - Ser                       1432

1    DIRECT EXAMINATION

2    BY MR. PARK:  (Continuing)

3    Q    The video ends at 17 minutes and 20 seconds in.

4         Mr. Diver, is that the entirety of your video

5    compilation you created?

6    A    Yes, it is.

7         MR. PARK:  No further questions.

8         THE COURT:  And the Enterprise van was in the

9    picture went through the light and then turned down the

10   street; is that correct?

11        THE WITNESS:  Yes, I believe it turned left on to

12   Blossom Avenue.

13        THE COURT:  Blossom?

14        THE WITNESS:  Blossom.

15        MR. SER:  If you want to leave the lighting as is.

16        MR. KOUSOUROS:  I have no questions.

17   CROSS-EXAMINATION

18   BY MR. SER:

19   Q    Good afternoon, Mr. Diver.

20   A    Good afternoon.

21   Q    You said that you worked for with the Manhattan District

22   Attorney's Office?

23   A    Yes, I do.

24   Q    It sounds like you have a specialty in examining video

25   surveillance?

Diver - cross - Ser                                    1433

1    A    Yes, I do surveillance video.

2    Q    And then preparing these compilation videos?

3    A    Yes.

4    Q    So fair to say you're pretty familiar with certain video

5    standards?

6    A    As in -- in what terms?  I'm sorry.

7    Q    Well, you're familiar with how video surveillance is

8    captured, for example; right?

9    A    Yes.

10   Q    And video surveillance can be captured through what's

11   called infrared illumination; correct?

12   A    Yes, I am familiar with that.

13   Q    You know what that is?

14   A    Yes, I'm familiar with it.

15   Q    Okay.  And the video footage that you reviewed in this

16   case came from infrared illuminated security cameras; right?

17   A    I don't have that knowledge off the top of my head.  I

18   didn't pull the video.

19   Q    You didn't go to the scene and check the cameras and see

20   what they look like?

21   A    Me myself, no.

22   Q    That wasn't something you chose to do?

23   A    No.  That was not part of my job.

24   Q    You chose not to do that; right?

25   A    I chose not to go view the cameras?

1   Q    Yes.

2   A    Sure.  Yeah.  I didn't go to the scene.

3   Q    And no one told you couldn't do that; right?

4   A    Yeah, I was just told to do the video compilation.

5   Q    Okay.  But IR means or infrared can be short and people

6   refer to as IR; right?

7   A    Sure.

8   Q    And infrared illumination is light that is invisible to

9   the human eye, right?  We can't see it?

10  A    Okay.

11  Q    Yes?

12  A    I'm not totally sure.

13  Q    You said you were familiar with the infrared-illumination

14  type cameras?

15  A    I've seen them before, yes.

16  Q    Okay.  But infrared illumination is a light that is

17  invisible to the human eye?  We can't see it; right?

18  A    Yes.

19  Q    And infrared illumination enables security cameras to

20  capture images in things like total darkness; right?

21  A    Yes, you can see certain people.

22  Q    Well, you can see whatever is captured by the field of

23  vision of the camera; right?

24  A    Right.

25  Q    So it could be people?

1   A     Sure.  Yes.

2   Q     It could be cars?

3   A     Yes.

4   Q     It could be just the scene?

5   A     Yes.

6   Q     Landmarks?

7   A     Yes.

8   Q     Okay.  But the purpose of IR illumination is to assist

9   the video equipment and its ability to capture the scene;

10  right?

11  A     Yes.

12  Q     So that even if it's too dark, for example, for the human

13  eye to see something, the infrared illumination ability of a

14  camera would light it up?

15  A     Yes.

16  Q     And the camera could capture the scene that way; right?

17  A     To an extent, yes.

18  Q     A human, on the other hand, may not be able to see what

19  the camera is showing because we don't see through infrared

20  illumination; right?

21  A     Correct.

22  Q     Okay.  So these cameras in the footage captured through

23  IR illumination will be better than what we would see if we

24  were standing out there at this time of night; correct?

25  A     Us ourselves standing at the karaoke bar looking across

1    the parking lot?

2    Q    No.

3         The footage captured by infrared-illumination based

4    cameras would be much better in terms of what you can see than

5    what a human would see standing in the place of those cameras;

6    right?

7    A    Yes, but also location of the camera, where it's located,

8    of course, you could see a better angle.

9    Q    Right.  But the purpose of the IR cameras is to capture

10   things we wouldn't be able to see as humans standing there at

11   that time in the middle of the night when it's dark out;

12   right?

13   A    I couldn't say.  I wasn't there on the scene.

14   Q    Well, you agreed that IR illuminated cameras see in total

15   darkness; right?

16   A    Yes.  Or sometimes you're able to see individuals, you

17   know, like, movement or -- from far away.  You don't know what

18   it is, but you still see movement.

19   Q    But you didn't go there and test that theory out, did

20   you?

21   A    No.

22   Q    So the image produced by an IR illuminated camera can be

23   clear like we are seeing in the video footage?

24   A    Yeah.  It's pretty clear.

25   Q    Detailed perhaps?

Diver - cross - Ser                          1437

1   A    To an extent.

2   Q    Okay.  And, so, as a result, it will make -- IR

3   illumination style cameras will make the image appear brighter

4   than it really is; correct?

5   A    As I said, I wasn't there at a specific time of night to

6   see.

7   Q    But that's the way IR illumination-based cameras work,

8   right?  They make things brighter so you could see?

9   A    To an extent.

10  Q    Now, you testified earlier that you were tasked with

11  watching for certain vehicles on the footage; correct?

12  A    Yes.

13  Q    And it sounds like you spent a considerable amount of

14  time reviewing all this footage.  You said 50 hours

15  approximately; right?

16  A    Yes.

17  Q    You watched every video file that you were given?

18  A    Yes.

19  Q    At least once?

20  A    More than once.

21  Q    Okay.  You rewound it, fast forward, go back, you can

22  view things over and over again; right?

23  A    Yes.

24  Q    Okay.  And you said one of the cars that you were looking

25  for, that you were told to look for was this white Enterprise

Diver - cross - Ser                      1438

1   van; right?

2   A    Yes.

3   Q    Now, the cameras on 131st --  I'm going to try to make

4   this easy so can understand landmark and geographically where

5   we are.

6             MR. SER:  Can I use the ELMO?

7   Q    Showing you what's been admitted into evidence as Defense

8   Exhibit Z-102.

9             This is the same photo that you saw earlier as an

10  Government Exhibit; correct?

11  A    Yes.

12  Q    Just so we can orient ourselves, there is a red bulb on

13  the bottom left where I'm pointing.  Can you see that?

14  A    Yes.

15  Q    That is the location at 131-1 Fowler Avenue?

16  A    Yes, it is.

17  Q    That's the GS KTV karaoke club; right?

18  A    Yes.

19  Q    That's the club that we just saw cameras inside capturing

20  what was going on; right?

21  A    Yes.

22  Q    Okay.  Even though the entrance -- withdrawn.  Even

23  though the address of the karaoke is a Fowler Avenue address,

24  the entry/exit is actually on 131st; right?

25  A    That is correct.

Diver - cross - Ser                                        1439

1   Q    And that was the doorway that was opened in the video

2   footage we watched when the gentleman stepped out on to the

3   sidewalk; correct?

4   A    When the victim steps out on to the sidewalk that is on a

5   131st Street.

6   Q    And I'm pointing approximately to where that doorway is

7   on 131st.  Is that a correct estimation?

8   A    Yeah, it's about there.

9            MR. SER:  And let the record reflect I am pointing

10  to a spot just beneath the dash between 131-1 Fowler Avenue,

11  approximately halfway or in the middle of the building there

12  on 131st Street.

13  Q    So this street here that I'm pointing to, sir, that's

14  131st; correct?

15  A    Yes.

16  Q    And this roadway that we see here, that's the Van Wyck;

17  correct?

18  A    I believe so.  You are talking about the highway above

19  the parking lot.

20  Q    Yes.  This right here (indicating).

21  A    Yes.

22  Q    So the judge asked you earlier where this parking lot

23  was.  If you were to walk out of GS KTV Karaoke on to the

24  sidewalk facing forward, the parking lot would be across the

25  street; correct?

Diver - cross - Ser                        1440

1  A     There's certain sections of the parking lot, but, yes,

2  the overall parking lot underneath the Van Wyck is across the

3  street from the karaoke.

4  Q     Correct.

5        And it runs under the Van Wyck, what is that?

6  A     North/south.

7  Q     North/south.  North/south, you said?

8  A     Yes.

9  Q     But the parking lot literally runs under the Van Wyck all

10 the way to College Point Boulevard; right?

11 A     I believe so, yes.

12 Q     And so, when you walked out of GS KTV karaoke, the

13 parking lot is across the street; right?

14 A     A portion of the parking lot, yes.

15 Q     The parking lot?

16 A     Yes.  I'm just referring to which specific parking lot.

17 Q     If you were to pan your view to the left, you would see

18 that parking lot continues under the Van Wyck, but you can't

19 see it anymore basically?

20 A     Until you can't see it, yes.

21 Q     Okay.  Just so we're oriented, that would be looking in

22 this direction under the Van Wyck if you come out of the

23 karaoke club; right?

24 A     What are you pointing to?  I'm sorry.

25 Q     If you come out of the karaoke club and you're standing

Diver - cross - Ser                     1441

1    on the sidewalk and you look to the left, you're looking in

2    this direction; right?

3    A     You're looking in that direction?

4          Yes, you're looking south.

5    Q     Correct.  So if you come out of the karaoke and look to

6    the left, you're looking --

7    A     South.

8    Q     South.  Okay.

9          Now, this street here that we have been talking

10   about is actually Fowler Avenue.

11   A     That is correct Fowler.

12   Q     Fowler Avenue runs all the way from 131st to College

13   Point Boulevard; right?

14   A     Yes.

15   Q     That's a one-way in that direction?

16   A     Yes, from west to east.

17   Q     Okay.  And so on the camera footage we saw came from

18   either cameras along 131st Street; right?

19   A     Yes.

20   Q     Or on Fowler Avenue; correct?

21   A     Yes.

22   Q     Okay.  Now, the footage that you showed us that was on

23   131st immediately in front of the karaoke club, looking

24   towards the Van Wyck, that footage began at approximately

25   12:00 a.m.; correct?

Diver - cross - Ser                          1442

1   A     The footage in general?

2   Q     Well, the footage in front of the karaoke club capturing

3   the exit/entryway, that begins approximately 12:00 a.m.;

4   right?

5   A     You're talking about overall?

6   Q     I'm talking about the video footage that captured the

7   entry/exit way to the karaoke club?

8   A     I'm sorry.  You're not speaking of just my compilation

9   specific --

10   Q     No. Not your compilation.  My apologies.  My question

11   wasn't clear enough.

12          Let me back up.  Let me ask you this:

13          The footage you have, you had over a dozen different

14   video files; right?

15   A     Yes.

16   Q     Some started at different times than others?

17   A     Yes, they did.

18   Q     Some were much longer than others; right?

19   A     Yes.

20   Q     For example, the video camera angles that were capturing

21   the entry/exit of the club, those started at approximately

22   12:00 a.m.?

23   A     Yes, they did.

24   Q     And they ran all the way through 3:00 a.m. continuously;

25   right?

Diver - cross - Ser                    1443

1    A    Approximately 3:00 a.m. yes.

2    Q    Other captures, though, maybe -- I don't know -- six

3    minutes, perhaps; right?

4    A    Yes.  There are some camera angles that capture not that

5    long.

6    Q    Right.  And the six minutes, for example, the BP gas

7    station footage we got, that captured six minutes but only

8    around the time that those cars passed by the BP gas station;

9    right?

10   A    That is correct.

11   Q    And it didn't go all the way back to midnight, at least

12   the footage that you were given; right?

13   A    Yeah, that doesn't capture that whole time.

14   Q    So you didn't have continuous footage from 12:00 a.m. to

15   3:00 a.m. for every video camera angle you were given?

16   A    I did not.

17   Q    Now, you watched, though, the footage which I think was

18   identified as Government Exhibit 103 and 104, which is the

19   video footage capturing the entry/exit to the club on 131st

20   from start to finish, 12:00 a.m. to 3:00 a.m.; right?

21   A    Yes.

22   Q    And your task was to watch and seen how many times you

23   might have seen a white Enterprise rental van driving on 131st

24   past the club; right?

25   A    Yes, I was watching the video and taking notes of when it

Diver - cross - Ser                                   1444

1  passed.

2  Q    Right.  And your notes were a chart that you kept, right,

3  a spreadsheet?

4  A    Yes.  It helps me orient myself as to the video times,

5  timestamps and any notes that I want to take.

6  Q    Again, you watched the footage from 12:00 a.m. to 3:00

7  a.m.?

8  A    On this camera, yes.

9  Q    Okay.  And you only saw that Enterprise van pass by on

10 131st pass the GS KTV karaoke club twice; right?

11 A    On video, yes, on this camera, yes.

12 Q    Did you see it on anything else other than video?

13 A    No.

14 Q    So you saw it twice on the video pass by the entry/exit

15 to the GS KTV karaoke; right?

16 A    Yes.

17 Q    I believe the first time was at approximately 12:42 or

18 12:43 a.m.; right?

19 A    Correct.

20 Q    And the second time was approximately 12:46, 12:47 a.m.;

21 right?

22 A    Yes.

23 Q    Okay.  So because of the way the streets work, and Fowler

24 Avenue being a one-way, right, the video captured that white

25 Enterprise van passing by the karaoke club and making a left

Diver - cross - Ser                    1445

1   on Fowler both passes; right?

2   A    Yes, heading east towards College Point Boulevard.

3   Q    So the only direction that van could go would have been

4   up towards College Point Boulevard on Fowler Avenue; right?

5   A    In that camera angle?  What I have seen, yes.

6   Q    It makes a left on Fowler, it goes up towards College

7   Point Boulevard; right?

8   A    Yes.

9   Q    After the first pass, it took about three to four minutes

10  for that van to reappear on video; right?

11  A    Yes.

12  Q    Which meant going up Fowler, based on what we said

13  earlier, that's a one-way; right?

14  A    Yes.

15  Q    And to get back it would be making a left on to College

16  Point Boulevard; correct?

17  A    Yes.  One can assume, yes.

18  Q    And then a left on to what is Avery Avenue there; right?

19  A    Yes.

20  Q    Avery Avenue is this street here; right?

21  A    Yes, it is.

22  Q    That's a one-way also?

23  A    Yes.

24  Q    And there are commercial buildings, if you know, along

25  Avery; right?

Diver - cross - Ser                           1446

1    A    I'm not aware of the location, but I know it's a one-way.

2    Q    Okay.  Do you know there is a Home Depot there?

3    A    I do.

4    Q    Okay.  Do you know there is a meat market supermarket at

5    the corner of Avery Road and College Point Boulevard?

6    A    I do not.

7    Q    So you do know there is some commercial buildings,

8    though, along that avenue?

9    A    Yes, I'm aware there are other buildings on that street.

10   Q    Okay.  And, so, you agree that the time between the first

11   time that van appeared, the Enterprise van appeared on 131st

12   in front of the club and the second time was approximately

13   somewhere between three and four minutes; right?

14   A    It was somewhere around there.

15   Q    Now, we saw the footage when the victim stepped out of

16   the karaoke club, you recall that; right?

17   A    Yes.

18   Q    All right.  And according to the timestamp on the video,

19   he steps through that doorway and on to the sidewalk,

20   according to timestamp, at 2:29 and 38 seconds in the morning;

21   right?

22   A    Yes.  Well, depends which camera angle you're speaking

23   about.

24   Q    Based upon I guess Government Exhibits 103 and 104.

25   A    I would have -- there's a lot of video.

Diver - cross - Ser                                    1447

1  Q    Would taking a look at your spreadsheet notes help
2  refresh your recollection?
3  A    Yes, if you don't mind.
4         MR. SER:  Your Honor, may I approach?
5         THE COURT:  Yes.
6  Q    Mr. Diver, I'm handing you what was previously marked as
7  3500-JD-1.
8  A    Thank you.
9  Q    I will direct your attention to the most-right-hand
10 column, which you have shaded in green; correct?
11 A    Yes.
12 Q    All right.  And if you -- actually, let's start over.
13         On the far left side you have GX number; right?
14 A    Yes.
15 Q    I want you to take a look at the section for GX-103, 104
16 and look all the way to the right in the green-shaded area.
17 A    Yes, I see it.
18 Q    Does that refresh your recollection as to what time on
19 GX103 and 104 -- actually, it should be 104, right?  That's
20 the later footage?
21 A    Yes.
22 Q    Does that refresh your recollection as to what time the
23 victim stepped out?
24 A    That camera angle, yes.
25 Q    According to that camera angle, he leaves the club at

1   approximately 2:29 and 38 seconds a.m.; right?

2   A    Yes.

3   Q    Okay.  And the shooting occurs, according to the

4   timestamp again on GX-104 at 2:31 and 56 seconds a.m.; right?

5   A    Yes, give or take.

6   Q    Which is approximately two minutes, 18 seconds time;

7   right?

8   A    Yes.

9            MR. SER:  Thank you.  You can put that aside.

10  Q    Now, all the footage you reviewed you said you obtained

11  from law enforcement; right?

12  A    Yes, from Detective Capo.

13  Q    From Detective Capo.  And that was everything they had;

14  right?

15  A    That was everything they had.

16  Q    Okay.

17  A    That I am aware of.  I wasn't there to pull video.  This

18  is what I was given.

19  Q    Well, typically, when you're asked to do a compilation,

20  you get everything because they want a thorough compilation;

21  right?

22  A    No.

23  Q    Is there anything in this case tell you that wasn't the

24  case?

25  A    No.

Diver - cross - Ser                               1449

1   Q    So you believe you had all the video footage that had

2   been seized in the case?

3   A    Yes.

4   Q    Okay.  And we talked about the cameras and the angles and

5   you would agree that some of the cameras and the angles show

6   the area of 131st Street in front of the club entry/exit;

7   right?

8   A    Yes.

9   Q    And then some of the angles show the portion of Fowler

10  Avenue close to 131st; correct?

11  A    Yes.  Closer to the corner.

12  Q    Okay.  And then you would agree some of the camera

13  footage that we have captured Fowler near this BP gas station

14  here at the end; correct?

15  A    So there is a camera angle essentially in the middle of

16  the block, 131-31 Fowler.

17  Q    That's on Fowler; right?

18  A    Yes.  I'm just --

19  Q    Yep.  I appreciate that.  It's on Fowler, though; right?

20  A    Yes.

21  Q    At then at the end, there's a BP gas station?

22  A    Yes.

23  Q    And that was the footage we saw towards the end of your

24  compilation; right?

25  A    Of the cars heading south.

Diver - cross - Ser                           1450

1   Q    And those cameras were facing the corner of Fowler Avenue

2   and College Point Boulevard; right?

3   A    Yes.

4   Q    They were facing approximately where my pen tip is;

5   right?

6   A    Yes, that intersection in general.

7   Q    You did not receive any camera footage from anyplace

8   along Avery Avenue; correct?

9   A    I did not.

10  Q    All right.  Now, at times in your video compilation, the

11  video replay, so to speak, speeds up and slows down; right?

12  A    Speeds up.

13  Q    Correct.

14       In one spot, you marked it 100 times, 100X; right?

15  A    Yes.

16  Q    That means it's playing 100 times the normal speed;

17  right?

18  A    Correct.

19  Q    There were other spots where it sped up but you didn't

20  identify in your compilation what the playback speed would

21  have been; correct?

22  A    I don't believe that's the case.

23  Q    Okay.

24       MR. SER:  Can we bring up -- I'll move on.  It's

25  okay.

1  Q    When you sped up the video at 100X, by virtue of the fact

2  that it is playing 100 times faster than normal, you don't see

3  everything that occurs; correct?

4  A    You see everything that occurs, but it is just in fast

5  motion.

6  Q    Okay.  If you play that at normal speed, GX103 and GX140,

7  you'll be able to see people coming and going through the

8  entry/exitway for GS KTV karaoke, right?

9  A    Yes.

10  Q    Not very clear, though, when it's playing at 100 times

11  speed; correct?

12  A    You can't tell faces, but you can see bodies coming out

13  of the karaoke.

14  Q    Very quickly?  It's like a flash; right?

15  A    Right.

16  Q    Okay.  And I believe the video in the compilation played

17  at 100X speed through to -- I think we stopped it at about

18  2:23 a.m.?

19  A    Yes, highlighting the parking lot.

20  Q    Okay.

21       MR. SER:  Ms. Abreu, can you bring up GX-104?  I

22  want to play a few portions of GX-104.  Can you queue up

23  GX-104 to start at, I believe it's -- based upon the timestamp

24  on the video -- 1:44 and 45 seconds a.m.

25       (Video playing.)

1           MR. SER:  Ms. Abreu, can you play it for

2    approximately the next two minutes.

3    Q    Mr. Diver, I want you to watch the video.

4           And this is a video capturing again the entry/exit

5    of the karaoke club; right?

6    A    Yes, facing north.

7    Q    On 131st; right?

8    A    Yes.

9    Q    The parking lot is under the Van Wyck?

10   A    Yes.

11   Q    That open doorway there is what leads in and out of the

12   karaoke club?

13   A    Yes.

14   Q    Or, at least, the hallway to get to that elevator to go

15   up; right?

16   A    Yes.

17   Q    Right now, at approximately 1:45 a.m., according to the

18   timestamp, there are a couple of people who have walked out of

19   the karaoke club; right?

20   A    Yes.

21   Q    There is a gentleman standing on the sidewalk in front of

22   those doors there; correct?

23   A    Yes.

24   Q    It looks like he's watching or looking at his phone?

25   A    I'm not sure what he's doing, but he's on his phone.

1   Q    And he's smoking a cigarette?

2   A    Yes.

3   Q    Okay.  And he is standing out in front of that club;

4   correct?

5   A    Correct.

6           MR. SER:  Continue to play the video, please.

7           (Video playing.)

8           MR. SER:  You can let it continue to play.

9   Q    And now we're at approximately 1:46 a.m., according to

10  the timestamp on the video, and this gentleman is still

11  standing out there now for about a minute; right?

12  A    Yes.

13  Q    And there are some cars parked on the upper right-hand

14  corner of that screen; right?

15  A    Are you talking about the cars with the lights on?

16  Q    Yes, sir.

17  A    Yes, they're parked.

18  Q    Now, we're approximately 1:46 and 30 seconds, and again,

19  this gentleman remains standing on the sidewalk smoking a

20  cigarette; right?

21  A    Yes.

22  Q    This is playing at normal speed; right?

23  A    Yes.

24           (Video playing.)

25           MR. SER:  Can you pause it there.

1           (Video paused.)

2    Q    So at about 1:47 a.m., he discards the cigarette and

3    begins walking over to those cars; right?

4    A    He begins to head northbound on 131st Street, yes.

5    Q    So he was standing out there for about two minutes;

6    correct?

7    A    Yes, approximately.

8           MR. SER:  Can you continue playing that for

9    approximately 15 seconds.

10          (Video playing.)

11   Q    You can see a silhouette there right at about 1:47 a.m.

12   and ten seconds; right?

13   A    You see the individual getting into the car.

14   Q    A silhouette of the individual; right?

15   A    I think you can see him pretty clear.

16          MR. SER:  All right.  Can you queue up this same

17   exhibit to 154 and 55 seconds a.m.

18          That's good.  You can start playing it there.

19          (Video playing.)

20   Q    So we are now 1:54 and 55 a.m., according to the

21   timestamp, in the upper left-hand corner?

22   A    It says 59.

23   Q    We started it at 55?

24   A    Yes.

25   Q    Again, this is the same camera angle of GX-104 looking at

1   the entry/exit to the club, right?

2   A    Yes.

3   Q    And approximately 1:55:05 it looks like three different

4   individuals walk out of the club on to the sidewalk?

5   A    Yes, heading north.

6   Q    Okay.  At least one appears to be in some sort of black

7   jacket with a hood up; correct?

8   A    Yes.

9   Q    And he is, based on --

10             MR. SER:  Can you pause it there?

11  Q    -- at least at 1:55:27 --

12             MR. SER:  If we can go back just slightly.

13  Q    -- he appeared to be staring across into the parking lot;

14  right?

15             MR. SER:  Right there.  That's good.

16  Q    He seems to be facing the direction of the parking lot;

17  right?

18  A    His body is.  I'm not sure where he is looking.

19  Q    But his head is facing at least the parking lot as well;

20  right?

21  A    It's across the street, yes.

22  Q    And the other two gentlemen, it looks like, went to talk

23  to somebody in that car with the headlights on; correct?

24  A    I would need you to continue to play the video.

25  Q    Okay.

1      MR. SER:  Play the video, please.

2      (Video playing.)

3  Q    Again, that person with the hood is on the sidewalk and

4  now at 1:55:35 walks over to that car; correct?

5  A    Walks into the middle of the street, yes.

6  Q    And here, at 1:55:43, we now see a gentleman actually

7  entering the club; correct?

8  A    Yes.

9  Q    It looks like he came from the direction of the parking

10 lot and the Van Wyck; right?

11 A    From this camera angle, I can't exactly tell you.

12      He's coming from south heading north into the bar.

13 Q    And now we're approximately 1:56 a.m.

14      MR. SER:  Can you pause it there for a moment.

15 Q    It appears over the Honda Caravan that's parked in front

16 of an open doorway, there appears to be a silhouette; right?

17 A    It's that same person that was in front of the karaoke

18 bar.

19 Q    With the hood up; right?

20 A    Yes.

21 Q    Standing in the street?

22 A    Yes.

23      MR. SER:  Continue.

24      (Video playing.)

25 Q    It appears now the door is opening on that car with the

1   headlights on at approximately 1:56 and 10 seconds a.m. and

2   everyone is getting in; correct?

3   A    Correct.

4   Q    Okay.

5         MR. SER:  Can you queue up GX-104 now to 2:21 and 50

6   seconds.  That's good.

7         (Video playing.)

8   Q    The timestamp here is 2:21 and 50 seconds a.m., as I said

9   it; correct?

10  A    Yes.

11  Q    And the same camera angle outside the karaoke on 131st;

12  right?

13  A    Yes.

14  Q    And, again, the doorway is on the right?

15  A    Yes, it is.

16        MR. SER:  Can you play it.

17        (Video playing.)

18  Q    And approximately 2:21 and 58 seconds, it looks like

19  three gentlemen leave the club and cross 131st; correct?

20  A    Yes.

21        MR. SER:  Continue playing.

22        (Video playing.)

23  Q    And they disappear out of view of the camera at

24  approximately 2:22:08 a.m.; right?

25  A    At this camera angle, yes.

1           MR. SER:  Can you go up one more, Ms. Abreu, 2:23

2    and 50 seconds.  Perfect, pause it.

3           (Video playing.)  (Video paused.)

4    Q    Again, I'm showing you GX-104, this is the same camera

5    angle facing 131st in front of the entry/exit to the club;

6    right?

7    A    Yes.

8    Q    The timestamp now is 2:23 and 50 seconds a.m.; is that

9    right?

10   A    Yes.

11   Q    This was 2/12/2019 for all of the clips we have been

12   viewing; right?

13   A    From -- yes.

14   Q    Okay.

15          MR. SER:  Can you please play the video.

16          (Video playing.)

17          MR. SER:  Pause it.

18          (Video paused.)

19   Q    At approximately 2:23 and 57 seconds a.m., it appears two

20   people now leave the club; right?

21   A    Yes.

22          MR. SER:  Can you play it.

23          (Video playing.)

24   Q    Appears to be a man and woman; right?

25   A    Yes.

1   Q    And they cross 131st.

2        MR. SER:  Pause it there.

3        (Video played.) (Video paused.)

4   Q    They cross 131st; right?

5   A    Yes.

6   Q    And disappear out of view at approximately 2:24:04 a.m.;

7   right?

8   A    In this camera angle, yes.

9   Q    A considerable amount of foot traffic in and out of the

10  club leading up to at least 2:24 a.m.; right?

11  A    Yes.  It's a karaoke bar.

12  Q    And it's open very late?

13  A    I don't know what time it's open until.

14  Q    Still open at this time; right?

15  A    Yes.

16  Q    And the shooting occurs just minutes after these people

17  left; right?

18  A    Shortly after.

19  Q    Approximately six minutes or so; right?

20  A    Right.

21       MR. SER:  I don't have anything further, Your Honor.

22       THE COURT:  Does the Government have anything

23  further?

24       MR. PARK:  Just a quick redirect.

25       THE COURTROOM DEPUTY:  Mr. Park, do you need the

Diver - redirect - Park                    1460

1    lights?

2           MR. PARK:  I'm okay.

3    REDIRECT EXAMINATION

4    BY MR. PARK:

5    Q    Mr. Diver, you were asked on cross-examination about

6    whether or not you went to the scene of the shooting.

7           When was the incident?  When did the incident occur?

8    A    The incident occurred February 12, 2019.

9    Q    And when were you asked to put together the compilation

10   video?

11   A    It wasn't for months after that, that Detective Capo had

12   approached me to assist him on creating the video compilation

13   the first time.

14   Q    And were you asked to go back to the scene, you know,

15   three, four years after the shooting to review the physical

16   cameras?

17   A    No, I was not.

18           MR. PARK:  No further questions, Your Honor.

19           THE COURT:  Thank you.  You can step down.

20           THE WITNESS:  Thank you.

21           (Witness steps down.)

22           THE COURT:  Call your next witness.

23           MS. MOORE:  The United States calls Detective

24   Jeffrey Lehn.

25           THE COURTROOM DEPUTY:  Step up and raise your right

Diver - redirect - Park                    1461

1   hand, please.  Do you solemnly swear or affirm that you will

2   well truly interpret the proceedings before the Court?

3            THE WITNESS:  Yes, I do.

4            (Witness sworn.)

5            THE COURTROOM DEPUTY:  Can you please state and

6   spell your name for the record.

7            THE WITNESS:  My name is Jeffrey Lehn, L-E-H-N.

8            THE COURTROOM DEPUTY:  You may be seated.  Thank

9   you.

10           THE WITNESS:  Thank you.

11           (Continued on next page.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1  **JEFFREY LEHN**,

2       called as a witness, having been first duly

3       sworn/affirmed, was examined and testified as follows:

4  DIRECT EXAMINATION

5  BY MS. MOORE:

6  Q    Good afternoon.

7  A    Good afternoon.

8  Q    What is your educational background?

9  A    I graduated from the University of Rochester with a dual

10 major in both history and studio art.

11 Q    Where do you currently work?

12 A    For the NYPD, New York City Police Department.

13 Q    What is your title there?

14 A    I'm a detective.

15 Q    How long have you been with the NYPD overall?

16 A    I have just finished 18 years this past summer.

17 Q    How long have you been a detective?

18 A    I was promoted in March of 2012.

19 Q    And do you work for any particular unit within the NYPD?

20 A    I do.  I work for auto crim.

21 Q    What does the auto cripples unit do?

22 A    Our mission statement is to investigate auto theft

23 through theft training with chop shops, exporters, basically

24 the business of auto crime.

25            And we also function as an help line for the

Lehn - direct - Moore                          1463

1   department because we are the police department's car experts.

2   Q    And you said you function as like a help line.  What kind

3   of help do you provide to other members of the NYPD?

4   A    I go out and do a lot of search warrants.  I -- where I

5   work on cars, I pull data out of the vehicles.  I discover

6   hidden traps and compartments where people have secreted items

7   or contraband, and I also do a lot of vehicle IDs as well.

8   Q    Have you received any specialized training in connection

9   with your position within the auto crimes unit?

10  A    I have.

11            It started when I actually -- we run a school.  It's

12  a four-day program.  It started when I actually attended as a

13  police officer in 2008.

14  Q    Can you describe that four-day school for us?

15  A    Sure.  It covers how vehicles are used in crimes and how

16  to identify vehicles and laws pertaining to vehicles.

17  Q    And have you received any additional training with

18  regards to cars?

19  A    I have.

20            So I have taken classes relating to traps and hiding

21  places.  I went to a conference this past winter or spring

22  relating to that.

23            I have taken -- I'm a member of IAATI.  The

24  International Association of Auto Theft Investigators.  I took

25  their photographic and vehicle identification class.

Lehn - direct - Moore                                    1464

1           As part of that class, I was also certified as a

2     Level 1 and Level 2 vehicle theft investigator.

3     Q    Can you describe THE IAATI classes and the certifications

4     that you received from them?

5     A    Okay.

6           It's the -- the photo video one specifically?

7     Q    Yes.

8     A    It was -- it -- it was a few days of training, how to

9     view images and pick up on details within images and video

10    that could lead to you discern what type of vehicle you're

11    looking at on film.

12    Q    Do you have any certifications besides the IAATI one that

13    you just mentioned?

14    A    I do.

15          I have received training from the Berla, B-E-R-L-A,

16    Corporation.  They provide software and hardware regarding

17    forensics extractions of vehicles.

18          I'm certified through them as a vehicle forensic

19    technician and a vehicle forensic examiner.

20    Q    What does that mean?

21    A    It means I can determine what sort of information systems

22    would potentially be in a vehicle I'm supposed to be working

23    on function, and then from there, remove it, obtain the data

24    and analyze it.

25    Q    Have you done any appraisal work with regards to cars?

1    A     I have.

2    Q     Can you tell us about that?

3    A     Yes.  I am certified as appraiser, actually, with the New

4    York State Department of Finance for vehicle damage and theft,

5    and I do appraisal work for District Attorney's Office and

6    other prosecutorial agencies.

7    Q     Can you explain what that means?

8    A     In order to achieve a certain level of charge, there are

9    different values associated with the grand larceny, that that

10   car needs to be worth $100, 3,000, 50,000.  Based on the value

11   of the car, that determines the level of charge.

12            In order to become certified for that, I took a

13   course relating to the construction of vehicles, because in

14   order to repair damage, you have to be able to know how

15   they're built, and I had to pass a test in regards to that as

16   well.

17   Q     And how is the appraisal work that you have done helpful

18   when you are identifying a vehicle?

19   A     It's incredibly helpful.

20            That appraisal work means you're still looking at

21   different parts and components of a vehicle, different body

22   panels, for instance, and now I'm looking at that just the

23   same on film.

24   Q     Do you have any -- did you have any experience with cars

25   before you joined the NYPD?

Lehn - direct - Moore                                    1466

1    A    My entire life has been cars.  It started out as an

2    interest and a hobby when I was a little kid.

3             I proceeded to -- my first jobs were in mechanic

4    shops, mom-and-pop shops.  I started sweeping the floors, oil

5    changes, kept going.  And then I got on the force when I was

6    21.

7    Q    How many years did you work in mechanic shops?

8    A    I started when I was 16, so 16 to 21.

9    Q    Are you a member of any organizations related to your

10   work in the field of auto crimes investigation and

11   identification of vehicles?

12   A    I am.

13            I am a member of the Northeast Chapter of IAATI,

14   I-A-A-T-I, International Association of Auto Theft

15   Investigators.

16            I'm also a member of the New York State Chapter and

17   the International Association of Special Investigation Units.

18   It is an insurance group, actually, related to the appraisals.

19   Q    Appraisals of cars?

20   A    Yes.

21   Q    Do you do any teaching related to your work with regards

22   to vehicle identification?

23   A    I do.

24   Q    Can you tell us about that?

25   A    Yeah.  So that class I spoke about earlier, the NYPD auto

Lehn - direct - Moore                    1467

1  crime class, I actually run it now.  I'm the lead instructor

2  and course director.  I wrote the entire curriculum.

3          It's a four-day program that we put on for members

4  of the NYPD and other law enforcement agencies.  I've had

5  district attorneys, members of DMV, their investigators, and

6  people from all over the world in law enforcement community.

7  Q    When did you begin teaching those classes?

8  A    I began teaching when we reopened right after COVID, so

9  January of 2021, and I became the lead instructor in -- the

10 end of last summer.

11 Q    Can you tell us what a vehicle identification is?

12 A    Sure.  So there are two types of vehicle identifications:

13 There is a physical or a digital or photographic.

14         Starting with the physical, that's when the car has

15 been messed with in some way that would make it so it would be

16 difficult for law enforcement or anybody to determine what the

17 VIN number of that vehicle is, whether the VIN number has been

18 changed or damaged in some way or is just unreadable due to

19 accident damage or something.

20         Then I would go into the vehicle and examine

21 component parts, engines, transmissions, other places where I

22 could find labels that could indicate what that car is.

23 Q    And just to back up a second.  You mentioned a VIN

24 number.  What is a VIN number?

25 A    I'm sorry.  VIN, V-I-N, stands for vehicle identification

1    number.  It's unique to your vehicle.

2              Since 1981, all vehicles sold in the U.S. or for the

3    U.S. market have a 17-character VIN number that is effectively

4    the fingerprint for that car.

5    Q    You described physical identifications.  Can you walk us

6    through a digital vehicle identification.  What does that

7    mean?

8    A    Sure.

9              A digital vehicle identification is when a case

10   detective traditionally or someone in law enforcement presents

11   images or video that features a vehicle prominently, and based

12   on details I observe on the car, whether it's the shape of the

13   body panels, the headlight, taillight configuration, turn

14   signals, spoilers, various parts of the vehicle, you look for

15   those trim details in order to determine what vehicle you're

16   actually looking at.

17   Q    How often, if at all, do you use records and websites in

18   the course of doing a digital vehicle identification?

19   A    Every time.  It's not possible without -- in order to

20   determine exactly what you have and to be sure, I try to

21   backup everything I do with records and websites.

22             I'll oftentimes start with something like Car Gurus,

23   a for-sale website, because people take very, very good and

24   accurate pictures of the car they're posting for sale and you

25   can see it from every single angle, various models, various

1  trims of these vehicles, and then from there, those ads will

2  usually have a VIN number in it.  So I will go to NHTSA,

3  National Highway Traffic Safety Association, and they have a

4  website that decodes the VIN number.  So I can run that and

5  that will help me make sure that I am looking at -- what I'm

6  looking at is exactly as it is listed in the ad.

7  Q    Do you use any additional records or pamphlets or

8  brochures during the course of your identifications?

9  A    Yes, whenever possible, I actually use the sales

10  brochures from car companies.  There are archival sites where

11  they're hosted.

12  Q    And approximately how many car identifications have you

13  been involved in?

14  A    Hundreds.

15  Q    And approximately how many cars have you completed a case

16  on?

17  A    Probably around -- a little over 50.

18  Q    When you complete a case on a car, what does that mean?

19  A    That involves doing DD5s or reports that involves being

20  prepared to testify in regards to it, actually.

21         I will send sample photos of vehicles and this is

22  the car I'm putting my name on that.

23  Q    And how, if at all, do you validate your opinion when you

24  identify a particular car as a certain make or model?

25  A    Well, after sourcing out other images and details from

Lehn - direct - Moore                    1470

1    the internet, once I come up with my own assessment, I will

2    have one of my coworkers review the materials and we -- we

3    collaborate and determine.

4             (Continued on next page.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1   (Continuing.)

2   BY MS. MOORE:

3   Q    When you say one of your other coworkers, is this someone

4   else who also has gone through -- who is a part of, I guess,

5   the autocrimes unit?

6   A    Yes.  Traditionally, or typically, it's someone who is in

7   the Autocrimes Unit that has training to do this as well.

8           MS. MOORE:  Your Honor, pursuant to Federal Rule of

9   Evidence 702, at this point, I would move to qualify Detective

10  Jeffrey Lehn as an expert in the field of vehicle

11  identification.

12          THE COURT:  All right.  There being no objection,

13  he'll be received as an expert in this field.

14  Q    In relation to a car, what is a make?

15  A    It's the brand.

16  Q    Can you give a couple examples?

17  A    Sure.  Honda, Acura, Toyota.  Nike is a shoe company,

18  Toyota, is a car company.  It's the brand itself.

19  Q    And how about a model, what does that mean?

20  A    That's the car.  Honda Accord, Acura Integra, Toyota

21  Camry.

22  Q    What's an aftermarket feature?

23  A    Something that wasn't placed there by the factory.

24  Q    So something you would add or change to a car subsequent

25  to purchase?

1  A    Yes, something somebody placed there because they liked

2  it or they're an enthusiast.

3  Q    Walk us through how you look at a photo or identify it as

4  particular make or model.

5  A    Sure.  So, different car companies, they have -- they

6  don't want to seem like every other car, right?  An Audi

7  wanted to differentiate themselves from BMW.  There are

8  different design features that these companies use to separate

9  themselves from the crowd.  I start looking at different

10 aspects of the car where different companies will do different

11 things.

12 Q    And then is it kind of a similar process for once you've

13 determined the make and model to identify what year a

14 particular car might be?

15 A    Well, exactly.  So in terms of years, most car

16 manufacturers will have a production run where, say a Toyota

17 Camry or a Honda Accord, that car will be stable and

18 relatively unchanged for a few years because the process of

19 designing machinery and building it, I assume it's very, very

20 expense and they want to get their money back on the design

21 process.  So there will be a couple years of production.

22 Q    And you're, again, looking at those particular details

23 and design identification points to determine what year a

24 particular car might be?

25 A    It's the little things.  It could be the way there's a

Lehn - direct - Moore                                    1473

1   stroke of color in a headlight or a taillight, or the shape of

2   the rear quarter glass window, the rear most piece of glass on

3   the car besides the windshield, the way the C pillar, which is

4   that rear pillar connected the car, headlight shape, the

5   grill, even wheel traces.

6   Q    Did there come a time when you became involved in this

7   case?

8   A    Yes.

9   Q    What did you do in this case?

10  A    I received some photos and I performed a vehicle

11  identification.

12  Q    Other than reviewing photos and viewing videos, did you

13  do anything else in regards to this identification?

14  A    No.

15  Q    Do you know Allen Yu?

16  A    No.

17  Q    Do you know Xi Zhang?

18  A    No.

19  Q    What about Antony Abreu?

20  A    No.

21  Q    Okay.

22           MS. MOORE:  May I approach, Your Honor?

23           THE COURT:  Yes.

24  Q    I've just handed you a drive that contains Government

25  Exhibits 101-A, 103-A through D, 106-A and B, 140-A, 148-A,

1    305-A, 307-A through F, 317 through 320, 459 and 527.

2           Do you recognize that drive?

3    A    I do.  It has my signature on it.

4    Q    Is that because you viewed it and then signed the drive?

5    A    That is correct.

6    Q    Are these the videos and photographs that you reviewed

7    during the course of your investigation in this case?

8    A    Yes.

9           MS. MOORE:  Mrs. Campbell, would you mind dimming

10   the light, and, Ms. Reed, if you could pull up

11   Government Exhibit 320.  And if we can play the first 40

12   seconds.

13          (Video played.)

14   Q    Stopping at 40 seconds, were you able to identify the car

15   that was driving in this video?

16   A    Yes.

17   Q    What were you able to identify it as?

18   A    It's a 2003 to 2005 Honda Accord.

19   Q    You give a range of years.  Why is there a range?

20   A    Because it was in production for several years.  It

21   remained unchanged during this time.

22          MS. MOORE:  So, Your Honor I see it's after one

23   o'clock, if it makes sense to stop for lunch now.

24          THE COURT:  How much longer do you have with this

25   witness?

1    MS. MOORE:  Probably, like, half an hour.

2    THE COURT:  All right.

3    Ladies and gentlemen, we'll adjourn for lunch and

4    we'll begin promptly at 2:00.  So have a wonderful lunch.

5    (Jury exits the courtroom.).

6    THE COURT:  All right.  You can be seated.  You can

7    step down.

8    (The witness steps down.)

9    THE COURT:  How many identifications are going to be

10   made here?  Is it from other video and --

11   MS. MOORE:  Sure.  He's going to be identifying this

12   car and explaining how he made that identification.  There are

13   certain aftermarket features present in this car which he will

14   also be identifying.  There's the photo that Croizer took,

15   he'll be identifying that, and the videos that we saw earlier

16   with Mr. Acosta Pena.

17   THE COURT:  So both from the event itself and from

18   the photos that were shown the other witness?

19   MS. MOORE:  The videos and photos, yes.

20   THE COURT:  The video, yeah.  Is there going to --

21   Mr. Kousouros, you're not crossing on this, correct?

22   MR. KOUSOUROS:  No.

23   THE COURT:  Mr. Mazurek, is there going to be any --

24   MR. SER:  It will be brief.  I'll try to keep it as

25   streamlined as possible.

Lehn - direct - Moore                                    1476

1          THE COURT:  Okay.  I think we can probably move it

2    along a little bit.

3               Okay.

4               (A luncheon recess was taken.)

5               (Continued on next page.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Lehn - direct - Moore                      1477

1           A F T E R N O O N   S E S S I O N

2           (In open court; jury not present.)

3           (Witness resumes the witness stand.)

4           THE COURT:  Bring the jury out, please.

5           (Jury enters the courtroom.)

6           THE COURT:  I think we're ready to begin.  Everyone

7    be seated.

8           Ms. Moore.

9           MS. MOORE:  Thank you, Your Honor.

10   BY MS. MOORE:

11   Q    So I think just before we broke for lunch, you identified

12   a video -- or a car in a video.

13           MS. MOORE:  Ms. Reed, can you please pull up

14   Government Exhibit 103-B, which is in evidence.

15   Q    Is this a still from the video you reviewed?

16   A    Yes.

17   Q    Looking at the white car on the roadway, are there any

18   thing that you see here in the still that were helpful to you

19   in making your identification of this car?

20   A    Absolutely.  Looking at the vehicle, the shape of the

21   headlights, the two-tone side view mirrors, the general body

22   shape, front end and the way the rear quarter glass attaches

23   to the seat pillar, how the -- how it's completely horizontal

24   and even across the doors all the way to the corner, very

25   helpful in making the identification.

1  Q    So you used a couple of technical terms.  So you

2  mentioned that there's a two-tone side mirror, can you just

3  explain what you're talking about now?

4  A    Absolutely.  The side view mirror, the mirror closest to

5  the driver, you can see it is white on top and black on the

6  bottom.

7  Q    You mentioned a C pillar?

8  A    That's correct, an A, B, and a C pillar.  The A pillar is

9  the one that frames the windshield, the B pillar separates the

10  front and rear doors, and the C pillar is the roof support on

11  the back of the car.

12  Q    And you also mentioned a rear quarter glass I believe?

13  A    Yes.

14  Q    What is that?

15  A    It's on the side of the car, the rear most piece of

16  glass.

17  Q    And what about the rear quarter glass was helpful now

18  identifying this car?

19  A    The way it comes to a sharp point as right there actually

20  where the mouse is pointing, the way the glass is horizontal

21  and a flat line across the windows and it proceeds all the way

22  to the C pillar where it's met -- where it stops, yeah.

23  Q    Great.  Does this car have a moonroof?

24  A    It appears to.

25  Q    What's a moonroof?

1   A    Moonroof, sunroof, to most people, they are

2   interchangeable.  It's a window on top of the car.

3   Q    Was the moonroof available on all 2003 2005 Honda

4   Accords?

5   A    I don't believe so.

6   Q    Would looking at the brochure refresh your recollection?

7   A    I'm pretty sure it was only available on two of the trims

8   actually.

9           THE COURT:  On what?

10          THE WITNESS:  Two of the trim levels.

11  Q    What is a trim level?

12  A    So that's the next step past model.  So it's make, would

13  be the brand, model would be -- so, Honda in this instance,

14  the model would be Accord, and beyond that is a trim level.

15  So Accord had the DX, LX, and EX trims, and you could get it

16  with a four similar Dr. Engine or a V6.  And this point in

17  time, the moonroof was only available on the EX trims.

18  Q    The EX and the EX V6?

19  A    Yes.

20          MS. MOORE:  Ms. Reed, could you please pull up, just

21  for the witness, Government Exhibit 454.

22  Q    Do you recognize this?

23  A    I do.

24  Q    What is this?

25  A    This the sales brochure for a 2003 Honda Accord.

1   Q    Was this helpful to you in identifying the car we saw in

2   the video?

3   A    Yes, it was.

4   Q    And can you explain how?

5   A    So sales brochures are automakers taking pictures of

6   different aspects of the car.  It's marketing materials so

7   it's a reference from the manufacturer that I can compare to

8   the car on film.

9        MS. MOORE:  Your Honor, at this time, I would move

10  to admit Government Exhibit 354 into evidence.

11       THE COURT:  It will be received.

12       (Government Exhibit 354 was received in evidence.)

13       MS. MOORE:  Ms. Reed, if could you please go to page

14  13.

15  Q    What does this show?

16  A    This is the front and side of a 2003 Honda Accord.

17       MS. MOORE:  And, Ms. Reed, could you please pull up

18  Government Exhibit 103-B side-by-side with this.

19       Great.

20  Q    Can you explain the similarities that you see between the

21  car in 103-B and the 2003 Honda that we see in the brochure?

22  A    Sure.  So if you look at shape of the headlights, they

23  are fairly triangular and the opening for the grill, which is

24  the opening to allow airflow just in front of the hood, those

25  are very similar as well.  And, again, you can see the

1    two-tone side view mirror.

2    Q    How about the general shape of the vehicle?

3    A    The body shape is the same and even that rear quarter

4    glass and the C pillar.

5    Q    Great.

6         MS. MOORE:  Ms. Reed, can you please pull up

7    Government Exhibit 106-B.

8    Q    And is this another still from the video we watched?

9    A    It is.

10        MS. MOORE:  Ms. Reed, can you pull up side-by-side

11   with this Government Exhibit 354 again, and can you go to page

12   six, please.

13   Q    What do we see on page six of Government Exhibit 354?

14   A    This is the side and rear view of the same Honda Accord.

15   Q    And looking at the still in 106-B and then from

16   Government Exhibit 354, can you explain what similarities you

17   saw between these two cars that helped you in your

18   identification process?

19   A    Again, if you look at the shape of c pillar, it matches,

20   and the taillights, the opening where the license plate would

21   go.

22   Q    The location of where the license plate would go?

23   A    The location but also the shape of the taillights and how

24   they frame it.  Additionally, you can see the horizontal in

25   the brochure in the bumper itself and you can see the shadow

1    of it in the video.

2    Q    Great.  What's a rear quarter panel?

3    A    It's a semi-structural part of a car.  It's basically the

4    rear quarter of a vehicle.  There's one on either side of the

5    car.  On the front, you have a fender, on the back, you have a

6    rear quarter panel.

7    Q    Okay.  And are the rear quarter panels consistent between

8    the car we see in 106-B and 454?

9    A    Yes.

10             MS. MOORE:  Ms. Reed, can we look back at 103-B,

11   please.

12   Q    So looking back at this car, is there anything that we

13   see here that's inconsistent with the -- with, like, a factory

14   model 2003 to 2005 Honda Accord?

15   A    There are.  Starting with the front bumper itself, the

16   2003 to five Honda Accord did not have openings for fog

17   lights, the sides under the headlamps.

18   Q    Are the fog lights the little lights that the cursor was

19   just showing that are underneath the --

20   A    Yes, right there, that circle, that's a fog light -- or

21   that's the -- and the 2003 to five Honda Accord, its bumper

22   didn't have these openings.  Additionally, the grill is

23   different.  If you notice, the opening for the grill is the

24   same but where the chrome runs between the headlights, on the

25   older car, the 2003 to 2005, the chrome wasn't this fatter

Lehn - direct - Moore                          1483

1    strip running along the top to the Honda H.

2    Q    What were those details, this change to the grill and the

3    fog lights and the bumper, what were those more consistent

4    with instead of a 2003 to 2005?

5    A    It was consistent with a 2006 or seven Honda Accord.

6    Q    Okay.

7              MS. MOORE:  And then, Ms. Reed, if we could

8    side-by-side this with Government Exhibit 354 again, please.

9    And could you please go to page 13 again.

10   Q    So I'm looking at the driver's side headlight in 454.  Do

11   we see any pigment there?

12             THE COURT:  See any what?

13             MS. MOORE:  Pigment.

14   A    In the still from the video?  Yes.

15   Q    No, in 454 from the --

16   A    Oh, from the brochure?  Yes, you do.  Right on the

17   outside edge, you can see the coloration or pigment.

18   Q    And what color is that?

19   A    Orange-ish.

20   Q    And then how about the car in 103-B, do we see that same

21   pigment in the driver's side light?

22   A    No, you do not.

23   Q    What does that tell you?

24   A    They were probably aftermarket.

25             THE COURT:  What does aftermarket mean?

1        THE WITNESS:  Aftermarket is something added on not

2   by the manufacturer, some -- a customization or a replacement

3   apartment put on the vehicle later on.

4        THE COURT:  All right.

5        MS. MOORE:  Ms. Reed, can you pull up, just for the

6   witness, Government Exhibit 455.

7   Q    Do you recognize this?

8   A    Yes.

9   Q    What is this?

10  A    This is the sales brochure for a 2006 Honda Accord.

11  Q    What this helpful to you in identifying certain of the

12  replacement parts that we saw on the other car?

13  A    It was.

14       MS. MOORE:  I move to admit Government Exhibit 455

15  into evidence.

16       THE COURT:  All right.  It will be received.

17       (Government Exhibit 455 was received in evidence.)

18       MS. MOORE:  If we can publish this and go to page

19  five, and then, Ms. Reed, if you could put that side-by-side

20  with Government Exhibit 354, and if you can go to page 13,

21  please.

22  Q    So, can you describe the differences that we see between

23  the grill and the bumper between the '03 and the '06 Honda

24  Accord?

25       THE COURT:  Maybe you just want to remind the jury

1   which is which.

2            MS. MOORE:  Sure.  That's a good idea.

3   Q    So which car are we seeing on the left?

4   A    The left is going to be the 2006 or seven Honda Accord.

5   Q    And the right?

6   A    Is going to be the three to five check.

7   Q    Great.  And then if you could explain the differences in

8   the grill and bumper.

9   A    So starting with the grill, if you look at the image on

10  the left, the 2006 or seven Honda Accord, you can see the

11  chrome strip running from the outside edge near the headlight

12  towards the Honda H along the top, and you can also see how

13  it's thick compared to the chrome on the other grill.

14           Additionally, if you look at the bumper, there are

15  vertical supports and the shape and cut off is a little

16  different.  There are openings underneath the headlights which

17  the -- the subject car had fog lights in, but you can see the

18  openings here very clearly, and on the older 2003 to five, you

19  can see the solid plastic on the bumper.

20           THE COURT:  Clarify something.  You said the subject

21  car.  What did you mean by that?

22           THE WITNESS:  The one that I ID'd before.

23           THE COURT:  The one that was in the video?

24           THE WITNESS:  Yes, ma'am.

25           THE COURT:  455, we're looking at the 2006?

1        THE WITNESS:  Yes.

2        THE COURT:  So just to clarify, what is the

3   difference between the 2006 and the car you saw in the video?

4        THE WITNESS:  The 2006 here?

5        THE COURT:  Yes.  You were -- the things with the

6   red markings around them, that's a 2006, right?

7        THE WITNESS:  This is a 2006?

8        THE COURT:  Now, you were saying that was different

9   from the car you saw in the video, correct?

10        THE WITNESS:  The car in the video is a 2003 to

11   five, but it's been customized.  There are aftermarket

12   additions or changes that were done with the vehicle.

13   Q    That were consistent with a 2006 to seven Honda Accord?

14   A    Especially the bumper, yes.

15   Q    And the grill?

16   A    Yes.

17        THE COURT:  So the bumper and the grill that we're

18   looking at now in the 2006 car, you saw those features in the

19   car you saw the video?

20        THE WITNESS:  Yeah.  So the --

21        THE COURT:  You're reaching the conclusion that it

22   was add-ons or whatever you call them?

23        THE WITNESS:  So it was -- the 2006 updates to the

24   vehicle, it was a refresh of the model.  They kept most of the

25   components under the hood the same and they just adapted,

1    stylisically, some changes to the vehicle so all of the parts

2    fit from one vehicle to another.  That's what this was.  So

3    it's the bumper and grill from a 2006 or seven Honda Accord on

4    the 2003 to five Honda Accord.

5    Q    And then to this point --

6              MS. MOORE:  Ms. Reed, if you can keep Government

7    Exhibit 455 page five up and then put it up -by-side with

8    Government Exhibit 103-B.  And then if you'll go it page five

9    of Government Exhibit 455.

10   Q    And then can you describe the differences or the

11   similarities that you see with regards to the grill in the

12   bumper in the car we see in Exhibit 103-B with the 2006 that

13   we see in Government Exhibit 455?

14   A    It looks very similar to me.  You can see the chrome in

15   the grill itself running along the top edge of the grill, you

16   can also see the openings underneath the headlights where the

17   fog lights are in 103-B.

18             MS. MOORE:  In Government Exhibit 455, can you

19   please go to page 25 but keep them side-by-side.  And if you

20   can zoom in the car on the top left.

21   Q    Do we see any fog lights in the car in Government Exhibit

22   455?

23   A    You do.

24   Q    And how are they shaped?

25   A    Oval or circular.

1  Q     How does that compare to the fog lights we see in

2  Government Exhibit 103-B?

3  A     The fog light in the brochure, it seems like a circular

4  or an oval in a black plastic mounting piece in that opening

5  in the bumper.  The fog light in 103-B appears to take up the

6  entire opening.  It's a completely different shape.

7  Q     What does that tell you?

8  A     It's probably aftermarket.

9  Q     Okay.

10         MS. MOORE:  And then, Ms. Reed, can you pull up

11  Government Exhibits 455 and 354 side-by-side, and if in

12  Government Exhibit 354, you can go to page 15 and if you'll go

13  to page 16 in 455.

14  Q     And, again, just for clarity, is the '06 on the left and

15  the '03 on the right?

16  A     Yes, the 2006 is on the left and the 2003 is on the

17  right.

18  Q     And what are we looking at on these pages for these two

19  cars?

20  A     This is the unibody, or the car minus everything.  This

21  is just the frame of the vehicle, no doors, no wheels, no

22  bumpers, no fenders.

23  Q     And will you remind us again just what a rear quarter

24  panel is?

25  A     Sure.  It's the rear quarter of the vehicle.  It starts

1   on the C pillar and goes the entire back part of the vehicle

2   and it ends where the door opens on the floor.

3           THE COURT:  Can you just show that on the --

4           THE WITNESS:  Sure.

5           MS. MOORE:  The screens don't work but I think

6   Ms. Reed will do a circle.

7           THE COURT:  All right.  What has been circled?

8   Well, it's not circled anymore.  What part of the car is that?

9           THE WITNESS:  That's the rear quarter panel.  It

10  would actually extend a little further forward even.

11          THE COURT:  How much further forward?

12          THE WITNESS:  Up until that C pillar, that's the

13  vertical pillar between the windshield and the door and a

14  little further down the wheel well.

15          THE COURT:  There?  Is that right?

16          THE WITNESS:  Yeah, it's welded into the car, so you

17  weld in just below the -- the wheel or just in front of the

18  wheel typically, and then into the C pillar as well, when you

19  attach it.

20  Q    And looking at the rear quarter panels of the two cars,

21  can you explain the differences?

22  A    It's significant.  If you look at the shape and the

23  method of how the bumper lines up and the retail lights.

24  Q    So given that the rear quarter panels of the car we saw

25  in Government Exhibit 320 and 103-B had -- and 106-B had a

1  rear quarter panel consistent with a 2003 to five but had a

2  bumper and a grill consistent with an '06 to '07, how are you

3  able to determine it was an '03 to '05 with an '06 to '07

4  grill instead of vice versa?

5  A    Bumpers swap and change very, very easily.  It's a few

6  clips typically, maybe a couple of fasteners.  With this, you

7  actually need to physically cut a semi structural member of

8  the car out and you need to do it on either side of the

9  vehicle.  Afterwards, you would need to weld in the new piece

10  and then smooth it out, send the whole car out to be painted.

11  It's an incredible amount of work.

12  Q    And how long would that take?

13  A    A long time, the body shop time, welding time, it -- it's

14  very expensive too.

15  Q    And how does that compare to the length of time and the

16  cost associated with changing a grill and a bumper?

17  A    Grill and bumper are very, very quickly, a couple hours.

18            MS. MOORE:  Ms. Reed, can we please go to Government

19  Exhibit three 20 and if you'll go to one minute and 59 second

20  and then if you'll go forward eight frames.

21            (Video played.)

22  Q    Do you see anything on the side mirrors that is

23  noteworthy here?

24  A    Yes, but can you zoom in a little bit?

25  Q    Sure.

1          THE COURT:  What exhibit is this just for the

2     record?  I'm sorry.

3               MS. MOORE:  320.

4               THE COURT:  320.  This is a still shot from a video?

5               MS. MOORE:  We're just at a particular point in time

6     in the video, correct, Your Honor.

7     Q     Do you see anything on the side mirrors that's

8     noteworthy?

9     A     Yes, you can see on the side mere it appears to be an

10    indicator, or a turn signal.

11    Q     And why was that noteworthy?

12    A     It wasn't available on 2003 to five Honda Accords.

13    Q     So again that's another aftermarket feature?

14    A     Yes.

15    Q     Okay.

16              MS. MOORE:  And then, Ms. Reed, if you can go to

17    106-B, please.

18    Q     Do you see anything noteworthy on the trunk of the car?

19    A     Sorry, my monitor turned off.

20    Q     Let us know when you're back up and running.

21    A     I'm good.

22    Q     Do you see anything noteworthy on the trunk of the car?

23    A     Yes, there appears to be a spoiler, a lip style spoiler.

24    Q     Why is that noteworthy?

25    A     Again, it wasn't available from the factory on the 2003

Lehn - direct - Moore                                    1492

1    five Honda Accords.

2    Q    Okay.

3         MS. MOORE:  Ms. Reed, can you please pull up

4    Government Exhibit 307-C first.

5    Q    Is this another still from the video that you reviewed?

6    A    My monitor is black, I'm sorry.  There we go.  Yes, it

7    is.

8    Q    Okay.

9         MS. MOORE:  And then if you'll zoom in on the car,

10   Ms. Reed.

11   Q    Were you able to identify the car?

12   A    Yes.

13   Q    What were you able to identify it as?

14   A    A 2003 to five Honda Accord.

15   Q    How were you able to do that?

16   A    The same as previous.  The shape of the C pillar, the

17   rear quarter glass, the dimple in the bumper, the shape of the

18   taillights framing out the rear license plate.  It appears to

19   even be an emblem in the correct place for the Honda logo.

20   Q    Great.

21        MS. MOORE:  Ms. Reed, can you please pull up

22   Government Exhibit 527.

23   Q    Is your screen up and running?

24   A    I'm just a couple seconds behind I think.  There we go.

25   Q    Okay, great.  Are you able to identify the car in this

1    photograph?

2    A    Yes.

3    Q    This one a little bit easier probably.  Can you explain

4    what kind of car this is and how you were able to identify it?

5    A    Well, it's a 2003 to five Honda Accord.  You can see the

6    Honda emblem clearly.  You can see where it says Accord above

7    the rear taillight.  The A and C are missing on this one,

8    though, there's a mark on the car where V6 may be indicated.

9    And it's just the shape, again, of the taillights surrounding

10   the license plate and the taillight on the deck lid of the

11   trunk.

12           MS. MOORE:  Can you please pull up side-by-side with

13   this, Ms. Reed, Government Exhibit 454, page 11.

14   Q    So you mentioned there was a marking on the car we see in

15   Government Exhibit 527 below the right taillight that was

16   consistent in location with a V6 badging.  Do we see that on

17   the Honda Accord we see in Exhibit 454?

18   A    Yes, that's what is circled.

19   Q    And are they in the same location?

20   A    Yes.

21   Q    Okay.

22           MS. MOORE:  Ms. Reed, if you'll please play

23   Government Exhibit 317.  It's already in evidence.  And if

24   you'll play it at half speed.

25           Could you zoom out.

1          (Video played.)

2          MS. MOORE:  And if you'll go to one second, please,

3   Ms. Reed.

4          (Video played.)

5   Q    What do we see here?

6   A    The spoiler.

7   Q    What kind of spoiler?

8   A    It appears to be a lip spoiler.

9   Q    Can you also see a bit of taillights?

10  A    Yes.

11  Q    What color is this car?

12  A    White.

13         MS. MOORE:  And, Ms. Reed, if you could go forward

14  ten frames, please.

15  Q    And what do we see there under the spoiler?

16  A    A Honda emblem.

17         MS. MOORE:  And if you could go forward another

18  eight frames, please, Ms. Reed.

19  Q    What do we see above the right taillight there?

20  A    The Accord badging.

21  Q    Does it appear to have any damage to it?

22  A    Yes, the A and C are missing it looks like.

23         MS. MOORE:  Can you go forward another ten frames,

24  please, Ms. Reed.

25         And what do you see below -- above the bumper below

1   the right taillight?

2   A    There's a mark there, the location corresponds to where

3   it could be badged V6.

4   Q    Based on viewing the car in this video, what kind of car

5   does this appear to be?

6   A    A 2003 to five Honda Accord.

7          MS. MOORE:  And can you pull up again Government

8   Exhibit 527, Ms. Reed.

9   Q    Are there similarities between the car we see here in

10  Government Exhibit 527 and the car we just saw in the video?

11  A    Well, yeah, they are both 2003 to five Honda Accords,

12  but, specifically, you can see the A and C missing out of

13  Accord, out of the Accord badge, and the mark for -- in the

14  location of the V6 badge is there.

15  Q    Are they both white?

16  A    They are.

17  Q    Do they both have lip spoilers?

18  A    They do.

19         MS. MOORE:  Ms. Reed, can you please play Government

20  Exhibit 318 at half speed.

21         (Continued on next page.)

22

23

24

25

1    BY MS. MOORE: (Continuing.)

2            MS. MOORE:  Can you please go to three seconds,

3    Ms. Reed.

4            (Video recording played.)(Video recording stopped.)

5    Q    And what do we see here?

6    A    A wheel with a Honda emblem.

7            MS. MOORE:  And can you go to seven seconds, please.

8    Q    And what part of the car do we see here?

9    A    The C pillar and the rear quarter glass.

10           MS. MOORE:  And can you go to eight seconds, please,

11   Ms. Reed.

12           (Video recording played.)(Video recording stopped.)

13   Q    What do we see at this part of the video?

14   A    The lip spoiler, the Accord badging missing the A and C,

15   and the taillights.

16   Q    Do we also see, like, a marking below the right rear

17   taillight?

18   A    Yes.  It's right there where the mouse is.

19   Q    And having viewed this video, what kind of car does this

20   appear to be?

21   A    2003 to '5 Honda Accord.

22           MS. MOORE:  And Ms. Reed, if you can now play

23   Government's Exhibit 319 at 50 percent speed.

24           (Video recording played.)(Video recording stopped.)

25           MS. MOORE:  Great.  If you'll play it again and stop

1    at three seconds.

2              (Video recording played.)(Video recording stopped.)

3    Q    What do we see here?

4    A    I see a lip spoiler and we're looking at the rear quarter

5    panel and the brake light.

6              MS. MOORE:  If you'll continue playing it and stop

7    at six seconds.

8              Can you go forward just a bit.  Stop.

9              (Video recording played.)(Video recording stopped.)

10   Q    What do we see on the side mirrors?

11   A    It appears to be a turn signal or indicator.

12   Q    And was that feature available on factory Honda Accords

13   of 2003 to 2005?

14   A    It was not.

15             MS. MOORE:  And if you'll play again and stop around

16   eight seconds.

17             (Video recording played.)(Video recording stopped.)

18   Q    What do we see here?

19   A    A headlight, but it's missing the pigmentation on the

20   outside edge.

21   Q    And do we also see fog lights in the bumper?

22   A    Yes.

23             MS. MOORE:  And if you could go to 12 seconds,

24   please, Ms. Reed.

25             And then go eight frames forward.

LEHN - DIRECT - MS. MOORE                    1498

1     (Video recording played.)(Video recording stopped.)

2   Q   Does this car have a moonroof?

3   A   Yes, it does.

4     MS. MOORE:  And if you'll play again and stop at 16

5   seconds.

6     (Video recording played.)(Video recording stopped.)

7   Q   And what do we see here?

8   A   The Honda grille with the chrome along the top edge

9   indicating a 2006 or '7 Honda Accord.  We can also see the

10  bumper shape that corresponds with those years, and fog lights

11  that are on.

12  Q   And if you'll look at this --

13    MS. MOORE:  Ms. Reed, can you pull this up side by

14  side with Government Exhibit 455.  If you'll go to Page 5,

15  please.

16    (Exhibit published.)

17  Q   Can you explain the similarities that we see in the car

18  in 319 and the car in 455?

19  A   So 455 is the sales brochure for the 2006 Honda Accord.

20  If you look at that, you see in the grille, the chrome strip

21  running along the top edge towards the Honda emblem, and you

22  can see the front bumper with the vertical supports and the

23  openings underneath the head lamps.

24  Q   Notwithstanding the bumper and grille being consistent

25  with a 2006 to '7, based on this video, what kind of car are

1    you able to say that this is?

2    A    A 2003 to '5 Honda Accord.

3    Q    And is that because of the rear quarter panel that we

4    saw?

5    A    Absolutely.

6             MS. MOORE:  And if you could pull up side by side,

7    319 and 103B, please, Ms. Reed.  And if you'll just zoom in a

8    little bit.

9             (Exhibit published.)

10   Q    Can you explain how these two cars compare?

11   A    They appear to be the same.  They both share the 2006 or

12   '7 front bumper and grille.  Additionally, they have fog

13   lights that appear to take up the entire opening within the

14   space on the bumper, and you can see the indicator on the

15   mirror on the passenger mirror, and you can see it on the

16   driver mirror in 103B.

17   Q    Do they both have moonroofs?

18   A    They do.

19   Q    Are they both white?

20   A    They are.

21            MS. MOORE:  Ms. Reed, can you play just another

22   second in 319.  A little further.

23            (Video recording played.)

24            MS. MOORE:  Can you go back so we can see the

25   driver's side light.  Maybe go to like 16 seconds, and then

1    we'll play it slowly, please.

2              Pause there.

3              (Video recording stopped.)

4    Q    Do we see any pigment in the driver's side light here?

5    A    No.  I don't see any pigment.

6    Q    Okay.

7              MS. MOORE:  And Ms. Reed, if you could pull up

8    Government Exhibit 459, which is in evidence.

9              (Exhibit published.)

10   Q    And looking at the first page, are you able to identify

11   the car that we see here?

12   A    Yes.

13   Q    And what kind of car is this?

14   A    It's a 2003 to '5 Honda Accord.

15   Q    And how are you able to identify it, thusly?

16   A    It's the shape of the triangular head lamp, the C pillar,

17   the way the rear quarter glass lines up and the shape of it,

18   and the rear quarter panel and the taillight shape.

19   Q    Does this car have any after-market features?

20   A    It does.

21   Q    What?

22   A    It has the lip spoiler and I can see the side-view

23   mirror, as well, with the indicator on it.

24   Q    Does this car have a moonroof?

25   A    It does.

1          MS. MOORE:  And if we can go to Page 2, please,

2     Ms. Reed.

3     Q     Looking at the front of this car, does it have any

4     after-market features?

5     A     It does.

6     Q     Can you explain those?

7     A     Sure.  The headlights are missing the pigmentation, and

8     the fog lights fill up the entire cavity or void in the bumper

9     underneath them.

10    Q     What about the grille?

11    A     The grille is -- appears to be a 2006 or '7 Honda Accord.

12    Q     And how does this car compare to the one we saw in the

13    video that we watched at the very beginning, Government's

14    Exhibit 320, where we saw the car turn, go down the street?

15    A     It looks the same.

16    Q     Thank you.

17          MS. MOORE:  No further questions.

18          THE COURT:  Mr. Ser.

19    CROSS-EXAMINATION

20    BY MR. SER:

21    Q     Good afternoon, sir.

22    A     How are you?

23    Q     Good.  Thank you.

24          Your role was to identify the vehicles you said

25    captured on all these videos and photographs that you were

1  provided, right?

2  A     Yes.

3  Q     To identify make and model of the white sedans that you

4  saw in all these different videos and photos, right?

5  A     Yes.

6  Q     All right.  And you were also asked to make a comparison

7  of the white sedans in what essentially amounts to four

8  separate sets of materials, right?

9  A     Yes.  I was asked to do an identification.

10 Q     Right.  And one set would be the videos that you were

11 provided, right?

12            I'm sorry, videos from approximately 131st Street in

13 Flushing, Queens.

14 A     I honestly don't know the location.

15 Q     Okay.  Another set would be the two still images that you

16 were provided behind this white sedan?

17 A     Again, I don't know the location.  I was sent some video

18 and photographs and asked to make a determination of the

19 vehicle.

20 Q     Okay.  What we saw the offer-up photos, right?  That's

21 one set of photographs you were provided?

22 A     That was a second identification I did later on.

23 Q     Right.  And then there were those three videos that we

24 were looking over just now that appeared to be inside some

25 sort of garage, right?

LEHN - CROSS - MR. SER                    1503

1   A    Yes.  That was part of the second identification.

2   Q    All right.  So those are two sets that you were

3   comparing, and then, again, we have the briefs sets which were

4   these outdoor videos, right?

5   A    The security camera, it appears to be footage?

6   Q    Right?

7   A    Yes.

8   Q    And then we had -- it appears two still photos, I guess,

9   of the back of a white sedan, right?

10  A    The security camera photos.

11  Q    Whatever it was from, it was two still images of the rear

12  end of a white sedan, right?

13  A    I -- do you want to --

14  Q    No, I'm asking you.  Just trying to narrow down the

15  categories of materials that you were comparing, that's all.

16  A    I received photographs that I made a determination on.

17  That was the first vehicle ID.  And then the second one had

18  the videos and the offer-up photographs.

19  Q    Okay.  But your role here was not to determine anyone who

20  might have been in the white sedans in the videos and images

21  you were looking at?

22  A    My job was to identify the vehicle, year, make, model.

23  Q    So you did not identify -- your job was not to identify

24  anyone inside of the vehicle?

25  A    Nope.

1  Q    Right.  Not to identify or determine who might have been

2  in possession of the vehicles?

3  A    Nope.

4  Q    Okay.  Not your job to determine when any of the

5  after-market modifications might have been made to those

6  vehicles?

7  A    No.

8  Q    Okay.  And not your job to determine who might have done

9  those after-market modifications to these vehicles, right.

10  A    No, sir.

11  Q    Now, in this case you didn't have an opportunity to

12  physically inspect the vehicle, right?

13  A    No, I don't.  Most of these, I don't, though, because

14  this is --

15  Q    My question is simple.

16          You didn't have a chance to do a physical inspection

17  of a vehicle here, right?

18  A    That's not part of a photographic or video

19  identification.

20  Q    Right.  So all you were provided were the photos and

21  videos to look at this in case, right?

22  A    Yes.  However --

23  Q    Sometimes you have a vehicle, though, to look at, right?

24  A    It's a different process.  If I have a physical video

25  vehicle to look at, it's because there's something wrong,

1   typically with --

2   Q    Or a vehicle has been --

3              THE COURT:  Let him finish his answer, okay.

4   A    Typically, when I'm examining a physical vehicle, the

5   actual object in front of me is unidentifiable for some

6   reason, whether it's the VIN numbers have been changed -- we

7   all call that tagged -- or if it's potentially been in a

8   really bad accident and the VIN numbers are crushed or

9   destroyed or something happened to it.  That's when I would

10  physically examine a vehicle to perform an identification.

11  Most of the vehicle identifications I do are photographic and

12  video based.

13  Q    Most.  But there are times where you have a physical

14  vehicle you can go inspect and look at, right.

15  A    Yeah, that's what I just said.  When I'm trying to

16  determine the VIN of the vehicle, true then.

17  Q    Right.  So if you have photos and videos of a vehicle

18  that you were provided, you can sometimes and do sometimes

19  make a comparison between those photos and videos and what you

20  physically can go inspect, correct?

21  A    I guess I could.  But that's a totally separate job, a --

22  Q    You've never had to make an identification or testify as

23  to opinion whether a vehicle is the same vehicle as depicted

24  in photos and videos and what might have been seized by law

25  enforcement at some point?

1  A    I have made that, yes.  I have testified --

2  Q    And so you would agree if you had a physical car to go

3  inspect, you'd be able to do a more detail inspection of a

4  vehicle you can go physically go see, right?

5  A    It's not necessary in this.  There's so many --

6  Q    I'm not asking if it's necessary in this.  But if you had

7  a physical vehicle to go inspect, you could go take a look at

8  that vehicle and look as close up as you felt you needed to,

9  right?

10  A    Again, that's not part of a photographic or video

11  identification.

12  Q    I'm asking you if you had a physical vehicle to inspect

13  it'd be almost no limitation as to what you could look at on a

14  vehicle if you actually had it to go look at, right?

15        You could get as close to it as you wanted, right?

16        Yes or no?

17  A    If I'm actually inspecting it?  If there --

18  Q    Sir, it's a yes-or-no question.

19        Could you get -- if you're doing a physical

20  inspection of a real car that's in the custody of police, you

21  can get as close to that vehicle to examine as you want,

22  right?

23  A    That depends on the circumstances.  Legally speaking, if

24  I'm able to open things up or why I'm going in.  I'm allowed

25  to identify a vehicle, and in order to do that, if it's a

1    physical identification because we don't know what the actual

2    VIN number is, so we can't tell what the vehicle is --

3    Q    Sir, I'm not asking about a VIN number.

4         I'm just asking, if you have a physical you can go

5    look at, you get up close and personal, even without touching

6    it, you can get within inches of a part of a vehicle to look

7    at it with your eyes, right?

8    A    Yes.

9    Q    Okay.  You can get up to within inches of it to look at

10   it with a camera, right?

11   A    Yes.

12   Q    To get up within inches of it to look at it with a video

13   camera, right?

14   A    I guess so.

15   Q    Now, if you're provided photos and videos, though, you're

16   stuck with whatever angle those photos and videos provide you,

17   right?

18   A    In this specific case, they're several different

19   angles --

20   Q    Sir, my question is this:  You cannot change the angle of

21   a photograph you were provided, right?

22        It is what is in the photograph in, correct?

23   A    It is.  But that's the reason for watching a video,

24   because it allows you to go frame by frame and see it as it

25   changes --

1  Q    And in a video, though, you're stuck with whatever angles

2  the entire video provides?

3        You may not still be able to see the entire car,

4  correct?

5  A    That's correct.  But --

6  Q    Thank you, sir.  That he was my question.

7        And then in photographs and videos, the lighting may

8  affect how well you can see a car, right?

9  A    Well, that's what I was about to speak about.

10  Q    Is it -- yes or no?

11  A    Yes, because when as a car moves down the street, it's

12  passing -- say there's a streetlight nearby or head lamps or

13  on in a different vehicle.  As that car moves, those lighting

14  changes will highlight different aspects of the vehicle, body

15  lines, different contours.

16  Q    Sometimes an image or a video will be out of focus,

17  right?  It'll be blurred?

18  A    Yes.

19  Q    Okay.  Those kinds of things will make it difficult to

20  use photos and videos to make an identification or comparison,

21  right?

22  A    Absolutely.

23  Q    Okay.  Now, you testified earlier about your opinion that

24  these white sedans we saw in all these videos and images were

25  one in the same, that was your opinion, right?

1   A    We were discussing the 2003 to '5 Honda Accord.

2   Q    Right.  And it's your opinion that the same car appears

3   in all of those videos and images that you were examining?

4   A    Yes, it does.

5   Q    You focused in particular, it seemed, on the rear -- the

6   back end of this white sedan, right?

7   A    Well, I looked at the entire car, because I had images of

8   the entire vehicle.  What I'm doing is --

9   Q    Let me rephrase that was question.  That was a bad

10  question on my part.

11           You focused, for example, on some missing letters on

12  Accord badge on the trunk lid on the back of the white sedans,

13  right?  That was one of the --

14  A    That was --

15           (Simultaneous Crosstalk).

16           (Court reporter interrupts for clarification.)

17  Q    I'm sorry, I'll repeat the question.

18           That was one of the points of comparison you were

19  looking at in all of these different photos and videos?

20  A    Yes.  That was just one of many aspects.

21  Q    You were looking at the other, I think you mentioned, the

22  Honda badge, that is the letter H and where it was position on

23  the back of the trunk lid, correct?

24  A    Yes.

25  Q    Okay.  You were also looking at how the bumper appeared,

1    correct?

2    A    The shape of it.

3    Q    Correct.

4    A    Yes.

5    Q    Okay.  You were looking at where you said an LX logo

6    would appear, correct?

7          On the rear end of the white sedan, you said below

8    one of the taillights there would be have been an LX badge or

9    something, correct?

10   A    Not an LX badge.  If there was a badge there, that would

11   indicate a V6, from the factory.

12   Q    Okay.  But a badge, nonetheless, on the back end, right?

13   A    I didn't identify a badge.  I said a mark.

14   Q    Okay.  So a mark on the back beneath that right

15   taillight, correct?

16   A    Yes.

17   Q    Okay.  So we have four or five of these points of

18   comparison just along the backside of the white sedan that you

19   were relying on, correct?

20   A    Yes.  In order to identify the 2003 to '5 Honda Accord.

21   Q    But you also used those points of comparison to testify

22   that you believed -- it was your opinion -- that the white

23   sedan was one in the same in all these different photos and

24   videos as well, correct?

25   A    Well, taking --

1   Q    Yes or no, sir?  It's just a yes-or-no question?

2   A    Can you repeat it for me?

3   Q    You relied on these points of comparison also in

4   rendering an opinion that that white sedan was one in the same

5   in all these videos and photos, correct?

6   A    With other points, yes.

7   Q    But those five were points you relied on, right?

8   A    That was part of it.

9   Q    So yes?

10  A    Yes.

11  Q    Okay.  Now, you testified earlier about some of these

12  modifications that are made to the vehicle.  You said that

13  these were after-market modifications, and you mentioned

14  something, you said, sometimes enthusiasts will make those

15  changes to cars, correct?

16  A    Yes.

17  Q    Okay.  And by enthusiasts, you mean car buffs, right,

18  people who are really into cars?

19  A    It could be.  It could also be this bumper was cheaper

20  and readily available and it fit after the vehicle was in an

21  accident.  I don't know.

22  Q    Sometimes things like magazine articles talk about trendy

23  modifications to be made to cars, right?

24  A    Yes.

25  Q    Okay.  Sometimes these car shows on T.V. talk about these

1    modifications that can be made to these cars now too, right?

2    A    Yes.

3    Q    Sometimes you go to car shows and you see these trendy

4    modifications that people are making, right?

5    A    Yes.

6    Q    Because it looks cool, people like the appearance, right?

7    A    That's the whole point.

8    Q    Right.  And you certainly know more about it than I do.

9            But it seems like modifications, right, at least

10   in this case, use parts from other model years in some

11   instances, right?

12           That's what you said?

13   A    It appears to share similar characteristics with the

14   front bumper and grille of a 2006 or '7.

15   Q    Okay.  And that's a standard part that you would have to

16   order from, say, Honda or some other company that mimics,

17   right?

18   A    Or you could get it from a junk yard or where ever.

19   Q    Point well taken.  But those are all the options that

20   you'd have to be able to get that part, right?

21   A    EBay, et cetera, yes.

22   Q    Okay.  And there are more than one part available we

23   assume, right?

24           I mean, more than one person can do these

25   modifications on a vehicle, right?

1    A     Absolutely.  But --

2    Q     And you said earlier that, you know, obviously, with the

3    magazine, the television, people are making these

4    modifications because they're trendy, right?

5    A     They're inspired by, say, culture.  I assume that's where

6    you're going, is it?

7    Q     I get to ask the questions.  I appreciate it.  We can

8    have a great conversation later.

9            But here's my point, I guess:  The cosmetic issues

10   that you cite on the back end of the Honda, those would be

11   more particular as far as making identifications, right?

12   A     Not necessarily.

13   Q     Well, if multiple cars can have similar modifications

14   cosmetic things that aren't likely to be identical on multiple

15   cars may be a better indicator for identification purposes,

16   correct?

17   A     Just the same as my identification was made taking into

18   account the totality of all the different photos and videos

19   that I can see of this car, the same holds true to this

20   specific car where the total of all of these modifications and

21   the damage makes it unique and identifiable.

22   Q     Right.  But the cosmetic things that you noticed on the

23   back of the car like the missing letters on the Accord badge,

24   that's very distinctive, correct?

25   A     It's distinctive.

1   Q    Okay.

2            MR. SER:  Can we please bring up GX 459.  All right.

3            (Exhibit published.)

4   Q    This is what you testified was a 2003 to 2005 white Honda

5   Accord, correct?

6   A    Yes, sir.

7   Q    Okay.  Now, this is a side view of the driver's side of

8   the car, correct?

9   A    Yes, sir.

10  Q    You cannot see the backside of the car, that is where the

11  license plate or the Accord logo would be, correct?

12  A    No.  But the taillight is there, the rear quarter

13  panel --

14  Q    I understand that.  I understand those for purposes of

15  identifying the make and model of the car, but my question

16  isn't whether you can see quarter panel and taillight, the

17  question is, based upon this picture, you can't see the Accord

18  emblem on the trunk lid, correct?

19  A    No.  But I can see the missing pigment in the

20  headlight --

21  Q    Sir, my question is, you can't see the Accord logo on the

22  trunk lid in the back, correct?

23  A    No.

24  Q    But you agreed with me three minutes ago was a very

25  distinctive cosmetic feature of the car you're looking at,

LEHN - CROSS - MR. SER                    1515

1    right?

2    A    One of the distinctive.

3    Q    Okay.

4         MR. SER:  Can you go to Page 2 of that exhibit.

5    Q    Sir, this is the second picture, same car we were just

6    discussing, right?

7    A    Yes, sir.

8    Q    And you'd agree you can't see that Accord badge here on

9    the trunk of this vehicle, right?

10   A    No.

11   Q    Okay.  Good.  Making progress.

12        MR. SER:  Can you go to the third picture.

13   Q    Okay.  This is the same vehicle we were just looking at,

14   right?

15   A    Yes.

16   Q    And again, now we're looking at the passenger side front

17   end of the same white sedan, correct?

18   A    Yes, sir.

19   Q    And you can't see the Accord logo on the back of the

20   trunk on this one, either?

21   A    No, sir.

22        MR. SER:  Can we go to the next picture.

23   Q    And again, I won't belabor the point, this is the same

24   white sedan, right?

25   A    Yes.

1   Q    Here we can only see the driver's side and front left of

2   the car, right?

3   A    Yes.

4   Q    And you cannot see that distinctive Honda -- I'm sorry,

5   Accord badge on the back of the trunk?

6   A    No.

7   Q    Okay.

8             MR. SER:  You can take that down.

9             Can we bring up GX 317, please.  Pause it at the

10  start.

11            (Exhibit published.)

12  Q    All right.  This is a 9-second video, right?

13            Is it on your screen there?

14  A    Yes, it is.

15  Q    And everyone can see it because it's in evidence.

16            This is a 9-second video, right?  On the bottom

17  right corner.

18  A    Yes, it is.

19  Q    The camera is being held by somebody who is walking

20  around as we can tell, right?

21  A    I assume, yes.

22            MR. SER:  Can you play it.

23            (Video recording played.)(Video recording stopped.)

24  Q    We saw some feet at the bottom there.

25            MR. SER:  You can pause it.

1  Q    Someone walking around probably holding some sort of

2  iPhone, right?

3  A    I don't know if it's an iPhone --

4              (Simultaneous Crosstalk).

5              (Court reporter interrupts for clarification.)

6  Q    But we agree, it's someone walking around holding a

7  recording device, right?

8  A    Yes.

9  Q    Not on a tripod?

10 A    No.

11 Q    And the camera is being held at an angle that would be

12 above, let's say, for example, the trunk lid looking down,

13 correct?

14 A    Yes.

15 Q    Okay.  It's not straight on the back of that car?

16 A    No, it's not.

17 Q    And the person appears to walk past the trunk area of the

18 vehicle and making its way -- making his or her way around to

19 the right side of that car, correct?

20 A    Correct.

21 Q    Okay.  And maybe a second or two glimpse at the back end

22 of that Accord, right?

23 A    Yes.

24 Q    Okay.  And the remainder of the video looks like it's --

25 we can play it from here, we can look at it.

1          The remainder of that video captures, look likes

2     he's focusing on the right wheel in the rear, right?

3     A     Mm-hmm.

4     Q     Yes?

5     A     Yes.

6     Q     Okay.  Thanks.

7              MR. SER:  Can you bring up GX 318.  And pause it at

8     the beginning.

9              (Exhibit published.)

10    Q     This, too, is another 9-second video that you have looked

11    at earlier, right?

12    A     Mm-hmm.

13    Q     And same thing, this one is a video recording by somebody

14    walking around holding a recording device?

15    A     Yes.

16    Q     So it's a bit unsteady, right?

17    A     Yes.

18    Q     Okay.  And again the angle is downward on the car as far

19    as the point of view goes, right?

20    A     That's correct.

21    Q     And it is not positioned directly behind the back of the

22    car, correct?

23    A     No, it's not.

24    Q     Okay.  Person making the recording here isn't on a knee,

25    right?

1   A    It appears to be standing.

2   Q    Right.

3          MR. SER:  And can we play the first five seconds and

4   then pause it.

5          (Video recording played.)(Video recording stopped.)

6   Q    So it appears first five seconds, at least, are focused

7   on this back right wheel, and then the -- was that the

8   passenger side of the car?

9   A    It is.

10  Q    Can't see the trunk yet, right?

11  A    No, sir.

12  Q    That's a fairly dark picture too, right?

13  A    Looking all the way off into the darkness, yes, it is.

14  Q    Can't even see the right front wheel in that one.

15         MR. SER:  All right.  Can we play the video.

16         (Video recording played.)

17         MR. SER:  All right.  Pause.

18         (Video recording stopped.)

19  Q    It's right around there that we can now see the back of

20  this car, right?

21  A    We started to, yes.

22         MR. SER:  Can we finish playing it.

23         (Video recording played.)(Video recording stopped.)

24  Q    And we really don't see any more of it, do we?

25  A    I mean, you see those 2003 to '5 Honda Accord.

1   Q    Exactly.  But it's a very quick glimpse at the -- where

2   the Accord logo would be on that trunk, right?  Not very long?

3   A    But that's why videos have pause buttons.

4   Q    They do.  You are right.

5        But the angle is, again, looking down on it?

6   A    A little bit, yeah.

7   Q    It's not directly behind it?

8   A    No, sir.

9   Q    And again, we agreed it was kind of a dark setting there,

10  right?

11  A    When you zoom all the way out to the front end of the

12  vehicle.  But the camera appears to have a light on it.

13  Q    Okay.

14       MR. SER:  Can we bring up 319.  And we're going to

15  pause it at the start.

16       All right.  Why don't I play that video.

17       (Video recording played.)

18       MR. SER:  You can pause it there.

19       (Video recording stopped.)

20  Q    You've watched this one, correct, sir?

21  A    Yes.

22  Q    You'd agree with me you cannot see any part of the back

23  bumper or back trunk lid on this one?

24  A    Can you play the start again?

25  Q    Sure.  And I'll rephrase that.

1              (Video recording played.)

2              You cannot see where the Honda Accord badge would be

3    on the trunk lid of this vehicle.

4              MR. SER:  Pause it there.

5              (Video recording stopped.)

6    A    Honda Accord badge, no.  Because you said trunk lid.

7    Q    I know.  I had to correct myself.  You are correct.

8              MR. SER:  I don't think I have anything further,

9    Your Honor.

10             THE COURT:  All right.  Anything further?  All

11   right.

12             MS. MOORE:  No, Your Honor.

13             THE COURT:  All right.  Thank you.  You can step

14   down.

15             (The witness was excused.)

16             THE WITNESS:  Have a great day.

17             THE COURT:  Call your next witness.

18             MS. LASH:  Your Honor, the Government calls David

19   Yu.

20             Your Honor, it's an in-custody witness, and I have

21   been told he's on his way.  He should be here momentarily.

22             THE COURT:  Bring him over here, please.

23             (The witness takes the stand.)

24
               (Continued on the following page.)
25

DAVID YU - DIRECT - MS. LASH                1522

1   DAVID YU, called as a witness, having been first duly

2   sworn/affirmed, was examined and testified as follows:

3              THE COURTROOM DEPUTY:  Remain standing and raise

4   your right hand, please.

5              (The witness was sworn and/or affirmed by the

6   courtroom deputy.)

7              THE WITNESS:  Yes.

8              THE COURTROOM DEPUTY:  Can you please state and

9   spell your name, for the record.

10             THE WITNESS:  David Yu, D-A-V-I-D Y-U.

11             THE COURTROOM DEPUTY:  You may be seated.  Thank

12  you.

13             MS. LASH:  Thank you, Your Honor.

14  DIRECT EXAMINATION

15  BY MS. LASH:

16  Q    Good afternoon, Mr. Yu.

17  A    Good morning.

18  Q    Mr. Yu, have you ever agreed to kill anyone?

19  A    Yes, ma'am.

20  Q    Were you told the name of the person that you agreed to

21  kill?

22  A    No.

23  Q    Who asked to you kill this person?

24  A    You You.

25  Q    Does You You go by any other name?

DAVID YU - DIRECT - MS. LASH                1523

1   A    Yes.

2   Q    What name is that?

3   A    Eddie.

4   Q    What was your relationship to You You at the time he

5   asked you to kill this person?

6   A    That was my best friend.

7   Q    I'd like to show you what's in evidence as Government's

8   Exhibit 2.

9           MS. LASH:  And Ms. Campbell...

10          (Exhibit published.)

11  Q    Mr. Yu, who's the person pictured in Government

12  Exhibit 2?

13  A    That's You You.

14  Q    Were you promised anything to kill this person?

15  A    Yes.

16  Q    What were you promised?

17  A    He promised me a large sum of money, and then later on,

18  he promised me that he was going to buy my mom a house.

19  Q    What happened to the person you were hired to kill?

20  A    He got murder.

21  Q    How?

22  A    He got shot.

23  Q    When the victim was shot, where were you?

24  A    I was a couple of blocks away.

25  Q    And were you on foot or in a vehicle?

DAVID YU - DIRECT - MS. LASH                    1524

1    A    I was in a vehicle.

2    Q    What vehicle were you in?

3    A    I was in a white van.

4    Q    Mr. Yu, I want you to look around the courtroom.

5         Do you see anyone else who was there that night the

6    person was killed?

7    A    Can you say that again.

8    Q    I said, Mr. Yu, can you look around the courtroom and

9    tell me if you see anyone else who was there the night the

10   person was killed?

11   A    Yes.

12   Q    Can you point to the point and identify that person by an

13   article of clothing that they're wearing?

14   A    He's wearing a black blazer and a tie, and a red tie.

15        THE COURT:  The record will reflect the

16   identification of the defendant Zhe Zhang.

17   BY MS. LASH:

18   Q    What did this person do during the murder?

19   A    Who?

20   Q    Where was this person when you saw him on the night of

21   the murder?

22   A    I saw him in a white car.

23   Q    Now, Mr. Yu, I want to you to look around the room again.

24        Is there anyone else who is sitting in this

25   courtroom who was part of the plan to murder this person?

1   A     Yes.

2   Q     And can you point that person and identify them by an

3   article of clothing they're wearing?

4   A     He got a blue blazer on.

5   Q     What color tie?

6   A     Gray.

7   Q     And what position at the table is this person sitting in?

8   A     On the left side.

9   Q     And is he the first person, the second person, the third

10  person?

11  A     The first person.

12  Q     Can you look again.

13          MS. LASH:  I think the witness is confused, Your

14  Honor.

15          THE COURT:  Let me just ask a question, just for

16  purposes of identification, everyone at the defense table,

17  take their mask off.  Everybody.  Okay.

18  BY MS. LASH:

19  Q     So Mr. Yu, can you tell me if anyone else sitting in this

20  courtroom was part of the plan to murder the person that was

21  killed that night?

22  A     Yes.

23  Q     And can you identify the person by the number of their

24  position at the table?  Are they number one, or number two or

25  number three or four?

1          What number in are they from the left side?

2   A    He number two.

3          MS. LASH:  Your Honor, can the record reflect that

4   the witness has identified the defendant, Allen Yu.

5          THE COURT:  Yes.  The record will so reflect.

6          You can put your masks back on.

7   BY MS. LASH:

8   Q    The person that you just identified, Mr. Yu, what was

9   their role in the murder?

10  A    What are you talking about?

11  Q    The person that you identified, how did you know him?

12          What was his name?

13  A    Allen?

14  Q    Yes.

15  A    That was the uncle of You You.

16  Q    And what was his role in the murder?

17  A    He ordered it.  He orchestrated the hit.

18  Q    Mr. Yu, have you pled guilty to your role in this murder?

19  A    Yes.

20  Q    Are you testifying today pursuant to a cooperation

21  agreement?

22  A    Yes.

23  Q    We'll come back to the murder in a moment.

24          Mr. Yu, I want to take a step back and ask you a

25  couple of questions about yourself.

DAVID YU - DIRECT - MS. LASH                    1527

1    A    All right.

2    Q    How old are you?

3    A    I'm 35.

4    Q    Where did you grow up?

5    A    In Flushing, Queens.

6    Q    Do you have any nicknames?

7    A    Yes.

8    Q    What are they?

9    A    Potato, buddha, and Billy.

10   Q    Why are you called potato?

11   A    When I was younger I was a little chubby kid, and one of

12   my big bros named me that.

13   Q    Were you wearing anything in particular when they gave

14   you that nickname?

15   A    I had a brown hoodie on.

16   Q    And what's the -- do you speak any other languages

17   besides English, Mr. Yu?

18   A    Yes.

19   Q    What language do you speak?

20   A    I speak Korean.

21   Q    And what's the Korean word for potato.

22   A    Gamja.

23   Q    Who took care of you as a child, Mr. Yu?

24   A    My parents.

25   Q    Do you have any siblings?

1   A    Yes, I have a little brother?

2   Q        Are you married?

3   A    No.

4   Q    Do you have any children?

5   A    No.

6   Q    And you said you spoke Korean.

7            How did you learn Korea?

8   A    My mom taught me how to speak Korean.

9   Q    Mr. Yu, did you attend school in New York?

10  A    Yes.

11  Q    Where did you attend high school?

12  A    In Queens.

13  Q    And what was the name of the high school?

14  A    Robert K. Kennedy High School.

15  Q    Did there come a time where you were in high school and

16  you joined a gang?

17  A    Yes.

18  Q    What grade were you in at school at the time?

19  A    I was, like, ninth grade.

20  Q    What gang did you join?

21  A    I joined MMP.

22  Q    What does MMP stand for?

23  A    Mo ming pie.

24  Q    And what language is mo ming pai?

25  A    It's Chinese.

1    Q    And what does that translate to in English, to your

2    knowledge?

3    A    It's like a slang saying, like, no named gangsters.

4    Q    Why did you join MMP?

5    A    A circle of my friends was MMP at that time.

6    Q    Which friends in particular?

7    A    You You.

8    Q    How did you come to meet You You?

9    A    I met him through a couple of my friends.

10   Q    And how old were you at the time?

11   A    I was, like, 15.

12   Q    Did you and You You attend school together?

13   A    No.

14   Q    So in MMP, who did you report to, Mr. Yu?

15   A    I reported to some dude named Shogun.

16   Q    Was that his real name?

17   A    No.

18   Q    And what was Shogun's rank within the gang?

19   A    He was a street boss.

20   Q    How high a rank is a street boss?

21   A    It's pretty high.

22   Q    Did you make any money as a member of MMP?

23   A    Yes.

24   Q    How did you make money?

25   A    I sold drugs, I worked in a gambling house.

DAVID YU - DIRECT - MS. LASH                    1530

1   Q      You said you sold drugs?

2   A      Yes.

3   Q      What drugs did you sell?

4   A      I sold coke -- cocaine, marijuana, and ecstasy.

5   Q      When did you start selling -- let's take marijuana

6   first -- marijuana?

7   A      Like, beginning of high school.

8   Q      And when did you start selling cocaine and ecstasy?

9   A      Like, end of high school.

10  Q      Approximately when you started selling marijuana,

11  approximately how much marijuana were you selling in a week's

12  time?

13  A      Likes, a ounce or two.

14  Q      And how much money would you earn from selling an ounce

15  of marijuana at that time?

16  A      A couple hundred dollars.

17                  (Continued on the following page.)

18

19

20

21

22

23

24

25

1    DIRECT EXAMINATION

2    BY MS. LASH:   (Continuing)

3    Q    Who did you sell the marijuana to?

4    A    To my friends.

5    Q    How about cocaine, how much cocaine were you selling when

6    you started selling cocaine at the end of high school?

7    A    Almost 50 grand at a time.

8    Q    And how much money could you earn from selling 50 grams

9    of cocaine?

10   A    A couple hundred dollars.

11           THE COURT:  How much?

12           THE WITNESS:  A couple hundred dollars.

13   Q    You mentioned ecstasy as well.

14           When you were selling ecstasy at the end of high

15   school, how much ecstasy were you selling?

16   A    About a hundred, 200 pills.

17   Q    And how much money could you earn from selling that

18   quantity of ecstasy?

19   A    A couple hundred dollars.

20   Q    What did you do with the money that you earned from those

21   drug sales?

22   A    I bought clothes.  I bought -- I bought sneakers.  Like,

23   I bought accessory stuff.

24   Q    Were you also using drugs at this time?

25   A    Yes, ma'am.

1   Q    Which ones?

2   A    I was smoking marijuana and I was popping E pills at that

3   time.

4   Q    You mentioned you also made money as a member of MMP

5   working at a gambling house; is that right?

6   A    Yes.

7   Q    What did you do at the gambling house?

8   A    I just watched the door.

9   Q    And when you watched the door, what were you looking for?

10  A    Customers, police.

11  Q    Did you carry a weapon?

12  A    Yes.

13  Q    What kind of weapon?

14  A    A baton stick.

15  Q    Any other weapons?

16  A    That's it.

17            MR. KOUSOUROS:  I'm sorry, Judge, I can't hear.

18            THE COURT:  What did you say?

19            THE WITNESS:  That's it.

20            THE COURT:  That's it?

21            THE WITNESS:  That's it.

22  BY MS. LASH:

23  Q    Mr. Yu, I'll just have you speak, if you could speak

24  directly the microphone.

25  A    All right.

D. Yu - direct - Lash                           1533

1    Q    You said you carried a baton stick while you worked at

2    the gambling house, right?

3    A    Yes, ma'am.

4    Q    Did you use the baton stick on customers or other

5    individuals at the gambling house?

6    A    No.

7    Q    Was there any other way you made money while you were a

8    member of MMP?

9    A    I collected debt payments like before a few times.

10   Q    What were the debts for?

11   A    I don't know.

12   Q    Who directed you to collect the debts?

13   A    My older brother.

14   Q    Approximately how many times did you do this?

15   A    A few times, a few times.

16   Q    When you were collecting debts for other members of MMP,

17   did you carry a weapon?

18   A    Yes.

19   Q    What kind of weapon?

20   A    A baton stick.

21   Q    Did you ever use your baton stick to collect a debt?

22   A    Yes.

23   Q    And how did you use it?

24   A    Like did I use it on somebody?

25   Q    Yes.

D. Yu - direct - Lash                          1534

1    A    No, ma'am.

2    Q    Mr. Yu, did you graduate from high school?

3    A    Yes.

4    Q    What year did you graduate?

5    A    2006.

6    Q    How did you do in school?

7    A    I passed.

8    Q    What was your plan after high school?

9    A    I wanted -- I wanted to get into special education.

10   Q    And why did you want to get into special education?

11   A    It was like a program in my church that I volunteered

12   with special education kids, and then like I grew a heart for

13   them.  I just wanted to learn more about them at that time.

14   Q    After you graduated high school in 2006, how were you

15   making money?

16   A    I was still selling drugs.

17   Q    Did there come a time where you went to prison?

18   A    Yes, ma'am.

19   Q    How old were you?

20   A    I was 18, 19.

21   Q    What happened?

22   A    I got caught with a gun in and a vest.

23            THE COURT:  You got caught what?

24            THE WITNESS:  I got caught with a gun and bullet

25   proof vest and I caught some drugs.

D. Yu - direct - Lash                    1535

1    Q     What drugs did you have on you at the time?

2    A     Cocaine.

3    Q     And why did you have a gun and a bullet proof vest?

4    A     At that time, there was this bar that, again, like we was

5    watching over.  Somebody came over there and he refused to pay

6    the bill, so one of my big boss called us.  I came over.  He

7    told me to take care of it.  He gave me a gun and he put the

8    vest on and then he said, Take care of the problem for me.

9    So, I went.  And I remember calling one of my friends that was

10   at the bar that -- that -- that they didn't want to pay the

11   bill.  I talked to him.  I talked to him into paying the bill.

12   He ended up paying the bill, so the beef got squashed.  I

13   returned the gun and vest back to Shogun, and then cops came.

14   And then they searched his car and they found the gun and vest

15   on him, and then I just took the blame for it.

16   Q     Did you plead -- sorry.

17         Did you plead guilty in this case?

18   A     Yes, ma'am.

19   Q     And were you honest about the police about why you had

20   the gun and the bullet proof vest?

21   A     No.

22   Q     What did you tell them?

23   A     I told them it was mine.

24   Q     And what was the truth?

25   A     It wasn't mine.

D. Yu - direct - Lash                              1536

1    Q    Why didn't you tell the police the truth?

2    A    Because at that time Shogun was on parole, so I didn't

3    want him to get into trouble.

4    Q    Remind us who was Shogun to you.

5    A    That was my big bro.

6    Q    And what was his rank in the MMP gang?

7    A    He was a street boss at that time.

8    Q    Were you sentenced in that case?

9    A    Yes.

10   Q    What was your sentence?

11   A    Two-and-a-half years.

12   Q    Where did you serve that sentence?

13   A    On Rikers and Greene.

14   Q    Mr. Yu, what, if anything, happened while you were

15   incarcerated at Rikers serving this sentence?

16   A    I stopped representing MMP and I turned Blood.

17   Q    What do you mean when you say you turned Blood?

18   A    I joined another gang.

19   Q    What are the Bloods?

20   A    A street gang.

21   Q    You were a member of MMP at the time, why join the

22   Bloods?

23   A    At that time I felt like Shogun, like, I felt like he

24   left me for -- like abandoned me.  I felt like he played me,

25   so, like, I stopped showing love to him.  I started hanging

1  out with the Bloods who were in jail and they asked me to join

2  and I said yeah.

3  Q    Did you join any particular subset of the Bloods street

4  gang?

5  A    Yes.

6  Q    What set did you join?

7  A    Stone Gorillas -- I joined Gorilla Stone Gangsters.

8  Q    At the time that you joined the Bloods, did you assault

9  anyone?

10 A    Yes.

11 Q    Who did you assault?

12 A    I cut a Latin King dude.

13 Q    And, Mr. Yu, what are the Latin Kings?

14 A    It's another -- it's another street gang.

15 Q    And what is the Latin Kings' position to the Bloods?

16 A    They're enemies.

17 Q    You said you cut him.  Can you explain what did you do?

18 A    I cut him with a -- with a scalpel.

19 Q    And where did you cut him?

20 A    I cut him on top of the lip.

21 Q    How did you get a scalpel?

22 A    Somebody gave it to me.

23         THE COURT:  Was this while you were in prison?

24         THE WITNESS:  Yes, ma'am.

25 Q    After that attack, were you accepted as a member of the

D. Yu - direct - Lash                              1538

1  Bloods?

2  A    I was already accepted.  It's just I had a personal

3  problem with the dude that I cut.

4  Q    Were you punished for this incident while you were at

5  Rikers?

6  A    No, I got away with it.

7  Q    When were you released from this sentence, Mr. Yu?

8  A    2010, December.

9  Q    After your release in December 2010, what was your

10 status?

11 A    I was on parole.

12 Q    What's parole?

13 A    I had to report to a parole officer.  I had to follow a

14 curfew.  I had to get a job.  I can't get no police contact.

15 And I got to follow curfew.  That's it.  Yeah.

16 Q    What were your plans after you were released from prison

17 in December of 2010?

18 A    I was going to school again.

19 Q    Did you enroll in an institution?

20 A    Yes.

21 Q    Did you attend any classes?

22 A    No.

23 Q    Why not?

24 A    I had to wait for the next -- the next semester to start.

25 Q    After your release from prison in 2010, what was your

1  relationship like with You You?

2  A    That was my best friend.

3  Q    Did you see You You after you were released from prison?

4  A    Yes.

5  Q    What happened?

6  A    He offered -- he had a bar that he was running and he

7  asked me to run the bar with him.

8  Q    And what was the name of this bar?

9  A    Yello.

10 Q    Where was it located?

11 A    In Flushing.

12 Q    Was this bar properly licensed?

13 A    No.

14 Q    How did you make money from running an unlicensed bar?

15 A    I didn't make no money out of it.

16 Q    And what was your role in connection with the bar?

17 A    Nothing really, I was just there with him.

18 Q    Did you ever commit a robbery in connection with this

19 bar?

20 A    Yes.

21 Q    Who participated in the robbery?

22 A    Me, You You, and some kid named Shorty.

23 Q    What did you do during the robbery?

24 A    I came into the bar where You You was at and I acted like

25 You You owed me -- he owed money, and some -- some dude that

1  sells the liquor bottles to him, he was there.  And me and

2  this kid Shorty, we went up in there and we asked You You,

3  Where's my money at?  And them we ended up just robbing both

4  of them.

5  Q    So, who did you rob in this robbery?

6  A    The liquor man.

7  Q    What did you take from him?

8  A    A couple bottles of liquor and $1,000.

9  Q    Did anyone have a weapon?

10  A    Yes.

11  Q    What weapon did they have?

12  A    He had a kitchen knife.

13  Q    Who had the kitchen knife?

14  A    Shorty had it.

15  Q    What did Shorty do with the kitchen knife?

16  A    He just showed -- nothing really, just scaring him.

17  Q    Was the the driver hurt?

18  A    No, nobody was hurt.

19  Q    You said you weren't making any money from your role at

20  this unlicensed bar.

21          How were you making money at the time?

22  A    I was selling ketamine at that time.

23  Q    What's ketamine?

24  A    It's a party drug.

25  Q    And why did you start selling ketamine?

D. Yu - direct - Lash                    1541

1   A    There was these kids, Shorty and these other couple kids

2   that -- that was hanging out on me and they was selling

3   ketamine at that time, and I just became -- I just started --

4   I just joined them to make money with them.

5   Q    And what was your role in the ketamine sales?

6   A    I was basically the muscle.

7   Q    And what does it mean to be the muscle?

8   A    Any problem they had, like, I took care of it.

9   Q    When you started selling ketamine after your release from

10  prison in 2010, how much ketamine were you selling at a time?

11  A    An ounce or two.

12  Q    In what time period?

13  A    Like in a week, less than a week, yeah.

14  Q    How much would you purchase an ounce of ketamine for?

15  A    At that time, it was like $400.

16  Q    And how much could you earn from selling an ounce of

17  ketamine?

18  A    600, 500.

19  Q    Did there come a time where you were selling more than an

20  ounce of ketamine?

21  A    Yeah.

22  Q    How much ketamine were you selling at that time?

23  A    I was selling wholesale.  I was doing a kilo at a time.

24  Q    And how many ounces are in a kilo?

25  A    Thirty-five.

D. Yu - direct - Lash                           1542

1    Q    What would you do with the kilo of ketamine?

2    A    I sold it one shot.

3    Q    And how much money would you earn from selling a kilo of

4    ketamine?

5    A    At that time I was making like a thousand.

6    Q    Where were you customers located?

7    A    In Flushing.

8    Q    And at that time, were there other dealers in Flushing

9    selling ketamine?

10   A    Yeah.

11   Q    So, that was your competition?

12   A    Yes.

13   Q    How did you interact with your competition?

14   A    I robbed them.

15   Q    And what happened after you would rob your competition?

16   A    I'd tell them stop selling it.

17   Q    Did they agree?

18   A    Yeah, but they -- they -- they still sold it, though.

19   Q    And in the course of your ketamine sales, did you ever

20   have an issue with one of the people you sold ketamine with?

21   A    Yes.

22   Q    And who was that?

23   A    It was Shorty.

24   Q    And what did Shorty do?

25   A    He started doing his own thing.

D. Yu - direct - Lash                          1543

1    Q     And what did you do after you realized Shorty was selling

2    ketamine on his own?

3    A     Ended up robbing him.

4    Q     What did you take?

5    A     His money.

6    Q     How much money?

7    A     It was 60,000.

8    Q     Where did you take the 60,000 from?

9    A     His house.

10   Q     How did you get inside his house?

11   A     His landlord opened the door for me.

12   Q     What did you do with the $60,000?

13   A     I broke -- I broke some -- I shared it with my friends.

14   Q     You mentioned that after your release from prison in 2010

15   you were on parole; is that right?

16   A     Yes, ma'am.

17   Q     Did you ever violate the terms of your parole?

18   A     Yes, ma'am.

19   Q     How many times?

20   A     Three times.

21   Q     Did you say three times?

22   A     Yes, ma'am.

23   Q     And how did you violate the terms of your parole?

24   A     On curfew, mostly curfews.

25   Q     What happened when you violated your parole?

D. Yu - direct - Lash                    1544

1   A     Sent me back to jail.

2   Q     During this time, did you ever spend any time in a

3   halfway house?

4   A     Yes.

5   Q     And what's a halfway house?

6   A     It's -- it's like a housing unit where, like, if you

7   don't have a address or if the parole denies your address,

8   they send you to a halfway house or a shelter.

9   Q     Did you violate the terms of your parole while you were

10  at the halfway house?

11  A     Yes.

12  Q     What did you do?

13  A     I didn't want to stay there, so the person that was

14  running the program, I was giving him $50 to sign my name into

15  the login book.

16  Q     And what happened after you paid this person $50 to sign

17  your name into the login book?

18  A     One week -- one week I didn't pay him, so he told my

19  parole officer.

20  Q     And what happened when your parole officer found out?

21  A     She told me to come in and I ran.

22  Q     And what happened after that?

23  A     I turned myself in and then I did -- I did some -- she

24  send me back to jail.

25  Q     Mr. Yu, were you arrested again in June of 2013?

1    A    Yes.

2    Q    What happened?

3    A    I got caught -- I got pulled over on a traffic stop and

4    they searched my car and they found drugs on me.

5    Q    What drugs did they find?

6    A    They found -- they found weed on me.  They found -- they

7    found cocaine, Xanax, and ketamine.

8    Q    Where were you when this happened?

9    A    I was in Bayside.

10   Q    And what borough is that in?

11   A    In Queens.

12   Q    What happened with that case?

13   A    I got sentenced to possession of an illegal substance and

14   they -- and they R&R'd me.

15   Q    Did you spend any time in jail after that?

16   A    No, ma'am.

17   Q    In 2013, what was your relationship like with You You?

18   A    That was still my best friend.

19   Q    Mr. Yu, you testified about the robbery of a delivery

20   driver at the bar Yello.

21          Have you ever participated in any other robberies?

22   A    Yes.

23   Q    Approximately how many robberies have you participated

24   in?

25   A    I can't -- I can't recall.

D. Yu - direct - Lash                                   1546

1    Q    Can you repeat that?

2    A    I can't -- I can't say, like, the right number.

3    Q    And why can't you say the right number?

4    A    Because there are a lot of robberies.

5    Q    Did you ever commit any other robberies with You You?

6    A    Yes.

7    Q    What other robberies did you commit with You You?

8    A    We robbed one of his friends at a parking lot, me and

9    somebody else, we pretend we was police.  We pulled the kid

10   over.  We searched the car.  We took the money and the drugs.

11   Q    How did you pretend that you were a police officer?

12   A    He was parked somewhere, we just ran up on the car and

13   then we showed him a fake badge.

14   Q    You said you took the drugs.  What drugs did you take?

15   A    He only had a pound of weed on him.

16   Q    Did you take anything else?

17   A    Yeah, like a thousand dollars.

18   Q    Did anyone use a weapon in this robbery?

19   A    No, there was no weapon involved.

20   Q    And when approximately did this occur?

21   A    Oh, I don't remember.

22   Q    Were you ever charged in connection with this robbery?

23   A    No, ma'am.

24   Q    Did you commit any other robberies with You You?

25   A    Yes.

1  Q    What did you do?

2  A    We robbed his other friend.

3  Q    Where was this person located?

4  A    Like in lower Manhattan.

5  Q    And who participated in this robbery?

6  A    Me, You You, and some kid named John Park.

7  Q    What happened?

8  A    You You went to go pretend that he was going to buy weed

9  off this kid.  He rang the doorbell.  The kid opened the door.

10 And then we just bum-rushed in there.

11 Q    What was your role in this robbery?

12 A    Take everything.

13 Q    What did you do while you were inside this person's

14 apartment?

15 A    It was supposed to be just him, but his girlfriend was

16 there.  She started yelling and she started running to the

17 kitchen to grab a knife, so I had -- so I -- so, I punched

18 her.

19 Q    And what happened after you punched her?

20 A    I knocked her out.

21 Q    Did anyone have a weapon in this robbery?

22 A    Yes.

23 Q    What weapon?

24 A    A fake BB gun.

25 Q    And who had the fake BB gun?

1   A    John.

2   Q    What did you steal in this robbery?

3   A    Like two pounds of weed.

4   Q    And were you charged in connection with this robbery?

5   A    No, ma'am.

6   Q    Do you remember when approximately this happened?

7   A    No, ma'am.

8   Q    What other robberies have you committed, Mr. Yu?

9   A    I robbed some dude that worked in a cash checking spot.

10  Q    What's a cash checking spot?

11  A    It's like -- it's like -- it's like a Western Union.

12  Q    And where was this cash checking spot located?

13  A    In Brooklyn.

14  Q    How did you get the idea for this robbery?

15  A    One of the workers gave us the rundown saying that every

16  Friday and Saturday the boss leaves with a large sum of money.

17  So me and my friend, we staked out.  And then one Friday, my

18  boy said, Today is the day.  We saw him coming out with a bag

19  and then while we was going, a girl came with him.  My boy

20  knocked him out and the girl started yelling.  I knocked her

21  out.  We took the bag and we ran.

22  Q    And how did the person that you were with knock out the

23  man with the bag?

24  A    Hit him with a brass knuckle.

25  Q    Where did he punch him?

1   A    In the mouth.

2   Q    And tell us again, what did you do with the woman that he

3   was with?

4   A    I knocked her out.

5   Q    How much money did you get in this robbery?

6   A    60,000.

7   Q    What did you do with that money?

8   A    I spent it.

9   Q    Were you ever charged in connection with this robbery?

10  A    No.

11  Q    Do you remember approximately when this happened?

12  A    2013.

13  Q    I want to ask you a couple more questions about that time

14  period, 2013, 2004.

15  A    All right.

16  Q    Did there come a time where you left the United States?

17  A    Yes, I went to Korea.

18  Q    Why did you go to Korea?

19  A    I was smuggling weed to Korea.

20  Q    How many times did you smuggle weed to Korea?

21  A    A few times.  A few times.

22  Q    A few times?

23  A    Yes.

24  Q    Can you give me a number estimate?

25  A    About six times.

D. Yu - direct - Lash                    1550

1  Q    About six.

2          How did you transport marijuana to Korea?

3  A    I put it in my luggage.

4  Q    And how much were you paid when you arrived with a pound

5  of marijuana?

6  A    40,000.

7          THE COURT:  How much?

8          THE WITNESS:  40.

9          THE COURT:  40?

10          THE WITNESS:  40,000.

11  BY MS. LASH:

12  Q    Why were you paid so much money, Mr. Yu?

13  A    That's how much -- that's how much we was costed at that

14  time over there.

15  Q    You said you estimated about six times you did this.

16          Were you ever detected by law enforcement?

17  A    No, ma'am.

18  Q    Upon your return to the United States, did you continue

19  to work with marijuana?

20  A    Yes, ma'am.

21  Q    What did you do?

22  A    I went out to California and I trimmed marijuana for --

23  for a little bit and packaged it.

24  Q    Approximately how long did you do that?

25  A    No more than a year, like six months.

D. Yu - direct - Lash                          1551

1    Q    And after you trimmed the marijuana, what was done with

2    it?

3    A    I packaged it.

4    Q    You packaged it for what purpose?

5    A    To get it shipped to New York.

6    Q    Mr. Yu, we've discussed your narcotics sales and several

7    robberies that you've committed.

8              Have you ever owned a gun?

9    A    Yes, ma'am.

10   Q    Who kinds of guns did you own?

11   A    I had .380 Special and I had a Glock 19.

12   Q    When did you own the .380 Special?

13   A    2018, 2019.

14   Q    And when did you own the Glock 19?

15   A    Like 2016, '15.

16   Q    In addition to these guns that you owned, did you have

17   access to other weapons?

18   A    Yes.

19   Q    Mr. Yu, have you ever fired a gun?

20   A    Yes, ma'am.

21   Q    Where have you fired a gun?

22   A    In the park, the rooftops.

23   Q    And what purpose did you fire a gun in the park?

24   A    I wanted to see if my gun -- if my gun was a workable

25   gun.

D. Yu - direct - Lash                    1552

1    Q    What time of day did you do this?

2    A    Like the middle of the night.

3    Q    And how did you fire the gun?

4    A    I shot it in the air.

5    Q    The same question about the rooftop.

6    A    Yeah.

7    Q    Why did you fire a gun on a rooftop?

8    A    The same reason.

9    Q    Did you say the same reason?

10   A    Yes, ma'am.

11   Q    And, again, what time of day was it?

12   A    Like the middle of the night, too.

13   Q    Mr. Yu, have you ever shot anyone?

14   A    No, ma'am.

15   Q    Have you ever fired a gun at a person?

16   A    No, ma'am.

17   Q    Besides a firearm, have you carried other weapons?

18   A    Yes, ma'am.

19   Q    You mentioned a baton stick?

20   A    Yeah.

21   Q    What other weapons have you carried?

22   A    I always carry a scalpel on me.

23   Q    Anything else?

24   A    A knife.  And I used to carry a screwdriver when I was

25   little.

D. Yu - direct - Lash                          1553

1    Q    And a screwdriver?

2    A    Yeah.

3    Q    Let's start with the scalpel.

4         Besides the incident that you discussed where you

5    cut the Latin King in prison with the scalpel, have you ever

6    used a scalpel on anyone else?

7    A    No, ma'am.

8    Q    You mentioned a baton stick.  Have you ever used a baton

9    stick to hit anyone?

10   A    Yes, ma'am.

11   Q    How many times?

12   A    A few times.

13   Q    Did you say a few times?

14   A    Yes, ma'am.

15   Q    You mentioned that you would carry a knife?

16   A    Yes, ma'am.

17   Q    Did you ever use the knife to cut anyone?

18   A    No, ma'am.

19   Q    You said when you were younger you had a screwdriver?

20   A    Yes, ma'am.

21   Q    Did you ever use the screwdriver --

22   A    No, ma'am.

23   Q    -- to hurt anyone?

24   A    No, ma'am.

25   Q    Mr. Yu, I would like to turn your attention to August of

D. Yu - direct - Lash                    1554

1    2016.

2            Were you arrested in August of 2016?

3    A    Yes, ma'am.

4    Q    What happened?

5    A    I was in Chinatown.  I went to go buy some drugs off some

6    dude, and he ended up selling fake drugs.  So I beat him up

7    and I took my money back, and he called the cops on me.

8    Q    What type of drug were you attempting to buy?

9    A    Ketamine.

10   Q    And how did you know the ketamine was fake?

11   A    I tried it and it wasn't it.

12   Q    How much ketamine were you attempting to purchase from

13   this person?

14   A    I bought an ounce off of him first.

15   Q    And how much money were you going to pay him for that

16   ounce of ketamine?

17   A    1400, almost 1400 at that time.

18   Q    You said this person called the police.  Were you

19   charged?

20   A    Yes.

21   Q    With what?

22   A    With robbery in the second degree.

23   Q    After you were charged, Mr. Yu, were you released on

24   bail?

25   A    Yes, ma'am.

D. Yu - direct - Lash                                    1555

1   Q    And what is bail?  What does that mean?

2   A    Basically, you either put a property or you put 10

3   percent of the bonds, and then they release you on a

4   condition.

5   Q    And what are some of the conditions of being on bail?

6   A    I have to sign in every week to the bail bondsman and I

7   have to stay out of trouble.

8   Q    Did you stay out of trouble when you were on bail?

9   A    Yes, I think I did.

10  Q    While you were on bail, did you do anything to avoid

11  going to prison in that robbery case?

12  A    Yes, I did.  Yeah.

13  Q    What did you do?

14  A    I tried to bribe the victim.

15           THE COURT:  You what?

16           THE WITNESS:  I tried to bribe the victim.

17  Q    And how did you do that?

18  A    One of my friends knew who he was, so I went through him

19  and then he offered him 5,000 not to go to court.

20  Q    And do you know whether that individual was paid?

21  A    No, not really.  But I know he gave him a thousand first.

22  Q    Do you know whether the individual still showed up to

23  court?

24  A    Yes, ma'am, he did.

25  Q    What happened with that case?

1  A    I got charged.

2  Q    Did you plead guilty?

3  A    Yes, ma'am.

4  Q    And were you sentenced?

5  A    Yes, ma'am.

6  Q    What was your sentence?

7  A    One-and-a-half to three.

8  Q    What does a sentence of one-and-a-half to three years

9  mean?

10 A    It means like if you finish your programs on good

11 behavior, you do your vocational, you come home on early

12 release from one-and-a-half to three years.

13 Q    When were you released from this prison sentence?

14 A    2018.

15 Q    Do you remember when month?

16 A    Yes, November.

17 Q    What was your relationship like with You You in November

18 of 2018?

19 A    That was my best friend.

20 Q    We are going to go back to November of 2018 in a minute,

21 but first I want to direct your attention to July of 2019.

22        Were you involved in another robbery with You You?

23 A    Yes, ma'am.

24 Q    Who was the target of this robbery?

25 A    I didn't know him.

1  Q    And why did you understand this robbery was to take

2  place?

3  A    You You asked me for help.  He, basically -- well, this

4  is what he told me.  He said, You got to give a

5  hundred-thousand to somebody to wash, but he's not gonna pay

6  him that.  But he's gonna make it look like he paid him, just

7  rob him and clear his debt.

8  Q    And what was your role in this robbery going to be?

9  A    I was the driver.

10 Q    Who was going to steal the money?

11 A    One of my Blood friends.

12 Q    How did this Blood friend of yours get involved?

13 A    I reached out to one of my Blood homey and my Blood

14 friend, and he -- he led me to him, to another Blood dude.

15 Q    On the day that this robbery happened, where were you?

16 A    I was down the block.

17 Q    And were you on foot or were you in a vehicle?

18 A    I was in a car.

19 Q    Could you see anything?

20 A    No.

21 Q    Did you hear anything when the robbery occurred?

22 A    I don't remember.

23 Q    I want to direct your attention to the following month

24 now, August of 2019.

25        Were you arrested again?

D. Yu - direct - Lash                              1558

1    A    I can't hear you.  Could you say it again?

2    Q    In August of 2019, were you arrested again?

3    A    Yes, ma'am.

4    Q    What happened?

5    A    One of my boy picked me up in a stolen car.

6    Q    And why were you arrested?

7    A    He got pulled over, and then we went on a high-speed

8    chase a little bit.  I was on parole, he was on parole, yeah,

9    and they took me -- they took me to jail after that.

10   Q    When the police pulled you over, were you searched?

11   A    Yes, ma'am.

12   Q    And what, if anything, did they find?

13   A    A baton stick and a bag of ketamine.

14   Q    What happened with this case?

15   A    I violated parole.

16   Q    And did you plead guilty to the new charges?

17   A    Yes, ma'am.

18   Q    Were you sentenced?

19   A    Yes, ma'am.

20   Q    What was your sentence?

21   A    Like 90 days.

22   Q    And when were you released from this prison term?

23   A    November 2019.

24   Q    After your release in November of 2019, did you commit

25   another robbery?

1    A    Yes, ma'am.

2    Q    What happened?

3    A    I robbed a drug dealer.

4    Q    How did you do it?

5    A    I just took it from him.

6    Q    And what did you take?

7    A    I took 15 pounds.

8    Q    Of what?

9    A    Of marijuana.

10   Q    Did you have a weapon?

11   A    No, ma'am.

12   Q    And how were you able to take the 15 pounds of marijuana

13   from him?

14   A    I told him I'll be back, and I never came back.

15   Q    What happened with that marijuana?

16   A    You You helped me sell it.

17   Q    And how much money did you get for selling the 15 pounds

18   of marijuana?

19   A    Almost 30,000.

20   Q    And what happened to that money?

21   A    We went to Atlantic City, and then You You gambled it.

22   Q    Mr. Yu, were you arrested again in October of 2020?

23   A    Yes, ma'am.

24   Q    What happened?

25   A    I took my friend's car and his parents called the cops on

1    me.

2    Q    And why were you arrested?

3    A    Because it was reported stolen.

4    Q    Did the police become involved?

5    A    Yes, ma'am.

6    Q    Did they conduct any searches when they found you in the

7    car?

8    A    What?  On the stolen car?

9    Q    Uh-hum.

10   A    I went -- I put it in an auto shop, and then they came

11   and got me from the auto shop.

12   Q    And what, if anything, did the police find when you were

13   arrested?

14   A    Drugs.

15   Q    What drugs?

16   A    They found ketamine, methamphetamine, and marijuana.

17   Q    Did you also have a weapon at the time?

18   A    Yes, I did.

19   Q    What kind?

20   A    I had a baton stick and a scalpel.

21   Q    What happened in this case?

22   A    I got a court appearance ticket.

23   Q    Did you serve any jail time?

24   A    No, ma'am.

25   Q    Mr. Yu, were you arrested again in April of 2021?

D. Yu - direct - Lash                    1561

1   A    Yes, ma'am.

2   Q    What were you arrested for?

3   A    Distribution of methamphetamine.

4   Q    What happened?

5   A    I sold to an undercover.

6   Q    You sold what to an undercover?

7   A    Methamphetamine.

8   Q    And how much methamphetamine did you sell?

9   A    A hundred grams.

10  Q    How much were you supposed to be paid for selling a

11  hundred grams of methamphetamine?

12  A    1800.

13  Q    Were you also using methamphetamine at the time?

14  A    Yes, ma'am.

15  Q    How long had you been using methamphetamine?

16  A    Like, almost a year.

17  Q    Since your arrest in April of 2021, where have you been

18  living?

19  A    In jail.

20  Q    Since you've been in jail, have you ever violated the

21  rules of the facility where you have been incarcerated?

22  A    Yes, ma'am.

23  Q    What did you do?

24  A    I got into a fight.  I smoked K2.  And then I used a cell

25  phone.

1   Q    What's K2?

2   A    It's just synthetic marijuana.

3   Q    At some point after your arrest in April of 2021, did you

4   decide to cooperate with law enforcement?

5   A    Yes, ma'am.

6   Q    In connection with your efforts to cooperate with the

7   Government, did you meet with law enforcement agents and

8   prosecutors?

9   A    Yes, ma'am.

10  Q    Did you agree to provide them information in these

11  meetings?

12  A    Yes, ma'am.

13  Q    What kind of information did you agree to provide them?

14  A    Information about my case and all my crime history.

15  Q    You said information about your case.

16  A    Yeah.

17  Q    What do you mean by that?

18  A    Whatever you guys asked me, about the murder, all my --

19  all my criminal history.

20  Q    And that criminal history that you referenced, did that

21  include crimes that you have never have been charged with?

22  A    Yes, ma'am.

23  Q    That the police didn't know about?

24  A    Yes, ma'am.

25  Q    Since April of 2021, can you estimate how many meetings

1    you've had with members of the Government?

2    A    A lot.

3    Q    How many is a lot?

4    A    Twenty, I'd say.

5    Q    Mr. Yu, did you eventually enter a guilty plea in federal

6    court?

7    A    Yes, ma'am.

8    Q    When did you plead guilty?

9    A    I think March, right, March.

10   Q    Of what year?

11   A    '22.

12   Q    And what crimes did you plead guilty to?

13   A    Distribution of methamphetamine, possession of

14   methamphetamine, and conspiracy to murder for hire.

15   Q    Have you been sentenced yet, Mr. Yu?

16   A    No, ma'am.

17   Q    What is your understanding of the maximum sentence that

18   you face as a result of that guilty plea?

19   A    Life.

20   Q    Did you plead guilty pursuant to what's called a

21   cooperation agreement?

22   A    Yes, ma'am.

23   Q    Mr. Yu, I'm going to direct your attention to the screen

24   in front of you, and I'll show you what's been marked for

25   identification as Government's Exhibit 3000.

D. Yu - direct - Lash                    1564

1    MS. LASH:  And, Ms. Reed, if you could scroll

2    through the 12 pages of this agreement, please.

3    BY MS. LASH:

4    Q    Mr. Yu, what is the document on the screen in front of

5    you?

6    A    It's my plea agreement -- it's my cooperation agreement.

7    Q    Does this 12-page cooperation agreement contain all of

8    the terms and conditions of your agreement with the

9    Government?

10   A    Yes, ma'am.

11   Q    Is there anything that has been left out of this

12   agreement?

13   A    No, ma'am.

14        MS. LASH:  Your Honor, the Government offers

15   Government Exhibit 3000.

16        THE COURT:  It will be received.

17        (Government's Exhibit 3000 received in evidence.)

18        MS. LASH:  Ms. Campbell, if we could publish this to

19   the jury.

20        (Exhibit published.)

21   Q    Mr. Yu, I'm showing the jury what is the last page of

22   your cooperation agreement.

23        Do you see your signature on that page?

24   A    Yes, ma'am.

25   Q    And where is it?

1   A    Where it says David Yu.

2   Q    Mr. Yu, what is your understanding of what you have to do

3   under the terms of this cooperation agreement?

4   A    I must tell the truth.

5   Q    What else?

6   A    I must tell you about all my crimes that I did and if you

7   guys need me to come testify, I must come testify.

8   Q    And how about future crimes, what are you allowed to do

9   about that?

10  A    I must not commit no more crimes.

11  Q    If you do everything that you are supposed to under this

12  cooperation agreement, what is your understanding of what the

13  Government is supposed to do for you?

14  A    If I -- if I tell the truth and follow all the rules?

15  Q    Yes.

16  A    I could get a 5K1 letter.

17  Q    What's your understanding of what a 5K1 letter is?

18  A    It's, basically, a recommendation letter to the judge

19  letting him know my cooperation, what I helped out with the

20  case, my admit -- what I admit to my crimes, my history of

21  crimes; yeah.

22  Q    You said that the 5K1 letter was a recommendation letter,

23  but does the letter include a sentence recommendation?

24  A    No, ma'am.

25  Q    And what is your understanding of what the 5K1 letter

1  allows the sentencing judge to do?

2  A    To go under my mandatory minimum.

3  Q    And as you sit here today, has the Government promised

4  that it will write this 5K1 letter for you?

5  A    No, ma'am.

6  Q    And even if the Government does write this 5K1 letter,

7  what is the maximum sentence that you could still face?

8  A    Life.

9  Q    Mr. Yu, what sentence are you hoping for?

10  A    Time served.

11  Q    How long have you been in jail so far?

12  A    Almost three years.

13  Q    Has anybody promised you that you are going to get a

14  reduced sentence?

15  A    No, ma'am.

16  Q    Has anybody promised that you are going to get a sentence

17  of time served?

18  A    No, ma'am.

19  Q    Who is responsible for determining what sentence you get?

20  A    The judge.

21  Q    And as far as you understand it, does the result of this

22  trial, what happens here, impact whether or not you get a 5K1

23  letter?

24  A    What you mean by that?

25  Q    I mean, in other words, does it matter whether the

1    defendants in this courtroom are found guilty or innocent --

2    A    No.

3    Q    Let me finish.

4          -- as to whether you get a 5K1 letter?

5    A    No, ma'am.

6    Q    Does whether you tell the truth in your testimony impact

7    whether you get a 5K1 letter?

8    A    Yes, ma'am.

9    Q    What is your understanding of what happens here if you

10   lie today?

11   A    You guys can rip my 5K1.  I mean the 5K1 opportunity goes

12   out the window.

13   Q    At that point would you get to take your guilty plea

14   back?

15   A    No, ma'am.

16   Q    What would your sentence be if you lied during your

17   testimony today?

18   A    Life.

19   Q    Mr. Yu, I'd like to turn back to November of 2018, after

20   you've been released from prison.

21   A    Right.

22   Q    Where did you live at the time?

23   A    In the Bronx.

24   Q    Remind us, what was your relationship like with You You

25   at this time?

D. Yu - direct - Lash                                    1568

1    A    He's my best friend.

2    Q    Did you receive a phone call from You You after your

3    release from prison?

4    A    Yes, ma'am.

5    Q    Why?

6    A    He told me that his uncle got a job for me.

7    Q    Did You You provide any other details about the job?

8    A    No, not yet.

9    Q    Did You You say anything else concerning his uncle?

10   A    No.

11   Q    At this time, had you ever met You You's uncle?

12   A    Yes, ma'am.

13   Q    When did you first meet him?

14   A    When I came home from jail the first time.

15   Q    And approximately what year was that?

16   A    Like 2011, '12, around that time.

17   Q    And where did you meet You You's uncle at that time?

18   A    At his company, at his office.

19   Q    And what company did he run?

20   A    A construction company.

21   Q    Have you seen him since you first met him in 2011 or

22   2012?

23   A    What do you mean?

24   Q    Had you ever seen You You's uncle since the first time

25   you met him in 2011 or 2012?

D. Yu - direct - Lash                    1569

1   A    Like -- like, did I meet him after that?

2   Q    Yes.  Did you see him after that?

3   A    Like -- like here and there, when I'm with You You

4   though.

5   Q    Can you estimate how many times you saw him after you

6   first met him in '11 or '12?

7   A    It was a few times.

8   Q    At this time, did you know You You's uncle's name?

9   A    No, I didn't.

10  Q    How did you refer to him?

11  A    Uncle.

12

13              (Continued on next page.)

14

15

16

17

18

19

20

21

22

23

24

25

D. Yu - direct - Lash                    1570

1    BY MS. LASH:   (Continuing.)

2    Q    And you said that you met him at his construction

3    company; is that right?

4    A    Yes, ma'am.

5    Q    Did you ever work for You You's uncle?

6    A    No, ma'am.

7    Q    In November of 2018 when You You called you about a job

8    for his uncle, what did you think the job was going to be?

9    A    I thought I was going to beat somebody up, you know what

10   I mean?  I thought somebody owed him money.  I thought I was

11   just going to beat somebody up for him.

12   Q    And why did you think they would call you for that task?

13                  MR. KOUSOUROS:   Objection.

14                  THE COURT:   I'll sustain the objection to the form

15   of the question.

16                  MS. LASH:   We'll move on.

17   Q    Did you agree to meet with You You and his uncle about

18   the job?

19   A    Yes, ma'am.

20   Q    And approximately how long after You You called you did

21   this meeting take place?

22   A    I can't -- I can't recall.

23   Q    Where did you meet You You and his uncle?

24   A    At a restaurant.

25   Q    Do you know the name of the restaurant?

D. Yu - direct - Lash                    1571

1   A    No, no, ma'am.

2   Q    Can you describe it for us?

3   A    It's, like, a noddle shop I think it was.

4   Q    Where was it located?

5   A    In Flushing.

6   Q    What streets?

7   A    Cedar and Holly, around there.

8   Q    Were there any notable landmarks in the area?

9   A    There was a big supermarket across the street.

10  Q    Mr. Yu, on your screen only, I'm showing you what's been

11  marked for identification as Government Exhibit 520.  Do you

12  recognize this?

13  A    Oh, yes, ma'am.

14  Q    What is it?

15  A    That's the -- that's the restaurant we went to.

16  Q    Okay.  And there's a few businesses in this picture.  Can

17  you tell us specifically which one?

18  A    I think it was the Taste Good place.

19  Q    Taste Good place?

20  A    Yeah, Taste Good.

21  Q    Is this a fair and accurate depiction of how the

22  restaurant looked in 2018?

23  A    Yes, ma'am.

24       MS. LASH:  Your Honor, the government offers

25  Government Exhibit 520 into evidence.

D. Yu - direct - Lash                         1572

1      THE COURT:  520 will be received, but perhaps you

2  need him to point out exactly which of the buildings is the

3  restaurant.

4          (Government Exhibit 520 was received in evidence.)

5          MS. LASH:  Yes, Your Honor.

6  Q    Now that the photograph of the restaurant is on the

7  screen, can you tell us what the name of the restaurant was?

8  A    I think it was the Taste Good place, yeah.

9  Q    And is the Taste Good place the second red awning in from

10 the left side of the picture?

11 A    Yes.

12 Q    What time did the meeting with You You and his uncle take

13 place?

14 A    In the afternoon.

15 Q    And how did you get to the restaurant?

16 A    You You drove me.

17 Q    Which car did you take?

18 A    His pick-up truck.

19 Q    When you arrived, where was You You's uncle?

20 A    He was already inside the restaurant.

21 Q    And what did you do when you got there?

22 A    I ordered a soda.

23 Q    And did you sit down?

24 A    Yes, ma'am.

25 Q    Who was sitting with you?

D. Yu - direct - Lash                    1573

1    A    Me, You You, and the uncle.

2    Q    Did anybody else order anything?

3    A    Yeah, they order something, I don't remember what it was,

4    though.

5    Q    How long were you inside the restaurant with You You and

6    his uncle?

7    A    Like, 20, 30 minutes.

8    Q    And what happened during this 20, 30-minute period?

9    A    They started talking in Chinese.

10   Q    What were they talking about?

11   A    I don't know.  I couldn't -- I don't understand Chinese

12   so, I mean, I can't say.

13   Q    What were you doing while they were talking?

14   A    I was just being respectful and sitting down.

15   Q    After 20 or 30 minutes had passed, what happened next?

16   A    We got up, we left, and I smoked a cigarette with the

17   uncle right outside the restaurant.

18   Q    And using Government's Exhibit 520, can you tell me

19   where, approximately, you smoked a cigarette with You You's

20   uncle?

21   A    Like, right here, right by where the -- right by where

22   the -- where the folding sign is at.

23   Q    Where the placard is above the Google stand in the middle

24   of the page?

25   A    Yeah, around there, yeah.

1  Q    Did you have any conversation with You You's uncle while

2  you were smoking a cigarette?

3  A    No.

4  Q    Did he interact with you at all?

5  A    I remember him patting my -- like he tapped, he patted my

6  shoulder.

7  Q    Did he say anything?

8  A    No.  Well, I don't remember actually.  I'm sorry.

9  Q    Who left the restaurant first?

10  A    We left at the same time.

11  Q    And where did you go?

12  A    Me and You You went to You You's car and the uncle went

13  the other way.

14  Q    When you were inside You You's car, what happened?

15  A    That's when You You, he broke it down to me what I had to

16  do.

17  Q    What did he say?

18  A    He told me -- that he wants -- the uncle wants me to ap

19  somebody for him.

20  Q    What does it mean to clap someone?

21  A    To shoot somebody.

22  Q    What?

23              THE COURT:  What?

24              THE WITNESS:  To shoot somebody.

25  Q    Did You You use the word clap?

1   A    Yeah, think so -- from -- my understanding, yeah.

2   Q    And what else did You You tell you about what he wanted

3   you to do?

4   A    That's it.  That was it basically.

5   Q    Did he tell you who his uncle wanted you to kill?

6   A    Yeah, he told me what the problem was.  He basically said

7   that somebody, like, his partner left the company and just

8   took all -- start his own company and, like -- and took all

9   the clients from him.

10  Q    Did he tell you the name of this person?

11  A    No.

12  Q    Did you ask?

13  A    I don't remember, ma'am.

14  Q    Did You You tell you what, if anything, you would receive

15  if you agreed to shoot this person?

16  A    He told me the uncle would take good care of me.

17  Q    And what did you understand that to mean?

18  A    That he was going to pay me a large sum of money.

19  Q    Was a specific amount of money --

20          MR. KOUSOUROS:  Objection, objection.

21          THE COURT:  Overruled.

22  Q    Mr. Why you, was a specific amount of money ever

23  discussed?

24  A    No, ma'am.

25  Q    Did you agree to kill this person?

1   A      Yes, ma'am.

2   Q      Did you discuss this job for You You's uncle again?

3   A      Excuse me?

4   Q      Did you discuss this job with You You, for his uncle,

5   again?

6   A      What does that mean?

7   Q      Did you have another conversation with You You about this

8   job?

9   A      Oh, yes, ma'am.

10  Q      And when did that happen?

11  A      A couple weeks later.

12  Q      What happened?

13  A      He said that he has another -- we have another meeting

14  with the uncle.

15  Q      And why were you meeting with his uncle?

16  A      To discuss about the job.

17  Q      Did you know where the meeting was supposed to take

18  place?

19  A      Yes, ma'am.

20  Q      Where?

21  A      Same restaurant.

22  Q      What happened on the day of the meeting?

23  A      I didn't go.

24  Q      Why not?

25  A      At that time, like, my -- like, I wasn't -- I wasn't

D. Yu - direct - Lash                    1577

1  really ready to do that job for him, I just didn't know how to

2  tell him yet.

3  Q     And why didn't you tell You You?

4  A     I didn't want to disappoint him.

5            THE COURT:  At this point in time, I think we'll

6  take a brief afternoon recess.

7            MS. LASH:  Yes, Your Honor.

8            THE COURT:  Okay.  We'll be going until 5:30 today,

9  that's why I wanted to make sure you have an afternoon recess.

10            (Brief recess.)

11            MR. MAZUREK:  Can I raise one issue first?

12            THE COURT:  With the witness here?

13            MR. MAZUREK:  Oh, no.

14            THE COURT:  We'll take the witness out.

15            (The witness steps down.)

16            THE COURT:  Yes, Mr. Mazurek?

17            MR. MAZUREK:  Your Honor, I expect that on direct

18  examination that --

19            THE COURT:  Everyone can be seated.

20            MR. MAZUREK:  -- that the government may seek to

21  elicit a conversation that this witness allegedly had with

22  You You about what You You understood that my client,

23  Mr. Zhang, was promised to receive from Allen Yu, the business

24  interest.  My concern is that the timing of that information

25  may be hearsay as opposed to a co-conspirator statement

1    because it was something that was learned after-the-fact and,

2    so, I wanted to alert the Court of that, that I would be

3    objecting to hearsay depending on how, you know, it is

4    elicited, but that is my understanding based on the witness

5    statements.

6             MS. LASH:  Your Honor, so, what Mr. Mazurek is

7    referencing is You You, and I expect David Yu will testify

8    that they had a conversation where You You told him that Zhang

9    was going to receive a percentage of the uncle's construction

10   company if he carried out the murder.  Mr. Yu does not recall

11   exactly when this conversation took place.  He believes it was

12   before the murder, but I expect he'll testify he can't be sure

13   as to the date.  Regardless of when the conversation happened,

14   it was close in time to the murder and it is a co-conspirator

15   statement.

16             As the government moved in limine, the conspiracy

17   here did not end with the death of the victim.  The object of

18   this conspiracy for the defendants was to receive payment and

19   that did not occur until December of 2019.  So Mr. Yu will

20   certainly testify that this conversation happened close in

21   time to the murder, it's a co-conspirator statement, and we

22   would be offering it on that basis.

23             MR. MAZUREK:  Your Honor, I mean, if he can't

24   remember, that is actually very relevant because the payment

25   itself is not -- as the government has said --

D. Yu - direct - Lash                    1579

1      THE COURT:  It's murder for hire, they have to

2  receive money, correct?  That's one of the elements?

3      MR. MAZUREK:  Yes, but it's the promise or the

4  agreement, the bargained for exchange.

5      THE COURT:  But isn't it entirely relevant and

6  wouldn't be pursuant to the conspiracy how they actually

7  received that money later on?

8      MR. MAZUREK:  But, I mean, there was no -- there is

9  no payment in this instance.  There's no business interest

10 that had changed hands.  The government's -- I mean, the

11 government's theory in remunerations seems to be a shifting

12 sand in this case.  They opened on the issue that it was a

13 $30,000 payment to my client in cash, however, You You's

14 testified that it was a percentage of the business -- of

15 Allen Yu's business.

16      I'm not sure where all of that lands at this stage

17 but all I know is that if David Yu learned from You You

18 after-the-fact that there was some business interest that had

19 been promised sometime before, that's just hearsay, it's just

20 puffing, it doesn't further the conspiracy in any way and

21 therefore is just blatant hearsay.  That's my concern, that

22 this witness shouldn't be able to say well, You You told me

23 after-the-fact that there was this supposed promise.  That is

24 not in furtherance of any of the aims of the co-conspirator,

25 but it's just rumor and gossip among two criminal associates

D. Yu - direct - Lash                    1580

1   and should be precluded.

2           MR. KOUSOUROS:  Judge, I would add that the

3   indictment in this case has the temporal limits of the

4   conspiracy from August of 2018 until February of 2019.  We

5   understand the on or about, but the on or about doesn't

6   necessarily go months and months and months beyond that.  That

7   is what was charged in the indictment.

8           MS. LASH:  The dates of the indictment, Your Honor,

9   courts have held that that doesn't matter in determining

10  co-conspirator statements for the duration of the conspiracy.

11          As you've pointed out, whether or not payment was

12  received, regardless of what was promised, is circumstantial

13  evidence of an element that the government has to prove; here,

14  the promise of payment.  The fact that payment was exchanged

15  illustrates the intent of these individuals in carrying out

16  this murder.  And, secondly, these statements were during and

17  in furtherance of the conspiracy.  You have coconspirators

18  discussing the aims of the conspiracy and I expect David Yu,

19  if asked, would testify that this information was relevant to

20  him in deciding whether or not to carry this out or if it was

21  after the conspiracy, how much he would receive for his

22  participation.

23          THE COURT:  Well, I'm inclined, without hearing what

24  he's going to say, to permit it as being a statement in

25  furtherance of the conspiracy.  I don't think this -- even if

D. Yu - direct - Lash                    1581

1    it is after the murder, I don't think that the conspiracy

2    necessarily ends at murder.  These are co-conspirators talking

3    to each other, reassuring each other, so I think it comes in.

4              Now you've got five minutes.

5              (Jury exits the courtroom.)

6              (Brief recess.)

7              (Witness resumes the witness stand.)

8              (Jury enters the courtroom.)

9              THE COURT:  All right.  Please be seated.  We're

10   ready to begin.

11             MS. LASH:  Thank you, Your Honor.

12             BY MS. LASH:
     Q    Mr. Yu, before the break, we were talking about a second
13   meeting that was planned with You You and his uncle; do you

14   remember that?

15   A    Yes, ma'am.

16   Q    And what happened on the day of the meeting?

17   A    I didn't show up.

18   Q    And what happened when you didn't show up?

19   A    You You got mad at me.

20   Q    And what did he do?

21   A    Cursed at me.

22   Q    How did he contact you?

23   A    He text me.

24   Q    Mr. Yu, I'd like to show you on the screen what's been

25   marked for identification as DX-23.

1    MS. LASH:  And, Ms. Reed, if we could scroll through

2    the first couple of pages so Mr. Yu can familiarize himself

3    with this.

4    Q    Mr. Yu, do you recognize these messages?

5    A    Yes, ma'am.

6    Q    And whose messages are in blue on the left side?

7    A    That's me.  The blue one is me.

8    Q    And whose messages are in green on the left side?

9    A    That's You You.

10    MS. LASH:  And, Your Honor, I see this is displayed

11    for the jury.  I believe a portion of DX-23 was moved into

12    evidence by Mr. Kousouros on a previous cross-examination.  To

13    the extent that the full exhibit was not moved in, the

14    Government moves in DX-23.

15    THE COURT:  Is DX is a defense exhibit?

16    MS. LASH:  It is, Your Honor.

17    THE COURT:  All right.  Then it will be received.

18    (Defendants' Exhibit DX-23 was received in

19    evidence.)

20    Q    Mr. Yu, looking at the first message in blue on the

21    screen, what's the date and time?

22    A    February 6, 2019.

23    Q    I'm sorry, I interrupted you.  What time was the message

24    sent?

25    A    12:20 a.m.

1  Q    And now that the jurors can see the messages, remind us

2  who is blue and who is green.

3  A    Blue is me and green is You You.

4  Q    I would like to read some of these messages with you.

5  I'll read You You's messages and I'll have you read your own

6  messages.  We're going to go through the first three pages.

7  So, please, you being.

8  A    "All right.  That strange."

9  Q    "Bullshit, we've been tapped.  We need to speak ASAP,

10  it's coming up, the day."

11  A    "Yeah, I know."

12  Q    And Mr. Yu, at the top of the page?

13  A    Oh.  "You said Monday."

14  Q    "You need to see me ASAP.  Stop fucking around.  End up

15  messing shit -- end up messing shit up and do life."

16          I'm going to stop there, Mr. Yu.  The messages on

17  page two that said, "it's coming up, the day," and you

18  replied, "you said Monday."  What did you understand the

19  message "it's coming up the day" to mean?

20  A    It was the day that we were supposed to do the shooting.

21  Q    Okay.  I'd like to continue with these messages.  We'll

22  start on page four with the first message is You You's

23  message.

24          "I'm dead serious."

25  A    "Okay I got you.  I got my program tomorrow in the

D. Yu - direct - Lash                    1584

1   morning.  After that, I could go and I could burn one with

2   you."

3   Q    "Yo my G, keep your word.  Stop messing around."

4   A    "I'm good.  I put $10 in the Metro so I got no excuse."

5   Q    And I'll stop you there on page five.  What did you mean

6   by, "I put ten dollars in the Metro, I got no excuse?"

7   A    I put $10 on the Metro card.

8   Q    What did you understand that you were supposed to do with

9   that Metro card?

10  A    I was supposed to come to Flushing, Queens and meet up

11  with You You.

12  Q    I'll continue at the bottom of page five with Yu Yu's

13  message.

14            "Where are you?"

15  A    "Waiting for my counselor.  My shit about to start."

16  Q    "Let me know when you finish."

17  A    "Ight.  My class about to end in ten minutes."

18  Q    "Yo, I'm waiting on you."

19  A    "Ight.  I'm gonna hop on the train and Imma go straight

20  to you".

21  Q    "Bet."

22  A    "I'm hopping on the train right now."

23  Q    "Yeah, I'm home for now."

24  A    "Yo, you really called my brother?"

25  Q    "Yo, it's too late.  I don't need to meet you.  I told

1   you I have to see you in working hours.  Pointless you coming

2   meet me at nighttime.  I got my shit to handle at night,

3   that's why I tell you to come meet me daytime.  You just keep

4   playing that time game with me."

5           And we'll stop there on page 11, Mr. Yu.  Why did

6   You You want to meet you in the daytime?

7   A   Because he wanted -- he wanted to talk about -- he wanted

8   to plan out about the job.

9           MR. KOUSOUROS:  Objection, objection to what

10  somebody else wanted.

11          MS. LASH:  I can rephrase, Your Honor.

12  Q   Mr. Yu, why did you understand that You You wanted to

13  meet you in the daytime?

14          MR. KOUSOUROS:  Same objection, Judge.

15          THE COURT:  Overruled.

16  Q   You can answer the question.

17  A   All right.  He wanted to talk about the -- about the job,

18  like he wanted to have a -- he wanted to have a perfect plan.

19  Q   And why did he want that conversation to occur in the

20  daytime?

21          MR. KOUSOUROS:  Objection, Judge.  Objection.

22          THE COURT:  Did you have an understanding, based on

23  your previous dealings with You You, as to what he meant by

24  this?

25          THE WITNESS:  What do you mean, ma'am?

1          THE COURT:  Well, you had to been talking to You You

2   for some time about this issue, right, about the killing or

3   you talked to him before about the killing?

4          THE WITNESS:  Yes, ma'am.

5          THE COURT:  And how well did you know him, You You?

6          THE WITNESS:  That was my best friend.

7          THE COURT:  Well, when he said this thing about the

8   daytime, did that mean something specific to you?

9          THE WITNESS:  No, he just wanted me to come earlier

10  and talk about it because I've been -- I've been dodging him,

11  yeah.

12         THE COURT:  Okay.

13  Q    Mr. Yu, I'm going to direct your attention to the top

14  message on page 11 where You You tells you "I've got my shit

15  to handle at night."  Did you have an understanding of what he

16  meant by that?

17  A    Yeah, that's when -- because he be selling weed, so,

18  like, I guess he was trying to -- he was trying to do his

19  little hustle at nighttime and -- and talk about the job thing

20  in the daytime.

21  Q    Okay.  I'm going to resume on page 11 with the message in

22  the middle.

23         "Everyday you got shit to do and reasons why you

24  can't make it and you more busy than me."

25  A    "It wasn't even that serious, b, she just wanted me to

D. Yu - direct - Lash                    1587

1   help her with the Medicaid -- with the Medicaid."

2   Q    And what did you mean when you wrote, "wanted me to help

3   her with her Medicaid?"

4   A    What's it called.  I was helping -- with her Medicaid, I

5   was helping my mom renew her Medicaid card at that time, on

6   that day, yeah.

7   Q    And, Mr. Yu, if you can continue on page 12 with the top

8   message.

9   A    "After that, I was gonna leave, bro."

10  Q    "I see.  You don't take this thing serious."

11  A    "I don't.  My -- I'm the one who's gonna clip him."

12  Q    And I'll stop you there, Mr. Yu.  What did you mean when

13  you wrote, "I'm the one who's gonna clap him?"

14  A    I -- I meant to tell him that I was to -- I -- I'm the

15  one that's going to be shooting him.

16  Q    And why did you say that?

17  A    Because at that time, I still didn't tell him that I

18  didn't want to do the job.

19  Q    And you told us earlier that you didn't want to be the

20  shooter, right?

21  A    Yeah.

22  Q    So why would you write that?

23  A    At that time, he -- he still believed that I was going to

24  go through with this job, that's why, like, I was dodging him

25  a lot.

D. Yu - direct - Lash                    1588

1   Q    And what was your plan at this point?

2   A    I was going to find one of my Blood homies, like, to do

3   it for me.

4   Q    And how did you go about doing that?

5   A    I -- I didn't do it.  I couldn't come up with -- I

6   couldn't find anyone to do it.

7   Q    Did you contact anyone at all?

8   A    No, I couldn't think of anyone who was -- that's a big

9   job that you're asking somebody to do, you know what I mean?

10  And if what if I asked him -- let's say I asked one of my

11  Blood -- my Blood friends, yo, what's up, you want to murder

12  somebody for me, I couldn't even offer him any money yet, I

13  didn't know how much I was going to get paid for it, I

14  couldn't give him a number for it.  And what if he said no,

15  you know what I mean, he would have been a liability.  So I

16  couldn't just -- I didn't just come up -- I didn't go ask

17  anybody.

18  Q    At the time you wrote that message, "I'm the one who's

19  gonna clap him," were you intending on shooting the victim?

20  A    No, ma'am.

21  Q    I'm going to continue reading these messages at the

22  bottom of page 13 with You You's message.

23            "Imma put it like this.  Someone have a job

24  interview, tells you to come in at 10:00 a.m.  You just

25  decide, oh, let me do my shit and go interview at 10:00 p.m.

D. Yu - direct - Lash                    1589

1  So, yeah, I don't know how that works.  I don't run on your

2  time, N.  So you do you, my G.  Imma handle with other

3  people."

4  A    "It's not even that.  It's only 5:30."

5  Q    "It's, like, the fifth time you did this.  You tell me

6  you see me during the daytime, then six p.m, no call, no text

7  so I call, then you've got a million things to do now.  I

8  mean, shit, you busy guy.  Ight, then guess you don't need to

9  see me."

10  A    "What you talking about, bro?"

11  Q    "All right.  Whatever, bro.  You bring nothing but

12  stress, bro.  I was having a good day.  I realize these days

13  you have nothing but bad energy around you.  Can't chill with

14  you and can't make money with you."

15  A    "No, bro, it's just you make me feel like I'm worth

16  nothing.  Like when you yell at me, I take everything to the

17  heart.  Damn, bro, my mom is bugging out right now."

18  Q    "Yo, mister, the job is taken care of.  Don't worry about

19  it.  My bad about my part.  Next time, hopefully I can see you

20  again."

21        And we'll stop there, Mr. Yu.  Did you see You You

22  after you exchanged these messages?

23  A    Yes, ma'am.

24  Q    Where did you see him?

25  A    I met him at his house.

D. Yu - direct - Lash                    1590

1   Q    In which room of his house were you in?

2   A    I was in the living room.

3   Q    Did you learn in that meeting what You You meant when he

4   wrote to you the job is taken care of?

5   A    Yes.

6   Q    And what did you learn?

7   A    That he didn't need me no -- that he found another

8   shooter basically.  He said he found -- that he found Zhe and

9   Zhe found the shooter for him that was really good at what he

10  do.

11  Q    You said You You told you that Zhe was going to do it; is

12  that right?

13  A    No, that he found -- that he -- that he hollered at Zhe

14  and Zhe said he was going to do it and Zhe found somebody else

15  that was going to be the shooter.

16  Q    Who is Zhe?

17  A    He was my friend.

18  Q    What's his full name?

19  A    Zhe Zheng.

20  Q    When did you meet him?

21  A    Who, Zhe?

22  Q    Yes.

23  A    Like 2005, 2006.

24  Q    And in 2018, 2019, what was your relationship like with

25  Zhe?

D. Yu - direct - Lash                    1591

1   A     2018 you said?

2   Q     Yes.

3   A     I had no problems with him.

4   Q     Were you friends?

5   A     Yeah, we're cool.

6   Q     What was the last time you had seen Zhe before You You

7   mentioned his name at this meeting?

8   A     I don't know, but, like, I see him here and there, like

9   at karaoke bars or I see him around.

10  Q     Did you have his contact information?

11  A     Yes.

12  Q     And what contact information did you have?

13  A     I had his WeChat.

14  Q     And what's WeChat?

15  A     It's like a Chinese WhatsApp.

16  Q     And what was -- what contact information did you have for

17  Zhe on WeChat?

18  A     New York Zhe.

19  Q     And what was New York Zhe?

20  A     That was his ID.

21  Q     So You You told you Zhe was going to do it?

22  A     Yeah.

23  Q     What did you understand that to mean?

24  A     That -- that Zhe was going to be part of the -- part of

25  the job.

D. Yu - direct - Lash                         1592

1    Q    And you said that Zhe found someone else to be the

2    shooter?

3    A    Yeah.

4    Q    What additional information did You You provide about

5    that?

6    A    That's it, that the shooter is really good at what he do.

7    Q    What else did You You say about the job?

8    A    What I said basically.

9    Q    Did You You say what he wanted your role to be?

10   A    Yes, I asked him, like, you don't need me no more, I'm

11   good, right?  He told me that he still wants me to be involved

12   and just ride out with him and if I do, then he say he's going

13   to buy my mom a house.

14   Q    Did you agree to ride with You You?

15   A    Yeah.

16   Q    Why?  Why did you agree to do that?

17   A    Because that was my boy and he said he was gonna buy my

18   mom a house.

19   Q    You told us earlier that you didn't want to pull the

20   trigger?

21   A    Yeah.

22   Q    Why agree to be there that night at all?

23   A    It's a big difference, like, you know what I mean, from

24   running up on somebody and just pulling the trigger and just

25   looking at for somebody just being a look-out.  I felt like it

D. Yu - direct - Lash                          1593

1   was a big difference.

2   Q    Did You You later tell you what Zhe wanted if he

3   participated in the murder?

4   A    Yeah.

5   Q    When did that happen?

6   A    I -- I can't -- I can't answer that directly but it was

7   later on, he told me that Zhe don't even want the money.

8           MR. MAZUREK:  Objection.

9   Q    Before you tell me what he said, you said it was later

10  on.  Where were you?

11  A    I was at his house.

12  Q    What were you doing at his house when he told you this?

13          MR. MAZUREK:  May I ask who "he" is, I'm getting

14  lost.

15  Q    Mr. Yu, you can look at me.  We were talking about what

16  You You told you that Zhe would get if he participated in the

17  murder.  You said you were at his house?

18  A    Yeah.

19  Q    What were you doing at his house?

20  A    At Yu Yu's house.  I was stocking up weed cartridges.

21  Q    And what was the weather like outside?

22  A    It was cold I remember because I told him to put the heat

23  up on me.

24  Q    Was that before or after the murder?

25  A    I don't -- I can't answer that.  I don't really remember.

D. Yu - direct - Lash                    1594

1   Q    Was it close in time to when the murder happened?

2           MR. MAZUREK:  Objection.

3           THE COURT:  Overruled.

4   A    I don't know, ma'am.

5   Q    Was it in the same season that the murder happened?

6   A    Yeah, it was during the wintertime.

7   Q    What did You You tell you that Zhe wanted if he

8   participated in the murder?

9           MR. MAZUREK:  Objection, hearsay and as to form.

10          THE COURT:  Well, I think your question is what, if

11  anything, did he tell him.

12          MS. LASH:  Yes, Your Honor.  I'll rephrase.

13  Q    Mr. Yu, what, if anything, did You You tell you that Zhe

14  wanted if he participated in the murder?

15  A    He wanted a percentage of the uncle's company.

16  Q    Did You You tell you why Zhe wanted a percentage of the

17  uncle's company?

18  A    No, no, ma'am.

19  Q    Before the murder happened, did you learn the name of the

20  person that you had agreed to kill?

21  A    No, ma'am.

22  Q    Did you learn what this person looked like?

23  A    No, ma'am.

24  Q    Mr. Yu, I would like to talk about the murder now.  How

25  did you know when the murder would take place?

D. Yu - direct - Lash                    1595

1   A    You You told me.

2   Q    What did he tell you?

3   A    To be ready for that day.

4         THE COURT:  I'm sorry, who is telling you this?

5         THE WITNESS:  You You.

6         THE COURT:  All right.

7   Q    What did You You tell you, Mr. Yu?

8   A    Just be on point, he told me to get a burner phone and

9   that we were going to rent out a van.

10  Q    What's a burner phone?

11  A    Prepaid phone.

12  Q    And why would a person purchase a burner phone?

13  A    It's not under your name so I guess whatever you do with

14  it, it continue come back -- trace back to you.

15  Q    You said You You told you to purchase a burner phone; did

16  you do that?

17  A    No.

18  Q    Why not?

19  A    I didn't have the funds for it.

20  Q    Did anyone else purchase a burner phone?

21  A    Yeah, You You did.

22  Q    And were you with You You when he purchased the phone?

23  A    No.

24  Q    After You You purchased the phone, what did he do?

25  A    He gave me the number to it and he told me to call --

D. Yu - direct - Lash                    1596

1  like, to talk only on this phone about the job.

2          MS. LASH:  Ms. Reed, if we could put up side-by-side

3  what's been marked for identification as

4  Government Exhibit 903 and 925, please.

5  Q    Mr. Yu, on your screen, can you see what's been marked

6  for identification as Government Exhibit 903?

7  A    Yeah.

8  Q    What is this a picture of?

9  A    The 903 -- the 903 one?

10 Q    The 903 one.

11 A    That's -- that's a picture of my phone.

12 Q    Okay.  And whose contact is displayed on your phone?

13 A    That's You You's -- that's You You's contact.

14 Q    Okay.  Is that a fir and accurate depiction of your

15 phone?

16 A    Yes, ma'am.

17 Q    925, what is this a picture of?

18 A    It's my phone.

19 Q    Okay.  And what's displayed on your phone?

20 A    You You's contact.

21 Q    Okay.

22          MS. LASH:  Your Honor, the government offers

23 Government Exhibit 903 and 925 into evidence.

24          THE COURT:  So these are two contacts you had for

25 You You in your phone?

1       THE WITNESS:  Yes, ma'am.

2       THE COURT:  Different contacts, right?

3       THE WITNESS:  Yes, ma'am.

4       THE COURT:  Was one of them the burner phone?

5       THE WITNESS:  Yes, ma'am.

6       THE COURT:  Which one?

7       THE WITNESS:  The one that says Mis, M-I-S.

8       THE COURT:  Okay.

9       They will be received.

10      (Government Exhibits 903 and 925 were received in

11  evidence.)

12      MS. LASH:  If we can display these to the jury,

13  Ms. Reed.

14  Q    Starting with Government's Exhibit 903, what contact is

15  this?

16  A    I can't hear you, ma'am.

17  Q    Starting with Government Exhibit 903, whose contact is

18  this?

19  A    That's You You's.

20  Q    Okay.  What's the contact name?

21  A    Mis.

22  Q    Why did you save it as Mis?

23  A    Because that's me and his nickname, we call each other

24  mister.

25      (Continued on the following page.)

1  DIRECT EXAMINATION (Continued)

2  BY MS. LASH:

3  Q    And the Court asked you, but what is this the contact

4  for?

5  A    That's the burner number.

6  Q    Could you read the phone number for us.

7  A    (929)401-9002.

8  Q    Now, turning to the left side of the screen in front of

9  you, you have Government Exhibit 925.

10       What is this contact?

11 A    That's You You's -- his first phone.

12 Q    And what is the contact name for this phone?

13 A    Mista.

14 Q    And could you read the number for us, please.

15 A    (347)553-2163.

16 Q    Thank you.

17       MS. LASH:  We can take these down, Ms. Reed?

18 Q    Mr. Yu, how far in advance of the murder did You You tell

19 you that it was planned to happen?

20 A    I don't remember, ma'am.

21 Q    Was it in the days before?

22 A    I don't really remember.

23 Q    On the day of the murder, when do you first hear from You

24 You that day?

25 A    The day of the murder?

DAVID YU - DIRECT - MS. LASH                    1599

1    Q    Yes.

2    A    The afternoon.

3    Q    And what happens?

4    A    He calls me and tells me to get ready.

5    Q    And what else does he say?

6    A    He tells me that -- not to sniff K.

7    Q    I'm sorry, can you repeat that, Mr. Yu.

8    A    He told me not to sniff K.

9    Q    And what you say, K, what do you mean?

10   A    Ketamine.

11   Q    I want to turn to that in a minute.

12        What did you do after you got the phone call from

13   You You telling you to get ready?

14   A    I got ready and I took the bus to Flushing.

15   Q    You said You You told you not to sniff K?

16   A    Yeah.

17   Q    Why did he say that to you?

18   A    Because he knew that I had a habit at that time.

19   Q    Did you go anywhere before you met You You?

20   A    Yes.

21   Q    Where did you go?

22   A    I went to go buy a bag of K.

23   Q    You said you had a habit at the time; is that right?

24   A    Yes, ma'am.

25   Q    How much ketamine were you using in a day's time?

1   A     Like three grams a day.

2   Q     And how long had you been using about three grams of

3   ketamine a day?

4   A     A little while.

5   Q     When you say, a little while, what do you mean?

6   A     I just came home, I just got released, so my, like,

7   tolerance was building up at that time.

8   Q     And when you say you had just got released, when was the

9   last time you had been released from prison?

10  A     November.

11  Q     How do you take ketamine?

12  A     Snort it.

13  Q     And how much ketamine at this time were you using at one

14  time?

15  A     Sniffing a half a bag.

16  Q     And you told us you were taking about three grams a day.

17        How many grams of ketamine are in a bag of ketamine?

18  A     Like a gram.

19  Q     A gram, okay.

20        So one bump that you would take would be about a

21  half a bag or half a gram of ketamine; is that right?

22  A     Yes, ma'am.

23  Q     At that time, how did half a gram of ketamine affect you?

24  A     I'll get high.

25  Q     Can you explain more?

1  A    Like, I'll slur my word, I wouldn't be able to, like,

2  walk straight.

3  Q    Could you drive a car?

4  A    Nah.

5  Q    How long did the effects of a half of gram of ketamine

6  last?

7  A    Like 30 minutes.

8  Q    On this day so far, before you went to purchase this bag

9  of ketamine, had you had any ketamine so far?

10  A    No, ma'am.

11  Q    Why not?

12  A    Because You You told me -- like, he was on to me, like,

13  he was going to make sure if I was high or not.  He was going

14  to see if I was high or not.

15  Q    After buying the bag of ketamine, did you use any

16  ketamine at that time?

17  A    I can't hear you.

18  Q    Sorry.  After buying that bag of ketamine, did you use

19  any ketamine at that time?

20  A    No, not at that time.

21  Q    After buying the ketamine, where did you go next?

22  A    I went to, like, 162nd and Sanford to meet up with You

23  You.

24  Q    And after meeting up with You You, where did you go?

25  A    I went to Enterprise.

DAVID YU - DIRECT - MS. LASH                    1602

1   Q    What do you mean when you say you went to the Enterprise?

2   A    Went to go rent out a van.

3   Q    Where was the Enterprise located?

4   A    On Northern Boulevard.

5   Q    And why did you go to Enterprise?

6   A    You You wanted to rent out a van.

7   Q    Ask why did You You want to rent a van?

8   A    He didn't want to use his car.  He, you know, like, he

9   didn't want to be seen with his car around the area.

10  Q    Did he tell you why he didn't want to use his own car?

11  A    Yeah, because he didn't want to be seen in it.

12  Q    What happened when you arrived at the Enterprise?

13  A    He picked the van and he rented the van out.

14  Q    And who was the person who actually rented the van?

15  A    You You.

16  Q    You said it was a van.

17         Can you describe it for you us?

18  A    It was a white van with a sliding door with just a driver

19  and passenger seat only, nothing in the back.

20  Q    After You You rented the van, what happened next?

21  A    We went to his house.

22  Q    And where did You You live at the time?

23  A    Fresh Meadow.

24  Q    Approximately how many minutes did it take to get from

25  the Enterprise to You You's house in Fresh Meadows?

1    A    No more than 10 minutes.  Not even 10 minutes.

2    Q    When you arrived at You You's house, what happened?

3    A    I chilled in his living room and then You You did what he

4    had to do.  Like, he was making couple of sales.

5    Q    And when you say, he was making a couple of sales, what

6    do you mean?

7    A    Like, he was selling marijuana at that time.  So he was

8    posting sales.

9    Q    And what were you doing while he was making marijuana

10   sales?

11   A    I was chilling in his living room playing with his dog,

12   watching T.V.

13   Q    Did there come a time where you and You You left his

14   house?

15   A    Yes, ma'am.

16   Q    Where did you go?

17   A    We went to GS.

18   Q    What's GS?

19   A    That's the karaoke bar where the victim died at.

20   Q    And where is GS, the karaoke bar, located?

21   A    On Fowler.

22   Q    And what's the cross street?

23   A    College Point.

24   Q    Had you been to GS before?

25   A    Yes, ma'am.

1    Q      How many times?

2    A      Few times.

3    Q      When you say a few times, can you give me an approximate

4    number?

5    A      About 20.

6    Q      Had you been to GS with You You?

7    A      Yes, ma'am.

8    Q      How did you get to GS from You You's house?

9    A      I drove the van.

10   Q      And was You You with you?

11   A      Yes, ma'am.

12   Q      Where did he sit?

13   A      He sat in the passenger's seat.

14   Q      Why did you and You You go to GS at this time?

15   A      We wanted to see where there was cameras at around the

16   area to see if there was any blind spots.

17   Q      And why were you looking for cameras and blind spots?

18   A      I don't know.  That's what You You wanted me to do.

19   Q      What did you talk about while you were in the van?

20   A      That if we ever get -- like, if we ever get caught and

21   questioned by the cops, why we was there, we was to say that

22   we was trying too see if You You's girl was cheating on him or

23   not.  He was trying to catch his girl cheating on him.

24   Q      When you got to GS, where did you go.

25   A      Right across street.  There's a parking lot for the bar.

1    Q    And what road is this parking lot around?

2    A    I don't know.  I don't know.

3    Q    Okay.

4    A    But it's right across the street.

5    Q    And what happened while you were in the parking lot

6    across the street from GS?

7    A    I saw police, so we drove off.

8    Q    Where did you go?

9    A    We went to College Point and Avery.

10   Q    I'm going to show you, Mr. Yu, what's in evidence as

11   Government Exhibit 52.

12        MS. LASH:  And this is in evidence, Ms. Campbell, so

13   it can be -- thank you.

14        (Exhibit published.)

15   Q    Mr. Yu, can you see on the screen in front of you

16   Government's Exhibit 52?

17   A    Yes, ma'am.

18   Q    Now, you said when you first arrived at GS, you parked

19   across from GS in a parking lot.

20        Can you indicate on this map where you -- sorry,

21   we'll just give the computer a minute.

22        MR. MAZUREK:  While we're waiting, can we have a

23   timeframe of what part of the night we're in.

24   Q    Mr. Yu, were you looking at your watch at any point in

25   this night?

DAVID YU - DIRECT - MS. LASH                    1606

1    A    No, ma'am.

2    Q    Do you know what time it was?

3    A    No, ma'am.

4            THE COURT:  Do you have an idea of what time it was?

5            Was it late at night?  Was it early part of the

6    evening?

7            THE WITNESS:  It was February, so it gets dark

8    early.  So it was definitely getting dark.  I don't know what

9    time it was, no, ma'am.

10   BY MS. LASH:

11   Q    And now, Mr. Yu, I'll direct your attention back to the

12   screen in front of you, Government Exhibit 52.  You mentioned

13   when you got to GS you were parked across the street in a

14   parking lot.

15           Can you indicate on this map where were you parked?

16   A    Yeah.

17   Q    I can't see what you're -- can you describe with your

18   words?

19   A    You see where your -- yeah, right there.

20   Q    Okay.  So do you know which -- what road is across the

21   street, the highway that you can see in this map?

22   A    Oh, it says Meridan Road.

23   Q    And where were you parked in relation to this big road?

24   A    Right under the highway.  There's a parking lot for the

25   bar.

DAVID YU - DIRECT - MS. LASH                   1607

1   Q    Mr. Yu, do you know where Fowler Street is on this map?

2   A    Yeah.

3   Q    Can you describe to me where that is?

4   A    It's where the bar is at.

5   Q    Okay.  So you're talking about the road that's running

6   along the bottom of the map from east to west where the cursor

7   is right now?

8   A    All right.

9   Q    Okay.  And at the end of Fowler in the other direction,

10  with that larger road, what road is that?

11  A    That's College Point.

12  Q    Now, you said that you left the parking lot and you moved

13  the white van?

14  A    Yeah.

15  Q    Where did you move the white van to?

16  A    I went up to College Point, I made a left, I went

17  straight to Pople, I made a right on, Pople, I went all the

18  way around to Avery and College Point.

19  Q    When you say, Pople, do you mean if you're looking at the

20  streets, the three streets on the upper right side of the map,

21  do you mean the middle one there?

22  A    Yeah, it says Pople Avenue.  Because Avery is a one-way.

23  Q    And then once you were on Pople Avenue, what did you do?

24  A    I went straight, I made another right, and I made another

25  right, and I came down Avery, and then I parked around that

1    corner right there.  Yeah, right here.  Yeah.

2    Q    And the corner you're describing is the corner of College

3    Point and Avery.

4              Are you across the street from any landmark?

5    A    Yeah, from a BP gas station.

6    Q    And can you describe where the BP gas station is on this

7    map?

8    A    Right across the street.  Yeah, right there.

9              MS. LASH:  Thank you, Ms. Reed.

10   Q    When you moved the car to Avery and College Point, what

11   were you doing?

12   A    We was just chilling right there.  You You was playing

13   with his phone and he got hungry and he said let's go get

14   shish kebab.  So we went to Kissena and Holly and got some

15   shish kebab.  And then we came back, back to the same spot at

16   Kissena and -- at Avery and College Point.  I finished eating

17   first, then I went to the BP gas station, and then I took a

18   little bump at the gas station.

19   Q    And so after you ordered the shish kebab, you said you

20   came back to Avery and College Point; is that right?

21   A    Yes, ma'am.

22   Q    And then you said you went to the BP gas station and you

23   took a bump?

24   A    Yeah.

25   Q    A bump of what?

DAVID YU - DIRECT - MS. LASH                1609

1   A    Of ketamine.

2   Q    How big a bump did you take of ketamine?

3   A    I took, like a small amount, like, a half a finger nail.

4   Q    How does a half a finger nail compare to the typical dose

5   that you testified you took, a half a bag?

6   A    Nothing.  It's just -- nothing, really.  Nothing at all,

7   actually.

8   Q    Can you give me an idea of what, like, percentage portion

9   a half a finger nail would be as compared to a half a bag of

10  ketamine?

11  A    Like not even a .1.

12  Q    I'm sorry, I didn't hear you?

13  A    Not even like a .1.

14  Q    Not even a .1?

15  A    Yeah.

16  Q    And how did the bump with that you described as like a

17  half a finger nail, how did that affect you?

18  A    Nothing.  It just stopped me from itching.

19  Q    After you took that bump of ketamine, what did you do?

20  A    I went back to the car and then You You told me drive

21  back to his house.

22  Q    And did You You say anything to you at the time?

23  A    No.

24  Q    Did you operate the car?

25  A    Yes.

1   Q    When you got back -- why did you go back to You You's

2   house?

3   A    You You said to go back to his house.

4   Q    And what were you doing when you got back to You You's

5   house?

6   A    I was chilling in his living room, and then You You had

7   made a couple more sales, I think.

8   Q    And while you were at You You's house, did You You stay

9   at his house the entire time?

10  A    No, he stepped out right quick.

11  Q    Do you know how long he's gone?

12  A    No, not really.  No more than 30 minutes.

13  Q    And what did you do while You You was gone?

14  A    I went to the bathroom and I took another little bump.

15  Q    And what -- when you say a bump, I want to be specific.

16       What do you mean?

17  A    Same amount that I just took at the bathroom.

18  Q    And what did you take a bump of?

19  A    Of ketamine.

20  Q    And you said the same amount.

21       What do you mean by that?

22  A    Like a half a finger nail.

23  Q    And how did this bump affect you?

24  A    Nothing.

25       THE COURT:  I'm sorry, when in time did you do the

DAVID YU - DIRECT - MS. LASH                1611

1    second hit?

2            THE WITNESS:  Oh, when I went back to his house and

3    when You You left the house for a second.

4            THE COURT:  So you did the second bump in his house?

5            THE WITNESS:  In the bathroom.

6            THE COURT:  In the bathroom of his house?

7            THE WITNESS:  Yeah.

8    BY MS. LASH:

9    Q    What happened after you took your second bump of

10   ketamine?

11   A    I came back -- I came back to the couch and I was just

12   chilling watching T.V. until You You returned.

13   Q    And did You You say anything to you when he returned?

14   A    No.

15   Q    Did there come a time where you left You You's house

16   again?

17   A    Yes.  Later on.

18   Q    Where did you go?

19   A    We went to this restaurant called Lake Pavilion.

20   Q    And how do you get to the restaurant?

21   A    I drive the van.

22   Q    And who, if anyone, is with you?

23   A    You You's in the passenger seat.

24   Q    You said that the restaurant is called Lake Pavilion?

25   A    Yes.

DAVID YU - DIRECT - MS. LASH                1612

1    Q    Where is it located?

2    A    On 59th or 60th and Main Street.

3    Q    In what city?

4    A    Queens.

5    Q    What does the restaurant look like?

6    A    It's a big restaurant.  Tall windows, fish tanks, inside

7    the windows.

8    Q    What do you do when you get to the restaurant?

9    A    You You told me circle around to see if you could see

10   somebody through the window.

11   Q    Did you know what was going on inside the restaurant when

12   you arrived there?

13   A    Yes, ma'am.

14   Q    And what was going on?

15   A    The victim was having a company Chinese New Year dinner

16   party.

17   Q    And how did you learn that?

18   A    You You told me.

19   Q    After you circled to see the windows, where did you do

20   go?

21   A    We drove back around, we circled around again, we went

22   down to 60th and -- we went to the back of the restaurant

23   where the big parking lot was, and You You told me to look for

24   the specific car, but he found it first.  He spotted the car

25   first, and he told me drive back around and park.

DAVID YU - DIRECT - MS. LASH                1613

1   Q    What car did You You tell you to look for?

2   A    I don't remember, ma'am.

3   Q    Now, you said that you parked by the back parking lot of

4   the restaurant; is that right?

5   A    Yes, ma'am.

6   Q    I'm going to show you what's in evidence as Government's

7   Exhibit 415.

8          MS. LASH:  And Ms. Reed, if we could go to Page 4.

9          (Exhibit published.)

10  Q    Mr. You, do you see Government Exhibit 414, Page 4?

11  A    Yes, ma'am.

12  Q    And what's shown in this picture?

13  A    That's the back parking lot.

14  Q    The back parking lot of what?

15  A    Of the restaurant.

16  Q    And you said that you parked in this vicinity; is that

17  right?

18  A    Yes, ma'am.

19  Q    And can you describe to me where you parked?

20  A    By the tree, exact.

21  Q    And when you say, the tree --

22  A    Yeah, right there.

23  Q    And that's the tree behind the white car that's parked on

24  the side of 60th Avenue?

25  A    Yes, ma'am.

1   Q    At this point in time, do you know what time it is?

2   A    No, ma'am.

3   Q    Was it dark outside?

4   A    Yes, ma'am.

5   Q    And at this point, what happens next?

6   A    I parked up for a little bit and then he sees the car

7   coming out and he tells me follow that car, so I followed the

8   car.

9   Q    And do you know who's inside the car?

10  A    No.  But I -- it was my guess though.

11  Q    Okay.  So what did you do when he told you to follow the

12  car?

13  A    I followed the car and went it went to GS.  It went all

14  the way to GS, and we was a little back, and then You You told

15  me to wait to see them park their car and he wanted to make

16  sure that dude came out of the car.  And, like, a couple of

17  people came out the car.  When he saw them, he told me drive

18  off now, and I drove off and we went back to Avery and College

19  Point.

20  Q    And when you were observing this car -- and to be clear,

21  do you remember what kind of car it was.

22  A    No, ma'am.

23  Q    And what did you see what when you were looking at the

24  car at GS?

25  A    You mean when they parked?

1   Q    Yes.

2   A    Numerous people came out.  I forgot how many people, but

3   it was more than one people that came out the car, and when he

4   seen the person, he told me to drive off and go back to Avery

5   and College Point.

6   Q    And where did you observe the car in the vicinity of GS?

7   A    Under the highway where the parking lot is.

8   Q    And how did that compare to where you had parked with You

9   You earlier?

10  A    What do you mean?

11  Q    Was it in the same location where you and You You had

12  parked earlier that night?

13  A    No.  I parked at Avery and College Point.

14  Q    And before you were at Avery and College Point, where

15  were you?

16  A    Oh, under the highway too.  Yeah, around that same spot.

17  Q    You said that you left the area and you went back to

18  Avery and College Point?

19  A    Yeah.

20  Q    Was the place that you parked the car, how did it compare

21  to where you had parked earlier in the night?

22  A    It's the same spot.

23  Q    And what happened when you got to Avery and College

24  Point.

25  A    We was just parked there, we was just idling.  He got

DAVID YU - DIRECT - MS. LASH                1616

1   hungry again, so we went to get shish kebab again, but we went
2   somewhere else.  We went on Prince Street.  We got the shish
3   kebab, came back, finished eating, and then we was just parked
4   there for a little bit, and then he tells me to -- he tells me
5   circle the block again where GS is at.  So I circle it.  So I
6   go down the one-way to Avery, and then when I'm driving, I see
7   a car, and then I turn and I see Zhe in there with somebody
8   else in the car.  I'm about to pull over to him to say what
9   up, but You You tells me, don't let Zhe see me, just drive
10  off.  So I drive off and I come back to Avery and College
11  Point again.  I parked there.
12  Q    I want to talk about when you circled the block, Mr. Yu.
13           MS. LASH:  So Ms. Reed, If you could pull up
14  Government Exhibit 52, please.
15  Q    Now, Mr. Yu, you said -- can you describe the route that
16  you took when you circled the block?
17  A    All right.  I'm at Avery and College Point, right.
18  Q    The same place that you had parked earlier, right?
19  A    Yeah, yeah.
20  Q    And where did you do go next?
21  A    I go straight down right there.  I'm going and I stop
22  right there.  Like, around that area, that's when I see Zhe
23  parked in a white four-door car.  I'm about to pull over to
24  him to say what up.  That's when You You tells me, yo, don't
25  let Zhe see me, just drive off, so I drive off.

1           MS. LASH:  And Ms. Campbell, is this screen working

2    for the jurors?  I just want to make sure that they can --

3           THE COURTROOM DEPUTY:  It's going in and out.  It

4    was working earlier and then it stopped.

5           THE COURT:  Can you turn the light down, maybe?

6           THE COURTROOM DEPUTY:  Yes, I can do that.

7           MS. LASH:  All right.  Thank you.

8    BY MS. LASH:

9    Q    Mr. Yu, okay.  So, I'm sorry.  Can I bring you back to

10   the time where you saw Zhe and the white car?

11   A    Yeah.

12   Q    So you indicated that you were on Avery Avenue, right?

13   A    Yeah.

14   Q    And what is the big gray rectangle that runs along the

15   side of Avery Avenue?

16   A    That's Home Depot.

17   Q    Okay.  You said you saw a white car.

18           Can you describe the car for me?

19   A    It was a white four-door car.

20   Q    What, if anything, did you notice about the car's make

21   and model?

22   A    It was a old car.

23   Q    And you said you saw Zhe?

24   A    Yeah.

25   Q    Where was he sitting in the car?

1    A    In the driver's seat.

2    Q    And was anybody else in the car?

3    A    Yeah, somebody else was with him.

4    Q    And who was that person?

5    A    I don't know him.

6    Q    What were you the lighting conditions when you saw Zhe?

7    A    It was pretty bright.

8    Q    Well, it was the nighttime, right?

9    A    Yeah.  But there was a lot of, like, -- it's a industrial

10   area, so a lot of lights was on, a lot of factory lights was

11   on.

12   Q    And you said that you noticed the white car and saw Zhe

13   while you were circling the block?

14   A    Yeah.

15   Q    How fast were you driving?

16   A    Not that fast.

17   Q    When you say, not that fast, can you give me an estimate

18   of your miles per hour?

19   A    Like five, 10 miles.

20   Q    And where were you in relation to Zhe?

21   A    I was in the driver's seat.

22   Q    And who, if anyone, was between you and Zhe?

23   A    Oh, You You.

24   Q    And where was You You seated?

25   A    The passenger seat.

DAVID YU - DIRECT - MS. LASH                    1619

1    Q    Can you estimate for me how far away Zhe was from you?

2    A    He wasn't that far.

3    Q    In feet or --

4    A    I don't know.

5    Q    And you said you saw Zhe?

6    A    Mm-hmm.

7    Q    What did you see?

8    A    I saw his whole face.  I made eye contact with him,

9    hundred percent.

10   Q    Are you certain that the person you saw in the driver's

11   seat of the white sedan was Zhe?

12   A    Yeah.

13   Q    You said you didn't recognize the person in the

14   passenger's seat?

15   A    Yeah.

16   Q    How long did you --

17   A    I didn't really see his face.

18   Q    How long did you observe the person in the passenger's

19   seat?

20   A    I was driving, I just saw him, and then when I saw him, I

21   was going to pull over right next to him.

22   Q    And you said You You told you, don't let him see you,

23   right?

24   A    Yeah.

25   Q    Did you ask him any questions about why he said that?

DAVID YU - DIRECT - MS. LASH                    1620

1    A    No, not at that time.  It went over my head at that time.

2    Q    Now, Mr. Yu, after you had driven the length of Avery

3    Avenue, where did you go next?

4    A    I circle back and I go back to College Point and Avery.

5    Q    And so do you see where the blue line that was just

6    drawn?

7    A    Yeah.

8    Q    What road is that; do you know?

9    A    That's Avery.  I make a left.

10   Q    On to what road?

11   A    I go back to College Point.

12   Q    And then what road -- how did you get back to College

13   Point?

14   A    I make a left to Pople, go all the way to Pople then make

15   a right, and I make another right at Pople and another right

16   to Avery.

17   Q    And you stop there?

18   A    Yeah.  I park at the same spot.

19   Q    What happened while you were parked at that location at

20   Avery and College Point?

21   A    We was parked there for a little bit until he gets, like,

22   a phone call later on.

23   Q    And who is he?

24   A    You You.

25   Q    Okay.  What language is You You speaking on that phone

1  call?

2  A    I don't remember.

3  Q    Does You You make any other phone calls?

4  A    Yeah.  Right after that phone call, he WeChat somebody

5  because when you call somebody through WeChat, it's a specific

6  ring tone that blares out.

7  Q    And -- I'm sorry.  Go ahead, Mr. Yu.

8  A    When he calls somebody from WeChat, he was speaking in

9  Chinese.  I ain't understand what he was saying.  He hung up.

10  I stepped out real quick -- not right away.  I stepped out

11  though.  When I went to go smoke a cigarette and I was just

12  chilling right there, and then, like, I can't say what exact

13  timeframe, I heard the four gunshots.  Once I heard the

14  gunshots, I went back into the car and I told You You I was,

15  like yo, I think it just went down, and I started driving off.

16  And he asked me, yo, are you sure.  And I said yeah, bro, I

17  just heard the gunshot.  And then --

18  Q    Let me stop you there for a minute, Mr. Yu.

19         You testified that that second phone call that you

20  think was a WeChat phone call, right?

21  A    Yeah.  I know it was a WeChat phone call.

22  Q    Okay.  And You You was speaking in Chinese?

23  A    Yeah.

24  Q    Have you ever been present when You You has spoken to Zhe

25  on the phone?

DAVID YU - DIRECT - MS. LASH                1622

1   A     Yeah.

2   Q     And what language do they communicate in?

3   A     In Chinese.

4   Q     Then you testified that you heard the gunshots and you

5   got back into the van, right?

6   A     Yes, ma'am.

7   Q     Could you see anything at that point?

8   A     Nah.

9   Q     And what happened next?

10  A     I drove off and I'm telling You You, like, it went down,

11  and then he asked me if I was sure and I was, like, yeah.  So

12  he started calling somebody, and then when he called the

13  person, the person didn't pick up, so he was like, yo -- he

14  said, yo, Zhe not picking up.  I said, yo, let him get away

15  real quick.  You know what I mean, it just went down.  Just

16  let him get away.  He's going to call you probably when he

17  gets away safely.  We go back to his house -- we go back to

18  You You's house and I chill there for a little bit and then I

19  go back home to the Bronx with the van.

20  Q     And when you say, the van, do you mean the Enterprise

21  van?

22  A     Yes, ma'am.

23  Q     Do you see You You the next day?

24  A     Yes, ma'am.

25  Q     Do you have a discussion about the shooting?

DAVID YU - DIRECT - MS. LASH                1623

1   A    Yes, ma'am.  He tells me that Zhe away, everything went

2   well, that he -- yeah.

3   Q    Where were you in the days following the shooting?

4   A    I was in New York.

5   Q    And who, if anybody, did you reach out to following the

6   shooting?

7   A    I reached out to my boy LB.

8   Q    Who is LB?

9   A    My boy Carlos.

10  Q    And why did you reach out to Carlos?

11  A    I needed a place to stay low at real quick.  I was at

12  parole -- I was on parole at that time, and You You, he left

13  somewhere.  You know may what I mean, and he didn't let me

14  know, so I needed a place to stay.  I didn't want to be around

15  be, like, none of my Asian friends.  So I reached out to one

16  of my blood friends named Carlos and I told him the situation.

17  I showed him way video clip of what happened, and I said yo, I

18  need a place to stay real quick bro.  I'm involved in this.

19  Q    And you told Carlos you were involved in the shooting?

20  A    Yes, ma'am.

21  Q    Did you tell Carlos you were the shooter?

22  A    No, ma'am.

23  Q    When is the next time that you saw Zhe after the murder?

24  A    I don't know exactly when.  But it was me and You You, we

25  went to a karaoke spot on Union Street and northern on the

DAVID YU - DIRECT - MS. LASH                1624

1    third floor.  While we was going up the elevator -- while we

2    was in the elevator, You You tells me, don't bring up the

3    shooting to Zhe, that Zhe doesn't know that I was involved.

4    Q    Did you ask You You any questions after he told you that?

5    A    At that time, I wanted to, but we was already walking to

6    the room that Zhe was at, and then when I went, it was Zhe and

7    some kid named Union.  They was over there.

8    Q    And what happened at that karaoke bar?

9    A    In the beginning, we gave each other a pound like

10   everything was cool, and then we ordered some drinks and then

11   they just started -- they went to the corner, You You and Zhe

12   and Union, they was in the corner.  They just started speaking

13   Chinese and I just got paranoid.

14   Q    Why did you get paranoid?

15   A    I just got paranoid.  I thought they was talking about

16   me, so I left.

17   Q    In the months following the murder, how did you feel?

18   A    You You wasn't -- like, he wasn't really giving me detail

19   of what was going on.  Like, I felt, like, he was keeping me

20   out the loop out of it, like, he was keeping me in the dark.

21   So, like, I started picking on to that.  So now, like, I

22   started getting paranoid around that.

23        I didn't know how he felt about me I didn't know how

24   Zhe felt about me, you know what I mean?  I didn't know where

25   I stood at with the job.  Like, why didn't he want people to

1  know that I was involved.  I mean, it wasn't a small job,

2  like, somebody died on it.  Like, you want to know ever player

3  that was involved in this.  Like, why are you not letting them

4  know I was involved.

5  Q    And how did you cope with these feelings of paranoia?

6  A    I thought they was going to move on me.  I thought they

7  thought that I was a liability, so I got myself a gun and I

8  protected myself on it.

9  Q    And when you saw you thought they were going to move on

10  you, what do you mean by that?

11  A    Like, I'm not saying that they was, but that was in back

12  of my thought, like, you know what I mean?  Where am I in this

13  puzzle, you know what I mean?  Like, what piece do I belong

14  with this, you know what I mean?

15        You You wouldn't tell me.  He just keep telling me

16  don't worry about it, you know what I mean?  I'm asking him,

17  like, when we going to go get paid?  He's telling me wait

18  until the summer, you know what I mean?  Et cetera, et cetera.

19  Q    When did you obtain a gun, Mr. Yu?

20  A    I don't remember the exact month.

21  Q    What season was it?

22  A    It was getting nice.  It was getting nice.

23  Q    And when you say nice, what do you mean?

24  A    The weather was getting nice.  It wasn't cold no more.

25  Q    And where did you obtain a gun?

DAVID YU - DIRECT - MS. LASH                1626

1    A    What does that mean?

2    Q    Where did you get a gun?

3    A    From one of my friends.

4    Q    Which friend?

5    A    My boy Alan.

6    Q    After you got gun, what did you do with it?

7    A    I just walked around with it.

8    Q    Did you test it?

9    A    Yes, ma'am.

10   Q    How did you do that?

11   A    I shot it in the park.

12   Q    At this point in, let's say the summer of 2019, had you

13   received anything for your participation in the murder?

14   A    No, ma'am.

15   Q    And what was your relationship like with You You in the

16   summer of 2019?

17   A    I played it cool with him.

18   Q    How was You You acting at this time?

19        What did you observe?

20   A    He started spending a lot of money now.  Like, he was

21   gambling heavy, he was buying nice clothes.

22   Q    What kind of clothes?

23   A    Like, he was buying Gucci this, like Louis Vuitton that.

24   Q    How else was You you spending money at this time?

25   A    He brought a watch, he bought a nice watch.

DAVID YU - DIRECT - MS. LASH                    1627

1    Q    What kind of a watch.

2    A    He bought a Yacht-Master.

3    Q    Who makes a Yacht-Master?

4    A    Rolex.

5    Q    What else, if anything, did he buy?

6    A    Oh, he got a chain.

7    Q    What kind of chain?

8    A    It was a gold 150-gram chain.

9    Q    Have you ever owned a chain like that?

10   A    Nah, not like that.  I owned a chain before.

11   Q    And what's your understanding of how much a gold 150-gram

12   chain can cost?

13   A    It's a heavy chain.

14   Q    And what's your understanding of how much it can cost?

15   A    Like 10,000 maybe.  About.  Yeah.

16   Q    So gambling buying nice clothes a Rolex watch a change.

17   What, if any, other purchases did You You make?

18   A    Oh, he bought a car.

19   Q    What kind of care?

20   A    He bought a M4 BMW.

21   Q    Anything else?

22   A    Later on, he bought a monkey.

23   Q    And what are -- how are you guys spending time together

24   in the summer of 2019?

25   A    We cool.  Like, we chilling every night, we going out

DAVID YU - DIRECT - MS. LASH                    1628

1   every night, we drinking every night.

2   Q    And how did that compare to the activities that you were

3   doing before the murder?

4   A    Like, we used to drink, we used to go out a lot.  But

5   like, now when he goes out now, it's like he goes extra.

6   Like, the bars we go to, like, we'll get the karaoke spots,

7   it's girls there that drinks with us, and he tips them $100 or

8   so.  Like, we'll get a girl, and now he's getting, like,

9   three, four girls.

10  Q    And are you guys eating out?

11  A    Yeah.  Every day.

12  Q    At this time by the end of the summer of 2019, had you

13  received any payment for your participation in the murder?

14  A    No, ma'am.

15  Q    You testified that in August of 2019, you went back to

16  prison; is that right?

17  A    Yes, ma'am.

18  Q    And where were you held?

19  A    I was in VCBC.

20  Q    What's VCBC?

21  A    That's the Boat that's connected with Rikers Island.

22  Q    And what was your relationship like with You You after

23  you got locked up.

24  A    He was mad at me.  He was mad at me.

25  Q    And why was he mad at you?

1    A    Because I got locked up.

2    Q    Did you see You You while you were incarcerated?

3    A    Yeah, he came to visit me.

4    Q    And did you have a conversation about the murder?

5    A    Yeah.  He got mad at me that I got in trouble and he told

6    me, like, I was supposed to stay out of trouble until the end

7    of the summer, that's when we was going to get paid, and then

8    we was going to leave -- like, we was going to be chilling

9    after that.

10   Q    When were you released from prison?

11   A    November.

12   Q    Of 2019?

13   A    Yes, ma'am.

14   Q    And in November when you were released, did you see You

15   You?

16   A    Yeah.

17   Q    And did you receive any money at that time?

18   A    No, ma'am.

19   Q    Mr. Yu, you testified you were arrested in April of '21

20   on methamphetamine charges; is that right?

21   A    Yes, ma'am.

22   Q    While you were incarcerated, did you try to figure out

23   You You's phone number so you could contact him?

24   A    Yes, ma'am.

25   Q    And what happened?

DAVID YU - CROSS - MR. MAZUREK          1630

1   A    I called back the dude that gave me his number, he told

2   me that he told You You that he gave me his number and that

3   You You got mad, so I never reached out to him.

4   Q    When is the last time you spoke to You You?

5   A    Like 2020, maybe.

6   Q    To this day, have you ever received anything for your

7   participation in the murder?

8   A    No, ma'am.

9        MS. LASH:  Nothing further, Your Honor.

10       THE COURT:  All right.  I think counsel want to go

11  out of order which the Court has permitted.

12       So Mr. Mazurek will inquire first and then

13  Mr. Kousouros.

14       MR. MAZUREK:  Thank you, Judge.

15  CROSS-EXAMINATION

16  BY MR. MAZUREK:

17  Q    Mr. Yu, my name is Henry Mazurek, and I'm the defense

18  lawyer for Zhe Zhang and we have never met before, correct?

19  A    Yes, ma'am.  I mean, yes, sir.

20  Q    In fact, you are aware that I made a request through your

21  lawyer, Mr. Brownstein, to speak with you, but you've declined

22  to interview with me, correct?

23  A    Yes, sir.

24  Q    On the other hand, you met with these folks, the

25  prosecutors and the agents for I think you said over 20 times

DAVID YU - CROSS - MR. MAZUREK          1631

1   correct?

2   A    Yes, sir.

3   Q    And before you came to Court today, you practiced the

4   questions and answers that you were just asked by Ms. Lash,

5   correct?

6   A    No, ma'am.  No.

7   Q    You never heard those questions before?

8   A    Yeah.  But we never practiced it.

9   Q    Oh, it wasn't a practice for you?

10  A    Yeah, we never practiced it.

11  Q    But you were asked questions and you answered just like

12  you did today?

13  A    Like, similarities.

14  Q    Similarities?

15  A    Yes.

16  Q    Did you do it last week while we were on break for trial?

17       Did you meet with them and have them ask you

18  questions and give answers just like you did today?

19  A    I met up with them last week.

20  Q    Yes?

21  A    Yes, I did.  Last week.

22  Q    Okay.  And you met with the prosecutors and the agents

23  and they asked you questions and you gave answers, right?

24  A    Yes, sir.

25  Q    Did they pretend to be me as the defense lawyer for a

1   time about asking you questions on cross-examination?

2   A    What do you mean?

3   Q    Did they say, okay, this is what a defense lawyer may ask

4   you, so you know, to help prepare you for the questions that

5   you might hear from me, Mr. Mazurek?

6   A    Oh, yes.

7   Q    Okay.  And you did that last week.

8        How many times did you do it last week?

9   A    Last week, one time.

10  Q    One time?

11  A    Yeah.

12  Q    How many hours did you spend?

13  A    I don't know.

14  Q    Was it more than three?

15  A    Oh, yeah.

16  Q    It was, like, the whole day?

17  A    Not really, nah.  Not the whole day.

18  Q    But more than three hours?

19  A    Yeah.

20  Q    Less than seven hours?

21  A    Yeah.  Something like that.

22  Q    Okay.  And let me ask you, Mr. Yu, I mean, you -- you've

23  had a long criminal history, right?  You've just testified on

24  direct examination about your multiple arrests, right?

25  A    Yes.   (Continued on the following page.)

1    CROSS-EXAMINATION

2    BY MR. MAZUREK:  (Continuing)

3    Q    And there are many times when you are committing crimes

4    that you never got arrested; right?

5    A    Yes.

6    Q    You have committed more robberies than you can count;

7    right?

8    A    Yes.

9    Q    And you also are someone who owned firearms for a large

10   part of your life; right?

11   A    No.  I did own a firearm.

12   Q    I'm sorry?

13   A    I did own a firearm.

14   Q    Guns?

15   A    Not all my life, though.

16   Q    Let me ask you this:  Since you were 19, that's when you

17   were first arrested and incarcerated, right?

18   A    Yes.

19   Q    Up until the time you were arrested for the

20   methamphetamine case in April of '21, that's ages 19 to what,

21   about 32?

22   A    Yes.

23   Q    Is that fair?

24   A    Yes.

25   Q    And out of those 13 years or so, you were in and out of

D. Yu - cross - Mazurek                              1634

1   prison; right?

2   A     Yes.

3   Q     You spent several years in prison within those years of

4   19 and 32; correct?

5   A     Yes.

6   Q     Especially because you almost always violated parole and

7   went back to prison, right?

8   A     Yes.

9   Q     So, for those few years when you were actually on the

10  street, you sometimes owned guns; right?

11  A     No.

12  Q     Well, let me let me ask you this:  When you were 19 years

13  old you had a Glock 40 from Shogun; right?

14  A     Yes.

15  Q     So, you started -- your first time you possessed a gun

16  was when you were 19; right?

17  A     Yes.

18  Q     Sometimes you would carry, you would have four guns in a

19  fanny pack; isn't that right?

20  A     No.

21  Q     You never told these agents and the prosecutors that you

22  would have four guns and you kept it -- you owned four guns

23  and you kept it in a fanny pack?

24  A     No.

25  Q     Did you meet --

1   A    I don't remember that.

2   Q    You don't remember that?

3   A    I don't remember that at all.

4   Q    You met with these guys for quite a lot, like over 20

5   times, right?

6   A    Yes.

7   Q    In one of those instances, and I'm referring to, for the

8   Government's benefit, David Yu 3500 number 10, on December

9   9th, 2021, page 4, isn't it true you told these agents and the

10  prosecutors that you owned four guns and you kept them in a

11  fanny pack?

12  A    I don't remember that.

13  Q    You don't remember that?

14  A    Yeah.

15  Q    Is there something that I can show you that might refresh

16  your memory?

17  A    I guess, yeah.

18  Q    All right.  We will move on.  We'll get back to that

19  later.

20        But you did keep guns in a fanny pack; right?

21  A    Yeah.  I had a gun -- I had a gun in a fanny pack.

22  Q    All right.  You just maybe didn't have four at one time?

23  A    Yeah, I never had four guns.

24  Q    Okay.

25        You would own one gun at a time; right?

1   A     (No response.)

2   Q     Right?  You would only have one gun at a time; right?

3   A     Yeah.

4   Q     You would typically have pocket pistols, is that right,

5   as you would call them as something you would fit into your

6   pocket or a fanny pack?

7   A     I don't know.  I don't know what that is.

8   Q     You don't know what that is?

9   A     No.

10  Q     What do they call it on the street, a gun you can fit in

11  your pocket?

12  A     I don't know what they call it.

13  Q     What would you call it?

14  A     A pistol.

15  Q     So, did you own a pistol?

16  A     Yeah, I owned a pistol.

17  Q     You owned a .40 Glock, right?

18  A     No, I never had a .40 Glock.

19  Q     No?  Isn't that what you just said you got from Shogun?

20  A     It wasn't mine, though.

21  Q     No, it was your big brother's; right?

22  A     Yeah.

23  Q     So you just took that, you took a hit for that one

24  because it was really your big brother's; right?

25  A     Yeah.

1    Q    But you had access to it; right?

2    A    Yeah.

3    Q    In fact, you were supposed to have access to it as a gang

4    member?

5    A    Yes.

6    Q    In order to be able to do harm if you needed to do harm,

7    if the gang wanted you to do that; right?

8    A    Yes.

9    Q    And that was just your first gang that you joined, right,

10   that's the MMP one?

11   A    Yes.

12   Q    And the Bloods are even more violent than MMP, right?

13   A    They're both violent.

14   Q    They're both violent?

15   A    Yeah.

16   Q    You also had a G37 that you got from Danny; right?

17   A    No.

18   Q    You don't remember having a G37?

19   A    I never had a G37.

20   Q    No?  Do you remember the Latimer Projects shooting?

21   A    That wasn't -- that wasn't me.

22   Q    That wasn't you, that was one of your friends, Chris Lee?

23   A    Yeah.

24   Q    He did the shooting?

25   A    Yes.

D. Yu - cross - Mazurek                    1638

1   Q    You provided the gun, right?

2   A    I didn't.

3   Q    That wasn't your gun that time?

4   A    No, that wasn't.

5   Q    That was another gang member's gun?

6   A    No.

7   Q    It was just a friend's gun?

8   A    That was his gun.  That wasn't my gun.

9   Q    Did you have access to that gun?

10  A    No.

11  Q    He didn't share it with you?

12  A    I never asked him, sir.

13  Q    So, the guns that you had, what kind of caliber did you

14  normally get?

15  A    I had a .380.

16  Q    .380?

17  A    Yeah, and I had a Glock 19.

18  Q    A .380 and a Glock 19.

19       Now, you testified on direct examination about the

20  events that transpired on February 11th to the 12th of 2019.

21       You testified that you initially had conversations

22  with You You in -- as soon as you got out of prison in

23  November of 2018 to kill a man; right?

24  A    No, not -- not -- not November.

25  Q    That's when you got out?

1   A     Yeah, I got out in November.

2   Q     Then almost immediately he called you; right?

3   A     Yeah.

4   Q     Your best buds, best friends; right?

5   A     Yeah.

6   Q     And the first thing that he called you about was killing

7   a man, right, that was the job?

8   A     Yes.  He had -- he told me he had a job for me.

9   Q     And initially you said, you told him yes, you'd do it;

10  right?

11  A     Yes.

12  Q     But then you got cold feet, you said, I don't want do

13  this, right?

14  A     Yes.

15  Q     But it's your testimony that you didn't tell You You

16  that, right?

17  A     Yes.

18  Q     Instead on February 6 I think we looked at an exhibit of

19  text messages on February 6 which is, by my count, five days

20  before the shooting and you said, I'm gonna -- I'm gonna be

21  the one to clap him; right?

22  A     Yes.

23  Q     But you didn't mean that, right, that was just your text

24  message at the time?

25  A     Yes.

1  Q    Okay.  And then on February the 13th, sir, that's just a

2  day or so after after the murder; right?

3  A    Yes.

4  Q    You contacted someone that you knew -- that you called

5  LB; right?

6  A    Yes.

7  Q    LB was a fellow by the name of Carlos Senquiz; right?

8  A    Yes.

9  Q    And Carlos Senquiz is a fellow Blood member; correct?

10 A    Yes.

11 Q    He was a fellow Ape as you called each other; right?

12 A    Yes.

13 Q    A Gorilla Stone set; right?

14 A    Yes.

15 Q    And as you called it, it's a violent gang; right?

16 A    (No response.)

17 Q    Is it a violent gang, sir?

18 A    Yes.

19 Q    Now, you contacted Carlos Senquiz on February 13th and

20 you were chatting with him on text messages; right?

21 A    Yes.

22 Q    And you weren't chatting about just nothing, you were

23 chatting about the shooting of Chris Gu, that's the fellow

24 whose name -- the victim; right?

25 A    Yes.

D. Yu - cross - Mazurek                    1641

1  Q    You later learned that's the victim's name; right?

2  A    Yes.

3  Q    You didn't want to know right before you shot him, right?

4  A    I never shot him.

5  Q    Well, let me say, when you contacted Carlos Senquiz on

6  February 13th, the date after he was shot, you sent him a

7  YouTube video link of his shooting; right?

8  A    Yes.

9  Q    And you told them -- you called him Scrap, is that right,

10 is that the word that you used for him?

11 A    Yes.

12 Q    That's a Blood term?

13 A    Yes.

14 Q    And you told him, Yo, Scrap, you heard what happened in

15 the hood; right?

16          Is that what you told him?

17 A    Yes.

18 Q    Do you remember that?

19 A    Yes.

20 Q    And you sent him that video link, right, of the shooting?

21 A    (No response.)

22 Q    Yes?

23 A    Yes.

24 Q    And you asked him right then and there, Yo, Scrap, I need

25 an extra black jacket; right?

D. Yu - cross - Mazurek                        1642

1    A    Oh, yes, I did ask him for a black jacket.

2    Q    Okay.  And that is a gun; right, sir?

3    A    No, sir, that's a black jacket.

4    Q    You're saying that right then when you asked him, Yo,

5    Scrap, I need an extra black jacket, you were actually talking

6    about an outerwear, a coat to wear in the wintertime?

7    A    Yes, sir.

8    Q    Okay.  Why, because you had to get rid of the black puffy

9    jacket you were wearing that night on February 12th?

10   A    No, that's not the reason why.  I just wanted -- I just

11   needed a new jacket.

12   Q    You just needed a new jacket?

13   A    Yeah.

14   Q    And you needed a gun, too; right?

15   A    No.

16   Q    Well, you asked him for a gun; right?

17   A    What --

18   Q    You just testified on direct examination that you needed,

19   you wanted to get a gun after this happened?

20   A    Yeah, but not from him, though.

21   Q    You didn't ask from LB?

22   A    No.

23   Q    You asked from other gang members?

24   A    No.  I just asked one person and I got it from him.

25   Q    The first person you asked for it, you got it from Allen

D. Yu - cross - Mazurek                          1643

1   Wong?

2   A    No.

3   Q    Who is Allen?

4   A    Somebody, not Allen Wong.

5   Q    Are you afraid to say, you can't say the name because

6   you're protecting someone?

7   A    No.

8   Q    So, why can't you tell me who you got the gun from, sir?

9   A    I just did, sir.  His name is Allen.

10  Q    What's his last name?

11  A    I don't know his last name.

12  Q    Who is he?  How do you know him?

13  A    I know him from my neighborhood.

14  Q    How long did you know him?

15  A    Like 2011, since 2011.

16  Q    All right.  So you've known him for about 12 years.

17       You don't know his last name, but you know him from

18  the neighborhood, is that what you're telling this jury?

19  A    I know him by Allen.

20  Q    That's all you know him by?

21  A    Yeah.

22  Q    Is he a gang member with you?

23  A    No.

24  Q    He's just a friend?

25  A    Yeah.

1   Q      And you're protecting him now?

2   A      Why would I protect him for?

3   Q      Because you got a gun from him, right, and that was just

4   another gun that you got in your long list of guns; right?

5   A      No.

6   Q      And when you went to Carlos Senquiz, you tried to go to

7   the Bland Projects to hide out after the shooting?

8   A      Yes.

9   Q      That's where Carlos Senquiz lived, in the Bland Projects;

10  right?

11  A      Yes, sir.

12  Q      And you asked Mr. Senquiz, when you saw him there on

13  February the 13th, you asked him, Can you recognize me in this

14  video, the YouTube video you sent him; right?

15  A      No, I don't remember that at all, sir.

16  Q      And you didn't just tell Carlos Senquiz that you were a

17  shooter, you told other people, right?

18  A      I don't remember none of that.

19  Q      You told Chris Lee, right?

20  A      No.

21  Q      You don't know who Chris Lee is?

22  A      I know who Chris Lee is.

23  Q      Chris Lee is a good friend of yours, right?

24  A      No.

25  Q      No?  You stayed with him and his mom from the years of

D. Yu - cross - Mazurek                    1645

1  about 2012 and 2013; right?

2  A   (No response.)

3  Q   You didn't stay with them in their house?

4  A   I slept over his house.

5  Q   Well, didn't his mom kick you out because you brought a

6  gun to the house?

7  A   No.  I let him borrow my BB gun, and then he had the BB

8  gun in his closet and his mom found it.

9  Q   It was just a BB gun?

10  A   Yeah.

11  Q   His mom wouldn't know that because she knows that you

12  were rolling around with real guns all the time; right?

13  A   I don't know.  I can't answer that.

14  Q   And when Carlos Senquiz -- and when you asked Carlos

15  Senquiz if you can recognize the person in the video is

16  because you were afraid that you would be identified as the

17  shooter; isn't that right?

18  A   No, sir.

19       MR. MAZUREK:  Your Honor, would this be a good time

20  to break?

21       THE COURT:  All right.

22       Ladies and gentlemen, we will break for the evening.

23  I am trying to make up for lost time, so if everyone could be

24  here, we need to start promptly at 9 o'clock.

25       I think Tiffany said you need to be here around

Proceedings                          1646

1   8:30, so we can make sure everybody is here and ready to go.

2          The object is to keep moving things along, so that's

3   why we are doing this.

4          Have a lovely evening, everyone.

5          A JUROR:  You, too.

6          (Jury exits the courtroom.)

7          (Witness leaves the stand.)

8          THE COURT:  Everyone can be seated.

9          I think last week, or maybe over the weekend I had a

10  submission from the defense regarding, I think it was Mr.

11  Burbano, is that his name?

12         MS. LASH:  Yes, Your Honor.

13         THE COURT:  Is the Government going to respond to

14  that?

15         Are you seeking to introduce what they are

16  complaining about or --

17         MS. LASH:  Your Honor, we believe -- as to the

18  statements they discuss as to Mr. Burbano, I have a copy of

19  their letter in front of me.  The first statement is Abreu

20  instructed Burbano to wear blue-and-purple rubber gloves to

21  prevent leaving fingerprints.

22         The Government thinks that's not a hearsay

23  statement, it was a command from Mr. Abreu to Mr. Burbano.

24         And as to the second statement, I was busy today

25  because today is the day this gets done; we are not seeking to

Proceedings                                              1647

1   elicit that statement from Mr. Burbano.

2          THE COURT:  I think there was another one they were

3   concerned about.  Was that all?

4          MS. LASH:  I think those were the two statements

5   that they specified for Mr. Burbano, although Mr. Mazurek can

6   correct me if I am wrong.

7          THE COURT:  Is there more than that?

8          MR. MAZUREK:  I'm trying to find the document.

9          MS. LASH:  Oh, I'm sorry, Your Honor.

10         On page 3 he talks about in May of 2019, when Abreu

11  tells him, You heard about the shit that I did, and Burbano

12  knew that that was a reference to the shooting that had

13  happened in February.  And we do seek to elicit that

14  statement, yes.

15         THE COURT:  Under what theory is that not hearsay?

16         MS. LASH:  It is a statement against penal interest,

17  Your Honor.  Mr. Abreu was implicating himself in a murder.

18         And as we've discussed previously, Mr. Burbano had

19  interacted with Mr. Abreu on a few occasions and we'll elicit

20  that.  They were both selling drugs at the time.  Mr. Abreu

21  had offered to sell Mr. Burbano drugs on a previous occasion.

22  And they were considered acquaintances when Mr. Burbano made

23  the statement.

24         THE COURT:  So that's the corroborating

25  circumstance, that he would have told that to a friend of his,

Proceedings                                    1648

1   you mean?

2          MS. LASH:  Yes, Your Honor.  We discussed this at

3   length at our court appearance last week, and I --

4          THE COURT:  Not this statement.

5          MS. LASH:  This statement, Your Honor, yes.

6          MR. MAZUREK:  I don't think so.

7          MS. LASH:  Yes, Your Honor, so we talked about --

8   there's two statements that Mr. Abreu made.

9          THE COURT:  I know there was one that I ruled on

10  before.

11         MR. MAZUREK:  Mr. Nguyen's statement, Chris

12  N-G-U-Y-E-N.  We talked about that one.

13         MS. LASH:  And, Your Honor, I gave a proffer at that

14  time that Mr. Burbano knew Mr. Abreu through his acquaintance.

15  They had a mutual a maintenance in common.  They had

16  interacted previously before the February 2019 incident where

17  he observed Mr. Abreu cleaning the white Honda Accord and

18  wearing blue-purple gloves.

19         He -- in those occasions, he had hung out with

20  Mr. Abreu at a bar.  Mr. Abreu had offered to sell him a large

21  amount of cocaine.  He was dealing cocaine at the time.  And

22  Mr. Burbano is expected to testify that he was selling

23  marijuana at the time and understood this as outreach from

24  someone else, who was also selling illegal drugs.

25         Then Mr. Burbano will talk about the February 11th

Proceedings                                1649

1    interaction with Mr. Abreu when he went to his house, he saw

2    him cleaning out the -- a white Honda Accord wearing

3    blue-and-purple gloves, and he spent some time with Mr. Abreu

4    that night.  They traveled to downtown Flushing in order to

5    park a second car that his friend had procured by using the

6    key to that car.

7                THE COURT:  What is the relevance of all of that?

8                I don't understand.  I thought that he was going to

9    testify that he saw him with the car that the Government

10   contends was the white Honda and that he saw him with those

11   blue grooves.  That's all I understood the testimony was.

12               I didn't understand we were going to talk about

13   grand theft auto.

14               MS. LASH:  I don't expect there's going to be any

15   testimony about grand theft auto.

16               THE COURT:  What is the relevance of where they went

17   past that time?

18               MS. LASH:  After they leave Mr. Abreu's house, they

19   go to downtown Flushing and he observes Mr. Abreu meet with a

20   young Asian man in his late 20s who's driving a white Mercedes

21   Benz with black trim.

22               THE COURT:  Oh, I remember this now.  That's --

23               MS. LASH:  That's defendant Zhe Zhang, Your Honor,

24   we will argue.

25               THE COURT:  Okay.  Do you anticipate he is going to

Proceedings                                      1650

1   identify him?

2         MS. LASH:  I do not, no.  I think he will identify

3   the general characteristics of the person he observed and the

4   vehicle.

5         And we will expect testimony from another witness

6   concerning Mr. Zhang's vehicle.

7         THE COURT:  Okay.

8         MS. LASH:  So -- so, I expect that's what he'll

9   testify to on February 11th.

10        The additional detail that I was providing Your

11  Honor is that Mr. Burbano continued to see Mr. Abreu, and

12  Mr. Abreu continued to make outreaches to Mr. Burbano.  And

13  there was an incident in the spring of 2019 where they all

14  went to have dinner together.  So, that would be Mr. Burbano,

15  Mr. Abreu, a mutual acquaintance whose name is Alex Rodriguez,

16  at a restaurant in Flushing called Blend.  At this restaurant,

17  Mr. Burbano had a conversation with Mr. Abreu, who

18  referenced -- well, what he said to him is, You heard about

19  the shit that I did in Flushing.

20        And Mr. Burbano will testify that he knew this to be

21  a reference to the shooting that had taken place in Flushing.

22        THE COURT:  And you're saying that that is a

23  statement against penal interest?

24        MS. LASH:  Absolutely, Your Honor.  He is admitting

25  to his participation in a homicide that happened several

Proceedings                                          1651

1  months prior in the location where the homicide happened.

2  He's making this statement to a person that he had met before,

3  was currently at dinner with, had attempted to sell drugs to

4  in the past, and those are the sufficiently corroborating

5  circumstances.

6              THE COURT:  So, that's why you're going to bring out

7  their drug relationship?

8              MS. LASH:  Yes, Your Honor.

9              And that's not all, because then Mr. Burbano sees

10 Mr. Abreu again, and this time it is outside Queens Criminal

11 Court.  And outside Queens Criminal Court, Mr. Abreu says

12 again, You remember the shit that I did.  I think it's going

13 to bite me in the ass, or something to that effect.

14             And, Again, Mr. Burbano will testify that he

15 understood that statement to be Mr. Abreu's second reference

16 to the murder that had happened.

17             THE COURT:  Well, why did he reach that conclusion?

18             MS. LASH:  Well, he used the same language that he

19 used in the first statement at the restaurant, You remember

20 that shit that I did.  So, again, uses the same phrase.  At

21 that time they are outside the criminal court building when he

22 makes that statement.

23             Mr. Abreu is clearly harkening back, this is the

24 next time that he had seen him after they had dinner in this

25 restaurant.  So, Mr. Burbano will testify that it was very

Proceedings                                          1652

1   clear what Mr. Abreu was referencing when he used the same

2   language in the second meeting they had together.

3            THE COURT:  What leads him in the first meeting, the

4   string of '19, why is it that he will say he concluded that

5   that was the murder of Chris Gu?

6            MS. LASH:  Well, he will say that on the news the

7   next day he saw that a shooting of a man had taken place in

8   Flushing after he saw --

9            THE COURT:  No, this is the spring of '19, of 2019.

10           Oh, you said the next day he would have heard --

11  seen something on TV, he wouldn't have seen it in the spring

12  of 2019.

13           MS. LASH:  No, Your Honor.  So, he sees Mr. Abreu on

14  February 11th.

15           THE COURT:  Right.

16           MS. LASH:  And the next day he sees on the news that

17  the murder had occurred.  At that time, their mutual

18  acquaintance, Alex Rodriguez, informs him that he understands

19  that Mr. Abreu is involved in this.

20           THE COURT:  You can't elicit that.

21           MS. LASH:  We don't intend to, but his conclusion

22  that that shit that I did is based on his viewing of the

23  murder.  And we don't intend to elicit the facts that their

24  mutual maintenance also stated that Mr. Abreu told him he was

25  involved in the murder.

Proceedings                                    1653

1    MR. MAZUREK:  Your Honor, I think that just explains

2  why this can't be admitted.  Ms. Lash is saying that the

3  context in which he witnessed that she seeks to elicit the

4  statement from about the shit I did is based on a hearsay

5  statement from somebody else.  That's not from the declarant

6  who has to make -- where there has to be clear

7  self-inculpatory statements against his penal interest.

8           The law says very strongly that, in the Second

9  Circuit, I quote "United States versus Salvador,

10  S-A-L-V-A-D-O-R, at 820 F.2d 558 pin cite 561, a Second

11  Circuit 1987 case that, I quote, "The inference the

12  trustworthiness from the proffered corroborating circumstances

13  must be strong, not merely allowable."

14           The corroborating circumstances suggested here by

15  the prosecutor is that the witness to the statement is getting

16  his context from a third-party who is saying this Alex

17  Rodriguez friend of his, who's saying, I think that's our guy,

18  that's Mr. Abreu.  And is basing the fact that in May of 2019

19  at a dinner with himself, Alex Rodriguez, and another couple,

20  when Mr. Abreu says something like that shit I did -- did you

21  see that shit I did is completely ambiguous.

22           First of all, it's completely ambiguous because

23  these guys are in a drug trade and it may have -- it may be

24  against penal interest, but have no relevance to this case; or

25  it may be something completely different that we don't know

1   about.  And it is based on completely inadmissible -- the

2   foundation is based on inadmissible hearsay.  The

3   corroboration is statements made by another person to Burbano,

4   not by the person, the declarant in this case, Abreu.

5          So, I think this just does not meet the 804(b)(3)

6   test in the least for Burbano to surmise based on what he

7   heard from Rodriguez that the shit I did in May of '19, the

8   statement that Abreu said at dinner, has anything to do with a

9   statement against penal interest involving a murder on

10  February 12th.

11         THE COURT:  Wait a minute.  I'm confused with my

12  notes.

13         How many times did he make this statement you heard

14  about what I did?

15         MS. LASH:  Twice, Your Honor.

16         THE COURT:  When is the first time he made it?

17         MS. LASH:  We expect him to testify in about May of

18  2019.

19         THE COURT:  And when is the second time he made it?

20         MS. LASH:  It was shortly after that.

21         THE COURT:  Is that the Queens Criminal Court?

22         MS. LASH:  Yes, Your Honor.

23         THE COURT:  So there's two.  There's a dinner that's

24  he's in, in the spring of 2019, and what is it that's going to

25  say Abreu said precisely?

Proceedings                                                    1655

1      MS. LASH:  Your Honor, it is going to be something,

2   in sum and substance, as you heard about that shit I did.

3          And he specifies in Flushing.  His understanding of

4   what he is talking about is not solely based on what their

5   mutual maintenance Allen Yu told him.  Remember he had been

6   with Abreu on the night of February 11, he observed him in the

7   white car wearing the gloves and he had told him today is the

8   day this gets done.

9          THE COURT:  But you're not offering that statement?

10         MS. LASH:  We are not.  The next day he sees on the

11  news there has been a murder in Flushing that has occurred and

12  they don't have the shooter and this is the information that's

13  available.

14         The next time he sees Mr. Abreu, Mr. Abreu is

15  carrying a gun, and --

16         THE COURT:  This is in the spring?

17         MS. LASH:  At Blend Restaurant, yes.

18         THE COURT:  In the spring, Abreu is carrying a gun?

19         MS. LASH:  He is carrying a gun, and he says you

20  remember that shit I did.  Now, the last time that Burbano had

21  seen Mr. Abreu was on February 11th of 2019.

22         THE COURT:  Does he say that I did in Flushing or --

23  at the dinner, does he say you heard about what I did in

24  Flushing?

25         MS. LASH:  I think so, Your Honor.  I don't have his

Proceedings                                            1656

1   3500 material in front of me.

2         MR. MAZUREK:  It just says, You heard about that

3   shit I did, at 3500-RB-5 at page 3, which was Exhibit B to our

4   September 28, 2023 letter motion.

5         MS. LASH:  Yes, Your Honor, and then at 3500-RB-2,

6   Mr. Burbano remembers it as:  You heard about that shit I did

7   in Flushing.

8         MR. MAZUREK:  And I just note, Your Honor, which I

9   pointed out in footnote one in our same letter motion, on page

10  3, that at that same 3500 interview that Ms. Lash is referring

11  to, RB-2, when asked about that statement that he heard from

12  Abreu is when the witness Burbano said or is reported in the

13  302 as, quote, Rodriguez showed Burbano a video of the

14  shooting of Xin Gu and told Burbano that Abreu was involved in

15  another shootout in Queens, New York, end quote.

16        So he's getting his information about the shootout

17  in Flushing from a third source, Alex Rodriguez, who showed

18  him the video of the shooting.

19        And I note that while Ms. Lash makes a connection to

20  rubber gloves and a white Honda Accord, at the time of the

21  meeting in May of 2019, at the dinner at the Blend Restaurant,

22  there were no surveillance videos of a white Honda Accord that

23  were available to the public.  So, I mean, I don't know how

24  he's making that connection with respect to Abreu, seeing

25  Abreu on February the 11th. (Continued on next page.)

Proceedings                                    1657

1          MS. LASH:  So, Your Honor, to Mr. Mazurek's point,

2    we're not disputing that Alex Rodriguez indicated to the

3    witness that Mr. Abreu was involved.  I'm only saying that

4    that is only one of many factors that allows Mr. Burbano to

5    conclude when Mr. Abreu clearly said to him "you know that

6    shit I did," he was referring to the murder.

7          MR. MAZUREK:  And, Judge, I just want to refer you

8    to one other case which I think analyzes the legal standard of

9    804(b)(3) very well and why there needs to be not just some

10   evidence but strong evidence that it is trustworthy and

11   understandably trustworthy even by the hearer of the

12   information and that is *United States versus Liu*, L-I-U.  It's

13   a Judge Caproni decision from March 9, 2022 and it's at 22

14   Westlaw 75 614 where Judge Caproni precluded the unavailable

15   witness's hearsay statements made during a telephone call in a

16   case alleging immigration fraud because the witnesses'

17   responses to the questions being asked of the witness were

18   entirely ambiguous, and that was also in the context of

19   eliciting information from the declarant about the person's

20   immigration status in an investigation for immigration fraud.

21         THE COURT:  Is this -- what case law does the

22   government have to support the fact that someone can give

23   their impression about what another person was saying if they

24   don't know -- I mean, what -- I'm just concerned about that

25   kind of testimony about his giving his impression of what he

Proceedings                                                    1658

1    meant.  I mean, if they talked in code or did something like

2    that, maybe that would -- but I don't know what the basis for

3    it.  It seems like to me that you could elicit a statement

4    that heard about whatever he did in Flushing and maybe argue

5    that that -- what he was talking about but I don't know to

6    what extent the witness can say I don't know what he was

7    talking about.

8              MS. LASH:  Your Honor, we would ask for an

9    opportunity to submit a short letter on that tonight.

10             THE COURT:  That would be a good idea because I seem

11   to remember a case I had once where they were actually -- it

12   was a conversation that a witness was having with another

13   person and it was -- the fact that he explained what the other

14   person was saying to him was problematic, it's a

15   Judge Katzmann decision and it's old.

16             MS. LASH:  Thank you, Your Honor.  Yeah, we will

17   look for that case and others.

18             THE COURT:  Yeah, because this is kind of a

19   difficult area.

20             MR. MAZUREK:  And, Judge, just to follow through on

21   this issue, even with Your Honor's suggestion of just leaving

22   it as the shit I did in Flushing, the concern I have is that

23   then becomes a 403 analysis.  Mr. Abreu is not here.  The only

24   relevance to this statement as to Mr. Zhang would be is if it

25   had probative value to show that Abreu actually did the murder

1    in carrying out the charged conspiracy.  The problem we have

2    here is that that shit did I in Flushing by a man, and as the

3    Government says, Burbano knows is a narcotics trafficker and

4    large amounts of cocaine and marijuana, I mean, that could

5    mean anything.  It doesn't mean that it has the relevance that

6    the government is going to seek to introduce it and there's

7    huge, substantially prejudicial, effect that it could have on

8    Mr. Zhang because we don't even get to confront the witness

9    who said it.  So the 403 analysis I think also needs to be

10   considered given the ambiguous nature of the statement.

11               THE COURT:  Well, the government will present

12   something and I will review it because they haven't yet had an

13   opportunity to respond to your letter.

14               MR. MAZUREK:  I understand.

15               THE COURT:  When is Mr. Burbano going to testify?

16               MS. LASH:  As soon as tomorrow, Your Honor.

17               THE COURT:  Really?

18               MS. LASH:  Yeah.

19               THE COURT:  That's good.

20               MR. MAZUREK:  So can we have the line-up after

21   Burbano?

22               THE COURT:  Well, Mr. Burbano.  Who else?

23               MS. LASH:  So I will just note for the Court, we are

24   having scheduling difficulties because we had not anticipated

25   having certain witnesses this week.  So our lateness in

1   providing the names of the witnesses is only due to the fact

2   that we are trying to get people from out of town to come back

3   to New York.  We have scheduled for tomorrow Mr. Yu and if

4   Mr. Mazurek and Mr. Kousouros have any indication of how long

5   the cross-examination will be, that would let the government

6   know how many witnesses we need to have waiting to testify.

7   So that would be my first question.

8           After Mr. Yu testifies, we have the tow principal

9   from the tow pound in Queens, Andrei Tarasko, we have a

10  sergeant, he'll testify to the fact that Mr. Abreu picked up a

11  Honda Odyssey with a temporary West Virginia license plate, we

12  have scheduled a sergeant from the NYPD whose name is Lucas,

13  he'll testify as to LPR records, or License Plate Reader

14  records, showing the location of certain vehicles in the days

15  I think shortly before the murder, we have Dr. Kristen Landi

16  who is the medical examiner in this case.  We had her slated

17  for Thursday, but given some issues with her scheduling, we

18  might try to move her to tomorrow depending on what kind of

19  time we'll have after Mr. Yu's cross.

20          And then the witnesses that are left, there are not

21  many, so they have the names of them, we have

22  Christopher Nguyen, we have Special Agent Richard Busick who

23  will testify about the cell-site location records, and --

24  right, well, we've mentioned Mr. Roberto Burbano and we have a

25  witness who will discuss some of the phone evidence in the

Proceedings                                          1661

1   case that's Special Agent Grace Chan and, I think that rounds

2   out the government's list at this point.

3            THE COURT:  What is Grace Chan going to testify

4   about?

5            MS. LASH:  She'll review some of the phone evidence

6   that has been admitted in this case, particularly the

7   conversation between Mr. Abreu and Mr. Zhang during the period

8   of the conspiracy.

9            THE COURT:  What is she going to -- what do you mean

10  she's going to review it?  What is she going to say?  Speaker?

11           MS. LASH:  Your Honor, that conversation has been

12  admitted per stipulation and the government will show that

13  Mr. Zhang and Mr. Abreu were in close contact in the months of

14  the conspiracy, that they sold marijuana together, that they

15  were close friends, and, so, Special Agent Chan will review

16  some of these messages for the jury.

17           THE COURT:  Is she going to interpret them?

18           MS. LASH:  No.

19           THE COURT:  Yeah.

20           MS. LASH:  She'll publish them to the jury.

21           And, Your Honor, on that note, given what occurred

22  with the witness last week, You You, on cross-examination when

23  the defense said there's no way that the conversation between

24  Mr. Zhang and Mr. You You can be admitted because it's so

25  prejudicial, and then on cross-examination, despite the

Proceedings                                    1662

1    hearsay contents of that conversation, they entered portions

2    that the government sought to enter on direct, but we

3    understood that the Court had prevented us from doing so.  So

4    on that basis, we want to enter the full conversation between

5    Mr. Zhang and Mr. Abreu.

6                MR. MAZUREK:  Judge, we only entered the relevant

7    portions of it that had to do with the conversations that the

8    witness was testifying about, not the full 1,100 pages of

9    hearsay that the government initially wanted to introduce.

10                MS. LASH:  It's not hearsay --

11                THE COURT:  I'm sorry, we seem to be drifting off

12   into something that I'm not even sure what we're talking

13   about.  You have conversations between Mr. Zhang and

14   Mr. Abreu?

15                MS. LASH:  Yes, Your Honor.

16                THE COURT:  That you want to introduce to show what?

17                MS. LASH:  So show their close relationship

18   association, to show that they were engaged in marijuana sales

19   together and, yeah, to show their relationship during the

20   course of the conspiracy.

21                THE COURT:  There's no objection to that?

22                MR. MAZUREK:  Well, they had this huge -- now it's

23   been introduced --

24                MS. LASH:  Your Honor, we had an 89 page document.

25   I've seen these text message exchange -- okay, there's a

Proceedings                            1663

1  number of messages on each page.  It's an 89 page document.  I

2  simply want to enter the entire conversation to prevent it

3  look like the government was hiding information from the jury

4  on cross-examination if the defense seeks to enter portions.

5           THE COURT:  You mean of an individual conversation

6  on an individual day?  Is that what you're talking about?

7           MS. LASH:  Either under a rule of completeness

8  theory.

9           THE COURT:  Are you talking about something you

10 think they're going to do or something that they've done?  I'm

11 not sure what you're talking about.

12          MS. LASH:  We had marked an 1,100 page conversation

13 --

14          THE COURT:  That, I remember.

15          MS. LASH:  -- between You You and Zhe Zhang.  It was

16 1,100 pages and it spanned from October through February.  We

17 sought to enter the entire conversation.  The defense objected

18 to certain portions because of relevance and 403 grounds.  We

19 reduced the conversation to about 100 pages.  On

20 cross-examination, the defense entered portions of the 1,100

21 page original chain that the government had sought to enter

22 and discuss with the witness.  I only raise that to say --

23          THE COURT:  You mean that they sought to raise

24 portions that you had cut out?

25          MS. LASH:  Yes.  And, so, I raise this to say that

Proceedings                                      1664

1   we, in good faith, had reduced the messages between Mr. Abreu

2   and Mr. Zhang to a 13 page text chain.  Now we are not using

3   the 13 pages, we are seeking to enter the entire text chain

4   between them.

5          THE COURT:  Well, which entire text chain?  Are you

6   talking about all -- are you back to 1,100 pages?  When you

7   say entire text chain --

8          MS. LASH:  No, Your Honor.  The 1,100 pages was

9   between You You and Zhang.  This text message chain is about

10  100 pages.

11         THE COURT:  Had you previously cut it down?

12         MS. LASH:  Yes, Your Honor.  We produced the 100

13  pages, we marked it as an exhibit, the defense had it for six

14  weeks, and then on the eve of trial, they raised to the Court

15  that this 89 page chat between Abreu and Zhang was prejudicial

16  because they talked about a bowl movement and a fat cousin.

17  So the government reduced the 89 page chat to 13 pages.  Now I

18  believe they're going to enter messages that were in the

19  original 89 page chat on cross-examination of Special Agent

20  Chan.  And, so, given what transpired with You You, the

21  government seeks to enter the entire chat between Mr. Abreu

22  and Mr. Zhang, which is approximately 100 pages.

23         MR. MAZUREK:  Your Honor, still, we object,

24  obviously, to the 89 pages.  It is hearsay and it is not

25  admissible.  We understand that the Court would allow them

Proceedings                                                1665

1   some leeway to show the relationship and I guess there is

2   marijuana --

3           THE COURT:  You know the 13 pages they're going to

4   introduce, right?

5           MR. MAZUREK:  We would only be seeking, I think like

6   two pages around February the 11th of text messages under the

7   rule of completeness to show the conversations between

8   Mr. Abreu and Mr. Zhang.

9           THE COURT:  Whatever you want to get in, I'll permit

10  the Government to get in, in their direct.  So I think that --

11  I mean, the government wants to introduce the whole thing and

12  I guess what their concern is that they would've introduced

13  all of this and now you're coming forward after they narrowed

14  it down and then cherrypicking things.

15          MR. MAZUREK:  We can show them -- they can put in

16  their exhibit, I don't care.  It was Ojust the dates that --

17  there's a text message on February I guess 11th or 12th, we

18  would ask for the -- just the text exchanges on the preceding

19  two or three days.

20          THE COURT:  And nothing else because --

21          MR. MAZUREK:  No, nothing else.

22          THE COURT:  Nothing else outside of the 13 pages

23  that they had suggested?

24          MR. MAZUREK:  That is correct.

25          THE COURT:  All right.  Then that would seem to

Proceedings                                         1666

1   solve the problem.  I mean, you found 13 pages that

2   highlighted what you were concerned about, made the point and

3   I understand your concern that they're coming back making it

4   look like they left something out but that seems like if you

5   think these 13 pages are the most relevant and they deal with

6   everything you want to bring out about the relationship, then

7   you can add the pages they want to put in and I'll preclude

8   them from putting anything else in, in cross.

9            MS. LASH:  Okay.  Thank you, Your Honor.

10           THE COURT:  That seems to work for everybody.  Okay.

11           MR. MAZUREK:  We also have the Carlos Senquiz issue

12   still.

13           THE COURT:  You want to put in the Carlos Senquiz

14   grand jury testimony?

15           MR. MAZUREK:  Yes.

16           MR. KOUSOUROS:  Obviously, I join in that, Judge.

17           THE COURT:  At this point in time, the defense makes

18   a pretty strong argument that you've taken the position in all

19   of these search warrants that it's David Yu who is giving the

20   accurate description, that his matches all of your other

21   evidence.  And that in Carlos Senquiz's rendition of David Yu

22   being the shooter, you didn't put in the warrants, you knew

23   about it, you didn't put in the warrants because you didn't

24   believe it.  So if he testifies in a grand jury, you don't

25   believe it, why don't you have a motive to cross examine him

1   at that point?

2           MS. LASH:  Because of the timing, Your Honor.

3           THE COURT:  What's the timing?  He testifies after

4   you've already had one search warrant affidavit.

5           MS. LASH:  Well, I think we had two search warrants

6   affidavits by the time he testified, But he testified in

7   September of 2021.  We did not sit down with David Yu for a

8   proffer.  We had his post-arrest and we did not sit down with

9   David Yu for a proffer until November.

10          THE COURT:  But you used David Yu in your search

11  warrants and told the magistrate judge that this is the guy

12  who's telling the truth.  So how can you tell me that you

13  really haven't heard enough from David Yu?  You were relying

14  on what he said in three search warrants.

15          MS. LASH:  We were, Your Honor, but we did not have

16  the additional information in September of '21 that we later

17  gained and could have used to cross examine Mr. Senquiz had he

18  testified at a later date.  And what I mean by that is not

19  just additional meetings with David Yu, but after

20  Carlos Senquiz testified, we signed up additional cooperating

21  witnesses.  So they provided the information to the FBI, we

22  signed up additional cooperating witnesses, and we had the

23  ability to ask David Yu what he told Carlos Senquiz, who is

24  the only other person who can testify to the substance of that

25  conversation.  The Second Circuit has held --

1          THE COURT:  Wait a minute.  Carlos Senquiz goes to

2     the jury, in I'm sorry, is it September of 2021?

3          MS. LASH:  Yes, Your Honor.

4          THE COURT:  And you interview David Yu, the first

5     post-arrest statement is in April?

6          MS. LASH:  April of '21, yes, and the first proffer

7     happens in October of '21 where there's additional

8     information -- additional questions asked about

9     Carlos Senquiz.  The fact is that September of '21, while we

10    obtained two search warrants and we went on to obtain several

11    additional search warrants, no arrests have been made, only

12    two searches had been conducted, one of which was for

13    cell-site information in a 30-day time period, the other of

14    which was for information on Mr. Abreu's phone, we simply

15    didn't have the information or the similar motive which I

16    think is the question that the Second Circuit says that the

17    burden is actually on the defense that they need to show, and

18    our motive in September of '21 was to gain additional

19    information for these search warrants, to --

20         THE COURT:  But you didn't put this information that

21    you gained in your search warrant?

22         MS. LASH:  We did not.

23         THE COURT:  So, I don't know --

24         MR. MAZUREK:  Judge, with respect to the cooperating

25    witnesses, by September '21 they had Chris Lin give all of his

1    statements about the admissions that Abreu made to him and the

2    information about Zhe Zhang feeling, you know, the way he felt

3    on February the 13th, they also had all of the Burbano

4    statements before September '21.  The only person they did not

5    have at that point in time was You You who cooperated after he

6    was indicted, but they basically had all of the evidence.  The

7    kind of evidence that they obtained at the time of the arrest,

8    you know, they're hardly using any of that evidence against

9    Allen Yu and Zhe Zhang.  They had basically all of the

10   evidence that they had by September of 2021 including three

11   cooperators, or at least two and a half if you don't count

12   David Yu although he was prominently mentioned in their search

13   warrants.

14        MS. LASH:  So that's not accurate.  There's a

15   difference between speaking to someone and getting information

16   in a proffer setting and having someone signed up as

17   cooperating witness where has pled guilty to crimes and agreed

18   to testify at trial.

19        THE COURT:  You're undermining the entire search

20   warrant opinion if you keep talking about this.  I'm really

21   concerned about that.  I mean, you basically asked all of the

22   magistrates to rely on the statements that David Yu gave and

23   now you're saying -- I mean, you're not taking the position

24   that you never have a similar motive because it's the grand

25   jury versus trial, are you?

Proceedings                                                1670

1        MS. LASH:  No, but, Your Honor, I don't understand

2  why we can't have it both ways.  We were relying on David Yu

3  --

4        THE COURT:  Well, that will be quoted back in I

5  can't tell you how many of the 18,000 additional letters that

6  I'm going to get they're going to have that phrase in there,

7  Ms. Lash.  You can withdraw that right now if you want to.

8        MS. LASH:  Thank you, Your Honor.  I'm only trying

9  to say we found David Yu's information at the time from the

10  post-arrest to be reliable, and we've said that in the crimes

11  hearing and will continue to say that, we testified to that

12  information at trial.  But at that time, we didn't have the

13  same motive to cross examine Carlos Senquiz in the grand jury.

14        THE COURT:  Well, you didn't believe what he said.

15        MS. LASH:  We did not.

16        THE COURT:  Doesn't that give you a motive to cross

17  examine him when he testifies in the grand jury that this guy

18  told me that he was the shooter.  You didn't believe that

19  David Yu was the shooter, you've never believed that David Yu

20  was the shooter, so if he says that, why don't you have a

21  motive to cross examine him about it?

22        MS. LASH:  Because if you look at what was said in

23  the grand jury testimony, Carlos Senquiz said that he

24  understood that he sent him that video because he thought he

25  was telling him that he was the shooter.  And I think I've

Proceedings                                    1671

1    said this from the beginning, I think that those two things

2    can exist, right, David Yu sent him this video and

3    Carlos Senquiz reached the incorrect conclusion that the

4    purpose of sending him that video was to show that he was the

5    shooter.

6                   (Continued on the following page.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

PROCEEDINGS                                    1672

1    (Continuing.)

2         THE COURT:  He said the guy told him, did you see

3    the person in the video, that's me, I'm the shooter.

4         What is subtle about that?

5         MS. LASH:  The statement that he -- the question

6    that was asked to him was, why did he send you that video,

7    what did you -- why did you understand that he sent you that

8    video, and the answer that he gave was not, I didn't need to

9    understand it because he told it to me.  He said, I understood

10   that he sent me that video because he was telling me that he

11   was the shooter.

12        MR. KOUSOUROS:  Judge, in lines 18 and 19, the

13   question is, why did you understand that to be the case, and

14   the answer is, when he sent it to me, he told me to take a

15   look at it to see if I could see him as the shooter.  I mean,

16   those are the words he used, not that -- let me just finish,

17   Devon.

18        Not that, you know, he understood that that's what

19   he was saying.  That's what he said.  When he sent it to me,

20   he told me to look at it to see if I could see him as the

21   shooter.  And quite frankly, that's why he understood what

22   David Yu was saying to him was that he was the shooter.

23        THE COURT:  Yeah.  All right.  Well, this is going

24   to be -- you intend to put this Grand Jury testimony in in

25   your case?

PROCEEDINGS                           1673

1              MR. KOUSOUROS:  We do, judge.

2              MS. LASH:  And Your Honor, if the Court's ruling is

3     that the Grand Jury testimony is allowed to come in in the

4     defense case, we'd ask that we can introduce evidence of

5     Carlos Senquiz's relevant convictions.

6              THE COURT:  Okay.  And which convictions are not

7     over 10 years old?

8              I mean, the ones over 10 years old, they don't come

9     in.  Which other ones?

10             MS. LASH:  Yes, Your Honor.  We describe those on

11    Page 5 and 6 of our letter.  There's a 2022 felony conviction

12    for attempted robbery in the second degree causing physical

13    injury.  That was a home invasion stabbing that Mr. Senquiz

14    committed.

15             There's a 2019 felony conviction for the attempted

16    criminal sale of controlled substances in the third degree,

17    and then there is a 2002 felony conviction for possession of a

18    weapon and a 2002 --

19             THE COURT:  Well, the 2002, that's more than 10

20    years, right?

21             MS. LASH:  Yes, Your Honor.

22             THE COURT:  I'm not good at math, but that strikes

23    me as that's old.

24             Now, the argument about the 2022 conviction is --

25    well, let me ask, first of all, defense counsel, why wouldn't

 1   a 2019 conviction that's before he testifies, why isn't that

 2   admissible?

 3            MR. MAZUREK:  Your Honor, because 609 talks about

 4   evidence of a prior conviction.

 5            THE COURT:  That one is a prior conviction, isn't

 6   it?

 7            MR. MAZUREK:  No, his testimony was in '21.

 8            THE COURT:  This was a 2019 attempted.

 9            MR. MAZUREK:  No, I'm sorry.  I thought you were

10   talking about -- sorry.  2019?

11            THE COURT:  Yeah, why doesn't that come in?

12            MR. MAZUREK:  I just don't think robbery goes to

13   credibility.

14            MR. KOUSOUROS:  No, 2019 is attempted criminal sale

15   of a controlled substance.

16            THE COURT:  That's a felony, isn't it?

17            MR. KOUSOUROS:  Yes.

18            THE COURT:  Then why wouldn't it come in?  It

19   doesn't have to go to --

20            MR. MAZUREK:  I withdraw that one.

21            THE COURT:  Okay.  So the other question is the 2022

22   conviction.

23            Your claim there is that that shouldn't impeach his

24   credibility because he gave the statement before he was

25   convicted.  That's your argument, right?

PROCEEDINGS                           1675

1          MR. MAZUREK:  Before that crime was committed, yeah.

2          THE COURT:  Before that crime was committed or

3     before he was convicted?

4          MR. MAZUREK:  Oh, I guess --

5          MR. KOUSOUROS:  We, it's clearly it was before he

6     was convicted.  It's a 2000 --

7          THE COURT:  I don't know.  What is the Government's

8     argument about that?

9          MS. LASH:  Your Honor, the reason that we're reading

10    in this Grand Jury testimony is because Mr. Senquiz is

11    unavailable.  If he were to take the stand this week and

12    testify as to the statements, we would be able to impeach him

13    with a 2022 felony conviction.

14         THE COURT:  That seems to make sense.

15         MR. MAZUREK:  609 talks about prior convictions in

16    the rule.

17         THE COURT:  But this is coming in, in effect, as if

18    he's testifying today, because he's not available.  So it's

19    the equivalent of his offering testimony today.  I don't know

20    if there's any case law on this.  It says 806 -- yeah.

21         It says 806 allows impeachment evidence of a hearsay

22    statement that would be admissible for those purposes if the

23    declarant had testified as a witness.  I think we only found

24    one case from the Military Court of Appeals.

25         That's *U.S. versus Bell* 44 MJ 403, 407.  And it's

 1  C.A.A.F 1996.  Maybe somebody in the Government would find a

 2  case that's a little more recent than that.

 3          MS. LASH:  We can try, Your Honor.

 4          THE COURT:  Okay.  All right.

 5          MR. MAZUREK:  Oh, and just one last thing to make

 6  sure the record is complete.

 7          I believe that bolstering our Carlos Senquiz's

 8  argument is the fact that the Government, today, on direct

 9  examination, they decided to elicit the meeting between Carlos

10  Senquiz and David Yu, and elicited the testimony that David Yu

11  completely denied the conversation that we are seeking to

12  introduce.  So since the Government now has actually done it

13  on their own, they shouldn't be able to, shall, I dare say,

14  get their cake and eat it too or have it both ways by

15  eliciting that information and then preventing us from

16  introducing --

17          THE COURT:  Well, you can -- what they, I guess,

18  were attempting to do was bring out, in essence, impeachment

19  evidence before you did.

20          MR. MAZUREK:  Well, they were trying to take the

21  sting out it.  But once they open the door to it --

22          THE COURT:  Well, opening the door to it is allowing

23  you, which you would have done anyway, to ask him, isn't it a

24  fact that you told Carlos Senquiz X?

25          MS. LASH:  Which he did several times on

PROCEEDINGS                                    1677

1    cross-examination in the 15 minutes that he had.

2              THE COURT:  Yeah, I mean you can ask him --

3              MR. MAZUREK:  I understand that.  But I'm saying, it

4    just enhances the record for us to be able to use 804(b)(1)

5    when they are the ones that actually inserted this in their

6    own direct examination of their own witness.  That's all I'm

7    saying.

8              THE COURT:  I'm not sure that it helps that

9    argument, particularly.  I think you otherwise have a strong

10   argument.  I don't think that necessarily helps it at all.

11   Okay.

12             See you all tomorrow morning, 9:00 o'clock, bright

13   and early.

14                  *     *     *     *     *

15    (Proceedings adjourned at 6:17 p.m. to resume on October 3,

16                       2023 at 9:00 a.m.)

17

18

19

20

21

22

23

24

25

1678

1                              I N D E X

2

3     WITNESS                                          PAGE

4     BRAINYS ALBERTO ACOSTA PENA

5          DIRECT EXAMINATION BY MS. LASH              1363

6          CROSS-EXAMINATION BY MR. MAZUREK            1380

7     JONATHAN DIVER

8          DIRECT EXAMINATION BY MR. PARK              1404

9          CROSS-EXAMINATION BY MR. SER                1432

10         REDIRECT EXAMINATION BY MR. PARK            1460

11    JEFFREY LEHN

12         DIRECT EXAMINATION BY MS. MOORE             1462

13         CROSS-EXAMINATION BY MR. SER                1501

14    DAVID YU

15         DIRECT EXAMINATION BY MS. LASH              1522

16         CROSS-EXAMINATION   BY MR. MAZUREK          1630

17

18

19

20

21

22

23

24

25

1679

**E X H I B I T S**

1

2

3

4    Government's Exhibit 459                          1366

5

6    Government's Exhibit 567                          1370

7

8    Government's Exhibit 319                          1372

9

10    Government's Exhibits 317 and 318                1375

11

12    Government's Exhibit 317-A                        1376

13

14    Defendant's Exhibit Z-97                          1384

15

16    Government Exhibits 100A, 101A, 103A through

17    103E, 105A, 106 through 106B, 140A, 148A,

18    305A, and 307A through 307F                       1407

19

20    Government Exhibit 320                            1411

21

22    Government Exhibit 354                            1480

23

24    Government Exhibit 455                            1484

25

1680

Government's Exhibit 3000                          1564

Government Exhibit 520                             1572

Defendants' Exhibit DX-23                          1582

Government Exhibits 903 and 925                    1597